**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiffs,*
*Audra McCowan and Jennifer Allen*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AUDRA McCOWAN *and* JENNIFER ALLEN, | : <br> : Civil Action No. 2:19-cv-03326 <br> : |
| Plaintiffs, | : **VERIFIED AMENDED** <br> : **COMPLAINT FOR** <br> : **DECLARATORY JUDGMENT,** |
| v. | : **INJUNCTIVE RELIEF,** *and* <br> : **DAMAGES** |
| CITY OF PHILADELPHIA, <br> COMMISSIONER RICHARD ROSS JR., <br> DEPUTY COMMISSIONER CHRISTINE COULTER, <br> CHIEF INSPECTOR DANIEL MacDONALD, <br> INSPECTOR MICHAEL McCARRICK, <br> LIEUTENANT TIMOTHY McHUGH, <br> SERGEANT BRENT CONWAY, <br> SERGEANT ERIC WILLIFORD, <br> SERGEANT KEVIN O'BRIEN, <br> SERGEANT TAMIKA ALLEN, <br> SERGEANT HERBERT GIBBONS *and* <br> OFFICER CURTIS YOUNGER, | : <br> : **JURY TRIAL DEMANDED** <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

## NATURE OF THE ACTION

1. This is an action for relief from violations of Title VII of the Civil Rights Act of 1964, 42

   U.S.C. §§ 2000e et seq. ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42

   U.S.C. § 1981 ("Section 1981"); Section 1983 of the Civil Rights Act of 1871, 42 U.S.C.

   § 1983 ("Section 1983"); the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601

1

et seq. ("FMLA"); the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 et seq. ("FLSA"); the Pennsylvania Whistleblower Law, 43 Pa.C.S. §§ 1421-1428 ("PWL"); and Pennsylvania common law for Intentional Infliction of Emotional Distress ("IIED"), Assault and Battery.

2. Plaintiffs Audra McCowan and Jennifer Allen (collectively, "Plaintiffs") seek injunctive and declaratory relief, actual damages, compensatory damages, punitive damages, liquidated damages, reinstatement, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit as remedies for Defendants' violations of their rights.

## THE PARTIES

3. Plaintiff Audra McCowan ("Ms. McCowan") is an adult individual resident of Philadelphia County and a citizen of the Commonwealth of Pennsylvania.

4. Plaintiff Jennifer Allen ("Ms. Allen") is an adult individual resident of Philadelphia County and a citizen of the Commonwealth of Pennsylvania.

5. Defendant City of Philadelphia (the "City") is a municipality of the Commonwealth of Pennsylvania.

6. The City owns, operates, manages, directs and controls the Philadelphia Police Department (the "PPD"), which employs the individual defendants named herein who at all relevant times were employed by the City and the PPD, acting under color of state law, and operating pursuant to official policies, customs or practices of the City and the PPD.

7. At all relevant times, the City acted or failed to act through its agents, servants and employees, including the individual Defendants named herein, each of whom were acting within the course and scope of their employment.

8. Defendant Commissioner Richard Ross Jr. ("Commissioner Ross") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

9. Defendant Deputy Commissioner Christine Coulter (Deputy Commissioner Coulter") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

10. Defendant Chief Inspector Daniel MacDonald ("Chief Inspector MacDonald") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

11. Defendant Inspector Michael McCarrick ("Inspector McCarrick") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

12. Defendant Lieutenant Timothy McHugh ("Lieutenant McHugh") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

13. Defendant Sergeant Brent Conway ("Sergeant Conway") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

14. Defendant Sergeant Eric Williford ("Sergeant Williford") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

15. Defendant Sergeant Kevin O'Brien ("Sergeant O'Brien") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

16. Defendant Sergeant Tamika Allen ("Sergeant Allen") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

17. Defendant Sergeant Herbert Gibbons ("Sergeant Gibbons") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

18. Defendant Officer Curtis Younger ("Officer Younger") is an adult individual and a citizen of the Commonwealth of Pennsylvania who maintains a principal place of business in the City of Philadelphia.

19. Defendants, the City, Commissioner Ross, Deputy Commissioner Coulter, Chief Inspector MacDonald, Inspector McCarrick, Lieutenant McHugh, Sergeant Conway, Sergeant Williford, Sergeant O'Brien, Sergeant Allen, Sergeant Gibbons and Officer Younger are hereafter collectively referred to as "Defendants."

20. Defendants were "employers" and Plaintiffs were "employees" within the meaning of the applicable law.

21. Defendants are being sued in their individual and official capacities.

22. Defendants systematically and willfully violate workers' rights under Title VII, Section 1981, Section 1983, the FMLA, the FLSA and the PWL.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER TITLE VII

23. On April 10, 2019, Plaintiffs timely filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging violations of Title VII, the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"), and the Philadelphia Fair Practices Ordinance, Philadelphia Code §§ 9-1101 et seq. ("PFPO").

24. The continuing acts of employment discrimination referenced in Plaintiffs' charges of discrimination were committed by the following parties: (1) the City; (2) Commissioner Ross; (3) Deputy Commissioner Coulter; (4) Chief Inspector MacDonald; (5) Inspector McCarrick; (6) Lieutenant McHugh; (7) Sergeant Conway; (8) Sergeant Williford; (9) Sergeant O'Brien; (10) Sergeant Allen; (11) Sergeant Gibbons; and (12) Officer Younger.

25. After Plaintiffs filed their charges, PHRC sent Plaintiffs correspondence stating, "In accordance with the Work Sharing Agreement between EEOC and PHRC, PHRC waived the opportunity to investigate the complaint back to EEOC. . . . However, PHRC reserves the right to docket, serve and require an answer at some future date. . . . After one year, if the case is still pending, the complainant will be notified of his/her right to file in the appropriate court of common pleas."

26. Pursuant to 42 U.S.C. § 2000e-5(f)(2), Plaintiffs asked EEOC to seek emergency preliminary injunctive relief to stop Defendants' ongoing violations of Title VII, which have continued to cause Plaintiffs irreparable harm.

27. EEOC forwarded Plaintiffs' requests for preliminary relief to the U.S. Department of Justice ("DOJ") for further action.

28. On June 21, 2019, DOJ issued Plaintiffs Notices of Right to Sue Within 90 Days.

29. Plaintiffs have timely filed this action and have complied with all administrative prerequisites to bring this lawsuit.

30. Plaintiffs' PHRA and PFPO claims are still pending before PHRC because less than one year has elapsed since PHRC assumed jurisdiction over their charges.

31. Plaintiffs' PHRA and PFPO claims will not ripen until after April 10, 2020. On that date, Plaintiffs will seek leave amend this complaint to assert their PHRA and PFPO claims against the parties referenced in ¶ 24 above. See Fed. R. Civ. P. 15(a) (Courts "freely give leave to amend when justice so requires"), 15(c) (Amendments "relate back" to the date of the original pleading), and 15(d) (Plaintiffs may "serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

## JURISDICTION AND VENUE

32. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it involves questions of federal law under Title VII, Section 1981, Section 1983, the FMLA, the FLSA, and the First and Fourteenth Amendments to the United States Constitution.

33. This Court has supplemental jurisdiction over Plaintiffs' PWL, IIED, Assault and Battery claims pursuant to 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts as Plaintiffs' Title VII, Section 1981, Section 1983, FMLA, FLSA, and First and Fourteenth Amendment claims.

34. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Philadelphia, and Defendants are subject to personal jurisdiction here.

35. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

**FACTS COMMON TO ALL CAUSES OF ACTION**

A.    **Introduction and Background**

36. Plaintiff McCowan is a 36-year-old Black female. She is the mother of two children, ages 16 and 12. She is married to Keith Brown, who is a PPD Sergeant.

37. Ms. McCowan has been employed as a sworn member of the PPD for over 15 years—her current rank is Corporal. Ms. McCowan's employment history with the City is as follows:

   a.  On March 1, 2004, 20-year-old Audra McCowan entered the Philadelphia Police Academy.

   b.  In October 2004, the City assigned her to the 23rd District, where she worked for four years.

   c.  In October 2008, the City transferred Ms. McCowan to the Police Board of Inquiry.

   d.  In March 2015, the City transferred her to work at the Philadelphia Police Academy as an instructor, where she worked for most of the year.

   e.  In December 2015, the City transferred Ms. McCowan to the Internal Affairs Bureau, where she worked for a little under two years.

   f.  In March 2018, Ms. McCowan started working in the PPD's Real Time Crime Center ("RTCC"), a special unit in the City's Delaware Valley Intelligence Center ("DVIC")—a multi-agency facility located in South Philadelphia, tasked with identifying emerging crime, terrorism and potentially dangerous weather events in Southeastern Pennsylvania, Southern New Jersey, Northern Delaware and Northeastern Maryland, and sharing that information with law enforcement agencies across the region.

38. Ms. McCowan is paid at an annual rate of approximately $85,000.00.

39. Plaintiff Allen is a 38-year-old Black Hispanic female. She is the mother of three children, ages 17, 13, and 1. She is married to Edward Allen, who is also a Philadelphia

police officer. Ms. Allen has been employed as a police officer in Philadelphia for over fifteen years—her current rank is Officer. Her employment history with the City is as follows:

    a. On March 1, 2004, at 23-years-old, Ms. Allen entered the Philadelphia Police Academy.

    b. In October 2004, upon graduating from the police academy, the City assigned her to Philadelphia's 12th District in Southwest Philadelphia.

    c. She was assigned to the 12th district until December 2010, when the City transferred her to the PPD's Juvenile Enforcement Team (JET)—a small tactical unit comprised of Philadelphia Police and Juvenile Probation Officers that conducts warrant service and probation searches on high risk, gang associated and violent juveniles who are on probation. Ms. Allen worked in the JET unit for over eight (8) years.

    d. Until recently, Ms. Allen worked in the PPD's special Analysis and Investigations (A&I) unit within the DVIC.

40. Ms. Allen is paid at an annual rate of approximately $77,000.00.

**B.** **The PPD's well-settled custom of sexual harassment permeates all 21 police districts, leaving its 6300-member force, including Plaintiffs, vulnerable to unchecked civil rights violations.**

41. A 2018 audit of the City's implementation of its sexual misconduct policies determined that the City has "a broken system for reporting, investigating and resolving sexual misconduct complaints." Rebecca Rhynhart, *Where is the City's Centralized Process for Handling Sexual Misconduct Claims?*, The Philadelphia Inquirer (March 18, 2019), https://www.philly.com/opinion/commentary/philadelphia-government-sexual-harassment-kenney-rebecca-rhynhart-20190318.html.

42. Over the course of Plaintiffs' employment with the City, these experienced and hard-working public servants have suffered continuous and ongoing sexual harassment and discrimination by both coworkers and supervisors.

43. In 2012, Ms. Allen was unwittingly grabbed and groped on two occasions by her immediate supervisor, Sergeant Bradford Williams, while on duty. The first incident occurred in the basement of a Philadelphia residence while Ms. Allen and Sergeant Williams were conducting a probation search of the house. On their way back upstairs, Ms. Allen was walking in front of Sergeant Williams and he reached out his hand and squeezed her butt. Knowing full well the futility of reporting the incident and the risks inherent in doing so, Ms. Allen kept quiet. The second incident occurred a few weeks later under similar circumstances: Sergeant Williams again grabbed Ms. Allen's butt after they had finished serving a warrant. Immediately after the second incident, Ms. Allen reported both assaults to her partner, Officer William Giulian and asked him to accompany her to confront Sergeant Williams in his office later that day.

44. In Summer 2015, Ms. McCowan filed a complaint against a coworker, Officer Patrick Fisher, describing multiple counts of sexual harassment that occurred while they were working together at the police academy, including inappropriate sexual comments such as, "you're giving me action in my pants," and "bend over like that again," as well as unwanted physical touching, including trying to kiss her and slapping her butt. Ms. McCowan's 2015 complaint was corroborated by a written statement from an eyewitness supervisor, Lieutenant Karyn Baldini, but the internal affairs investigator assigned to the case—Sergeant Conway—declined to punish Officer Fisher and Ms. McCowan was forced to continue working with him.

45. On April 22, 2016, Ms. Allen was groped by another cop in the JET unit, Officer James Williams, who slapped her on the rear end on his last day at work before retiring from the PPD. Ms. Allen confronted Officer Williams in a text message:

| Ms. Allen: | I am absolutely in disbelief. I cannot believe someone I considered a friend would violate me. The moment you grabbed my butt is the moment I completely lost respect for you. Especially because you knew exactly how I felt when Sgt. [Williams] did that to me. I'm not sure why you would ever think it was ok to disrespect me like that. But just know you have a daughter, and you would never want someone to do that to her. Very disrespectful…And in extreme violation of my body. |
|---|---|
| Officer Williams: | Jen I am so sorry! No I didn't think it would cause you to feel this way. I do understand you feeling this way especially considering you went through it with Sgt. [Williams]. I didn't think about that. I was only thinking of myself. Please forgive me. I cherish your friendship and would never knowingly do anything to disrespect you. I see I've messed that up but if you could ever forgive me I'm here. |
| | I wish there was a way to undo what I did. A way to somehow make things right. I won't bother you again but I wish there was something I could do to get our friendship back and reverse the damage and hurt I've done. |

## C. In Spring 2014, Plaintiff Allen rejected the first of many unrelenting inappropriate sexual advances from Defendant Younger.

46. In Spring 2014, Ms. Allen and her husband Edward were cleaning their garage, when Ms. Allen received a text message on her personal cell phone from Officer Younger asking if she was available to talk. She said yes thinking it was work-related. Officer Younger called and said, "I have a crush on you," "I like you," and "I'm interested in you." Ms. Allen and Mr. Allen told Officer Younger not to call back.

## D. Beginning in Fall 2018, Plaintiffs were denied equal employment opportunity in their duty stations in the DVIC.

*i. Plaintiff Allen was denied career-advancing training and job assignments because of her status as a black female.*

47. Ms. Allen went out of work on maternity leave in Spring 2018 and was due to return to work on October 22, 2018. Before going out on maternity leave, Ms. Allen put in a request to transfer from her assignment in JET (where she worked rotating day and night shifts for eight years) to the A&I unit in the DVIC—a plainclothes, daytime position that

would be more suitable for caring for her newborn child, and would also provide her training necessary to pursue her goal of becoming a police detective.

48. On October 12, 2018, Officer Tonetta Dawson, Aide to Chief Inspector MacDonald—the Commander in the DVIC—told Ms. Allen her transfer request was granted.

49. On October 21, 2018, Ms. Allen texted Officer Dawson to confirm if she should report to JET or A&I the next day. Officer Dawson said to call Sergeant Williford, a supervisor in A&I, who told Ms. Allen she would need special training before she could transfer to the unit, and instructed her to continue following her current schedule of rotating day and night shifts in JET.

50. On November 15, 2018 Officer Dawson texted Ms. Allen saying she would be detailed to A&I on days when JET was on night work. Although this arrangement would temporarily accommodate her request for a shift change, rotating between two different units is an uncommon practice in the PPD and, as demonstrated below, Ms. Allen's request for permanent transfer to A&I was denied solely because she is a black female.

51. In late-November 2018, Ms. Allen continued to express interest in career advancement, work opportunities and training for a position in A&I to Sergeant Williford, who said he would send her information on the training she needed, but never did.

52. In December, when Ms. Allen followed up with Sergeant Williford about training opportunities, he said he was "working on it" but that Inspector McCarrick, a white male commander in the DVIC, did not want her to get the A&I position.

53. On December 7, 2018, Officer Julius Caesar texted Ms. Allen saying "Sergeant Williford said 'I hope Tonetta is not selling Jen a dream because she is never going to be an analyst.'"

ii. *Plaintiff McCowan was also denied career-advancing job opportunities and training because of her status as a black female.*

54. On November 30, 2018, Ms. McCowan was promoted to Corporal and transferred from RTCC to the High Intensity Drug Trafficking Area ("HIDTA") unit in the DVIC.

55. Upon arriving to her new position, she was not given a workstation. Inspector McCarrick was supposed to meet with her to discuss her assignment but never did.

56. Around December 10, 2018, Chief Inspector MacDonald told Ms. McCowan that her transfer to HIDTA "was a mistake," and that she was being moved so the PPD could give her job to Corporal Neal Wilson, a less-qualified male counterpart. Sergeant Williford said, "If you fight the HIDTA issue you'll labeled a troublemaker."

57. She was not trained or given any work to do.

**E.     In December 2018, Plaintiffs complained to Defendant Williford about the denial of equal employment opportunity in the DVIC, which he agreed was motivated by their race and gender.**

58. In early-December 2018, Ms. Allen and Ms. McCowan told Chief Inspector MacDonald's aide, Officer Dawson, that they had been denied work opportunities that were given to their male and white female counterparts. Officer Dawson said that the reason for the difference in treatment was "race-related and also us being women." A few minutes later, Plaintiffs overheard Officer Dawson and Sergeant Williford screaming loudly in his office about Plaintiffs' reports of discrimination.

59. Sergeant Williford texted Ms. Allen asking Plaintiffs to meet him in his office. He said, "I don't want you to think I'm not helping you. Tonetta was just in here yelling at me about white bosses (Inspector McCarrick and Chief Inspector MacDonald) looking out for their own, and she said I should help you when I can." He agreed that Plaintiffs' male

and white female counterparts would have received training and job assignments by now and promised to talk to Inspector McCarrick, who "was supposed to talk to you about your job duties but went to a luncheon instead."

60. Later, Sergeant Williford told Ms. Allen, "Per the Chief, starting Monday, December 10th, you'll begin training without having to rotate between two units." The training Ms. Allen was promised did not occur.

**F.      The severity of Defendant Younger's inappropriate and unwelcome sexual verbal conduct toward Plaintiff Allen escalated.**

61. During the week of December 10, 2018, Officer Younger, who was working in A&I, told Ms. Allen that after he called her in Spring 2014 he "was going to come to her house and handle her husband because nobody talks to me that way."

62. Officer Younger made other hostile sex- and gender-based comments to Ms. Allen such as, "My daughter is gay, and I don't like her girlfriend. I purposely hit her in the head with a tailgate and we got into an argument."

63. A few weeks later, Officer Younger told Ms. Allen she is "one sexy motherfucker." She asked Officer Younger to please focus on work.

**G.      Plaintiff McCowan rejected similar inappropriate advances from Defendant Younger.**

64. On January 3, 2019, Ms. McCowan and Officer Younger were exchanging work-related text messages about a coworker, Officer Chan, who had been in a car accident. Officer Younger asked Ms. McCowan if he could call her and she said yes, assuming he had an update on Officer Chan's condition.

65. Officer Younger called and said, "You know I have a crush on you?" Ms. McCowan responded, "Well, thank you for the update on Chan, I have to finish making dinner for my husband and my family," and hung up.

66. The next day, Officer Younger asked Ms. McCowan "what she cooked for dinner last night," and she told him he was out of line and directed him not to make similar comments in the future. Ms. McCowan reported Officer Younger's inappropriate advances to her supervisor, Lieutenant McHugh.

67. Officer Younger ignored Ms. McCowan's orders and his unwelcome sexually harassing conduct toward her increased in severity over the next several weeks. For example, Officer Younger made statements such as, "Damn, you sexy," and "You gonna have to stay away from me," as well as sexually suggestive sounds like "Mmm, Mmm, Mmm."

68. Some of Officer Younger's inappropriate comments were made in the presence of his supervisors.

69. During the week of January 7, 2019, while Ms. McCowan was using the C75 copy machine near Sergeant Kyler's office, Officer Younger approached her and asked: "Are you sure there's no room for me to slide in." Ms. McCowan tried to ignore Officer Younger, who then asked, "Do I have any chance with you?" Ms. McCowan shook her head "no" and said, "You have no chance." Officer Younger then stood with his back against the wall and hands at his sides, and said: "Well, if you ever change your mind, just break the glass." Throughout the rest of the day, Officer Younger kept muttering "remember, just break the glass," in passing.

**H. Defendants continued to deny Plaintiffs equal employment opportunity in the DVIC through January 2019.**

70. In January 2019, Sergeant O'Brien, a supervisor in A&I, told Ms. Allen to "sit with Ta'Nea Jones," a black female civilian who worked in the unit. Ms. Jones told Ms. Allen, "I'm limited in what I can show you because you need access to so many different programs that you haven't been trained on, such as Facial Recognition, the Police System, and the Leads System, and you'll need a desk and a computer if you're going to be producing any work product." She also said she didn't have time to train Ms. Allen because she was bombarded with work.

71. Ms. Allen asked Defendant McHugh about getting access to a computer and he said she was "still in JET and wouldn't need a desk."

72. Around January 8, 2019, Ms. McCowan noticed that her payroll code was changed from 7407 (the HIDTA payroll code) to 9853 (the Intelligence Bureau payroll code) in violation of PPD policy and her collective bargaining agreement. She was transferred to A&I and her HIDTA job was given to Corporal Wilson.

73. Upon transfer to A&I, Ms. McCowan was the only black female supervisor in the unit. Despite her status as a supervisor, her male counterparts excluded her from all unit-specific supervisory meetings. A white male subordinate, Officer Shawn Hagan, was invited to attend the meetings in her place.

74. Ms. McCowan was also excluded from important inter-office emails and memoranda that she should have received in her role as a supervisor.

75. Her name was omitted from an internal contact sheet that listed the names of the other unit supervisors including Lieutenant McHugh and Sergeant O'Brien.

76. Ms. McCowan's colleagues (specifically, Ms. Jones and Renee Collier) frequently asked why she was excluded from supervisor meetings and not included as a recipient on important emails and inter-office memoranda.

77. On January 9, 2019, Sergeant Williford sent Ms. McCowan a text message saying:

| | |
|---|---|
| Sergeant Williford: | Had to keep reminding them supervisors includes Cpl [McCowan] and not Sean! |
| Ms. McCowan: | Thank you. It's getting a little old. |
| Sergeant Williford: | Yes. |

78. On January 10, 2019, Sergeant Williford texted Ms. McCowan asking:

| | |
|---|---|
| Sergeant Williford: | Hey are you going to the meeting? |
| Ms. McCowan: | What meeting? |
| Sergeant Williford: | Exactly! I hear there is a meeting. |
| Ms. McCowan: | News to me. |

79. When Ms. McCowan went into the conference room the persons in attendance at the meeting were all white males: Kevin Thomas, John Grasso, Lieutenant McHugh, Sergeant O'Brien, and Officer Hagan (her subordinate). After this, they started holding supervisor meetings in secret in Kevin Thomas's office without notifying her.

**I.** **Plaintiffs' work environment became increasingly sexually hostile when Defendant Williford joked about Plaintiff Allen's breast milk being stolen from the refrigerator in the break room in the DVIC.**

80. On January 10, 2019, at approximately 11:30 am, Ms. Allen went to the women's locker room in the DVIC to breast pump as she was still nursing her baby. She expressed five ounces of milk into a 150ml Medela breast milk bottle with a yellow lid. She sealed the bottle tight, placed it upright in small all-black milk bag, and zippered the bag completely closed. She walked the bag to the cafeteria and placed it in the full-sized refrigerator in the middle of the top shelf.

81. At 4:00 pm, at the end of her shift, Ms. Allen walked to the cafeteria to retrieve her milk from the refrigerator to bring home. At the time, her son was exclusively fed by nursing or expressed milk. When Ms. Allen opened the refrigerator, she noticed that the small black milk bag was sitting on the bottom shelf—not where she had placed it earlier that day. Ms. Allen also noticed that the bag was partially-unzipped—not how she had left it. When she removed the milk bag from the refrigerator and opened it, she noticed that 4 ounces of expressed milk were gone; and only 1 ounce of milk was left. There were no signs that the bottle had spilled (the bag was not wet, nor was there any liquid inside the bag); it appeared to have been tampered with.

82. Ms. Allen immediately reported the incident to Lieutenant McHugh. She showed him the nearly-empty bottle of milk and said, "This is a major violation of both me and my infant son."

83. That night, Ms. Allen purchased a refrigerator from Walmart for $96.10 so she could store the milk at her desk.

84. The next day, Sergeant Williford said, "I heard your milk was stolen from the refrigerator," and promised to "write an email to address it," but never sent such an email and otherwise failed to take action.

85. Over the next several weeks, whenever Sergeant Williford saw Ms. Allen carrying her milk bag from the locker room to her refrigerator he laughed and joked about her milk being stolen and made comments about "wanting chocolate milk" or "needing milk."

**J.     Defendant Younger's sexual harassment of Plaintiff Allen escalated from verbal conduct to physical touching.**

86.   Around mid-January, Ms. Allen attended a daily prayer circle in the cafeteria. Officer Younger was present, along with several witnesses, one of whom later stopped attending the morning meetings because of how Officer Younger treated and talked about women.

87.   After each morning prayer, those in attendance customarily hugged and said, "God bless you." Officer Younger turned to Ms. Allen, placed his hands around her waist, and said, "You're so small!" And picked her up off the ground in an embrace. Ms. Allen ordered Office Younger to put her down.

**K.     Plaintiffs observed officers and supervisors forge attendance sheets at a mandatory sexual harassment training.**

88.   Around January 17, 2019, Plaintiffs attended an annual mandatory MPO training course on workplace sexual harassment. Officer Dawson, Aide to Chief Inspector MacDonald, sat to the immediate right of Ms. Allen. Officer Dawson asked Ms. Allen to borrow her black pen (Officer Dawson also had a blue pen), and Ms. Allen watched Officer Dawson mark officers who were absent as "present" on the attendance sheet, alternating between black and blue pens for each name.

89.   During the class, Officer Dawson showed Ms. Allen a text message from Sergeant Whittle with his payroll number, which Officer Dawson used to sign the attendance sheet and submit a test on his behalf. When Ms. Allen looked at the attendance sheet, she also noticed that Officer Shawn Hagan was signed in, but was not in attendance.

90.   Officer Dawson also submitted tests for absentees (the tests were a required part of the class). Officer Dawson asked Ms. Allen to complete a blank test for one of the absent officers, but she declined.

91. Lieutenant McHugh and Sergeant O'Brien were present and knew that the attendance sheet was forged because Shawn Hagan's name was signed between Lieutenant McHugh and Sergeant O'Brien.

92. After the sexual harassment class, Officer Younger told Ms. Allen, "That class was bullshit!" His statement was witnessed by Officer Burnett.

93. Officer Younger later pointed to Ms. Allen's breasts and said, "It looks like you need to go pump because they are looking big."

94. A few days later, around January 23, 2019, Officer Younger told Ms. Allen, "You lost your ass after having the baby." His statement was witnessed by Detective Robert Richardson.

95. Later in January 2019, Officer Younger told Ms. Allen, "If you gained 15 more pounds you would be on point." His statement was witnessed by Officers Caesar and Rozier.

**L.    Defendant Younger's sexual harassment of Plaintiff McCowan also escalated from verbal conduct to physical touching.**

96. On January 21, 2019, Officer Younger said, "Hey, babe" to Ms. McCowan who responded, "You mean Corporal?" This exchange was witnessed by Lieutenant McHugh and Ms. Allen. Ms. McCowan looked at Ms. Allen and said, "You heard me, right?" Ms. Allen responded, "Yes" and shook her head in disbelief.

97. On January 28, 2019, Officer Younger approached Ms. McCowan and started picking up and making inappropriate comments about the family photographs on her desk. He commented on her "smile," and "big forehead," and pointed to a wedding photo and asked, "Are you pregnant in that picture?"

98. Referencing several photographs of Ms. McCowan's husband, Officer Younger said, "You have pictures of this motherfucker all over your desk. My wife doesn't have

pictures like this on her desk." Ms. McCowan responded, "That's between y'all." Officer Younger said, "Oh, I forgot, y'all are still wet. It's still new."

99. Officer Younger suddenly reached out and gripped Ms. McCowan's left hand and forcibly tried to remove her wedding band from her finger. She screamed: "Stop! They don't come off!" Officer Younger laughed and asked, "You don't take them off when you sleep?" Ms. McCowan repeated "No! My rings don't come off!"

100. Officer Younger continued making inappropriate comments all day and repeatedly asked Ms. McCowan if she was "sure he had zero chance." She responded, "In how many different languages do I need to say no?"

101. These incidents were witnessed by Civilian Renee Collier who was sitting nearby.

102. The sexual harassment was so open and obvious that several of Ms. McCowan's coworkers left notes and cards on her desk expressing sympathy:



103. On January 29, 2019, Ms. McCowan called out sick and made an appointment with her family doctor to whom she described Officer Younger's verbal and physical advances in detail, which caused her to feel depressed, anxious and fearful about returning to work. Her physician wrote her a sick note, and strongly recommended she seek mental health counseling.

**M.** **Plaintiffs complained to Defendant Williford about ongoing sex- and race-based discrimination at the DVIC.**

104.    Around the end of January, Chief Inspector MacDonald told Ms. Allen he was going to give her a certain training packet that had previously been given to all the other analysts in A&I but never gave it to her.

105.    On January 29, 2019, Ms. Allen again asked Sergeant Williford about her continued lack of training and work opportunities in A&I. He said, "It seems race related," and promised to talk to Chief Inspector MacDonald.

**N.** **Defendant Williford tried to stop Plaintiffs from reporting Defendant Younger's workplace sexual harassment to Defendant MacDonald.**

106.    On January 29, 2019, Ms. Allen called Ms. McCowan (who was out of the office) and reported that she had been harassed by Officer Younger. Ms. McCowan described to Officer Allen similar verbal and physical harassment that she had been enduring from Officer Younger. Ms. McCowan told Ms. Allen to document everything in a memo and promised to personally deliver both written complaints to Chief Inspector MacDonald immediately upon her return to work the next morning.

107.    Ms. Allen and Ms. McCowan typed separate EEO complaints against Officer Younger and printed them for hand delivery to Chief Inspector MacDonald.

108.    On January 30, 2019, Sergeant Allen (Ms. Allen's direct supervisor) walked in on Ms. Allen crying in the locker room and asked why she was crying. Ms. Allen said, "I'm requesting a meeting with Chief Inspector MacDonald regarding an EEO matter."

109.    At 8:00 am the same day, immediately upon Ms. McCowan's arrival to work, she told Officer Dawson (Chief Inspector MacDonald's aide) that she needed to personally speak to Chief Inspector MacDonald about two harassment complaints involving

employees under his command. Officer Dawson said, "I'll tell you when the Chief arrives."

110.     A few minutes later, Ms. McCowan received a text message from Sergeant Williford encouraging her not to deliver Plaintiffs' complaints of unlawful sexual harassment to Chief Inspector MacDonald: "Please see me before you submit those memos . . . let me handle it."

111.     Ms. McCowan texted back saying, "What I have to talk about should go directly to the boss. It's bigger than what you may think. It also involves Jen."

112.     Sergeant Williford arrived at Ms. McCowan's desk and told her to follow him to the conference room where she repeated her request to speak directly to Chief Inspector MacDonald, who had previously told her that he "wanted to know about situations like this before they left the building." Sergeant Williford said, "As a supervisor you have to learn that there are other supervisors you can go to—you have to go to Inspector McCarrick before MacDonald."

113.     Ms. McCowan responded, "It's my understanding that the chain of command doesn't apply when reporting an EEO complaint or misconduct within the Department. I need to speak with Chief Inspector MacDonald about an EEO complaint."

114.     Sergeant Williford said, "Although the Chief has an 'open-door policy,' he kind of doesn't; and you're on probation—you don't want to be labeled a troublemaker."

115.     After her unsuccessful attempt at meeting with Chief Inspector MacDonald, Ms. McCowan met Ms. Allen and Sergeant Allen in the women's locker room, where Plaintiffs reported their EEO complaints to Sergeant Allen. Sergeant Allen then wrote a memo addressed to Captain Heizenroth detailing the sex- and race-based discrimination

that the two women had been experiencing at the DVIC but omitted Plaintiff's reports of sexual harassment/hostile work environment.

116.     Word got out quick: at 1:30 pm, Sergeant O'Brien called Ms. McCowan and asked, "Is there something going on with Jen? Inspector McCarrick had a meeting and said Jen filed an EEO complaint and told all of us to be careful. Am I a part of it?" Ms. McCowan said, "Jen's sergeant is handling it," and then she thanked Sergeant O'Brien for calling and hung up the phone.

117.     Ms. Allen had an anxiety attack at work and left early. She saw her primary care doctor, who took her out of work until February 4, 2019.

118.     Despite Plaintiffs' multiple requests through various channels to speak with Chief Inspector MacDonald, he did not meet with them.

**O.     Plaintiff McCowan emailed Plaintiffs' complaints directly to Defendant MacDonald, and texted a summary of their complaints to Defendant Ross; thus initiating a cascade of retaliatory employment actions against Plaintiffs.**

   *i.     Report to Defendant MacDonald*

119.     At 9:58 am, having been blocked from delivering their EEO complaints to Chief Inspector MacDonald in person, Ms. McCowan sent them to him in an email with the subject line "EEOC Complaint":

> Good Morning Sir, Myself and Officer Jennifer Allen have a situation that we would like for you to be made aware of. We tried to meet with you yesterday, but our attempt was unsuccessful. I have attached two memorandums, one that Officer Allen wrote and another that I wrote. Thank you for taking the time to read this email and our memos.
>
> Respectfully,
>
> Corporal Audra McCowan #8194

(See attachments on the following page)

*MEMORANDUM*

TO      :   Chief Inspector, Intelligence Bureau

FROM   :   Corporal Audra McCowan #8194, PR#250998

SUBJECT  :   <u>**SEXUAL HARASSMENT COMPLAINT**</u>

1. On January 3, 2019, while sending text messages about Officer Chan's auto accident, Officer Curtis Younger #5211 asked if he could call me. I assumed that it was in reference to Officer Chan, so I said, "Yes." Officer Younger called me, he talked about Officer Chan's accident and gave me on his condition (as he received them from Officer Toughill-Highway Patrol). All of a sudden Officer Younger stated, "You know I have a crush on you." I quickly said, "Well thank you for the update on Chan, I have to finish making dinner for my husband and family." I quickly ended the conversation. At that very moment I was in the kitchen standing next to my husband. The next day Officer Younger asked me what I cooked for dinner last night. I told him that he was out of line and that can't happen again. Sometime later that day I informed Lt. Timothy McHugh #180 of what happened the night before. I also told Lt. McHugh #180 that I believe that I handled it.

2. Within the next two weeks, Officer Younger made the below comments:

   a.) "Damn, you sexy."
   b.) "You gonna have to stay away from me."
   c.) Officer Younger would also make sounds such as "Mmm, Mmm, Mmm."

3. During the week of January 7, 2019, while I was using the C75 copy machine (the large copy machine near Sgt. Kyler's office), Officer Younger came over to me and asked me if I was sure there was "No room for him to slide in, was there any chance?" As I rolled my eyes and shook my head in disbelief, I said "No there is no chance." He then stood against the wall with his hands down by his side and said, "Well, if you ever change your mind, just break the glass." Several times after that, Officer Younger would say in passing, "Remember, just break the glass."

4. On January 21, 2019, Officer Jennifer Allen and I were talking to Lt. McHugh #180 at his desk when Officer Younger walked up and said, "Hey Babe." I said, "You mean Corporal?" Officer Younger chuckled. I looked at Officer Allen and said, "You heard me right?" Officer Allen said, "Yes" and shook her head in disbelief.

5. On January 28, 2019, while I was sitting at my desk, Officer Younger was making copies at the C75 copy machine located behind my desk. When Officer Younger walked past, I asked Officer Younger, "What meeting were you in that Inspector McCarrick said he wanted a supervisor in?" Officer Younger told me that it was the Monday shooting call. The subject quickly changed when Officer Younger looked at my desk and pointed to a picture of my husband and I. Officer Younger then made a comment about "My smile, big forehead and that my husband looked like he was wearing a police shirt." He looked at another picture of me and my husband from our wedding and asked, "If I was pregnant in the picture?" Officer Younger then picked up a picture of my husband and I and said, "You have pictures of this motherfucker all over your desk." I said, "He's my husband!" Officer Younger then said, "My wife doesn't have pictures like this on her desk." I then said, "That's between ya'll." Officer

Younger then said, "Oh I forgot ya'll are still wet. It's still new." I said, "No, we've been together for a while." Then Officer Younger proceeds to assault me by trying to pull my wedding rings off my finger. I said, "Stop! They don't come off!" Officer Younger laughed and said, "You don't take them off when you sleep?" I replied, "NO! My rings don't come off." I was mortified and shocked that his actions went that far. Later that day, Officer Younger asked me if I was sure that there was "ZERO CHANCE" for him. I said, "Yes Zero. How many different languages do you need me to say it in? Civilian Renee Collier was seated at her desk right next to me when this occurred.

6. On January 29, 2019 I called out sick because I was physically Ill after this last incident with Officer Younger. I can no longer work with nor supervise Officer Younger due to his continued and unwanted sexual harassment and sexual advances towards me.

7. On January 30, 2019 when I reported on for work at 8:00am, I asked Officer Tonetta Dawson if when you, Chief MacDonald, could speak with me when you came in from Compstat. I also told Officer Dawson that I had a memo for you. She told me that she would let me know when you arrived and could meet with me. Not too long after that, Sgt. Eric Willingford #8718 sent me a text message asking me to "Please see him before I submit my memo because I know that he would never steer me wrong." Then I responded, "I know you wouldn't but this place is a mess." Some time later Sgt. Willingford sent a text stating, "Can you come see me?" I responded, "What I have to talk about should go directly to the boss. It's bigger than what you may think. It also involves Jen." Then Sgt. Willingford responded, "I'll be right there." Once at my desk, Sgt. Willingford asked if we could speak in the conference room. I followed Sgt. Willingford and he commenced to ask me what was going on. At this time I told Sgt. Willingford that I wanted to talk to you, Chief Inspector MacDonald because you said that you wanted to know about situations before they leave the building. However, Sgt. Willingford began to tell me that as a supervisor I have to learn that there are other supervisors that I could go to. He then told me that I have to go to Inspector McCarrick before coming to you. I responded telling Sgt. Willinford, "Inspector McCarrick doesn't even speak to me nor include me in on any of his supervisor meetings, so no I don't feel comfortable talking to the Inspector." I then told Sgt. Willingford that I have to speak with the Chief in reference to an EEO Complaint. Sgt. Willingford proceeds to tell me that, "Although the Chief has an open door policy, he kind of doesn't." Sgt. Willingford continues to say that, "He's just going to kick it back to me to handle anyway." I proceeded to tell Sgt. Willingford that it was my understanding that Chain of Command doesn't apply when reporting an EEO complaint or misconduct in the Department. Sgt. Willingford continued to say, "You're on probation, you don't want to be labeled as a trouble maker or even get in trouble." I was mortified because I felt as if I was being told that I could not come to you about this serious problem. I was really disturbed and upset by this meeting with Sgt. Willingford, I went home sick.

8. I take my duties as a sworn officer and supervisor very seriously. I have a job to do and I have always performed my duties with the utmost integrity. I don't come to work to be harassed nor bullied. It is a very difficult and uncomfortable situation when a co-worker consistently sexually harasses you. No one can tell what to think or how to feel. Everyone responds differently. It is not welcomed and it has to stop. Change has to happen.

Audra McCowan
Corporal                                        #8194
Intelligence Bureau

## *MEMORANDUM*

TO     :   Chief Inspector, Intelligence Bureau

FROM    :   Police Officer Jennifer Allen #1487, PR#250988

SUBJECT:   **SEXUAL HARASSMENT COMPLAINT**

1. In early 2016 Officer Younger #5211 sent a text to my phone around 5:00 pm and asked me was I available to talk. I text back that I was available. My husband Edward Allen (then boyfriend) and I were in the garage cleaning when Officer Younger called me. Officer Younger proceeded to tell me that he likes me and was interested in me. Officer Younger knew that I was in a relationship. So I found it quite odd that this was the reason for him calling. Officer Younger also knows my husband personally through the Philadelphia Police Department. My husband heard everything Officer Younger said because the call was on speaker phone. My husband told Officer Younger not to contact me anymore if it is not work related.

2. In December of 2018 Officer Younger began to train me on how to write intelligence products. During the training he brought up the incident that occurred back in 2016. He stated to me that at the time of the incident he was going to "go to my house and handle my husband because no one talks to him that way."

3. In January 2019 Officer Younger attempted to pick me up and lift me in the air in the cafeteria at the Delaware Valley Intelligence Center (DVIC).

4. In January 2019 Officer Younger stated to me "It looks like you need to go pump because they are big." When Officer Younger made this comment, he was pointing to my breast.

5. In January 2019 Officer Younger stated to me and Officer Burnett from the Criminal Intelligence Unit that the "sexual harassment MPO class was bullshit."

6. In January 2019 I heard Officer Younger call Corporal McCowan #8194 "babe" which also occurred in front of Lt. McHugh #180.

7. On January 9, 2019, while walking beside me in the office, Officer Younger stated to me "you are one sexy motherfucker".

8. On January 23, 2019 Detective Robert Richardson and I were being trained by Officer Younger. Officer Younger stated to me in front of Detective Richardson, "you lost your ass after having the baby."

9. On January 30, 2019 I notified Sgt Allen about the harassment.

10. Also on January 30, 2019, after I left for the day, a meeting was held at work without my knowledge in reference to me filing an EEOC complaint.

11. Officer Younger has created and continues to create a hostile and uncomfortable work environment for me. I have made it clear that his advances and comments are not welcomed. I have been so stressed over this situation that it is physically affecting me. Provisions are made for me at work so that I am able to pump milk for my son. However, recently due to the stress my milk supply has decreased. Thank you for your time and attention to this sensitive and serious matter.

P/O Allen #1487

Jennifer Allen
Police Officer                                    #1487
Juvenile Enforcement Team

---

120.     The same day, Ms. Allen received a text message from her former JET partner,

Officer Berthcsi, who was confused as to why Ms. Allen was being placed back out on

the streets in the JET unit: "I heard you are back with us on day work?"

121.     From February 1st to 6th, 2019, Ms. McCowan's family doctor took her out of

work on sick leave.

122.     On February 4, 2019, at approximately 8:52 am, Sergeant Allen told Ms. Allen

that her desk was being moved from the A&I section. Ms. Allen asked where the order to

move her desk was coming from, and Sergeant Allen responded that the order was

coming from Chief Inspector MacDonald and Inspector McCarrick.

123.     On February 5, 2019, Sergeant Allen texted Ms. Allen saying, "call me,"

apologized for "passing on bad information," and told Ms. Allen to remain at her desk,

unless she felt "uncomfortable," in which case she should "write a memo."

124.     On February 6, 2019, Ms. McCowan returned to work from sick leave and was

informed by Lieutenant McHugh that, while she was out sick, Inspector McCarrick met

with each analyst except Officer Allen. He also said, "Inspector McCarrick asked me

what your duties are, and I told him I don't know exactly what McCowan does. He also asked what Jen's duties are and I said I didn't know."

125.     During this conversation, Ms. McCowan told Lieutenant McHugh that, a few days earlier, on January 21st, Officer Hagan (her subordinate), asked her to review a work product. She questioned why she had not been trained to produce work product, while her subordinate had received the training he needed to do so. Ms. McCowan also told Lieutenant McHugh about having asked Civilian Supervisor Grasso three times for training and sample work product to review, which she never received.

*ii.*     *Report to Defendant Ross*

126.     In early- to mid-February 2019, Ms. McCowan texted and called Commissioner Ross on his personal cell phone to inform him that she had been experiencing sexual harassment and a hostile work environment in the DVIC, and that she had been punished for reporting same.

127.     Commissioner Ross asked, "Who is it against?" Ms. McCowan responded, "P/O Curtis Younger." Commissioner Ross declined to act on her report, and instead suggested, "So why don't you just order his dumb ass to go sit down and get out of your face 'Officer.'" Ms. McCowan responded, "Think about how you would feel if it was your daughter. Would it matter if it was someone that works for her or not? If she told the person to repeatedly stop, that doesn't matter?" Commissioner Ross stated, "I know you don't like for me to be straight with you, largely because 'two rams always seem to butt heads' . . . but I want to offer you some sage advice as a friend." Ms. McCowan asked Commissioner Ross to share his advice and he responded, "No, not the time based on your frame of mind."

128.     During these conversations, Commissioner Ross also stated he was going to "school" Ms. McCowan on sexual harassment and indicated that he continues to be upset with her and was getting in the way of redressing her complaints in retribution for her breaking off their two-year affair, which lasted from 2009 to 2011.

**P.     Defendant Conway failed to conduct a prompt, thorough and impartial investigation of Plaintiffs' internal discrimination complaints, and failed to take appropriate disciplinary and corrective measures where necessary to resolve the problems and prevent harassment from happening again.**

129.     On February 6, 2019, at 9:00 am, Ms. Allen was interviewed by Sergeant Conway at the Internal Affairs Building about the sexual harassment complaint she filed against Officer Younger. Sergeant Conway started the interview by telling Ms. Allen that "he knows Audra [McCowan]," from when they used to work together. Sergeant Conway also said, "I'm married to an African American woman" and, "I have an autistic son."

130.     Sergeant Conway made references to other sexual harassment and assault allegations made by other female cops (against Inspector Anthony Washington and Chief Inspector Carl Holmes) and expressed his opinion that, "In those cases, the females were lying." He asked Ms. Allen why she "waited so long to speak up."

131.     Sergeant Conway typed his interpretation of Ms. Allen's answers to his questions, which he asked her to review and correct but rushed her to sign the document. He also instructed her to write that she wanted to be separated from Officer Younger. She said she didn't want to be moved from her position and he responded, "They can't do that because that would be a lawsuit. And if they do it, I'll tell them they can't."

132.     On February 8, 2019, Sergeant Conway summoned Ms. McCowan to Internal Affairs. He said, "The Philadelphia Police Department has the highest payouts in lawsuits out of all the City agencies, so these interview questions are worded to assist the City in

defending against a lawsuit in case you and Officer Allen decide to sue. Basically the questions are worded to determine that you didn't do what you were supposed to do." He further explained his opinion that, "You can't be sexually harassed because you are a supervisor." He also said, "You failed to timely report your complaints against Officer Younger because you didn't submit them on the Philadelphia Police Department Intranet." He also said, "You may be held liable for failing to properly report this because the City is tired of paying out settlement money." He also said, "Chief Flacco suggested that telling your husband about Officer Younger should be considered reporting to a supervisor." Sergeant Conway also said, "My wife is Black."

133.     After their interviews at Internal Affairs, the men in Plaintiffs' unit started acting differently toward them.

134.     Chief Inspector MacDonald told Ms. McCowan that "Officer Younger is working on a taskforce project in addition to his daily duties, and he is doing a great job."

135.     Sergeant O'Brien and Lieutenant McHugh asked Ms. Allen "what unit she was in." Ms. Allen responded, "I should be asking you."

136.     Civilian Jones texted Ms. Allen, saying, "They weird as hell in here," regarding the behavior of the males in their unit.

137.     The same day, Ms. Allen received a supportive text message from Officer Lillian Figueroa who noticed Ms. Allen looked distressed due to her ongoing mistreatment at work: "You look so stressed!!!" Ms. Allen responded, "I absolutely am. You have no idea."

138.    Ms. McCowan took her blood pressure, which was 176/86. One hour later, it was 129/91, and then 123/91. Ms. McCowan never had a problem with her blood pressure until now.

139.    On February 11, 2019, Sergeant Allen told Ms. Allen she would be working on the street. Ms. Allen stated that she was supposed to be training with Civilian Jones for an analyst job.

140.    Sergeant Allen walked away for a few minutes, then returned and informed Ms. Allen she would be "working inside and not out on the street" that day.

141.    Later that afternoon, Sergeant Allen approached Ms. Allen in the locker room and told her to "go back out on the street."

142.    At 3:50 pm, Sergeant Allen again approached Ms. Allen and said she would be "working inside the next day."

143.    On February 12, 2019, Ms. Allen had an appointment with her family doctor, who took her out of work on sick leave until February 15, 2019. Ms. Allen's weight was 109 pounds. Ms. McCowan told Lieutenant McHugh that "Jen and Lil (a Hispanic woman in the unit) are out sick," and he rolled his eyes.

144.    Ms. McCowan overheard Sergeant O'Brien and Lieutenant McHugh say, "How does Jen get 3 weeks of vacation around the holidays?"

145.    Ms. McCowan overheard Sergeant O'Brien and Lieutenant McHugh talking about Officer Ferguson, another black female who had been temporarily detailed to A&I, asking, "Why does she have to be in this unit? She has family in South Philly who are into criminal activity—it's a conflict for her to work here. She can't work here." Ms.

McCowan overheard Sergeant O'Brien call the Safety Office to ask if Officer Ferguson could be "sent back to the 1st District for the rest of her restricted duty time."

146.     On February 13, 2019, Ms. McCowan was standing in the conference room next to Inspector McCarrick's office when Officer Younger walked by and stared at her with a look of disgust.

147.     On February 14, 2019, Sergeant Williford emailed Ms. Allen through the city email instructing her to sign up for training scheduled for February 26th. Ms. Allen signed up for it, but it was later taken away from her by Lieutenant McHugh, who approached Ms. McCowan and said, "We're not sending Jen to the training on the 26th."

148.     Instead of training, Sergeant Allen told Ms. Allen to "report to work at 3:00 pm on the 26th to start back night work."

149.     On February 18, 2019, between 12:00 pm and 1:00 pm, Sergeant Allen interrupted Ms. Allen twice to "check on her" while she was breast pumping in the women's locker room.

150.     On February 19, 2019, Sergeant Allen texted Ms. Allen saying, "Meet me at 20th and Pattison." Sergeant Allen told Ms. Allen that she "could see the disappointment" in Ms. Allen's face at work, and that she appeared to be "trying to hide her disappointment from her coworkers." Sergeant Allen told Ms. Allen, "Just relax and fall back, I'm telling you."

151.     The same day, Ms. Allen was breast pumping in the women's locker room in the DVIC when Sergeant Allen interrupted her and asked, "Are you almost done?" This was witnessed by Corporal Linder, Ms. McCowan, and Officer Victoria Ayers.

152.     On February 20, 2019, Ms. Allen went to a meeting with Inspector McCarrick and Sergeant Allen. Inspector McCarrick told Ms. Allen that he "got a call from Dungan Road," and said, "In your EEO complaint you asked not to work with Curtis Younger, correct?" Ms. Allen attempted to clarify she didn't want to be moved but Inspector McCarrick interrupted: "Captain Abrams called and said to have you go back to working with JET. Don't go back to A&I."

153.     On February 21, 2019, at 12:45 and 1:28 pm, Sergeant Allen interrupted Ms. Allen when she was breast pumping in the women's locker room on her break.

154.     On February 22, 2019 at 10:46 am, Officer Younger said in the presence of Ms. McCowan "I have some meatballs for you" in reference to his genitals.

**Q.     Defendants continued to deny Plaintiff Allen her rights as a nursing mother.**

155.     On February 22, 2019, Ms. Allen used a personal day and scheduled an appointment with a mental health therapist.

156.     Sergeant Allen texted Ms. Allen then called and said that effective immediately her schedule would be rotating between day and night shifts.

157.     On February 25, 2019, Ms. Allen sought counseling from a therapist.

158.     On February 26, 2019, at 3:15 pm, Sergeant Allen told Ms. Allen that the vacation request she had made back in December 2018 was partially denied.

159.     That night, Ms. Allen texted Sergeant saying she was heading home on her one-hour break to pump. Sergeant Allen texted back, "Ok."

160.     When Ms. Allen returned to the DVIC, Sergeant Allen said, "I thought you were going to pump in the DVIC bathroom."

161.     Sergeant Allen then stated she would no longer be able to accommodate Ms. Allen going home to pump and threatened to "take time away" from Ms. Allen "if she ever went home to pump again."

162.     Sergeant Allen insisted Ms. Allen pump in the locker room at work because "women nurse in front of women all the time."

163.     At 11:04 pm, Ms. Allen received a text message from Officer Caesar asking, "Yo what's up with you on nights?"

164.     On February 27, 2019, Sergeant Allen told Ms. Allen that if she didn't want to use the DVIC bathroom to pump then to "use the interview room" and sign the key out from the male officer working at the RTCC, who told Ms. Allen he "didn't know anything about it and wasn't familiar with the keys."

165.     It took nearly 30 minutes to find help to get into the interview room, which is located on the exterior of the building near the entrance. In the middle of winter, the room was freezing inside because it is unheated. It also had a large window, which meant that anyone who walked by would be able to see her pumping.

166.     Officer Caesar saw Ms. Allen and asked, "what's been going on?" Lieutenant Gonzalez saw her and said she "had not been herself lately."

167.     Ms. Allen was unable to pump that night. She texted Sergeant Allen and asked her to carry her sick for the remainder of her tour and also said she had a doctor's appointment the following day at 3:00 pm. Sergeant Allen told Ms. Allen to meet her at her desk and said:

> Sergeant Allen:     What happened tonight?
> Ms. Allen:     What do you mean what happened?
> Sergeant Allen:     Did you pump?

| | |
|---|---|
| Ms. Allen: | No. |
| Sergeant Allen: | Why? |
| Ms. Allen: | Because the room was too cold and has a window. |
| Sergeant Allen: | Well that's the only room we have so what are you going do? |
| Ms. Allen: | What do you mean what am I going to do? |
| Sergeant Allen: | There is no other room for you to pump. |

168. Ms. Allen said "ok" and had to take sick leave to pump at home.

169. At 8:23 pm, Officer Caesar texted Ms. Allen asking, "What happened are you good?"

## R. Plaintiff McCowan filed another complaint and Defendants said she would be punished for doing so.

170. On February 25, 2019, Sergeant O'Brien delivered to Ms. McCowan two court notices for Civilian Renee Collier and Officer Nathan Ramos, who were to be interviewed as witnesses in Ms. McCowan's EEO investigation, and he instructed her to deliver them.

171. Shortly thereafter, at 1:40 pm, Ms. McCowan received a text message from Ms. Collier asking, "Can you meet me in the ladies' room? Wanna talk real quick?" Ms. McCowan responded "Yes." In the women's locker room, Ms. Collier told Ms. McCowan that she had spoken with the EEO investigator, who asked if she "may have witnessed something," or if she was "around when something was said." Ms. Collier told Ms. McCowan that she "didn't want to be involved in nobody's mess."

172. At 3:00 pm, as Ms. McCowan was walking from her locker back to her desk, she walked past Officer Julius Caesar and Sergeant Williford, who were having a conversation. She excused herself and kept walking past them. Officer Caesar (who is friends with Ms. McCowan) caught up to her and they started talking. Officer Caesar

made a joke about her wavy hair (the two always joke about her hair) and briefly nudged her shoulder with his elbow. They both laughed, and Ms. McCowan went to her cubicle. There was nothing inappropriate about the conversation. But a few minutes later, at 3:32 pm, Sergeant Williford appeared at Ms. McCowan's desk:

| | |
|---|---|
| Sergeant Williford: | Apparently that was inappropriate touching. |
| Ms. McCowan: | What was? |
| Sergeant Williford: | When Caesar put his arm around you. |
| Ms. McCowan: | You're joking right? He didn't put his arm around me, he nudged my shoulder with his elbow, and we're friends. Who is this coming from? |
| Sergeant Williford: | Inspector McCarrick. |

173.     Sergeant Williford also said that when he asked Inspector McCarrick "who put their arm around McCowan," Inspector McCarrick said "the guy with the afro." Sergeant Williford said he asked, "which one," and Inspector McCarrick kept incorrectly saying "Rozier" in reference to Officer Caesar.

174.     On March 6, 2019, Ms. McCowan wrote a second EEO memo, titled: "REQUEST TO BE DETAILED OUT," and submitted it to the Deputy Commissioner of Organizational Services. She stated in her memo:

  i.   On January 30, 2019, I submitted a memorandum detailing some of the ongoing sexual harassment and hostile work environment practices within the Delaware Valley Intelligence Center. As a result. the accused officer has not been moved, creating for me, more of a hostile work environment.

  ii.  I respectfully request to be detailed out of the building, to a unit in my current chain of command under Deputy Commissioner Christine Coulter; pending the adjudication of my complaint.

  iii. Any consideration in this matter will be greatly appreciated.

175.     On March 7, 2019, Ms. McCowan had a follow-up appointment with her primary

care doctor where she reported chest pain, neck pain, and numbness on the right side of

her face. Her doctor opined that these were physical manifestations of stress related to the

negative work events described above, and prescribed Effexor XR 37.5, an

antidepressant, Lorazepam 0.5, an antianxiety medication, and Prednisone, a steroid to

treat the tension in her neck.

176.     On March 8, 2019, Ms. McCowan took another sick day.

177.     On March 9, 2019, Ms. McCowan went to the emergency room at Riddle Hospital

complaining of severe pain in her lower back that was radiating down to her legs. The ER

doctor diagnosed Ms. McCowan's physical symptoms as being caused by her stress at

work.

178.     Internal Affairs notified Ms. McCowan via email that she was scheduled for

another interview with Sergeant Conway on March 12, 2019 regarding the memo she

submitted on March 6, 2019.

179.     A few days before the interview, Ms. McCowan contacted Roosevelt Poplar, the

FOP Lodge 5 Vice President, to ask how she could obtain representation for the

interview. Mr. Poplar asked if she "knows Tim Strange," an attorney who works with the

City, and suggested she "try calling him and see if he will do you a favor and sit in on the

interview. Just tell him that you feel like you're being treated as the defendant."

180.     Ms. McCowan then called Mr. Strange's cell phone but he did not return her call.

181.     On March 11, 2019, Lieutenant McHugh called Ms. McCowan and said he

"needed her to go in the room with the new Bureau hires and review the outline of

today's training." To date, Ms. McCowan had not received the same training that she was being asked to review with the new transfers.

182.     At 8:25 am, she texted him back saying "before you start this training I would like to speak to you." Lieutenant McHugh responded, "Ok I'm here. I'm heading in a meeting." Ms. McCowan said "Okay. Is anyone going to speak to me about my memo about being detailed out during the EEO investigation? I am requesting to go to EAP (Employee Assistance Program) right now." Lt. McHugh did not respond.

183.     At 8:55 am, Lieutenant McHugh told Ms. McCowan, "As far as I know, you'll be out of here in a couple days."

184.     At 10:00 am, Ms. McCowan reported to EAP to obtain mental health counseling. At EAP, Ms. McCowan met with Corporal Beard, who expressed "utter shock" at Ms. McCowan's story and repeatedly said she was "dumfounded" and "astounded" by Defendants' actions.

185.     On March 12, 2019, at 11:00 am, Ms. McCowan went to her second Internal Affairs interview with Sergeant Conway, who interrogated her for nearly two more hours. At the start of the interview, Sergeant Conway said, "Attorney Tim Strange wants to talk to you off the record." Mr. Strange then entered the room, and Sergeant Conway left.

186.     Mr. Strange said he could not represent her because he was representing Officer Younger, and said, "You're a supervisor now, so you're going to have to take a hit."

187.     Sergeant Conway returned and made the following statements:

- "I talked to the guy who wrote the sexual harassment policy for the City and he said that a supervisor can't be sexually harassed by a subordinate."

- "I don't understand why Jen didn't have a problem breast pumping in the DVIC for months, then all of a sudden she did, it's kind of suspicious that she had an issue during her first night of night work."

- "I told Chief MacDonald that he made a bad decision by giving Jen a day work position when she came back from having the baby."

- "Giving Jen the job was setting a bad precedent."

- "How did you get promoted?"

- "Do you know of anyone else who went to a special unit as a result of being promoted? I never heard of such a thing."

- "Chief Flacco has caused the City to lose lawsuits because he refuses to be EEO trained."

- "What special training do you have that qualified you to work in HIDTA?"

- "If there had not been a second party (Ms. Allen) on your complaint, the complaint would have been dismissed from the very beginning."

- "We have been exploring the possibility that you are making all this up just to get out of your current position."

- "Some officers (such as Officer Younger) could use favoritism to wield power over their supervisors," which he compared to "trying to discipline Chief Flacco's aide. Even though she is a lower rank, she holds power because of her proximity to the Chief."

- "If you knew there was a hostile work environment in the DVIC, why would you want to work there as a new promote?"

- "They aren't going to move you because it would set a bad precedent."

- "Chief Flacco was questioning how does a new promote get transferred to a special unit?"

188.    Ms. McCowan's interview ended at 12:55 pm, almost two hours after it started.

**S.    Defendants detailed Plaintiff McCowan to Police Radio as punishment for her complaints.**

189.    On March 12, 2019, at 3:58 pm (the same day as Ms. McCowan's second Internal

Affairs interview with Sergeant Conway), as Ms. McCowan was preparing to leave at the

end of her shift, Lieutenant McHugh called her from across the room. When she turned

around, he said sarcastically, "Hold on a minute, let me get my glasses, I have a text message from Kevin Thomas (the building Civilian Director) that has your name on it!" He read the text: "Effective tomorrow you will be detailed to Police Radio!"

190.    Police Radio is an extremely busy and hectic place to work. There is a perception within the PPD that assignment to Police Radio is a punishment.

191.    Moreover, Ms. McCowan's daywork/weekends-off schedule, which she held for the past 11 years, would change immediately to alternating day and night shifts with alternating days off.

192.    Ms. McCowan's desk was moved to the tape room at Police Radio, an unheated room among the building's computer servers. The temperature in the room drops below 50 degrees, requiring a winter coat to stay warm.

193.    On March 13, 2019, at 7:00 am, Ms. McCowan reported to work at Police Radio, and spoke with Lieutenant Watkins. He said that he "didn't have any information" regarding her new assignment, and that she would "have to wait until I talk with the Captain at 8:00 am." He further stated that "each squad in the unit has all the supervisors they need, so whatever squad you go to, you will be an extra supervisor, and you won't count on their manpower projection." Lieutenant Watkins also said that Ms. McCowan "can't work on the dispatch floor without proper training by the state."

194.    After Lieutenant Watkins spoke with Captain Deacon at Police Radio, he informed Ms. McCowan that she would "basically be a rotating administrative corporal handling any extra work that the Captain or Lieutenant or Inspector have." Lieutenant Watkins also confirmed that she would be "working rotating shifts in Squad 1, Platoon D." Lieutenant Watkins also said, "The Captain is being told where to put you."

195.     At 8:00 am, Ms. McCowan was greeted by one dispatcher who said, "Welcome to hell."

196.     At 10:00 am, Ms. McCowan spoke again with Captain Deacon, who said he "still doesn't have any assignments for her." He also said, "Inspector Gillespie asked if he could have you in 5 Squad (steady day work) but was told 'no' by Deputy Coulter's Office." He said he asked Deputy Coulter's office if Ms. McCowan "could get Pennsylvania Emergency Management Agency (PEMA) training so she could at least help out on the radio floor, and they said no."

197.     Ms. McCowan asked if she could at least be placed on the overnight "last out" shift (working steady hours from 10:00 pm to 6:00 am every night), which would ensure that either she or her husband, Keith, would be at home at night with their children before they went to bed. At 1:47 pm, Lieutenant Watkins called Ms. McCowan into his office. When she arrived, Lieutenant Ezekiel Williams was present. Lieutenant Williams told her: "They said you can't work overnight either."

198.     Ms. McCowan's sudden shift change from steady day work to rotating day and night shifts was a violation of standard operating procedure. Normally, when someone is detailed to a different unit—they keep their shift. And if they must be moved to either a new unit or a new shift, they are given reasonable notice (30 days)—she was given less than 24 hours.

199.     Since being detailed to Police Radio, Ms. McCowan has not been given any work assignments—she has been forced to sit, without work, for 8 hours every day.

200.     On March 15, 2019, Ms. McCowan sought treatment from a psychologist. She had another appointment later in March.

201.     On March 20, 2019, Ms. McCowan checked in with Corporal "Lou" at Police

Radio to make sure her time was properly documented for payroll. Corporal Lou said

they forgot to put her time in. Ms. McCowan also noted that her time wasn't properly

inputted March 13, 2019 either. She also noted that on March 19, 2019, she was put in

the daily attendance record as a "9," which is civilian pay.

202.     From March 26 to March 27, 2019, Ms. McCowan went out of work on sick leave

due to ongoing emotional distress from the work events described above.

203.     On April 4, 2019, Ms. McCowan was again forced to take sick leave.

204.     On April 11, 2019, she checked her time for that pay period and again found that

she had been put in the system as a civilian for April 8th and 9th. Each time she noticed

that her payroll records were incorrectly inputted, she had to email Melissa Lumpkin in

finance to have her pay fixed.

205.     From April 20 through April 28, 2019, Ms. McCowan was again forced to take

sick leave.

206.     On April 29, 2019, at 6:57 am, Ms. McCowan had the following dialogue with

Corporal Smith:

| | |
|---|---|
| Ms. McCowan: | Good morning. Here's my sick note. My payroll number is at the top. |
| Cpl. Smith: | What's this? |
| Ms. McCowan: | My sick note from last Saturday to today. |
| Cpl. Smith: | I don't know if they put you in because they don't know what's going on. |
| Ms. McCowan: | I don't know how they don't know what's going on I called in. |
| Cpl. Smith: | I'll see. |

207.     Because of the repeated mistakes with her payroll, Ms. McCowan typed a memo asking for access to DARS (the payroll system), which she is supposed to already have access to as a supervisor. Ms. McCowan also typed a hardship memo regarding her shift change. She handed the two memos to Sergeant Laskowski who he spoke to Captain Deacon who denied her request for access to DARS and promised to "speak to the chief" about her hardship memo.

208.     Officer Janean Brown sent Ms. McCowan a text message stating that Sergeant Conway asked, "Audra's down here right?" Officer Brown responded, "Yeah she's upstairs," and Sergeant Conway said, "That was the worst job position (working at Police Radio)."

209.     On April 30, 2019, around 9:00 am, Ms. McCowan spoke with a civilian worker in Police Headquarters named Maria who works in Deputy Commissioner Coulter's office. Maria said, "They talk openly  about your situation in Deputy Coulter's office, it's so unprofessional."

210.     Ms. McCowan went immediately to the Safety Office and spoke with Molly O'Neil who told her to contact Joe Shrank from FOP about filing a union grievance. Mr. Shrank passed Ms. McCowan's message along to John McGrody, FOP Vice President, who filed a grievance on her behalf:



## PHILADELPHIA LODGE #5
## FRATERNAL ORDER OF POLICE
**11630 Caroline Road, Philadelphia, PA 19154-2110**
215-629-3600      website:  www.fop5.org      215-629-5736 (fax)

**John J. McNesby, President**                          **John Hoyt, Recording Secretary**

May 15, 2019

AUDRA MCCOWAN
34 E KNOWLTON RD
MEDIA, PA 19063

**Statement of Grievance**
*The city is violating numerous provisions of the collective bargaining agreement by:*

**CORPORAL AUDRA MCCOWAN  Payroll Number 250998**
Member Has Her Schedule And Hours Of Work Changed In Violation Of The Collective
Bargaining Agreement And Without Sufficient Notice.

### REMEDY REQUEST:

By way of remedy it is requested that all bargaining unit members directly and indirectly
affected by each and every aspect of any such violation be Made Whole in all respects,
regardless of whether specifically identified herin but not limited to:

Make Whole For All Losses.

Respectfully Submitted,

John R. McGrody ,
Vice President

**EXECUTIVE BOARD MEMBERS**
Vice Presidents: Roosevelt L. Poplar, John R. McGrody, Steven J. Weiler, Nicholas DeNofa
Recording Secretary: John Hoyt    Financial Secretary: Michael P. Trask    Treasurer: John Ruane
Trustees: William Sierra, Austin A. Fraser, Terryl D. Reid,  Kenora D. Scott, John McLaughlin  Conductor: Sharon Jonas
Guards: Peter Sweryda, Jason Hernandez   Chaplain: Louis J. Campione

211. On May 13, 2019, Lieutenant Watkins informed Ms. McCowan that she would not be allowed to get PEMA training necessary to perform any work in the Radio unit; therefore, she would be sitting indefinitely at a dispatch console without the use of a computer.

212. At 4:45 pm, Sergeant Laskowski handed Ms. McCowan her hardship memo stating her request to be placed back on her previous daytime work schedule was denied.

213. On May 14, 2019, Ms. McCowan received call from John McGrody at FOP stating, "Deputy Coulter said that there was a meeting on Friday, May 10, 2019, with Commissioner Ross, 1st Deputy Patterson, and Deputy Coulter, and they all decided to disapprove your hardship memo."

214. From May 21 through May 28, 2019, Ms. McCowan was again forced to take sick leave.

215. On May 29, 2019, at approximately 1:00 pm, Civilian Maria from Deputy Commissioner Coulter's office said she saw Sergeant Jann from the Commissioner's office go into Deputy Coulter's office with a memo in her hand, mention Ms. McCowan's name, and say, "Well that's what happens when you have a reputation."

216. On June 5, 2019, Ms. McCowan presented to the office of Sergeant Brent Conway for a third Internal Affairs interview about her complaints.

217. On June 7, 2019, Ms. McCowan reported to her nightwork shift and dispatchers were using the console at her seat. Sergeant Laskowski told her to "sit out in the hallway." After 4 hours of sitting in the hallway without any work assignments, Ms. McCowan used 4 hours of sick time.

218.     On June 8, 2019, Ms. McCowan was informed that she would be expected to sit in the hallway without work indefinitely.

219.     On June 12, 2019, Staff Inspector Bailey Davis walked by Ms. McCowan sitting in the hallway and asked if she was okay because she "looked sad."

220.     On June 21, 2019, John McGrody from FOP called Ms. McCowan to tell her that FOP and PPD had a First Step Meeting on June 19, 2019 and that the PPD denied her request for shift change. Mr. McGrody said, "You worked in the building long enough to know how it works. Once you're out of the clique they ostracize you. Between you and me, this is all coming from Commissioner Ross, who he said he was mad because he thinks you're making all this up."

221.     By now, Ms. McCowan had had spent over 800 hours (100 days since March 13, 2019) sitting around all day at Police Radio without having been given any work opportunities.

222.     From June 24 to June 26, 2019, Ms. McCowan was again forced to use sick time to attend to the stress and anxiety related to the negative work events described above.

223.     On June 26, 2019, Ms. McCowan notified Ms. Heather McCaffrey and Ms. Patricia Sullivan in the police personnel office, stating she was exercising her rights under the FMLA to take time off from work to treat a qualifying medical condition for which she was under the care of a physician.

224.     On July 1, 2019, Ms. McCowan's physicians submitted the executed forms and certifications necessary to take Ms. McCowan out of work on FMLA leave.

225.    On July 10, 2019, Sergeant Laskowski texted Ms. McCowan, "No one seems to know anything about your FMLA status. Checked with personnel and they don't have anything."

226.    On July 11, 2019, Ms. Sullivan at police personnel left a voicemail for Ms. McCowan stating she received her FMLA paperwork but that her FMLA paperwork would not be processed "unless she submitted a formal memo requesting FMLA leave."

227.    Upon information and belief, to date, Ms. McCowan's FMLA paperwork has not been processed.

**T.    Plaintiff Allen was also forced to take extended medical leave to treat her severe emotional distress, and she was punished for doing so immediately upon returning to work.**

*i.    Plaintiff Allen's doctor took her out of work for four weeks.*

228.    On February 28, 2019, at 3:00 pm, Ms. Allen went to a follow-up appointment with her primary care doctor. She weighed 102 pounds—she had lost 7 pounds in 2 weeks since her last appointment on February 12, 2019. Ms. Allen's doctor was concerned about her rapid weight loss, anxiety, headaches, inability to sleep, and low milk supply and took her out of work for four weeks. Upon notifying Defendants about her need to go out of work regarding her aforementioned medical issues, Defendants failed to notify Ms. Allen of her FMLA rights and she was forced to use her remaining sick time.

229.    On March 4, 2019, Ms. Allen had another appointment with her therapist.

230.    On March 25, 2019, Ms. Allen had a follow-up appointment with her family doctor, and discussed returning to work in a few days pending examination and approval

by the City doctor located at the City of Philadelphia Employee Medical Services building at 19th and Fairmount.

231.     Having had time away from the negative work events described above, Ms. Allen had regained two pounds since her last doctor's visit.

232.     On March 26, 2019, Ms. Allen had an appointment with City doctor's office. This was a prerequisite to her returning to work the next day.

233.     At 8:04 am, Ms. Allen texted Sergeant Allen stating that she was at the City doctor. Sergeant Allen did not respond. At the City doctor's office, Ms. Allen was seen by a certified nurse practitioner named Dinon, who asked Ms. Allen about her anxiety and whether she was on anti-anxiety medication. Ms. Allen said, "No, because I'm breastfeeding." The nurse practitioner then asked Ms. Allen, "is that something that was a problem at work?" And Ms. Allen said "yes." The nurse practitioner was shocked by this and suggested Ms. Allen return to work on Restricted Duty status to address her anxiety and so she could successfully breast pump at work without interference. She told Ms. Allen to call and advise her primary care doctor.

234.     City of Philadelphia Employee Medical Services provided Ms. Allen with the below Restricted Duty Certification dated March 26, 2019:

235.     After her visit with the City doctor, Ms. Allen called her family doctor as instructed. Her doctor's office agreed that it was in Ms. Allen's best interest to return to work on Restricted Duty and they wrote a note stating same. Ms. Allen was also told to seek counseling from a therapist if she had not done so already.

236.     Ms. Allen took the Restricted Duty note to the PPD's Safety Office, where she was given Restricted Duty Instructions and assigned a plainclothes daywork shift in the Criminal Intelligence Unit in the DVIC:

### RESTRICTED DUTY INSTRUCTIONS
### (NON-DUTY RELATED MEDICAL INJURY/ILLNESS)

TO:  **P/O Jennifer Allen**                                  DATE:  **3/26/19**

You are to report to  **Criminal Intelligence Unit**                  effective  **3/27/19**
They will arrange your hours and type of work. They are responsible for posting your attendance on the D.A.R. In order to avoid problems with your paycheck, however, it is essential that your permanent District/Unit be notified of your "Restricted Duty" assignment and schedule. PLEASE NOTE THAT IT IS YOUR RESPONSIBILITY TO NOTIFY YOUR PERMANENT DISTRICT/UNIT OF YOUR "RESTRICTED DUTY" ASSIGNMENT AND SCHEDULE AND TO PROVIDE THEM WITH YOUR PAPERWORK.

*ii.     Defendants punished Plaintiff Allen for reporting and seeking medical treatment for unlawful workplace discrimination and harassment.*

237.     On March 27, 2019, at 8:05 am, Ms. Allen reported to the supervisors at the Criminal Intelligence Unit in the DVIC and presented them with her Restricted Duty Instructions.

238.     At 8:20 am, Ms. Allen was talking to a group of police officers when Sergeant Allen called her from across the room and ordered her to "meet me at my desk," and said, "What are you doing?" Ms. Allen explained that she was placed on Restricted Duty and assigned to the Criminal Intelligence Unit, and handed Sergeant Allen her Restricted Duty instructions. Sergeant Allen asked, "Will they be putting your time in (referring to her hours for payroll)?" Ms. Allen's Restricted Duty instructions clearly describe the

procedure for posting her attendance, but Sergeant Allen said, "Well, tell them to put it in for you!"

239.        A few minutes later, Sergeant Allen called Ms. Allen back over to her desk and said:

| | |
|---|---|
| Sergeant Allen: | Who put you out restricted? |
| Ms. Allen: | My doctor put me out restricted. |
| Sergeant Allen: | Who did you speak to in the Safety Office, and what was said to you? |
| Ms. Allen: | In reference to what? |
| Sergeant Allen: | In reference to your assignment. I need to know who put you in Criminal Intelligence because I can't take it at face value. |

240.        Several police officers witnessed the above interaction, including Officer Cortes, Officer Sneed, Officer Ho, Officer Hailey and Officer Swisher.

241.        Officer Hailey asked Ms. Allen, "What was that about with the Sergeant? She was talking to you wrong. You should ask what her issue is with you, because by the way she was talking to you, I can tell she doesn't like you."

242.        At 8:50 am, Sergeant Allen told Ms. Allen to follow her to the Captain's office, where they met with Lieutenant Muller and Lieutenant McHugh. Sergeant Allen said, "You will report to me and you will still be working under me." Ms. Allen said, "Ok, no problem." Sergeant Allen then said, "You are to sit at my desk and I will give you your work assignment." Ms. Allen said, "Ok, no problem." Sergeant Allen then said, "You are to remove all of your things from your desk over in A&I."

243.        At around 3:20 pm, Sergeant Allen approached Ms. Allen while she was talking to Officer Mendez and Officer Haskins. Sergeant Allen said, "Come here." Ms. Allen

followed her to a conference room. Corporal Linder also entered the room. Ms. Allen sat directly across from Sergeant Allen; Corporal Linder was seated at the head of the table. Sergeant Allen handed Ms. Allen a piece of paper and said, "This is what occurred earlier." Ms. Allen read the paper—a counseling memo for insubordination instituting a progressive discipline plan:

### PHILADELPHIA POLICE DEPARTMENT
## COUNSELING FORM

| NAME | BADGE | PAYROLL | COUNSELING DATE |
|---|---|---|---|
| P/O Jennifer Allen | #1487 | 250988 | 3-27-19 |

REASON FOR COUNSELING:

**INSUBORDINATION**

STATEMENT:

On Wednesday, March 27, 2019, at approx. 8:20am while I was having a conversation with you to gain clarity in reference to your paper work since returning from sick status, you walked off during the conversation and stated in a hostile and loud tone," I don't see what the problem is, you can call the safety office".  I attempted to continue the conversation and ask you to come back to the area and you continued to walk off. The tone of your conversation towards me was unprofessional, disrespectful and goes against departmental policy code 4-§-003-10. This memo serves to bring to your attention; your behavior and correct it going forward. In the future, progressive disciplinary actions will be taken.

*Jennifer Allen #1487*

| SIGNATURE OF SUPERVISOR | DATE | TIME |
|---|---|---|
| *T.J. Allen #8710* | 03/27/19 | 3:44 pm |
| Sgt. T. Allen #8710 | 3-27-19 | 3:44 pm |

244.       Ms. Allen said, in her usual respectful tone and manner, "That did not occur." Sergeant Allen stated she "wasn't going back and forth," and told Ms. Allen that if she "wanted to say anything then write it down."

245.    While Ms. Allen was writing, Sergeant Allen said, "What you're writing—does that pertain to what happened today?" Ms. Allen said "yes," and continued writing for a moment. Sergeant Allen interrupted again: "Well I have more things to address. I need a sick note from you." Ms. Allen started to say, "I provided the sick note to…" but Sergeant Allen interrupted, "I'm not going back and forth with you."

246.    Ms. Allen tried to clarify that she had already given her sick note to the Safety Office at 19th and Fairmount, but Sergeant Allen said in a hostile tone of voice, "Do they put your time in? I provided you with the directive to refer to when you were out sick." Ms. Allen asked for a copy of said directive, which she had not received. Sergeant Allen said, "No. Read it on your own time."

247.    Sergeant Allen then said, "Effective tomorrow (March 28, 2019), you will be detailed to the Neighborhood Services Unit (NSU). Report there at 9:00 am."

248.    Ms. Allen continued to write her statement on Sergeant Allen's discipline memo and Sergeant Allen said, "I'm only giving you a few more minutes." Ms. Allen started to sign the back of the memo underneath her written explanation of the facts and Sergeant Allen interrupted again: "Don't sign your name there, sign it on the front." Ms. Allen signed her name and noted the time, "*Jennifer Allen, 3:43p*." She flipped the paper over and signed on the front as well, and then handed the paper back to Sergeant Allen. Sergeant Allen read Ms. Allen's statement of the facts and laughed out loud. Ms. Allen asked for a copy. Sergeant Allen said she "wasn't coming back in here" and told Ms. Allen to meet her at her desk if she wanted a copy.

249.    At 3:53 pm, Corporal Linder, who witnessed the interaction, texted Ms. Allen in response to Sergeant Allen's behavior: "What the HELL???!!!!!"



250.    At 3:54 pm, Ms. Allen asked Corporal Linder if they could talk after she picked

up her copies of Sergeant Allen's disciplinary memo, and Corporal Linder said "ok." At

3:55 pm (approximately 10 minutes after the meeting), Ms. Allen went to Sergeant

Allen's desk to retrieve copies of the memo:

Ms. Allen:             Can I have my copy?

Sergeant Allen:       Hold on, I'm doing something.

| | |
|---|---|
| Ms. Allen: | Ok. |

251.    Ms. Allen waited. Sergeant Allen finally said, "here it is," and placed it on a cabinet, instead of in Ms. Allen's hand like a professional. Ms. Allen looked at the copy and noticed that it was only the front side of the memo and did not include the back page with her continued explanation of the facts and signature:

| | |
|---|---|
| Ms. Allen: | Sergeant, this doesn't have both sides. |
| Sergeant Allen: | Oh, it doesn't? (in a sarcastic tone of voice) |
| Ms. Allen: | The other side is blank. |
| Sergeant Allen: | You're going to have to wait. |
| Ms. Allen: | Ok. |

252.    Ms. Allen then waved at Corporal Linder and gestured for her to come over. Corporal Linder walked over and Ms. Allen said, "I'm waiting on another copy." Corporal Linder said, "Ok. See me after you get it." Ms. Allen said "ok." Ms. Allen continued to wait for Sergeant Allen to return with a copy of the second page of the memo.

253.    At 4:02 pm, she looked down at her watch and waited a few more minutes. Sergeant Allen stood up and walked to the copy machine. She returned and placed Ms. Allen's copy on a cabinet right beside the copy machine (instead of handing it to her), and said, "There it is," and walked away.

254.    Ms. Allen met with Corporal Linder who instructed Ms. Allen to "write down everything that happened," and advised Ms. Allen to "file complaints for the breast pumping incidents" as well as the retaliatory discipline by Sergeant Allen. Corporal

Linder told Ms. Allen that she would "get a memo from Officer Hailey" who was also a witness.

**U.    Defendants continued to deny Plaintiff Allen her rights as a nursing mother.**

255.    When Ms. Allen arrived to NSU, her new supervisor, Sergeant Herbert Gibbons, told her to "pump in in Officer John Whipple's office" because Officer Whipple was out of the office at that time.

256.    In early-April 2019, Ms. Allen was in the lunch room placing her expressed milk in the refrigerator when Officer MaryAnn Darden asked if she had been "notified that you have to start pumping in Mary's (a civilian coworker) office." Ms. Allen said she had not been notified, and asked Officer Darden where she heard this. Officer Darden did not specify, but said, "The same person also said you and Officer Newsome (another nursing mother) should pump at the same time in the same room."

257.    Officer Newsome and her mother, Officer Richardson, walked in on the conversation between Ms. Allen and Officer Darden. Officer Richardson asked, "Who was the person who had an issue with where they pump? And why was it being discussed with an officer who had nothing to do with the situation?"

258.    Officer Richardson, Officer Newsome and Ms. Allen together approached Sergeant Gibbons and told him what transpired. Ms. Allen asked, "Where do you want me to pump?" Sergeant Gibbons responded, "The office that I told you to pump in before."

259.    Between April 8 and April 17, 2019, Officer Martin told Ms. Allen that "people need to get into the office you're pumping in during the time that you pump (12:00 pm to

1:00 pm),” and directed Ms. Allen to “pump in Mary's office from now on.” Mary was on vacation during this time and her office was available.

260.    The next day, April 18, 2019, Sergeant Gibbons called Ms. Allen and Officer Newsome into his office. Sergeant Gibbons stated, “You are to put the sign (which they hung on the door while they were pumping) back in my office after each use.” He said he “didn't want to hear Mary making a big fuss about the sign being stored in her bin at her office door” and that he wanted “to avoid hearing her mouth.”

261.    Employers are responsible for alerting employees about the employer's worksite lactation support program, and for negotiating policies and practices that will help facilitate each employee's infant feeding goals. Employers should know exactly how to support employees like Ms. Allen and Officer Newsome, including educating all staff about the importance of respecting a coworker's privacy while pumping and providing coverage during lactation breaks. Employers are expected to ensure that all employees will assist in providing a positive atmosphere of support for breastfeeding employees.

262.    Breastfeeding and working takes a lot of time, coordination, and dedication from a mother—it's not easy. A lactation space is necessary because in order to begin the flow of milk, mothers must be able to sit down and be relaxed and not stressed. Mothers who are in an open or uncomfortable space, or who are worried about hostility from coworkers may not be able to pump milk or may not be able to pump milk as quickly. However, these recent conversations demonstrated that supporting breastfeeding moms at work is of little importance to the City or the PPD.

263.    Officer Richardson took Ms. Allen and Officer Newsome into the break room and tried comforting them because they were both crying. Officer Richardson then called

Sergeant Gibbons into the room and told him that "this was the fifth time collectively that Janelle and Jen were being talked to about their pumping situations." She further stated that "it's a law for breastfeeding mothers, and you need to understand that and address anyone who has an issue with it."

264.    Sergeant Gibbons responded, "I won't address anyone because I would be kicked out the unit. Anytime I have spoken up before I was backstabbed and given 18's (disciplined)." Officer Richardson said, "This is bigger than 18's. Look at how this is making them feel." Officer Newsome said, "I do not feel comfortable with the procedure of getting the sign from you, because I have to walk into an office with three male officers and ask them for the sign, and then walk back into the same office to return it to them. It makes me feel uncomfortable, and that's why I leave the sign stored in the bin in Mary's office." Ms. Allen agreed. Sergeant Gibbons said, "You can keep the sign between the both of you and don't have to get it from me anymore."

265.    Approximately 10 minutes later, Ms. Allen observed Sergeant Gibbons and Captain Vann walk out of the office together.

266.    About 5 minutes after that, Ms. Allen was called into the break room again by Sergeant Gibbons. Officer Newsome and Officer Richardson were also present. Once inside the break room, Sergeant Gibbons said, "Effective immediately you will pump in Mary's office, a permanent sign will be made that will hang on the door, and you will each have keys to the office. You can pump whenever you want to." He also told them to notify him if anyone has a problem with that arrangement.

267. On April 22, 2019, Mary was back at work. Ms. Allen asked Sergeant Gibbons if Mary had been notified that she was to pump in Mary's office, and Sergeant Gibbons said "yes."

268. Ms. Allen, accompanied by another female officer, then went to Mary's office and asked to use it to pump. Mary responded, "For what? I have work to do, use another office."

269. Ms. Allen went to Sergeant Gibbons and said, "Mary said I can't use her office." Sergeant Gibbons responded, "She has to," but took no further action.

270. On April 29, 2019, Ms. Allen and Officer Newsome were instructed to pump in the building's lunch room during lunch hour (between 12:00pm and 2:30pm). That afternoon, when Ms. Allen and Officer Newsome were pumping in the lunch room, people started gathering outside and knocking on the door asking "what was going on inside." One employee who was waiting outside said, "finally," and groaned before entering the lunch room. The employee then asked Ms. Allen if she could "come in while you're pumping because I'm a woman."

271. Ms. Allen stopped pumping at work.

## V. Plaintiffs' families have been significantly impacted by Defendants' unlawful employment actions.

272. Defendants' malicious, willful, outrageous, and unlawful conduct toward Plaintiffs has greatly impacted not only Plaintiffs, but also their families.

273. For example, in March 2019, Ms. Allen's daughter got her report card for the trimester. Until then, she had been an honor-roll student. Although she received honors that trimester, her grades sharply dropped. For example, her math grade fell from a 99-point average to a 90-point average. Ms. Allen is very hands-on with her kids'

schoolwork, but because she has been consumed with stress and anxiety at work, she has been unable to work as closely with her kids on their homework as she normally would. Moreover, Ms. Allen's children have noticed a significant change in their mother's affect at home—they see her anxiety and depression in her facial expressions, in the way that she speaks and in her actions. his causes them significant distress.

274.     Also, in early-March 2019, Ms. Allen's husband took their 10-month-old son to a doctor appointment at Children's Hospital of Philadelphia (CHOP). His weight was 21 pounds, 0.9 ounces. Just over a week later, on March 11, 2019, Ms. Allen's husband again took their son for a follow-up appointment at CHOP. The doctor informed the Mr. Allen that their son was "underweight." His weight had dropped to 20 pounds, 0.3 ounces due to Ms. Allen's low milk supply—a direct result of her mistreatment at work.

275.     Ms. McCowan's shift change has had a detrimental impact on her children, who had grown accustomed to their mother being home for dinner and family time. The change has been particularly hard on her 11-year-old son, who now has to get into the house after school and wait there by himself until his older brother gets home from track and football practice. He has never known his mother to be at work at night. Both children have been having trouble sleeping, even when Ms. McCowan's husband, Keith, is home with them; because they worry about their mother traveling home alone at night. Her youngest son calls her at 10:00 pm every night, but his bedtime is 9:00 pm. Also, because Ms. McCowan no longer has weekends off, she is be unable to participate in family activities or attend her children's sporting events.

**W.** **After Plaintiffs filed this lawsuit, Defendants retaliated by significantly changing Plaintiff Allen's job assignment and hours of work and taking adverse action against Plaintiff Allen's husband for accompanying her to her deposition on his day off.**

   *i.*   *Change in Plaintiff Allen's job assignment and hours of work*

276.    On July 29, 2019, at approximately 4:00 pm, Plaintiffs filed their Verified

Complaint in the U.S. District Court for the Eastern District of Pennsylvania thus

initiating this lawsuit.

277.    The same day, Plaintiffs effected service of process upon Defendants.

278.    On July 30, 2019, the morning after Defendants became aware of this lawsuit,

Defendants again changed Plaintiff Allen's job assignment, schedule and hours of work

in retaliation for participating in this case. At approximately 12:15 pm, Ms. Allen was

notified by her supervisor, Lieutenant Joseph Waters, that "effective immediately" Ms.

Allen was reassigned to the PPD's "Police Tow Squad" and her hours of work were

being changed from:

   A.  Ms. Allen's current schedule of steady Monday-Friday daytime work (8:30 am to
       4:30pm) with weekends-off to

   B.  A completely different schedule rotating between daytime and nighttime shifts
       (7:00 am to 3:00 pm, 3:00 pm to 11:00 pm) with rotating days off.

279.    Lieutenant Waters instructed Ms. Allen to report to Tow Squad, which is in a

different geographic location than NSU, "at 6:30 am tomorrow (July 31, 2019)." He

handed her a yellow sticky note with the details of her new assignment:



280.    Lieutenant Waters told Ms. Allen that her reassignment "came from the Safety

Office." Ms. Allen called the PPD's Safety Office and spoke with Molly O'Neil, a

civilian supervisor, who told Ms. Allen that the order to change her assignment and hours

of work "came from the Deputy Commissioner's office." It is unheard of for a Deputy

Commissioner to call the Safety Office in reference to manpower. Upon learning of

Defendants' most recent retaliatory adverse employment action against her, Ms. Allen

was forced to take 4 hours of sick leave and went home for the day.

281.    On August 2, 2019, Ms. Allen's family doctor prescribed Prozac 20 mg to treat

Ms. Allen's increased anxiety and emotional distress related to the negative work events

described above.

ii.    *Retaliatory adverse employment actions against Plaintiff Allen's husband*

282.    At 10:30 am on August 14, 2019, Plaintiffs presented to the office of the City of

Philadelphia Solicitor at 1515 Arch Street, 16th Floor, Philadelphia, PA 19102 for

depositions.

283.     Plaintiff Allen was accompanied by her husband, Officer Edward Allen, who had taken a vacation day (which he had requested and received approval for several days in advance) to support his wife at her deposition.

284.      Edward Allen wore plain clothes (a black polo shirt and gray dress pants) and waited patiently in the lobby with Ms. McCowan while Ms. Allen was sitting for her deposition. Mr. Allen did not have his police radio because he was on vacation.

285.     At 11:05 am, Mr. Allen received a call on his cell phone from Officer Sanchez, the Inspector's Aide, who asked, "Where are you?" Mr. Allen responded, "I am on vacation." Officer Sanchez asked, "Are you sure you're on vacation?" Mr. Allen said "yes," and Officer Sanchez said, "Ok have a good day."

286.     At 11:12 am, Mr. Allen received another phone call from his immediate supervisor, Sergeant Harper (who was the person who approved Mr. Allen's vacation day several days prior), asking "Where are you?" Mr. Allen did not want to speak about this lawsuit, so he told Sergeant Harper he was at a doctor's appointment. Sergeant Harper responded, "Are you sure you are at a doctor's appointment and not at a deposition?" Mr. Allen asked, "How do you know I'm at a deposition?" Sergeant Harper responded, "The Captain of the 22nd District was called, the Lieutenant from the 22nd District was called, and the Inspector of Central Division was called. The Inspector of Central Division contacted me and stated that the Office of Human Resources of Philadelphia contacted Inspector Healy. Inspector Healy's office stated that you are in full uniform with your police radio up loud causing a disturbance at your wife's deposition, and that they had to tell you several times to turn your police radio down. They want to know why you are there and in full uniform."

287.  Mr. Allen stated, "You approved my vacation. You know I'm on vacation. I am not in full uniform. I am in plain clothes. I do not have a police radio and I am not in the deposition. I am in the lobby with Corporal McCowan. I am not here testifying. I am not a witness. I am just here to support my wife." Sergeant Harper responded, "Ok, I was just calling to check on you to make sure none of that was going on because they contacted us." Mr. Allen thanked Sergeant Harper for calling and they hung up the phone.

288.  On August 15, 2019, Mr. Allen spoke with Sergeant Harper about the above incident. Sergeant Harper said, "Everything I told you was relayed to me. The Captain of the 22nd District also asked for an evaluation of your job performance."

289.  Sergeant Harper then read Mr. Allen an email from the Captain of the 22nd District, which stated, "Is this the officer that was at the deposition today without permission to be there?" Sergeant Harper then told Mr. Allen, "I don't know of a police directive that says you needed permission to support your wife at a deposition."

290.  Plaintiffs anticipate Defendants and their agents will continue retaliating against them and their husbands (who are also sworn members of the PPD) for participating in this lawsuit.

## X.  The above are just some examples of the unlawful discrimination and retaliation to which Defendants subjected Plaintiffs and for which Defendants are strictly liable.

291.  Defendants' unlawful conduct directed at Ms. McCowan and Ms. Allen continued and increased in severity after they filed charges of discrimination and retaliation with EEOC on April 10, 2019 and after they filed this lawsuit on July 29, 2019.

292.  Defendants discriminated against Plaintiffs in the terms and conditions of their employment because of Plaintiffs' sex, race and color characteristics. Plaintiffs also make claims of intersectional discrimination. Title VII prohibits discrimination not just because

of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex). For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against White women or African American men. See Jeffries v. Harris County Comty. Action Comm'n, 615 F.2d 1025, 1032-34 (5th Cir. 1980) ("we hold that when a Title VII plaintiff alleges that an employer discriminates against black females, the fact that black males and white females are not subject to discrimination is irrelevant"). Likewise, and by way of further example, Title VII protects Asian American women from discrimination based on stereotypes and assumptions about them "even in the absence of discrimination against Asian American men or White women." Lam v. University of Hawaii, 40 F.3d 1551, 1561-62 (9th Cir. 1994) (holding lower court erred when it treated the claim of an Asian woman in terms of race or sex separately; lower court should have considered whether discrimination occurred because of the plaintiff's combined race and sex). By way of further example, the law also prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute – e.g., race and disability. See Peter Blanck et al., The Emerging Workforce of Entrepreneurs with Disabilities: Preliminary Study of Entrepreneurship in Iowa, 85 Iowa L. Rev. 1583 n.157 (2000) (African American women with disabilities disproportionately disadvantaged in employment opportunities).

293.	Defendants retaliated against Plaintiffs because they reported or otherwise opposed Defendants' illegal conduct.

294.	Defendants subjected Plaintiffs to sexual harassment and a hostile work environment based on sex, race, color and retaliation.

295.     Plaintiffs claim a continuous practice of discrimination and make all claims herein

under the continuing violations doctrine.

296.     Plaintiffs claim unlawful constructive and/or unlawful actual discharge and also

seek reinstatement of their positions, benefits and seniority.

297.     As a direct result of Defendants' unlawful discrimination and retaliation,

Plaintiffs have been forced to seek ongoing medical treatment including mental health

therapy and antidepressant and anti-anxiety medication to treat their emotional distress.

Prior to events complained of in this case, Plaintiffs had no history of inpatient mental

health intervention, psychotropic treatment or any other history of outpatient counseling.

Plaintiffs further claim aggravation, activation and/or exacerbation of any preexisting

condition.

## CAUSES OF ACTION

### COUNT I
### TITLE VII DISPARATE TREATMENT
### 42 U.S.C. § 2000e-2
### Plaintiffs Audra McCowan and Jennifer Allen v. Defendant City of Philadelphia

298.     Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

299.     Title VII provides, in relevant part, that "it shall be an unlawful employment

practice for an employer . . . to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of [her] race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

300.     Title VII further provides that "it shall be an unlawful employment practice for

any employer . . . controlling . . . training or retraining, including on-the-job training

programs to discriminate against any individual because of [her] race, color, religion, sex,

or national origin in admission to, or employment in, any program established to provide . . . training." 42 U.S.C. § 2000e-2(d).

301.      In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which added new language to Title VII's definitions subsection to specify that Title VII's "ter[m] 'because of sex' . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions.; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k); Young v. United Parcel Serv., Inc., 135 S. Ct. 1344-45 (2015) (explaining "that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act.").

302.      Title VII further provides that "un unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

303.      The City engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiffs with respect to their compensation, terms, conditions, training and privileges of employment because of their race, color and sex.

304.      The City subjected Plaintiffs to adverse tangible employment actions—defined as significant changes in Plaintiffs' employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in their employment benefits.

305.     Plaintiffs protected characteristics (race, color and sex) played a determinative factor in the City's decisions.

306.     The City cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by the City for its actions against Plaintiffs are pretextual and can readily be disbelieved.

307.     Alternatively, Plaintiffs' protected status played a motivating part in the City's decisions even if other factors may also have motivated its actions against Plaintiffs.

308.     The City acted with the intent to discriminate.

309.     The City acted upon a continuing course of conduct.

310.     As a result of the City's violations of Title VII, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Jennifer Allen and Audra McCowan, demand judgment against Defendant, City of Philadelphia, and pray for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that the City's conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiffs are entitled.

**TITLE VII HOSTILE WORK ENVIRONMENT**
**42 U.S.C. § 2000e-2**
**Plaintiffs Audra McCowan and Jennifer Allen v. Defendant City of Philadelphia**

311.     Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

312.     Title VII also prohibits hostile work environment harassment, defined as

unwanted comments or conduct regarding the plaintiff's protected characteristics that

have the purpose or effect of unreasonably interfering with the terms and conditions of

the plaintiff's employment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993).

313.     An employer is strictly liable for supervisor harassment that "culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment."

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

314.     Respondeat superior liability for the acts of non-supervisory employees exists

where "the defendant knew or should have known of the harassment and failed to take

prompt remedial action. Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir.

1990).

315.     Employer liability for co-worker harassment also exists where "the employer

failed to provide a reasonable avenue for complaint." Huston v. Procter & Gamble Paper

Prods. Corp., 568 F.3d 100, 105 (3d Cir. 2009).

316.     In sexual harassment cases, examples of conduct warranting a finding of a hostile

work environment include verbal abuse of a sexual nature; graphic verbal commentaries

about an individual's body, sexual prowess, or sexual deficiencies; sexually degrading or

vulgar words to describe an individual; pinching, groping, and fondling; suggestive,

insulting, or obscene comments or gestures; the display in the workplace of sexually

suggestive objects, pictures, posters or cartoons; asking questions about sexual conduct; and unwelcome sexual advances. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ("discriminatory intimidation, ridicule, and insult"); Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (repeated demands for sexual favors, fondling, following plaintiff into women's restroom, and supervisor's exposing himself); Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) (stressing that inquiry "must consider the totality of the circumstances" rather than viewing component parts separately).

317.	Additionally, The Third Circuit recognizes a hybrid cause of action for hostile work environment based on retaliation, holding that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

318.	Here, Defendant's conduct occurred because of Plaintiffs' legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile or abusive.

319.	The sexually harassing conduct directly refers to Plaintiffs' sex traits and the retaliatory harassing conduct refers directly to Plaintiffs' protected activity.

320.	The City delegated to Plaintiffs' supervisors the authority to control the work environment and they abused that authority to create a hostile work environment.

321.	Sexually explicit verbally- and physically-harassing conduct filled the environment of Plaintiffs' work area.

322.     The City knew that the sexually explicit verbally- and physically-harassing conduct filled Plaintiffs' work environment.

323.     Sexually explicit verbally- and physically-harassing conduct occurred daily.

324.     Sexually explicit verbally- and physically-harassing conduct caused Plaintiffs to sustain severe emotional distress resulting in physical illness and serious psychological sequelae.

325.     Plaintiffs subjectively regarded the sexually explicit verbally- and physically-harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

326.     Additionally, Defendants are liable for a retaliatory hostile work environment because Defendants subjected Plaintiffs to "a thousand small cuts" including but not limited to repeated acts of intimidation and continued changes to Plaintiffs' working conditions in the hope that Plaintiffs will decide to leave their employment or drop their claims against Defendants.

327.     The conduct was both severe and pervasive.

328.     The conduct was physically threatening and humiliating.

329.     The conduct unreasonably interfered with Plaintiffs' work performance.

330.     The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiffs' employment.

331.     The City provided a futile avenue for complaint.

332.     The City retaliated against Plaintiffs for their complaints.

333.     The City acted upon a continuing course of conduct.

334.     The hostile work environment that occurred in this case is identical to the hostile

work environment created by the City and the PPD in the <u>Vandegrift</u> case, in which

Judge Kearney stated:

> When a female police [officer] complains about specific sexual
> assaults and harassment creating a hostile work environment
> involving certain officers, the police department must recognize,
> like any employer, its obligation to comprehensively and impartially
> address and evaluate appropriate remedies.
>
> In this case, the female [officer] advised the department of specific
> credible claims of harassment and sexual assaults by identified
> officers in allegedly sexually charged police stations towards her
> and other women officers over many years . . . resulting in an
> internal investigation of her complaints without remedy by instead
> changing the experience female [officer's] conditions of
> employment.

<u>Vandegrift v. City of Philadelphia</u>, 228 F.Supp.3d 464, 469 (2017).

335.     As a result of the City's violations of Title VII, Plaintiffs have suffered damages,

including, but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress,

reputational harm, diminishment of career opportunities, and other harm, both tangible

and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against

Defendant, City of Philadelphia, and pray for the following relief: (1) an award of compensatory

damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and

costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest

and court costs as further allowed by law; (4) an adjudication and declaration that Defendant's

conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable

relief to which Plaintiffs are entitled.

**COUNT III**
**TITLE VII RETALIATION**
**42 U.S.C. § 2000e-3**
**Plaintiffs Audra McCowan and Jennifer Allen v. Defendant City of Philadelphia**

336.    Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

337.    Title VII protects employees from retaliation for attempting to exercise their

rights under the Act:

> 42 U.S.C. § 2000e-3. Other unlawful employment practices
>
> (a) Discrimination for making charges, testifying, assisting, or
> participating in enforcement proceedings. It shall be an unlawful
> employment practice for an employer to discriminate against any of
> his employees . . . because [she] has opposed any practice made an
> unlawful employment practice by this subchapter, or because [she]
> has made a charge, testified, assisted, or participated in any manner
> in an investigation, proceeding, or hearing under this subchapter.

338.    The Supreme Court in <u>Burlington v. N. & S.F. Ry. V. White</u>, 548 U.S. 53, 68

(2006) held that a cause of action for retaliation under Title VII lies whenever the

employer responds to protected activity in such a way that "might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."

339.    Informal complaints and protests can constitute protected activity under the

"opposition" clause of 42 U.S.C. § 2000e-3(a). <u>Moore v. City of Philadelphia</u>, 461 F.3d

331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal

protests of discriminatory employment practices, including making complaints to

management.").

340.    Title VII's anti-retaliation provision also protects employees who speak out about

discrimination by answering questions during an employer's internal investigation.

<u>Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee</u>, 555 U.S.

271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

341.    Retaliation need not be job-related to be actionable under Title VII—an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. White, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

342.    "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[she] was acting under a good faith, reasonable belief that a violation existed.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995); see also Moore, 461 F.3d at 341 (finding that a transfer of a police officer from a district could constitute actionable retaliation because it "is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad.").

343.    An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

344. Title VII not only bars retaliation against the employee who engaged in the protected activity; it also bars retaliation against another employee if the circumstances are such that the retaliation against that employee might well dissuade a reasonable worker from engaging in protected activity. See Thompson v. North American Stainless, LP, 131 S. Ct. 863, 868 (2011).

345. Here, the City discriminated against Plaintiffs because of their protected activity under Title VII.

346. Plaintiffs were acting under a reasonable, good faith belief that their, or someone else's, right to be free from discrimination on the basis of sex, race or color was violated.

347. Plaintiffs were subjected to materially adverse actions at the time or after the protected conduct took place.

348. The City also discriminated against Plaintiffs by taking materially adverse actions against third parties who engaged in protected activity on Plaintiffs' behalf.

349. There was a causal connection between the City's materially adverse actions and Plaintiffs' protected activity.

350. The City's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

351. The City acted upon a continuing course of conduct.

352. Plaintiffs will rely on a broad array of evidence to demonstrate a causal link between their protected activity and the City's actions taken against them, such as the unusually-suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiffs after Defendants became aware of Plaintiffs' protected activity.

353.     As a result of the City's violations of Title VII, Plaintiffs have suffered damages,

including, but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress,

reputational harm, diminishment of career opportunities, and other harm, both tangible

and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against

Defendant, City of Philadelphia, and pray for the following relief: (1) an award of compensatory

damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and

costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest

and court costs as further allowed by law; (4) an adjudication and declaration that Defendant's

conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable

relief to which Plaintiffs are entitled.

## COUNT IV
## VIOLATIONS OF FLSA PROTECTIONS FOR NURSING MOTHERS
### 29 U.S.C. § 207(r)
### Plaintiff Jennifer Allen v. All Defendants

354.     Plaintiff incorporates by reference each and every allegation made in the above

paragraphs of this complaint.

355.     Section 4207 of the Patient Protection and Affordable Care Act ("ACA"), which

amended Section 7 of the FLSA, 29 U.S.C. § 207, requires employers to provide

"reasonable break time for an employee to express breast milk for her nursing child for 1

year after the child's birth each time such employee has need to express the milk." 29

U.S.C. § 207(r)(1)(A).

356.     The law further requires employers to provide "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." 29 U.S.C. § 207(r)(1)(B).

357.     The FLSA and the "Break Time for Nursing Mothers" provision cover all public agency employees of a State, a political subdivision of a State, or an interstate government agency. 29 U.S.C. § 203(s)(1)(C).

358.     The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee, including individual supervisors and management officials. 29 U.S.C. § 203(d).

359.     Defendants violated Ms. Allen's rights under the FLSA by (1) failing to provide reasonable break time for Ms. Allen to "express breast milk for her nursing child for 1 year after the child's birth each time she had a need to express the milk"; and (2) failing to provide Ms. Allen "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used to express breast milk."

360.     As a result of Defendants' violations of the FLSA, Ms. Allen has suffered damages, including, but not limited to: loss of employment, diminishment of career opportunities, past and future lost wages, reputational harm, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff, Jennifer Allen, demands judgment against all Defendants and prays for the following relief in accordance with the FLSA and as further allowed by law: (1) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the

FLSA; (2) equitable and injunctive relief; (3) reinstatement of fringe benefits and seniority; (4) promotion; (5) compensatory damages; (6) reasonable attorneys' fees; (7) litigation costs; (8) pre- and post-judgment interest; (9) liquidated damages; (10) punitive damages; (11) employment in accordance with the FLSA; and (12) all additional general and equitable relief to which Plaintiff is entitled.

### COUNT V
### FLSA RETALIATION
### 29 U.S.C. § 215
### Plaintiff Jennifer Allen v. All Defendants

361.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

362.    The FLSA prohibits retaliation by employers against employees for asserting their rights under the Act. 29 U.S.C. § 215(a)(3).

363.    Defendants violated the FLSA's anti-relation provision when they took materially adverse employment actions against Ms. Allen for asserting her rights under the Break Time for Nursing Mothers law.

364.    As a result of Defendants' violations of the FLSA, Ms. Allen has suffered damages, including, but not limited to: loss of employment, diminishment of career opportunities, past and future lost wages, reputational harm, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff, Jennifer Allen, demands judgment against all Defendants and prays for the following relief in accordance with the FLSA and as further allowed by law: (1) an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the FLSA; (2) equitable and injunctive relief; (3) reinstatement of fringe benefits and seniority; (4)

promotion; (5) compensatory damages; (6) reasonable attorneys' fees; (7) litigation costs; (8) pre- and post-judgment interest; (9) liquidated damages; (10) punitive damages; (11) employment in accordance with the FLSA; and (12) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT VI
## FMLA INTERFERENCE
### 29 U.S.C. § 2615(a)(1)
### Plaintiffs Audra McCowan and Jennifer Allen v. Defendant City of Philadelphia

365.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

366.    The FMLA provides eligible employees of covered employers with up to 12 workweeks of unpaid, job protected leave in a 12-month period for, specified health and caregiving reasons, including a serious health condition that makes the employee unable to perform the essential functions of her job, as well as pregnancy and caring for a new child. 29 U.S.C. §§ 2601 et seq.

367.    A covered employer must provide FMLA benefits and protections to eligible employees and comply with their responsibilities under the FMLA and its regulations at 29 C.F.R. part 825.

368.    At all relevant times, Plaintiffs were eligible employees of a covered employer with a qualifying medical condition and/or caregiving reason entitling them to the protections of the FMLA.

369.    The City violated the FMLA by interfering with, restraining and/or denying Plaintiffs' rights under the FMLA by, *inter alia*:

   a. Failing to comply with the general notice requirements under the FMLA;

   b. Failing to comply with the eligibility notice requirements under the FMLA;

c. Failing to comply with the rights and responsibilities notice requirements under the FMLA;

d. Failing to comply with the designation notice requirements under the FMLA;

e. Failing to provide notice of a fitness-for-duty certification with the designation notice as required by the FMLA;

f. Failing to continue to contribute to Plaintiffs' health benefits while they were placed on involuntary medical leave;

g. Discharging and/or constructively discharging, suspending and/or disciplining Plaintiffs notwithstanding that Plaintiffs were fit to perform their duties and return to work at the end of their FMLA leave;

h. Retaliating against Plaintiffs for asking for attempting to exercise their rights under the FMLA;

i. Failing to provide Plaintiffs with the proper FMLA forms and/or medical certifications;

j. Failing to supervise and/or train its employees and supervisors on compliance with the provisions of the FMLA;

k. Failing to have in place proper FMLA policies, procedures and compliance; and/or

l. Otherwise violating the FMLA.

370. The City's violations of the FMLA were grossly negligent and/or willful.

371. As a direct and proximate cause of the City's willful violations of the FMLA, the City is liable for Plaintiffs' compensation and benefits lost by reason of the above violations, for other actual monetary losses sustained as a direct result of the City's violations, and for appropriate equitable or other relief tailored to the harm suffered by Plaintiffs. See 29 CFR 825.300 (e).

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against the City and pray for the following relief: (1) an award of compensatory damages in an amount

consistent with the FMLA; (2) an award of reasonable attorneys' fees and costs of this action in accordance with the FMLA; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an award of liquidated damages in accordance with the FMLA; (5) an adjudication and declaration that the City's conduct as set forth herein is in violation of the FMLA; and (6) all additional general and equitable relief to which Plaintiffs are entitled.

**COUNT VII**
**FMLA RETALIATION**
**29 U.S.C. § 2615(a)(2)**
**Plaintiffs Audra McCowan and Jennifer Allen v. Defendant City of Philadelphia**

372.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

373.    The FMLA protects employees from retaliation.

374.    The City violated the FMLA by retaliating and discriminating against Plaintiffs for exercising their rights under the FMLA by, *inter alia*:

    a.    Failing to continue to contribute to Plaintiffs' health benefits while they were placed on involuntary medical leave;

    b.    Discharging and/or constructively discharging, suspending and/or disciplining Plaintiffs notwithstanding that Plaintiffs were fit to perform their duties and return to work at the end of their FMLA leave;

    c.    Retaliating against Plaintiffs for attempting to exercise their rights under the FMLA;

    d.    Failing to supervise and/or train its employees and supervisors on compliance with the provisions of the FMLA;

    e.    Failing to have in place proper FMLA policies, procedures and compliance; and,

    f.    Otherwise violating the FMLA.

375.    The City's violations of the FMLA were grossly negligent and/or willful.

376. As a direct and proximate cause of the City's willful violations of the FMLA, the City is liable for Plaintiffs' compensation and benefits lost by reason of the violations, for other actual monetary losses sustained as a direct result of their violation, and for appropriate equitable or other relief tailored to the harm suffered by Plaintiffs. See 29 CFR 825.300 (e).

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against the City and pray for the following relief: (1) an award of compensatory damages in an amount consistent with the FMLA; (2) an award of reasonable attorneys' fees and costs of this action in accordance with the FMLA; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an award of liquidated damages in accordance with the FMLA; (5) an adjudication and declaration that the City's conduct as set forth herein is in violation of the FMLA; and (6) all additional general and equitable relief to which Plaintiffs are entitled.

**COUNT VIII**
**SECTION 1981 DISPARATE TREATMENT**
**42 U.S.C. § 1981**
**Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants**

377. Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

378. Section 1981 prohibits race discrimination in the making and enforcing of contracts. 42 U.S.C. § 1981.

379. The Third Circuit has stated that "a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII of the Civil Rights Act and 42 U.S.C. § 1981." Clark v. Twp. of Falls, 890 F.2d 611, 618-19 (3d Cir. 1989).

380. The Third Circuit has treated Section 1981 claims and Title VII claims interchangeably with respect to adverse employment actions. See, e.g., Barnees v.

Nationwide Mut. Ins. Co., 598 Fed. Appx. 86, 90 (3d Cir. 2015); Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (a Title VII case); Thompson v. City of Waco, 764 F.3d 500, 503 (5th Cir. 2014) (a Section 1981 case).

381.     Under Section 1981, both employers and individual employees can be liable for discrimination in employment. See Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001) ("Although claims against individual supervisors are not permitted under Title VII, this court has found individual liability under § 1981 when [the defendants] intentionally cause an infringement of rights protected by Section 1981,  regardless of whether the [employer] may also be held liable."); Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986) ("employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable").

382.     Defendants violated Section 1981 by intentionally discriminating against Plaintiffs in a serious tangible way with respect to their compensation, terms, conditions or privileges of employment.

383.     Plaintiffs' race characteristics were a determinative or motivating factor in Defendants' employment actions.

384.     Defendants cannot show any legitimate nondiscriminatory reason for their employment practices and any reasons proffered by the Defendants for their actions against Plaintiffs are pretextual and can readily be disbelieved.

385.     Plaintiffs' protected status played a motivating part in the Defendants' decisions even if other factors may also have motivated Defendants' actions against Plaintiffs.

386.     Defendants acted with the intent to discriminate.

387. Defendants acted upon a continuing course of conduct.

388. Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights and as a result there should be an award of punitive damages against Defendants.

389. As a result of Defendant's violations of Section 1981, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages in an amount consistent with Section 1981; (3) reasonable attorneys' fees in accordance with Section 1981; (4) litigation costs in accordance with Section 1981; (5) pre- and post-judgment interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Section 1981; (7) punitive damages in accordance with Section 1981; (8) front pay in accordance with Section 1981 (9) all additional general and equitable relief to which Plaintiffs are entitled.

## COUNT IX
### SECTION 1981 HOSTILE WORK ENVIRONMENT
### 42 U.S.C. § 1981
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

390. Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

391. The standards for a hostile work environment claim are identical under Title VII and Section 1981. See, e.g., Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 95 (3d Cir.

2005) ("Regarding [plaintiff's] hostile work environment claim, the same standard used under Title VII applies under Section 1981."); <u>Ocasio v. Lehigh Valley Family Health Center</u>, 92 Fed.Appx. 876, 879-80 (3d Cir. 2004) ("As amended by the 1991 Civil Rights Act, § 1981 now encompasses hostile work environment claims, and we apply the same standards as in a similar Title VII claim.").

392. While the standards of liability are identical under Title VII and Section 1981, there is a major difference in the coverage of the two provisions: under Title VII, only employers can be liable for discrimination in employment, but under Section 1981, individuals, including other employees, can be liable for racial discrimination against an employee. <u>See</u> <u>Cardenas</u>, 269 F.3d at 268; <u>Al-Khazarji</u>, 784 F.2d at 518.

393. Defendants subjected Plaintiffs to harassment motivated by Plaintiffs' race characteristics.

394. Defendants' conduct was not welcomed by Plaintiffs.

395. Defendants' conduct was so severe or pervasive that a reasonable person in Plaintiffs' positions would find the work environment to be hostile or abusive.

396. Plaintiffs believed their work environment was hostile or abusive as a result of Defendants' conduct.

397. As a result of the hostile work environment, Plaintiffs suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

398. Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace

on the basis of race, failing to fully communicate the policy to its employees, failing to

provide a reasonable way for Plaintiffs to make a claim of harassment to higher

management, and failing to take reasonable steps to promptly correct the harassing

behavior raised by Plaintiffs.

399.     Defendants acted upon a continuing course of conduct.

400.     As a result of Defendants' violations of Section 1981, Plaintiffs have suffered

damages, including, but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress,

reputational harm, diminishment of career opportunities, and other harm, both tangible

and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against

all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages

in an amount consistent with Section 1981; (3) reasonable attorneys' fees in accordance with

Section 1981; (4) litigation costs in accordance with Section 1981; (5) pre- and post-judgment

interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct

as set forth herein is in violation of Section 1981; (7) punitive damages in accordance with

Section 1981; (8) front pay in accordance with Section 1981 (9) all additional general and

equitable relief to which Plaintiffs are entitled.

## COUNT X
### SECTION 1981 RETALIATION
### 42 U.S.C. § 1981
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

401.     Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

402.     The Supreme Court has held that retaliation claims are cognizable under Section

1981 despite the absence of specific statutory language. CBOCS West, Inc. v.

Humphries, 553 U.S. 442 (2008).

403.     The Third Circuit has indicated that the legal standards for a retaliation claim

under Section 1981 are generally the same as those applicable to a Title VII retaliation

claim. See, e.g., Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) ("[T]o establish a

prima facie retaliation claim under Title VII [or] § 1981 … , [a plaintiff] must show: (1)

that he engaged in a protected activity; (2) that he suffered an adverse employment

action; and (3) that there was a causal connection between the protected activity and the

adverse employment action"); Khair v. Campbell Soup Co., 893 F. Supp. 316, 335-36

(D.N.J. 1995) (noting that with respect to retaliation claims, "The Civil Rights Act of

1991 extended § 1981 to the reaches of Title VII.").

404.     The most common activities protected from retaliation under Section 1981 and

Title VII are: (1) opposing unlawful discrimination; (2) making a charge of employment

discrimination; (3) testifying, assisting or participating in any manner in an investigation,

proceeding or hearing under Section 1981. See Robinson v. City of Pittsburgh, 120 F.3d

1286, 1299 (3d Cir. 1997) (filing discrimination complaint constitutes protected activity),

overruled on other grounds by Burlington N. & S.F. Ry. Co. v. White, 126 S. Ct. 2405

(2006); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)

(advocating equal treatment was protected activity); Aman v. Cort Furniture, 85 F.3d

1074, 1085 (3d Cir. 1989) (under Title VII's anti-retaliation provision "a plaintiff need

not prove the merits of the underlying discrimination complaint, but only that 'he was

acting under a good faith, reasonable belief that a violation existed'"); Griffiths v.

CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir. 1995).

405.     Section 1981 applies against employers acting under color of State law. See 42 U.S.C. § 1981(c); see also Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987) (noting that "the Court has construed [Section 1981] to forbid all 'racial' discrimination in the making of private as well as public contracts").

406.     Here, Defendants discriminated against Plaintiffs because of their protected activity under Section 1981.

407.     Plaintiffs were acting under a reasonable, good faith belief that Plaintiffs', or someone else's, right to be free from discrimination on the basis of race was violated.

408.     Plaintiffs were subjected to a materially adverse action at the time, or after the protected conduct took place.

409.     Defendants also discriminated against Plaintiffs by taking materially adverse actions against third parties who engaged in protected activity on Plaintiffs' behalf.

410.     There was a causal connection between Defendants' materially adverse actions and Plaintiffs' protected activity.

411.     Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

412.     Defendants acted upon a continuing course of conduct.

413.     Plaintiffs will rely on a broad array of evidence to demonstrate a causal link between their protected activity and Defendants' actions taken against them, such as the unusually-suggestive proximity in time between events, as well as Defendants'

antagonism and change in demeanor toward Plaintiffs after Defendants became aware of their protected activity.

414.    As a result of Defendants' violations of Section 1981, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages in an amount consistent with Section 1981; (3) reasonable attorneys' fees in accordance with Section 1981; (4) litigation costs in accordance with Section 1981; (5) pre- and post-judgment interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Section 1981; (7) punitive damages in accordance with Section 1981; (8) front pay in accordance with Section 1981; and (9) all additional general and equitable relief to which Plaintiffs are entitled.

### COUNT XI
### DISPARATE TREATMENT IN VIOLATION OF EQUAL PROTECTION CLAUSE
### 42 U.S.C. § 1983
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

415.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

416.    The Fourteenth Amendment to the United States Constitution protects persons from being subjected to discrimination, by persons acting under color of state law, on the basis of a protected class (e.g., sex, race, or color). U.S. Const. amend. XIV.

417.    Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

418.    Section 1983 provides a cause of action for unconstitutional employment discrimination by both employers and individuals, so long as the plaintiff shows that the defendant acted under color of state law. See Fitzgerald v. Barnstable School Committee, 129 S. Ct. 788, 796 (2009) ("The Equal Protection Clause reaches only state actors, but § 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities."); see also Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) ("Liciardello and Doyle objectively should have known the applicable legal standard, and thus are not protected by qualified immunity in treating, or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment.").

419.    "[M]unicipalities and other local government units [are] included among those persons to whom § 1983 applies." Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

420.     Defendants violated Section 1983 by intentionally discriminating against Plaintiffs in a serious tangible way with respect to their compensation, terms, conditions or privileges of employment.

421.     Plaintiffs' protected characteristics (sex, race, color and protected activity) were a determinative or motivating factor in Defendants' employment actions.

422.     Defendants cannot show any legitimate nondiscriminatory reason for their employment practices and any reasons proffered by the Defendants for their actions against Plaintiffs are pretextual and can readily be disbelieved.

423.     Plaintiffs' protected status played a motivating part in the Defendants' decisions even if other factors may also have motivated Defendants' actions against Plaintiffs.

424.     Defendants acted under color of state law.

425.     Defendants acted with the intent to discriminate.

426.     Defendants acted upon a continuing course of conduct.

427.     Moreover, this case unquestionably involves official policy: the City, the PPD, and their policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

428.     Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights and as a result there should be an award of punitive damages against Defendants.

429.     As a result of Defendants' violations of Plaintiffs' Equal Protection rights,

Plaintiffs have suffered damages, including, but not limited to: past and future lost wages,

pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation,

emotional distress, reputational harm, diminishment of career opportunities, and other

harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against

all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages

in an amount consistent with Section 1983; (3) reasonable attorneys' fees in accordance with

Section 1983; (4) litigation costs in accordance with Section 1983; (5) pre- and post-judgment

interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct

as set forth herein is in violation of Section 1983; (7) punitive damages in accordance with

Section 1983; (8) front pay in accordance with Section 1983; and (9) all additional general and

equitable relief to which Plaintiffs are entitled.

## COUNT XII
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF EQUAL PROTECTION CLAUSE
### 42 U.S.C. § 1983
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

430.     Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

431.     The Third Circuit has made it clear that sexual harassment can give rise to an

equal protection claim. See, e.g., Andrews v. City of Philadelphia, 895 F.2d 1469, 1478-

79 (3d Cir. 1990) (upholding verdict for plaintiff on sexual harassment claims against city

employees, based on conclusion that evidence supported finding of purposeful

discrimination); see also Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1185 (7th

Cir. 1986) ("Sexual harassment of female employees by a state employer constitutes sex

discrimination for purposes of the equal protection clause of the fourteenth
amendment."); Cheryl L. Anderson, "Nothing Personal:" Individual Liability under 42
U.S.C. § 1983 for Sexual Harassment as an Equal Protection Claim, 19 BERKELEY J.
EMP. & LAB. L. 60, 80 (1998) (citing Meritor Savings Bank v. Vinson, 477 U.S. 57
(1986) as support for argument that sex harassment can satisfy the intentional
discrimination requirement for equal protection claims).

432.     The Third Circuit has also made clear that a sexual harassment equal protection
claim can be made even if the defendant is not the plaintiff's supervisor. See
Bonenberger v. Plymouth Twp., 132 F.3d 20, 24 (3d Cir. 1997).

433.     Additionally, a plaintiff can show an equal protection violation by a supervisor
who fails properly to address harassment by the plaintiff's co-workers. Andrews, 895
F.2d at 1479.

434.     A municipal employer can be liable on the theory that it directly encouraged
harassment of the plaintiff, or on the theory that it did not do enough to prevent the
harassment. See Bohen, 799 F.2d at 1187 ("[A] plaintiff can make an ultimate showing of
sex discrimination either by showing that sexual harassment that is attributable to the
employer under § 1983 amounted to intentional sex discrimination or by showing that the
conscious failure of the employer to protect the plaintiff from the abusive conditions
created by fellow employees amounted to intentional discrimination."); cf. Reynolds v.
Borough of Avalon, 799 F. Supp. 442, 447 (D.N.J. 1992) (holding that "a reasonable jury
might find that the risk of sexual harassment in the workplace is so obvious that an
employer's failure to take action to prevent or stop it from occurring--even in the absence

of actual knowledge of its occurrence--constitutes deliberate indifference, where the employer has also failed to take any steps to encourage the reporting of such incidents").

435. Defendants violated Section 1983 by subjecting Plaintiffs to sexual harassment.

436. Defendants' conduct was not welcomed by Plaintiffs.

437. Defendants' conduct was so severe or pervasive that a reasonable person in Plaintiffs' position would find the work environment to be hostile or abusive.

438. Plaintiffs believed their work environment was hostile or abusive as a result of Defendants' conduct.

439. As a result of the hostile work environment, Plaintiffs suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

440. Defendants failed to exercise reasonable care to prevent sexual harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of sex, failing to fully communicate the policy to their employees, failing to provide a reasonable way for Plaintiffs to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiffs.

441. Defendants acted under color of state law.

442. Defendants acted with the intent to discriminate.

443. Defendants acted upon a continuing course of conduct.

444. Moreover, this case unquestionably involves official policy: the City, the PPD, and their policymaking officials (1) directed that the violations occur; (2) authorized the

violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

445.     Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights and as a result there should be an award of punitive damages against Defendants.

446.     As a result of Defendant's violations of Plaintiffs' Equal Protection rights, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages in an amount consistent with Section 1983; (3) reasonable attorneys' fees in accordance with Section 1983; (4) litigation costs in accordance with Section 1983; (5) pre- and post-judgment interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Section 1983; (7) punitive damages in accordance with Section 1983; (8) front pay in accordance with Section 1983; and (9) all additional general and equitable relief to which Plaintiffs are entitled.

## COUNT XIII
### RETALIATION IN VIOLATION OF PETITION CLAUSE
### 42 U.S.C. § 1983
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

447.     Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

448. The First Amendment gives persons the right to petition the Government for a redress of grievances. U.S. Const. amend. I.

449. "[R]etaliation by a government employer for a public employee's exercise of the right of access to the courts may implicate the protections of the Petition Clause." Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2494 (2011); see also Mack v. Warden Loretto FCI, 839 F.3d 286 (3d Cir. 2016) (holding that an inmate's oral grievance is protected under the Petition Clause).

450. To be protected under the First Amendment, speech by a government employee "must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Waters v. Churchill, 511 U.S. 661, 668 (1994).

451. A report of sexual harassment by a government official can constitute speech on a matter of public concern. See Azzaro v. County of Allegheny, 110 F.3d 968, 975 (3d Cir. 1997) (reasoning that the plaintiff's reports "brought to light actual wrongdoing on the part of one exercising public authority.").

452. The plaintiff must show a "causal link" between the protected speech and the adverse employment action. See Azzaro, 110 F.3d at 981 (reversing summary judgment dismissing First Amendment retaliation claim because there existed "a material dispute of fact as to whether [plaintiff's] reports were a motivating factor in the discharge decision").

453. If the plaintiff shows that the decisionmaker was aware of the protected conduct, then the plaintiff may use the temporal proximity between that knowledge and the

adverse employment action to argue causation. <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003).

454.　　Here, Plaintiffs engaged in activity that was protected by the First Amendment's Petition Clause.

455.　　Plaintiffs' speech was on a matter of public concern.

456.　　Defendants took materially adverse employment actions against Plaintiffs for engaging in protected activity.

457.　　Plaintiffs' protected activity was a substantial or motivating factor in Defendants' decisions.

458.　　Defendants cannot show any legitimate nondiscriminatory reason for its employment practices and any reasons proffered by Defendants for their actions against Plaintiffs are pretextual and can readily be disbelieved.

459.　　Defendants acted upon a continuing course of conduct.

460.　　Moreover, this case unquestionably involves official policy: the City, the PPD, and their policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

461.　　Defendants acted with malice or reckless indifference to Plaintiffs' federally protected rights and as a result there should be an award of punitive damages against Defendants.

462.　　As a result of Defendants' violations of Plaintiffs' Free Speech rights, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the First Amendment; (7) punitive damages; (8) front pay; and (9) all additional general and equitable relief to which Plaintiffs are entitled.

## COUNT XIV
### PENNSYLVANIA WHISTLEBLOWER RETALIATION
### 43 P.S. § 1423
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

463.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

464.    The PWL provides, " No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).n

465.    "Wrongdoing includes not only violations of statutes or regulations that are of the type that the employer is charged to enforce, but violations of any federal or state statute

or regulation." <u>Golaschevsky v. Dep't of Envtl. Protection</u>, 554 Pa. 157, 162 (1998) <u>citing</u> 43 P.S. § 1422.

466.     In order to make out a retaliation case under the PWL, a plaintiff must plead: (1) wrongdoing and (2) a causal connection between the report of wrongdoing and adverse employment action. <u>McAndrew v. Bucks County Bd. Of Com'rs</u>, 982 F. Supp. 2d 491, 503 (E.D. Pa. 2013).

467.     In analyzing whether the motive for an adverse employment action is retaliatory, courts in the Third Circuit have looked at two factors: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." <u>Hussein v. UPMC Mercy Hosp.</u>, 466 Fed.Appx. 108, 112 (3d Cir.2012).

468.     As a result of Defendants' violations of the PWL, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the PWL; (7) reinstatement; (8) front pay; and (9) all additional general and equitable relief to which Plaintiffs are entitled.

## COUNT XV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

469.     Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

470.     Plaintiffs bring claims against all Defendants for IIED and hold each vicariously

liable for the acts of the others.

471.     To prove a claim of IIED, the following elements must be established: (1) the

conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it

must cause emotional distress; and (4) that distress must be severe. Hooten v. Penna.

College of Optometry, 601 F.Supp. 1155 (E.D.Pa.1984); Hoy v. Angelone, 691 A.2d 476,

482 (Pa.Super. 1997); Restatement (Second) of Torts § 46.

472.     During Plaintiffs' employment, Defendants intentionally and recklessly harassed

and inflicted emotional injury on Plaintiffs by subjecting them to outrageous treatment

beyond all bounds of decency.

473.     Defendants verbally, mentally and physically abused Plaintiffs and treated them

in a demeaning and inferior manner, which no reasonable person could be expected to

endure.

474.     As a direct and proximate result of Defendants' malicious and conscious wrongful

actions, Plaintiffs have sustained severe emotional distress resulting in bodily injury and

damages supported by medical evidence.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against

all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages;

(3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an

adjudication and declaration that Defendants' conduct as set forth herein is in violation of the law; (7) punitive damages; (8) and all additional general and equitable relief to which Plaintiffs are entitled.

## COUNT XVI
## ASSAULT AND BATTERY
### Plaintiffs Audra McCowan and Jennifer Allen v. Defendant Younger

475.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

476.    Under Pennsylvania law, battery is defined as an intentional harmful or offensive contact with the person of another. Nace v. Pennridge Sch. Dist., 185 F.Supp.3d 564, 584 (E.D. Pa. 2016) (quoting C.C.H. v. Philadelphia Phillies, Inc., 596 Pa. 23 (2008)). The fact that contact occurs without consent is sufficient to establish that it is offensive, and no intent to harm the plaintiff need be established. Id. (quoting Cooper ex rel. Cooper v. Lankenau Hosp., 616 Pa. 550 (2012)).

477.    Under Pennsylvania law, assault is defined as an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery. Regan v. Upper Darby Twp., 363 Fed.Appx. 917, 921 (3d Cir. 2010) (quoting Cucinotti v. Ortmann, 399 Pa. 26 (1960)). In other words, battery is an offensive touching without consent, and assault is an action that makes a victim believe that a battery is about to occur. Martin-McFarlane v. City of Philadelphia, 299 F.Supp.3d 658, 670–71 (E.D. Pa. 2017).

478.    Here, Defendant Younger acted intending to cause harmful or offensive contact with Ms. McCowan and Ms. Allen, or to cause Plaintiffs' imminent apprehension of such contact, and Plaintiffs were thereby put in such imminent apprehension. Further,

Defendant Younger's assaults concluded with actual, nonconsensual bodily contact with Ms. McCowan and Ms. Allen.

479.    As a direct and proximate result of Defendant Younger's malicious and conscious wrongful actions, Plaintiffs sustained humiliation as well as severe mental and emotional distress from the indignity to which they were subjected, which resulted in bodily injury and damages, including punitive damages, to be determined at trial.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, demand judgment against Defendant Younger and pray for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the law; (7) punitive damages; (8) and all additional general and equitable relief to which Plaintiffs are entitled.

## <u>COUNT XVII</u>
## <u>DECLARATORY RELIEF ALLEGATIONS</u>
### <u>Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants</u>

480.    Plaintiffs incorporate by reference each and every allegation made in the above paragraphs of this complaint.

481.    A present and actual controversy exists between Plaintiffs and Defendants concerning their rights and respective duties.

482.    Plaintiffs contend Defendants violated their rights as complained of herein.

483.    Plaintiffs are informed and believe that Defendants deny these allegations.

484.    Declaratory relief is therefore necessary and appropriate.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, seek a judicial declaration of the rights and duties of the respective parties.

## COUNT XVIII
## INJUNCTIVE RELIEF ALLEGATIONS
### Plaintiffs Audra McCowan and Jennifer Allen v. All Defendants

485.    Plaintiffs incorporate by reference each and every allegation made in the above

paragraphs of this complaint.

486.    No plain, adequate, or complete remedy at law is available to Plaintiffs to redress

the wrongs addressed herein.

487.    If this Court does not grant the injunctive relief sought, Plaintiffs will be

irreparably harmed.

**WHEREFORE**, Plaintiffs, Audra McCowan and Jennifer Allen, seek an order enjoining

Defendants from engaging in the unlawful acts complained of herein.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury on all issues raised by this complaint.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

By: _____

IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiffs,*
*Audra McCowan and Jennifer Allen*

Dated: 8/16/2019

## **VERIFICATION**

Under penalty of perjury under the laws of the United States of America and the Commonwealth of Pennsylvania, I declare that I have read the foregoing Complaint, and that the facts alleged therein are true and correct to the best of my knowledge and belief. I understand that a false statement in this Verification will subject me to penalties of perjury.

Jennifer Allen

Dated: __08/16/2019__

## **VERIFICATION**

Under penalty of perjury under the laws of the United States of America and the

Commonwealth of Pennsylvania, I declare that I have read the foregoing Complaint, and that the

facts alleged therein are true and correct to the best of my knowledge and belief. I understand

that a false statement in this Verification will subject me to penalties of perjury.

_____
Audra McCowan

Dated:_ 08/16/2019 _