**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AUDRA MCCOWAN, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-3326-KSM** |
| **CITY OF PHILADELPHIA, et al.**, | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                          **January 11, 2021**

Plaintiffs Audra McCowan and Jennifer Allen have filed a 24-count complaint against the City of Philadelphia and eleven individually named defendants in their official and individual capacities, bringing claims of discrimination, retaliation, hostile work environment, intentional infliction of emotional distress ("IIED"), assault and battery, violations of Pennsylvania's Whistleblower Law, and violations of the Family and Medical Leave Act ("FMLA") related to their employment with the Philadelphia Police Department. (*See generally* Doc. No. 49.) Allen also alleges violations of the Fair Labor Standards Act's ("FLSA") protections for nursing mothers and FLSA retaliation by the City and ten of the individual defendants. (*Id.*) Defendants filed three motions to dismiss. (Doc. Nos. 53–55.) For the reasons discussed below, we will grant the motions in part and deny them in part.

## I.     *Factual Background*

Plaintiffs allege that beginning in October 2018, they were subject to gender discrimination and retaliation in their work assignments at the Department and forced to tolerate unwanted sexual comments and touching from one of the male officers in their unit. Allen also

separately alleges that she and another female officer were repeatedly denied a private lactation room.  Taking the lengthy allegations in Plaintiffs' second amended complaint (Doc. No. 49) as true, the relevant facts are as follows.

### A.   Allen and McCowan Transfer to the Delaware Valley Intelligence Center ("DVIC")

#### 1.   Allen Begins Working at the DVIC in November 2018

Jennifer Allen is a Black Hispanic female.  (Doc. No. 49 at ¶ 39.)  She entered the Philadelphia Police Academy in March 2004 and graduated with the rank of officer in October of that year.  (*Id.*)  After graduation, Allen was stationed at the 12th District until December 2010 when the City transferred her to the Department's Juvenile Enforcement Team ("JET"), a small tactical unit that conducts warrant service and probation searches on high-risk, gang-associated, and violent juveniles on probation.  (*Id.*)  Allen remained with JET until the spring of 2018, when she left the unit on maternity leave.  (*Id.* at ¶ 47.)

Before leaving, Allen requested a transfer from her assignment with JET to the Analysis and Investigations ("A&I") unit of the DVIC.  (*Id.*)  The transfer would allow her to go from a rotating day and night shift position to a purely daytime position.  (*Id.*)  On October 12, 2018, ten days before Allen was scheduled to return from leave, the commander of the DVIC, Defendant Chief Inspector Daniel MacDonald, had his aide tell Allen that her transfer request had been granted.  (*Id.* at ¶ 48.)  However, the day before Allen was scheduled to return to work, a supervisor in A&I — Defendant Sergeant Eric Williford — told Allen that she could not transfer to the unit without special training and instructed her to continue reporting to JET.  (*Id.* at ¶ 49.)

Allen reported solely to JET from October 22 to November 15, 2018, when she was allowed to alternate between her JET position and a position with A&I.  (*Id.* at ¶ 50.)  As soon as she began working at A&I, Allen asked for training opportunities in the unit.  (*Id.* at ¶¶ 51–52.)

In response to her inquiries, Sergeant Williford responded that he was "working on it" and that he would send her the information.  (*Id.*)  However, in December 2018, Williford admitted that Defendant Inspector Michael McCarrick, a commander in the DVIC, did not want Allen to have a full-time A&I position.  (*Id.*)  A coworker later overheard Williford saying that Allen "is never going to be an analyst" at A&I.  (*Id.* at ¶ 53.)

### 2.    *McCowan Begins Working at DVIC in November 2018*

Audra McCowan is a Black female.  (*Id.* at ¶ 36.)  She also entered the Philadelphia Police Academy in March 2004, and over the next 14 years, served as an officer with the Philadelphia Police Department.  (*Id.* at ¶ 37.)  In that time, she worked at the 23rd District, with the Police Board of Inquiry, as an instructor at the Academy, and at the Internal Affairs Bureau. (*Id.*)

On November 30, 2018, McCowan was promoted to corporal and transferred to the High Intensity Drug Trafficking Area ("HIDTA") unit in the DVIC.  (*Id.* at ¶ 54.)  When she arrived at the unit, she was not assigned a workstation, trained, or given any work to do.  (*Id.* at ¶¶ 55, 57.) And a few days into the assignment, Chief Inspector MacDonald told McCowan that her transfer to HIDTA "was a mistake" and that she would be moved so that the Department could give the position to Corporal Neal Wilson, an allegedly less-qualified male coworker.  (*Id.* at ¶ 56.)  Chief Inspector MacDonald warned McCowan that if she "fought the HIDTA issue, [she'd] be labeled a troublemaker."  (*Id.*)

### 3.    *McCowan and Allen Speak to Sergeant Williford About Their Assignments*

After their first few weeks at the DVIC, Allen and McCowan spoke with their friend, Officer Tonetta Dawson — the Chief Inspector's aide — about the troubles they had experienced in the DVIC and how they believed that they were being denied work opportunities based on

their gender and race.  (*Id.* at ¶ 58.)  Officer Dawson agreed with Plaintiffs that the difference in treatment was "race-related and also [them] being women."  (*Id.*)

Not long after this conversation, Sergeant Williford met with Plaintiffs.  (*Id.* at ¶ 59.)  He told them that he did not want them "to think I'm not helping you" and that Officer Dawson had "yell[ed] at [him] about white bosses (Inspector McCarrick and Chief Inspector MacDonald) looking out for their own."  (*Id.*)  Sergeant Williford confirmed that Plaintiffs' male and white female counterparts would have received training and job assignments in the DVIC by now. (*Id.*)  Sergeant Williford told Allen that starting "Monday, December 10th, you'll begin training without having to rotate between two units."  (*Id.*)  That training never occurred.  He also promised McCowan that he would talk to Inspector McCarrick, who "was supposed to talk to you about your job duties but went to a luncheon instead."  (*Id.*)

### 4.    *Allen Continues to Go Untrained*

The most training that Allen received occurred in January 2019 when another supervisor in A&I, Defendant Sergeant Kevin O'Brien, had Allen sit with a civilian in the unit.  (*Id.* at ¶ 70.)  However, the civilian warned Allen that she did not have time to train Allen because she was bombarded with work.  (*Id.*)  She also said that she was "limited" in what she could show Allen because Allen needed "access to so many different programs that [she had not] been trained on, such as Facial Recognition, the Police System, and the Leads System, and [Allen also needed] a desk and a computer if [she was] going to be producing work product."  (*Id.*)  After this meeting, Allen asked Lieutenant McHugh when she would have access to a computer.  (*Id.* at ¶ 71.)  He responded that she was "still in JET and wouldn't need a desk."  (*Id.*)

Contrary to McHugh's statements, at the end of January, Chief Inspector MacDonald told Allen that he was going to give her a training packet that had been given to all the analysts in

A&I.  (*Id.* at ¶ 104.)  She never received the training packet.  (*Id.*)  When Allen followed up with Sergeant Williford about her continued lack of training and work opportunities in A&I, he said, "It seems race related," and promised to speak with MacDonald.  (*Id.* at ¶ 105.)

### 5.   *Someone Tampers with Allen's Breast Milk*

In addition to the issues surrounding assignments and training, Allen also experienced problems related to her need to breast pump while at work.  (*See id.* at ¶ 80.)  The first incident occurred on January 10, 2019, when Allen placed a full bottle of milk in a black bag in the refrigerator in the cafeteria.  (*Id.*)  When she went to retrieve the milk at the end of her shift, she noticed that the bottle had been moved to a different shelf, the bag unzipped, and most of the milk was missing.  (*Id.* at ¶ 81.)  There was no sign that the milk had spilt.  (*Id.*)  Allen reported the incident to Lieutenant McHugh and showed him the nearly empty bottle.  (*Id.* at ¶ 82.)  The next day, Sergeant Williford told Allen that he had heard her milk was stolen from the refrigerator and promised to "write an email to address it."  (*Id.* at ¶ 84.)  Williford never sent the email, and over the next few weeks, when he saw Allen carrying her milk from the locker room, he would laugh and make comments about "wanting chocolate milk" or "needing milk."  (*Id.* at ¶¶ 84–85.)

### 6.   *McCowan is Transferred to A&I*

In January 2019, McCowan was officially transferred to A&I, and her HIDTA position was given to the allegedly less-qualified Corporal Wilson.  (*Id.* at ¶ 72.)  At the time, McCowan was the only Black female supervisor in A&I.  (*Id.* at ¶ 73.)  Despite her status as a supervisor, the male supervisors in the unit excluded her from supervisory meetings and invited a white male subordinate to attend the meetings in her place.  (*Id.*)  She was likewise excluded from emails and memoranda that she should have received as a supervisor, and her name was omitted from

an internal contact sheet that listed the unit supervisors.  (*Id.* at ¶¶ 74–75.)  Sergeant Williford noticed that McCowan was frequently excluded from communications and told her that he had urged the other supervisors to include her.  (*Id.* at ¶¶ 77–78.)

### B.    *Inappropriate Sexual Comments and Advances from Officer Younger*

In addition to being denied scheduling and training opportunities while they were assigned to DVIC, Plaintiffs allege that they repeatedly experienced sexual harassment at the hands of another officer in A&I, Defendant Officer Curtis Younger.  (Doc. No. 49 at ¶ 61.)

### 1.    *Younger's Advances Toward Allen*

Officer Younger initially made advances toward Officer Allen in the spring of 2014[1] when he called her personal phone to tell her, "I have a crush on you," "I like you," and "I'm interested in you."  (*Id.* at ¶ 46.)  At the time, Allen and her husband — who also works for the Philadelphia Police Department —told Younger not to call back.  (*Id.*)  When Allen transferred to A&I in the winter of 2018, Younger picked up where he had left off.  (*Id.*)  In December, he approached Allen and told her that after his initial call in 2014, he had wanted to "come to her house and handle her husband because nobody talks to me that way."  (*Id.* at ¶ 61.)  Over the next few weeks, Younger continued to make hostile comments to Allen, telling her that "[m]y daughter is gay, and I don't like her girlfriend.  I purposefully hit her in the head with a tailgate

---

[1] Although Plaintiffs' claims center on conduct that occurred between October 2018 and October 2019, Plaintiffs allege that they experienced harassment throughout their tenure with the Police Department.  (*See* Doc. No. 49 at ¶¶ 42–46.)  In 2012, Allen claims she was "unwittingly grabbed and groped on two occasions by her immediate supervisor, Sergeant Bradford Williams, while on duty."  (*Id.* at ¶ 43.)  The first incident occurred while Allen and Sergeant Williams were conducting a probation search.  (*Id.*)  Allen alleges that Williams squeezed her butt while she walked in front of him up the stairs.  (*Id.*)  A few weeks later, Williams again squeezed Allen's butt after they finished serving a warrant.  (*Id.*)  Allen did not report either incident, allegedly because reporting would be futile and carry inherent risks.  (*Id.*)  However, she did tell her partner about them.  (*Id.*)  Allen also alleges that in 2016, another officer slapped her butt while they were both at work.  (*Id.* at ¶ 45.)  Allen later confronted the officer, who immediately apologized.  (*Id.*)

and we got into an argument." (*Id.* at ¶ 62.) He also told Allen that she is "one sexy motherfucker," to which Allen replied by asking him to please focus on work. (*Id.* at ¶ 63.) Then, in mid-January, after a prayer circle that they both attended, Officer Younger turned to Allen, placed his hands on her waist, and said, "You're so small," while picking her up off the ground in an embrace.[2] (*Id.*) Allen immediately ordered him to put her down. (*Id.*)

## 2.   *Younger's Advances Toward McCowan*

While he was making inappropriate comments to Allen, Officer Younger also made numerous inappropriate comments to Corporal McCowan, despite the fact that she was his superior.[3] When McCowan transferred to A&I, Younger called her and said, "You know I have a crush on you?" (*Id.* at ¶ 65.) McCowan, who was at home with her family, said, "I have to finish making dinner for my husband and my family," and hung up. (*Id.*) The next day, McCowan told Younger that he was out of line and ordered him not to make similar comments in the future. (*Id.* at ¶ 66.) She then reported his inappropriate advances to her supervisor, Defendant Lieutenant Timothy McHugh. (*Id.* at ¶ 67.)

Over the next few weeks, Younger continued to make inappropriate comments toward McCowan, including "Damn, you sexy," and "You gonna have to stay away from me," as well as suggestive sounds like "Mmm, Mmm, Mmm." (*Id.*) These comments were made in the

---

[2] Allen and Younger attended the same daily prayer circle in the Department cafeteria. (Doc. No. 49 at ¶ 86.) After each morning prayer, those in attendance customarily hugged and told each other, "God bless you." (*Id.* at ¶ 87.)

[3] Like Allen, McCowan also alleges that she began experiencing sexual harassment within the Department years earlier. In the summer of 2015, McCowan filed a sexual harassment complaint against a coworker at the Academy. (Doc. No. 49 at ¶ 44.) According to McCowan, the officer made multiple inappropriate sexual comments, tried to kiss McCowan, and slapped her butt. (*Id.*) A supervisor corroborated the complaint with an eyewitness statement, and Defendant Sergeant Brent Conway conducted the internal investigation for the complaint. (*Id.*) The City allegedly did not punish the officer for his actions, and McCowan was forced to continue working with him. (*Id.*) The second amended complaint does not explain why the officer went unpunished.

presence of his supervisors.  (*Id.* at ¶ 68.)  Then, during the week of January 7, 2019, while McCowan was using the copy machine, Officer Younger asked her, "Are you sure there's not room for me to slide in?"  (*Id.* at ¶ 69.)  When McCowan ignored him, he asked, "Do I have any chance with you?"  (*Id.*)  When McCowan told him that he had "no chance," Younger stood with his back against the wall and hands at his sides, and said, "Well if you ever change your mind, just break the glass."  (*Id.*)  Throughout the day, Younger would mutter, "remember, just break the glass," when he passed McCowan.  (*Id.*)

### 3. *Plaintiffs Attend Annual Training on Workplace Sexual Harassment*

On January 17, 2019, Allen and McCowan attended an annual mandatory training course on workplace sexual harassment.  (*Id.* at ¶ 88.)  Allen sat next to Officer Dawson (Chief Inspector MacDonald's aide), and watched as she used a blue and black pen to mark "present" next to officers' names who were not in attendance.  (*Id.*)  One sergeant even sent his payroll number to Officer Dawson so that she could use it to sign the attendance sheet and submit a test on his behalf.  (*Id.* at ¶ 89.)  Officer Dawson completed tests for other absentees as well and asked Allen to complete a test for one of the absent officers, but Allen declined.  (*Id.* at ¶ 90.)

Younger attended the sexual harassment training, but afterward told Allen that he thought "[t]hat class was bullshit!"  (*Id.* at ¶ 91.)

### 4. *Younger Continues to Make Inappropriate Comments*

Despite the sexual harassment training, Officer Younger continued to make sexual comments and advances toward Allen and McCowan.  Immediately after the training, Younger pointed to Allen's breasts and told her "It looks like you need to go pump because they are looking big."  (*Id.* at ¶ 93.)  A few days later, he told her, "You lost your ass after having the

8

baby," and "If you gained 15 more pounds you would be on point." (*Id.* at ¶¶ 94–95.) These comments were overheard by other officers. (*Id.*)

Similarly, on January 21, 2019, Officer Younger said, "Hey, babe" to McCowan, who responded, "You mean Corporal?" (*Id.* at ¶ 96.) Lieutenant McHugh witnessed this exchange. (*Id.*) One week later, Officer Younger approached McCowan's desk and made inappropriate comments about her family photos, including comments about her "smile" and "big forehead." (*Id.* at ¶¶ 97–98.) He asked McCowan if she was pregnant in her wedding photo, and then referencing several photographs of McCowan's husband said, "You have pictures of this motherfucker all over your desk.  My wife doesn't have pictures like this on her desk." (*Id.*) McCowan responded, "That's between y'all," to which Younger said, "Oh, I forgot, y'all are still wet.  It's still new." (*Id.*) Younger then grabbed McCowan's left hand and tried to pull her wedding rings off her finger. (*Id.* at ¶ 99.) When McCowan screamed, "Stop! They don't come off!" Younger laughed and asked if she took them off when she slept. (*Id.*) McCowan told him again, "My rings don't come off!" (*Id.*) Later that day, Younger asked McCowan if she was "sure he had zero chance" with her. (*Id.* at ¶ 100.)

### C.   *Plaintiffs File Complaints with the Department's Equal Employment Office ("EEO")*

After weeks of waiting to be given the typical duties and training needed for a position in the DVIC and weeks of listening to Younger's inappropriate comments, Plaintiffs filed internal complaints of sexual harassment and gender discrimination with the City.

### 1.   *McCowan and Allen File EEO Complaints*

On January 29, 2019, Officer Allen spoke with Corporal McCowan about Officer Younger's conduct, and the two women decided to file formal complaints with the Department. (*Id.* at ¶¶ 106–07.) When McCowan arrived at work the next day, she told Officer Dawson that

she needed to speak with Chief Inspector MacDonald about two harassment complaints involving employees under his command.  (*Id.* at ¶ 109.)  A few minutes later, Sergeant Williford messaged McCowan, "Please see me before you submit those memos . . . let me handle it."  (*Id.* at ¶ 110.)  McCowan responded, "What I have to talk about should go directly to the boss.  It's bigger than what you may think.  It also involves [Allen]."  (*Id.* at ¶ 111.)

Williford then told McCowan that "[a]s a supervisor you have to learn there are other supervisors you can go to — you have to go to Inspector McCarrick before MacDonald."  (*Id.* at ¶ 112.)  McCowan responded that she wanted to speak with Chief Inspector MacDonald about an EEO complaint and that she did not believe the chain of command applied when reporting an EEO complaint or misconduct within the Department.  (*Id.* at ¶ 113.)  Williford warned her, "Although the Chief has an 'open-door policy,' he kind of doesn't; and you're on probation — you don't want to be labeled a troublemaker."  (*Id.* at ¶ 114.)

After this encounter, Plaintiffs met with Defendant Sergeant Tamika Allen and reported their complaints to her.  (*Id.* ¶ 115.)  She wrote a memo addressed to Captain Heizenroth detailing the issues that the two women had with training and assignments at the DVIC but omitted their allegations of sexual harassment.[4]  (*Id.*)

On February 1, McCowan emailed her EEO memo and Jennifer Allen's EEO memo to Chief Inspector MacDonald, explaining, "We tried to meet with you yesterday, but our attempt was unsuccessful."  (*Id.* at ¶ 119 (explaining that McCowan submitted "two memorandums [to MacDonald], one that Officer Allen wrote and another that [she] wrote").)  MacDonald did not meet with Plaintiffs to discuss their complaints.  (*Id.* at ¶ 118.)

---

[4] Plaintiffs do not provide any information about Captain Heizenroth, and it is unclear who, if anyone, in upper management at the City ultimately received Tamika Allen's memo.  It is also unclear whether those claims in Tamika Allen's memo were investigated by the City.

2.      *McCowan Reports Younger's Harassment to Police Commissioner Ross*

Corporal McCowan also messaged Defendant Police Commissioner Richard Ross on his personal cell phone about the sexual harassment and hostile work environment she experienced at the DVIC.[5]  (*Id.* at ¶ 126.)  In response to her complaints about Younger, Ross asked why she did not "just order his dumb ass to go sit down and get out of your face 'Officer.'"  (*Id.* at ¶ 127.)  McCowan asked Ross to "[t]hink about how you would feel if it was your daughter.  Would it matter if it was someone that works for her or not?  If she told the person to repeatedly stop, that doesn't matter?"  (*Id.*)  Ross responded, "I know you don't like for me to be straight with you . . . but I want to offer you some sage advice as a friend."  (*Id.*)  When McCowan asked him for his advice, he backpedaled, saying, "No, not the time based on your frame of mind."  (*Id.*)  McCowan alleges that throughout this conversation, Ross indicated that he was going to "school" McCowan on sexual harassment, that he continued to be upset with her for previously breaking off their two-year affair, and that he was getting in the way of her redressing her complaint in retribution.  (*Id.* at ¶ 128.)

3.      *Sergeant Conway's Investigation*

Allen and McCowan's written complaints against Younger were sent to the City's Equal Employment Office, where they were investigated by Defendant Sergeant Brent Conway.  (*See id.* at ¶ 129.)  On February 6, 2019, Conway interviewed Allen about her complaint and began the interview by telling Allen that he is "married to an African American woman."  (*Id.*)  Conway also referenced other sexual harassment and assault allegations made by female officers and opined that "the females were lying."  (*Id.* at ¶ 130.)  He then asked Allen why she "waited so long to speak up."  (*Id.*)

---

[5] McCowan alleges that she and Ross had an affair from 2009 to 2011.  (Doc. No 49 at ¶ 128.)

At the end of the interview, Sergeant Conway asked Allen to review and correct his notes from their interview together, but before Allen could read the document, Conway allegedly rushed her to sign it and told her to write that she wanted to be separated from Younger.  (*Id.* at ¶ 131.)  When she responded that she did not want to be moved from her position, Conway assured her that "[t]hey can't do that because that would be a lawsuit.  And if they do it, I'll tell them they can't."  (*Id.*)

Two days later, Conway interviewed McCowan.  He began by telling her that "[t]he Philadelphia Police Department has the highest payouts in lawsuits out of all the City agencies, so these interview questions are worded to assist the City in defending against a lawsuit in case you and Officer Allen decide to sue."  (*Id.* at ¶ 132.)  He added, "Basically the questions are worded to determine that you didn't do what you were supposed to do."  (*Id.*)  During the interview, Conway also said that in his opinion, "You can't be sexually harassed because you are a supervisor."  (*Id.*)  He also told McCowan that she and Allen had "failed to timely report [their] complaints against Officer Younger because [they] didn't submit them on the Philadelphia Police Department Intranet" and that McCowan "may be liable for failing to properly report this because the City is tired of paying out settlement money."  (*Id.*)  As with Allen, Conway also told McCowan that his "wife is Black."  (*Id.*)

### D.    *Allen Continues to Experience Uncertainty in Her Scheduling and Her Ability to Breast Pump While at Work*

#### 1.    *Allen Is Transferred Back to JET*

On February 1, 2019 — after Corporal McCowan sent the EEO memos to Chief Inspector MacDonald — Officer Allen received a message from her former JET partner asking why Allen was being placed back on the streets in the JET unit:  "I heard you are back with us on day work."  (Doc. No. 49 at ¶ 120.)  This was the first time Allen heard about the transfer.

Consistent with the rumor, on February 4, 2019, Sergeant Tamika Allen told Officer Allen that her desk was being moved from the A&I section on the orders of Chief Inspector MacDonald and Inspector McCarrick.  (*Id.* at ¶ 122.)  However, the next day, Sergeant Allen apologized for "passing on bad information" and told Officer Allen that she could remain at her A&I desk unless she was "uncomfortable" there.  (*Id.* at ¶ 123.)

A few days later, on February 11, 2019, Sergeant Allen again told Officer Allen that she would be working the street with JET.  (*Id.* at ¶ 139.)  Allen responded that she was supposed to be training for an analyst job with A&I, and Sergeant Allen walked away, returning a few minutes later to say that Allen would actually be "working inside and not out on the street" that day.  (*Id.* at ¶ 140.)  Despite this exchange, later that afternoon Sergeant Allen told Allen to "go back out on the street."  (*Id.* at ¶ 141.)

On February 14, 2019, Sergeant Williford emailed Allen, instructing her to sign up for training in A&I scheduled for February 26.  (*Id.* at ¶ 147.)  However, Lieutenant McHugh later told McCowan, "We're not sending [Allen] to training on the 26th."  (*Id.*)  Instead of training, Sergeant Allen told Allen to "[r]eport to work at 3:00 p.m. on the 26th to start back night work." (*Id.* at ¶ 148.)  On February 20, Allen had a meeting with Inspector McCarrick and Sergeant Allen.  (*Id.* at ¶ 152.)  McCarrick told her that he "got a call" about how in her EEO complaint Allen "asked not to work with Curtis Younger."  (*Id.*)  Allen attempted to clarify that she did not want to be moved, but before she could finish, McCarrick told her that she had "to go back to working with JET.  Don't go back to A&I."  (*Id.*)  Two days later, Sergeant Allen informed Allen that her schedule would return to rotating between day and night shifts at JET.  (*Id.* at ¶ 156.)

### 2.    *Allen Continues to be Denied a Lactation Room*

Around the same time, Allen also experienced inconsistencies in her ability to breast pump while at work.

Allen typically pumped in the women's locker room, but in mid-February, she was repeatedly interrupted while doing so.  First, on February 18, 2019, Sergeant Allen twice interrupted Officer Allen to "check on her."  (*Id.* at ¶ 149.)  The next day, Sergeant Allen interrupted her again, asking "Are you almost done?" and she interrupted Allen again on February 21.  (*Id.* at ¶¶ 151, 154.)  After these interruptions, Allen tried to go home to pump.  On February 26, she messaged Sergeant Allen that she was going home on her one-hour break to pump.  (*Id.* at ¶ 159.)  Although Sergeant Allen responded "ok," she later told Allen that she would no longer accommodate Allen going home to pump and threatened to "take time away" from Allen "if she ever went home to pump again."  (*Id.* at ¶¶ 160–61.)  Sergeant Allen insisted that Allen pump in the locker room because "women nurse in front of women all the time."  (*Id.* at ¶ 162.)

The next night, Sergeant Allen told Allen that she could "use the interview room" to pump by signing the key out from a male officer.  (*Id.* at ¶ 164.)  When Allen asked the officer for the key, he said he "didn't know anything about it and wasn't familiar with the keys."  (*Id.*)  It took 30 minutes for someone to help Allen get into the interview room, and when she got inside, the unheated room was extremely cold and had a large window, meaning anyone who walked by would be able to see her.  (*Id.* at ¶ 165.)  Allen texted Sergeant Allen that she was unable to pump and that she needed to use sick leave for the remainder of her shift that night.  (*Id.* at ¶ 167.)  Sergeant Allen told Allen to meet her at her desk and questioned why Allen had been unable to pump.  (*Id.*)  When Allen explained that the room was too cold and had a

window, the Sergeant responded, "Well that's the only room we have so what are you going to

do?"  (*Id.*)  When Allen asked, "What do you mean what am I going to do," Sergeant Allen

reiterated that there was "no other room for [her] to pump."  (*Id.*)  Allen responded "ok" and took

sick leave to pump from home.  (*Id.* at ¶ 168.)

Allen had seen her physician multiple times at the beginning of 2019 related to

depression and anxiety caused by her work situation.  After the interview room incident, Allen

went to a follow-up appointment with her primary care doctor and learned that she had lost seven

pounds since her last appointment two weeks earlier.  (*Id.* at ¶ 228.)  Concerned about her rapid

weight loss, anxiety, headaches, inability to sleep, and low milk supply, Allen's doctor took her

out of work for four weeks.  (*Id.*)  Although Allen told Defendants that she would be taking

extended medical leave, no one informed her of her rights under the FMLA, and she was forced

to use her remaining sick time instead.  (*Id.*)

### 3.    *Allen Returns to Work on Restricted Duty Status and Is Transferred to the Department's Neighborhood Services Unit ("NSU")*

At the end of March 2019, Allen scheduled an appointment with the City doctor's

office — a prerequisite to her returning to work the next day.  (*Id.* at ¶ 232.)  A nurse practitioner

with the City's Employee Medical Services suggested that Allen return to work on restricted

duty status to address her anxiety, and Allen's primary care doctor agreed.  (*Id.* at ¶¶ 233, 235.)

In light of this recommendation, the Department's Safety Office assigned Allen a daywork shift

in the Criminal Intelligence Unit of the DVIC.  (*Id.* at ¶ 236.)

On March 27, 2019 Allen reported to the Criminal Intelligence Unit with the restricted

duty instructions.  (*Id.* at ¶ 237.)  But within 15 minutes, Sergeant Allen confronted her and

asked, "What are you doing?"  (*Id.* at ¶ 238.)  After questioning Allen about her restricted duty

status, Sergeant Allen asked her who she spoke to in the Safety Office, explaining that she

"need[ed] to know who put you in Criminal Intelligence because I can't take it at face value."
(*Id.* at ¶ 239.)  Later, the two women met with Lieutenant McHugh, and Sergeant Allen informed
Allen that she would "report to me and you will still be working under me. . . . You are to sit at
my desk and I will give you your work assignment. . . .  You are to remove all of your things
from your desk over in A&I."  (*Id.* at ¶ 242.)  Allen responded, "Ok, no problem" to each
statement.  (*Id.*)

Later that afternoon, Sergeant Allen called Allen to the conference room and handed her
a counseling memo for insubordination.  (*Id.* at ¶ 243.)  The memo detailed how Allen "walked
off" during their previous conversation and used a "hostile and loud tone" that was
"unprofessional, disrespectful and goes against department policy code."  (*Id.*)  Sergeant Allen
said, "This is what occurred earlier," and told Allen to sign the memo.  (*Id.* at ¶¶ 243–44.)  Allen
responded, "That did not occur," and Sergeant Allen told her to write down anything she wanted
to say.  (*Id.*)  As Allen was drafting her response, Sergeant Allen demanded her sick note.  (*Id.* at
¶ 245.)  Allen told her that she had already given the note to the Safety Office, but Sergeant
Allen responded, "I provided you with the directive to refer to when you were out sick."  (*Id.* at ¶
246.)  Allen asked for a copy of the directive, saying she had not received it.  (*Id.*)  Sergeant
Allen denied the request and said, "Read it on your own time."  (*Id.*)  She then told Allen that
"[e]ffective tomorrow (March 28, 2019), you will be detailed to the Neighborhood Services
Unit."  (*Id.* at ¶ 247.)

When Allen finished drafting her statement, she handed the memo to Sergeant Allen and
asked for a copy.  (*Id.* at ¶ 248.)  Sergeant Allen said she "wasn't coming back in here" and if
Allen wanted a copy, she would have to meet her at her desk.  (*Id.*)  When Allen went to retrieve

the copy, Sergeant Allen made her wait and then refused to place the copy in her hand, placing it on the cabinet instead.  (*Id.* at ¶¶ 250–53.)

### 4. Allen Is Refused a Lactation Room at the NSU

Allen's breast pumping issues increased with her transfer to the Neighborhood Services Unit.  When she arrived at the NSU, Allen reported to her new supervisor, Defendant Sergeant Herbert Gibbons.  (*Id.* at ¶ 255.)  Sergeant Gibbons instructed Allen to breast "pump in Officer John Whipple's office" because Officer Whipple was out of the office at the time.  (*Id.*)  A few weeks later, a fellow officer told Allen that she was to start pumping in the office of a civilian coworker who was out on vacation and that she and Officer Newsome, another nursing mother, were to "pump at the same time in the same room."  (*Id.* at ¶ 256.)  Officer Newsome overheard this conversation, and the two of them approached Gibbons about the issue.  (*Id.* at ¶ 258.)  He reiterated that the women were to pump in the "office that I told you to pump in before."  (*Id.*)

Over the next few days, Allen continued to experience pushback on her ability to pump in the office assigned by Gibbons.  (*Id.* at ¶ 259.)  One officer told Allen that "people need to get into the office you're pumping in during the time that you pump" and again directed her to "pump in [the civilian coworker's] office from now on."  (*Id.*)  Gibbons later confirmed that the two women were to use the civilian coworker's office, and he instructed them to put the sign that they usually placed on the door while pumping "back in my office after each use" because he "didn't want to hear [their coworker] making a big fuss about the sign being stored in the bin at her office door."  (*Id.* at ¶ 260.)

At this point, Officer Newsome's mother, who is also an officer with the Department, confronted Sergeant Gibbons, telling him that he needed to "address anyone who has an issue with" Allen and Newsome pumping.  (*Id.* at ¶ 263.)  Gibbons responded, "I won't address

anyone because I would be kicked out of the unit.  Anytime I have spoken up before I was

backstabbed and [disciplined]."  (*Id.* at ¶ 264.)  Allen and Newsome then explained that they did

not feel comfortable getting the sign from Gibbons because it meant they would have "to walk

into an office with three male officers and ask them for the sign, and then walk back into the

same office to return it to them."  (*Id.*)  Gibbons said they could "keep the sign between the both

of [them]" and not get it from him anymore.  (*Id.*)

Fifteen minutes later, Gibbons called Allen and Newsome into the breakroom and told

them, "Effective immediately you will pump in [the civilian's office], a permanent sign will be

made that will hang on the door, and you will each have keys to the office.  You can pump

whenever you want to."  (*Id.* at ¶ 266.)  He also told them to notify him if anyone had a problem

with that arrangement.  (*Id.*)  Despite Gibbons's statements, when the civilian coworker returned

to work on April 22, 2019, she did not let Allen use her office, and instead said, "I have work to

do, use another office."  (*Id.* at ¶ 268.)  Allen reported the incident to Gibbons, but he did not

address the issue.  (*Id.* at ¶ 270.)

A week later, Gibbons told the women to pump in the building lunchroom between 12:00

p.m. and 2:30 p.m.  (*Id.* at ¶ 270.)  That afternoon, while they were pumping, employees

gathered outside the cafeteria, knocked on the door, and asked "what was going on inside."  (*Id.*)

When the women finished, one of the waiting employees said, "finally," and asked if she could

"come in while [they were] pumping because I'm a woman."  (*Id.*)  Allen stopped pumping at

work.  (*Id.* at ¶ 271.)

### E.    *McCowan Files a Second EEO Complaint and Is Transferred to Police Radio*

A little over a month after Allen transferred out of A&I, McCowan also transferred out of

the unit.

###### 1.     *McCowan Files a Second EEO Complaint*

On March 6, 2019, McCowan wrote a second EEO memo, titled "Request to be Detailed Out," and submitted it to Defendant Deputy Commissioner Christine Coulter.  (Doc. No. 49 at ¶ 174.)  In the memo, McCowan asserted that she continued to experience a hostile work environment because Officer Younger had not been moved from the DVIC.  (*Id.*)  Specifically, on February 22, 2019, Younger said "I have some meatballs for you," in reference to his genitals.  (*Id.* at ¶ 154.)  McCowan asked to be "detailed out of the building, to a unit in [her] current chain of command under Deputy Commissioner Christine Coulter; pending the adjudication of [her] complaint."  (*Id.*)

Sergeant Conway scheduled a second interview with McCowan for March 12 to discuss her March 6 memo.  (*Id.* at ¶ 178.)  A few days before the interview, McCowan contacted her union representative about obtaining legal representation.  (*Id.* at ¶ 179.)  The representative suggested that McCowan contact an attorney who works with the City.  (*Id.*)  The attorney never returned McCowan's call, but he was present for the beginning of her interview with Conway and took a few minutes to speak privately with her.  (*Id.*; *see also id.* at ¶¶ 185–86.)  The attorney told her that he could not represent her because he was representing Officer Younger.  (*Id.*)  He also said that because McCowan was a supervisor, she was "going to have to take a hit."  (*Id.*)

After this discussion, Sergeant Conway returned and interviewed McCowan for two hours.  (*Id.* at ¶¶ 185, 187.)  Among other things, Conway told her:

- "I talked to the guy who wrote the sexual harassment policy for the City and he said that a supervisor can't be sexually harassed by a subordinate."

- "I just don't understand why [Allen] didn't have a problem breast pumping in the DVIC for months, then all of a sudden she did, it's kind of suspicious that she had an issue during her first night of night work."

19

- "I told Chief MacDonald that he made a bad decision by giving [Allen] a day work position when she came back from having the baby," and giving Allen "the job was setting a bad precedent."

- "How did you get promoted?"  "Do you know of anyone else who went to a special unit as a result of being promoted?  I never heard of such a thing."  "Chief Flacco was questioning how does a new promote get transferred to a special unit."

- "What special training do you have that qualified you to work in HIDTA?"

- "If there had not been a second party (Ms. Allen) on your complaint, the complaint would have been dismissed from the very beginning."

- "We have been exploring the possibility that you are making all this up just to get out of your current position."

- "They aren't going to move you because it would set a bad precedent."

(*Id.* at ¶ 187.)

### 2.    *McCowan Is Transferred to Police Radio*

A few hours after her interview with Sergeant Conway, McCowan was transferred to Police Radio, "an extremely busy and hectic place to work."  (*Id.* at ¶ 190.)  Plaintiffs allege that "[t]here is a perception within the [Department] that assignment to Police Radio is a punishment."  (*Id.*)  In addition, the transfer meant McCowan's schedule changed from daywork with weekends off to alternating day and night shifts with alternating days off.  (*Id.* at ¶ 191.)

On March 13, 2019, McCowan reported to Police Radio, where she was greeted by one dispatcher who said, "Welcome to hell."  (*Id.* at ¶ 195.)  She was given a desk in the tape room, an unheated room among the building's computer servers where the temperature frequently drops below 50 degrees.  (*Id.* at ¶ 192.)  And she was told that she would "basically be a rotating administrative corporal handling any extra work that the Captain or Lieutenant or Inspector have" because "each squad in the unit has all the supervisors they need."  (*Id.* at ¶¶ 193–94.)

A few hours into her first day, the captain at Police Radio told McCowan that one of the inspectors had asked if McCowan could have a squad with steady day work, but Deputy

Commissioner Coulter's office had said "no." (*Id.* at ¶ 196.) Coulter's office had also declined to allow McCowan to receive the training necessary for her to work on the radio floor. (*Id.*) A civilian worker in Coulter's office later told McCowan, "They talk openly about your situation in Deputy Coulter's office." (*Id.* at ¶ 209.)

During her time at Police Radio, McCowan was given no work assignments and was forced to sit without work for eight hours every day. (*Id.* at ¶ 199.) She also noticed that her time was often improperly documented for payroll, and she was incorrectly receiving civilian pay. (*Id.* at ¶¶ 201, 204.) McCowan requested access to the payroll system, something she was supposed to have as a supervisor, but her request was denied. (*Id.* at ¶ 207.) McCowan also submitted a hardship memo regarding her shift change and asked her union representative to file a grievance on her behalf. (*Id.* at ¶¶ 207, 210; *see also id.* at p. 45.) Her union contact later told her that "Deputy Coulter said there was a meeting on Friday, May 10, 2019, with Commissioner Ross, 1st Deputy Patterson, and Deputy Coulter, and they all decided to disapprove your hardship memo." (*Id.* at ¶ 213.) A few weeks later, the union representative told McCowan that the Department had formally denied her grievance. (*Id.* at ¶ 220.) By way of explanation, the union representative said, "You worked in the building long enough to know how it works. Once you're out of the clique they ostracize you. Between you and me, this is all coming from Commissioner Ross, who he [sic] said he was mad because he thinks you're making all this up." (*Id.*)

### 3.      *McCowan Takes FMLA Leave*

McCowan's experience at Police Radio continued to decline. When McCowan reported to her night shift on June 7, 2019, dispatchers were using the console at her seat. (*Id.* at ¶ 217.) The sergeant in charge told McCowan to "sit out in the hallway," and after four hours without

any work assignments, McCowan used four hours of sick time and left.  (*Id.*)  The next day, McCowan was informed that she would be expected to indefinitely sit in the hallway without work.  (*Id.* at ¶ 218.)

Over the next two months, McCowan was repeatedly forced to take sick leave to attend to the stress and anxiety that she experienced from work.  (*See id.* at ¶ 222.)  On July 26, 2019, she exercised her rights under the FMLA to take time off from work to treat her condition.  (*Id.* at ¶¶ 223–24.)  Although McCowan submitted the necessary paperwork, the Department failed to process her FMLA leave.  (*Id.* at ¶¶ 226–27.)

### F.    Allen and McCowan File This Lawsuit

On July 29, 2019, Officer Allen and Corporal McCowan filed their initial complaint in this case and effected service of process on Defendants the same day.  (Doc. No. 1; *see also* Doc. No. 49 at ¶¶ 276–77.)

#### 1.    Allen is Reassigned to Police Tow Squad

The day after Plaintiffs filed their complaint, the Department changed Allen's job assignment, schedule, and hours of work.  (Doc. No. 49 at ¶ 278.)  She was reassigned from the NSU to the Department's Police Tow Squad, which meant her schedule of weekday, daytime work with nights and weekends off changed to a rotating schedule of daytime and nighttime shifts.  (*Id.*)  When Allen contacted the Department's Safety Office about the shift change, she was told that the change "came from the Deputy Commissioner's office."  (*Id.* at ¶ 280.)

In response to this reassignment, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, which sought an order prohibiting Defendants from changing either Plaintiff's job assignment, schedule, or hours of work until after this case is closed.  (Doc. No. 2.)  In response, Defendants agreed to return Plaintiffs to their job assignments held as of

July 29, 2019 and to refrain from altering those assignments until after final resolution of this case.  (Doc. No. 8.)  On August 20, 2019, the Court entered an Order to that effect (Doc. No. 13), and Allen was returned to the NSU and to a steady day shift with weekends off.

### 2.   Allen's Husband Receives Backlash for Going with Her to Deposition

On August 14, 2019, Plaintiffs went to the office of the City Solicitor for depositions related to the preliminary injunction motion.  (Doc. No. 49 at ¶ 282.)  Allen's husband, who is also an officer in the Department, took a vacation day so that he could accompany his wife to her deposition.  (*Id.* at ¶ 283.)  Thirty minutes into the deposition, he received a call from an officer asking, "where are you?"  (*Id.* at ¶ 285.)  Mr. Allen responded that he was on vacation, and the conversation ended.  (*Id.*)  A few minutes later, he received a second call, this time from the sergeant who had approved his vacation time.  (*Id.* at ¶ 286.)  The sergeant told him that multiple individuals in upper management had called his office to tell him that Mr. Allen was "in full uniform with [his] police radio up loud causing a disturbance at [his] wife's deposition, and that they had to tell [him] several times to turn your police radio down."  (*Id.*)  They also wanted to "know why [he was] there in full uniform."  (*Id.*)

Mr. Allen responded:

> You approved my vacation.  You know I'm on vacation.  I am not in full uniform. I am in plain clothes.  I do not have a police radio and I am not in the deposition.  I am in the lobby with Corporal McCowan.  I am not here testifying.  I am not a witness.  I am just here to support my wife.

(*Id.* at ¶ 287.)  When Mr. Allen returned to work the next day, his sergeant told him that the captain had "asked for an evaluation of [his] job performance."  (*Id.* at ¶ 288.)

### 3.   McCowan Resigns and Allen Is Labeled a Troublemaker

On October 2, 2019, McCowan resigned from the Police Department after being told by her doctor that her employment conditions were having a detrimental impact on her mental and

physical health.  (*Id.* at ¶ 292.)  Allen remains employed with the Department.  However, since filing this lawsuit, her coworkers and supervisors have referred to her as a "troublemaker," at least one of the City doctors has refused to see her, and the Department has required her to use leave for her restricted duty needs because it allegedly did not receive the restricted status paperwork that she submitted.  (*Id.* at ¶¶ 295–97.)

>    **G.**   ***Systemic Problems at the City and the Department***

Allen and McCowan allege that their individual experiences are two examples of a wide-spread problem within the City generally and at the Police Department specifically.  In 2018 and 2019 both the City Controller and the Mayor of Philadelphia acknowledged that the City had not done enough to prevent sexual harassment.

First, in March 2018, City Controller Rebecca Rhynhart conducted an audit on the City's implementation of its sexual misconduct policies and found that the City has "a broken system for reporting, investigating and resolving sexual misconduct complaints."  (Doc. No. 49 at ¶ 41.) Then, in August 2019, Philadelphia Mayor James Kenney announced the resignation of Commissioner Ross in a press release.  (*Id.* at ¶ 291.)  Mayor Kenney acknowledged that a year earlier, the City had "implemented a new sexual harassment prevention policy and a series of internal reforms designed to prevent workplace discrimination."  (*Id.*)  Although rolling out the new policy was expected to take time, the Mayor stated that he "[did] not believe the Police Department [had] taken the necessary actions to address the underlying cultural issues that too often negatively impact women — especially women of color."  (*Id.*)

>    **II.**   ***Procedural History***

As mentioned above, Plaintiffs filed their initial complaint in this case on July 29, 2019. (*See* Doc. No. 1.)  The operative complaint is Plaintiffs' second amended complaint, which was

filed on May 21, 2020, and contains 24 counts.[6]  (Doc. No. 49.)  For clarity, the Court has

created a chart outlining which Plaintiff brings which counts against which Defendants:

| I | Title VII Disparate Treatment | Both Plaintiffs | City of Philadelphia |
|---|---|---|---|
| II | Title VII Hostile Work Environment | Both Plaintiffs | City of Philadelphia |
| III | Title VII Retaliation | Both Plaintiffs | City of Philadelphia |
| IV | Violations of FLSA §207's Protections for Nursing Mothers | Allen | All Defendants except Younger |
| V | Retaliation in Violation of FLSA § 215 | Allen | All Defendants except Younger |
| VI | FMLA Interference | Both Plaintiffs | City of Philadelphia |
| VII | FMLA Retaliation | Both Plaintiffs | City of Philadelphia |
| VIII | Section 1981 Disparate Treatment | Both Plaintiffs | All Defendants except Younger |
| IX | Section 1981 Hostile Work Environment | Both Plaintiffs | All Defendants except Younger |
| X | Section 1981 Retaliation | Both Plaintiffs | All Defendants except Younger |
| XI | Section 1983 Disparate Treatment in Violation of Equal Protection Clause | Both Plaintiffs | All Defendants except Younger |
| XII | Section 1983 Hostile Work Environment in Violation of Equal Protection Clause | Both Plaintiffs | All Defendants except Younger |
| XIII | Section 1983 Retaliation in Violation of Petition Clause | Both Plaintiffs | All Defendants except Younger |
| XIV | Pennsylvania Whistleblower Retaliation | Both Plaintiffs | All Defendants except Younger |
| XV | Intentional Infliction of Emotional Distress | Both Plaintiffs | All Defendants |
| XVI | Assault and Battery | Both Plaintiffs | Younger |
| XVII | Pennsylvania Human Relations Act ("PHRA") Discrimination | Both Plaintiffs | City of Philadelphia |
| XVIII | PHRA Retaliation | Both Plaintiffs | All Defendants |
| XIX | PHRA Aiding and Abetting | Both Plaintiffs | All Defendants |
| XX | Philadelphia Fair Practices Ordinance ("PFPO") Discrimination | Both Plaintiffs | City of Philadelphia |
| XXI | PFPO Retaliation | Both Plaintiffs | All Defendants |

---

[6] Before filing their second amended complaint, Plaintiffs consented to the dismissal, with prejudice, of the claims asserted against Younger under the FLSA (Counts IV and V), § 1981 (Counts VIII through X), § 1983 (Counts XI through XIII), and the Pennsylvania Whistleblower Law (Count XIV).  (*See* Doc. No. 23 at pp. 1–2; *see also* Doc. No. 30.)

| XXII | PFPO Aiding and Abetting | Both Plaintiffs | All Defendants |
| XXIII | Declaratory Relief | Both Plaintiffs | All Defendants |
| XXIV | Injunctive Relief | Both Plaintiffs | All Defendants |

Defendants have filed three motions to dismiss the second amended complaint.  (*See* Doc. Nos. 53–55.)  First, Defendant Younger moves to dismiss all but the assault and battery claim.  (Doc. No. 53 (moving to dismiss Counts XV, XVIII, XIX, and XXI through XXIV).)  Second, Defendants the City of Philadelphia, Christine Coulter, Daniel MacDonald, Michael McCarrick, Timothy McHugh, Brent Conway, Eric Williford, Kevin O'Brien, Tamika Allen, and Herbert Gibbons (collectively, the "City Defendants") have moved to dismiss McCowan's claims against Coulter and Gibbons and Allen's claims against Coulter in their entirety.  (Doc. No. 54 at p. 1.)  They have also moved to dismiss Allen's FLSA protections claim (Count IV), Plaintiffs' Section 1981 claims (Counts VIII through X), Plaintiffs' Section 1983 claims (Counts XI through XIII), Plaintiffs' Pennsylvania whistleblower claims (Count XIV), and Plaintiffs' IIED claims (Count XV).  Last, Defendant Ross has moved to dismiss all claims brought against him.  (Doc. No. 55 (moving to dismiss Counts IV, V, VIII through XV, XVIII, XIX, and XXI through XIV).)

## III.    *Standard of Review*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement.'"  *Id.*  Factual allegations must be "enough to raise a right to relief above the speculative level," and a "complaint may proceed even if it strikes a savvy judge that

26

actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

That said, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678; *see also Bell Atl. Corp.*, 550 U.S. at 555 (explaining that the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action").  It is the Defendants' burden to show that a complaint fails to state a claim.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

Because many of Defendants' arguments overlap, we address the motions to dismiss together, beginning with Defendants' contention that most of Plaintiffs' claims against Gibbons, Ross, and Coulter should be dismissed in their entirety for failure to plead facts in relation to those Defendants.  We then address Defendants' remaining contentions claim by claim.

## IV.    *Plaintiffs' Claims Against Gibbons, Ross, and Coulter*

The City Defendants argue that we should dismiss McCowan's claims against Gibbons and Coulter and Allen's claims against Coulter because they lack supporting allegations.  (Doc. No. 54 at pp. 8–10.)  For similar reasons, Ross argues that we should dismiss Allen's claims against him.  (Doc. No. 55-2 at p. 3.)

### A.    *McCowan's Claims Against Gibbons*

The City Defendants argue that McCowan has not alleged any facts that connect her to Gibbons, and therefore, the fourteen causes of action brought by her against him must be

dismissed.  (Doc. No. 54 at pp. 8–9.)  McCowan does not respond to this argument.  (*See* Doc. No. 60 at p. 4 (stating that "Plaintiffs address Defendants' arguments in the order presented in [Defendants'] memorandum of law" but not including any discussion of this issue); *see also* Doc. No. 66 at p. 1.)

  The City Defendants are correct that McCowan has not alleged any facts showing that Gibbons knew McCowan, interacted with her at the Department, or acted against her in any way. *See Abdellatif v. Alza Wrae Indus. Co.*, Civil Action No. 18-2297, 2019 WL 1284689, at *4 (E.D. Pa. Mar. 20, 2019) (dismissing all claims brought against one defendant "because the facts alleged in the Complaint are insufficient to support his involvement in any alleged cause of action"); *cf. Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . ." (quotation marks omitted)); *Ackah v. Pa. Dep't of Corr.*, No. 4:08-CV-0376, 2008 WL 11366478, at *9 (M.D. Pa. Nov. 14, 2008) ("[T]he Court will dismiss Ackah's § 1983 and § 1981 claims against Wenerowicz because Ackah has failed to allege his personal involvement in any constitutional violation or discrimination."); *Fleet v. CSX Intermodal, Inc.*, Civ. A. No. 17-3562, 2018 WL 3489245, at *18 n.174 (E.D. Pa. July 18, 2018) ("Individual liability under the FMLA, PHRA, and PFPO require personal involvement.") (collecting cases). Because McCowan has not alleged facts to support her claims against Gibbons, we will dismiss the claims brought by her against him.

  In the alternative, we find that dismissal is warranted because McCowan failed to respond to the City Defendants' argument.  *See, e.g.*, *Ghoubrial v. Johanns*, Civil Action No. 05-CV-04256, 2006 WL 8459472, at *2 n.6 (E.D. Pa. Sept. 29, 2006) ("[P]laintiff filed a response but did not address the sovereign immunity argument made by the United States.  The motion to

dismiss by the United States could, therefore, be granted as uncontested."); *Bowser v. Bogdanovic*, No. 08-cv-847, 2010 WL 1462548, at *5 (M.D. Pa. Apr. 9, 2010) ("We note that, as a matter of course, the Court could dismiss Plaintiffs' claims because Plaintiffs failed to respond to the arguments for dismissal of those claims set forth in the Defendants' Brief in Support of the instant Motion.").

For those reasons, we dismiss McCowan's claims against Gibbons with prejudice. *See, e.g.*, *Jones v. Brouse*, CIVIL NO. 3:15-CV-0680, 2016 WL 1242347, at *4 (M.D. Pa. Mar. 30, 2016) ("Because plaintiff has failed to oppose the motion to dismiss, granting leave to amend would be futile.").

### B.     *Allen's Claims Against Ross*

Ross similarly argues that "[n]owhere in Plaintiffs' [second amended complaint] does Allen assert factual allegations that pertain to Defendant Ross nor does she claim to have had any interaction with Ross while working at the Department." (Doc. No. 55-2 at p. 6.) For that reason, he argues that her claims against him should be dismissed with prejudice. (*Id.*) Allen does not address this argument in her response brief. (*See* Doc. No. 59 at p. 6 (stating that "Plaintiffs address Defendant's arguments in the order presented in the 'Argument' section of his memorandum of law" but failing to address this argument).)

We agree with Ross that Allen has not alleged any facts suggesting that he knew her, interacted with her, was aware of the discrimination she allegedly experienced, or was involved in any of the adverse actions taken against her. In short, her only allegation about Ross is that he was Police Commissioner during the relevant period. Because this fact alone is insufficient to support Ross' personal involvement in any alleged cause of action, we will dismiss Allen's claims against him. *See Abdellatif*, 2019 WL 1284689, at *4; *cf. Evancho*, 423 F.3d at 353;

*Ackah*, 2008 WL 11366478, at *9; *Fleet*, 2018 WL 3489245, at *18 n.174.  In the alternative, we

find that dismissal is warranted because Allen failed to respond to Ross's argument.  *See, e.g.*,

*Ghoubrial*, 2006 WL 8459472, at *2 n.6.

For those reasons, Allen's claims against Ross are also dismissed with prejudice.  *Cf.*

*Jones*, 2016 WL 1242347, at *4.

### C.    *Plaintiffs' Claims Against Coulter*

The City Defendants argue that all of Plaintiffs' claims against Coulter must be dismissed

because, with one exception, they have not directly attributed any actions to Coulter, and refer

instead to "Deputy Coulter's office."  (Doc. No. 54 at p. 5.)  The only allegation as to Coulter

individually is that a union representative told McCowan that Coulter attended a meeting related

to McCowan's hardship memo, which was denied.  According to the City Defendants, this one

allegation "does not give rise to liability under any of the theories asserted by Plaintiffs."  (*Id.* at

p. 9.)  Plaintiffs respond to this argument with one sentence, stating that the second amended

complaint shows "Defendant Coulter . . . (1) directed the discrimination, harassment and

retaliation to occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage

in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6)

failed to adopt needed policies to prevent violations."  (Doc. No. 60 at pp. 4–5.)  Plaintiffs also

cite generally to paragraphs 9, 19, 174, 196, and 209 of the second amended complaint.[7]

---

[7] Allen and McCowan offer no meaningful factual or legal analysis to support their claims that
Coulter was personally involved in their alleged constitutional violations.  They do not cite legal authority
in their brief, and provide only a conclusory one-sentence response that references — without
discussion — five paragraphs in the second amended complaint.  Given the length of the factual
allegations in the second amended complaint (305 paragraphs spanning 68 pages) and the number of legal
claims (24 claims asserted by 2 plaintiffs against 12 defendants), the Court finds Plaintiffs' utter failure to
explain or defend their claims against Coulter both frustrating and deficient under this Court's local rules.
*See* Local R. E.D. Pa. 7.1(c) (requiring that every motion be "accompanied by a brief containing a concise
statement of the legal contentions and authorities relied upon in support of the motion" and that the
opposing party provide "a brief in opposition"); *Miller v. Cadmus Commc'ns*, Civil Action No. 09–cv–

Despite the poor showing by Plaintiffs in their briefing, we find that the second amended complaint alleges personal involvement by Coulter.  For example, Allen alleges that her transfer to Police Tow Squad "came from the Deputy Commissioner's office" and occurred the day after Allen filed a federal complaint against Coulter.  (Doc. No. 49 at ¶ 280.)  *Cf. Solan v. Ranck*, 326 F. App'x 97, 101 (3d Cir. 2009) (finding personal involvement for § 1983 purposes where the defendant, "possessed of the knowledge of [the plaintiff's] complaint . . . approved of the transfer in retaliation for [the plaintiff's] complaint").  McCowan similarly alleges that she submitted her second EEO complaint to Coulter and asked that she be detailed out of the DVIC because of Younger's conduct.  (*Id.* at ¶ 174.)  McCowan was then transferred to Police Radio, which has a reputation for being a hectic place to work and is viewed as a punishment.  *Cf. Vandegrift v. City of Philadelphia*, 228 F. Supp. 3d 464, 492 (E.D. Pa. 2017) (finding plaintiff's "transfer to an extremely busy and hectic workplace could reasonably dissuade a reasonable person in [her] position from making a charge of discrimination" and thereby give rise to a claim for retaliation).  Once there, Coulter's office or Coulter herself rejected a request that McCowan be given a steady day work shift, refused to approve training for McCowan, denied her hardship memo, and rejected her union grievance.  (*Id.* at ¶¶ 196, 213.)

Although the City Defendants take issue with Plaintiffs' references to "Coulter's office," those references, construed liberally, suggest that Coulter was involved in the relevant actions,

---

02869, 2010 WL 762312, at *5 (E.D. Pa. Mar. 1, 2010) ("Pursuant to Local Rule 7.1(c), all litigants are required to address substantive matters in a meaningful manner."); *Tata v. Lindcrest Apartments*, Civil Action No. 06-CV-00798, 2008 WL 11515275, at *1 n.1 (E.D. Pa. Oct. 9, 2008) ("Fully developed legal argument, citation to legal authority, and discussion of the relevant facts aid this Court in performing its duty, and ultimately in serving the ends of justice.  Any brief in opposition or any other memorandum of law that is lacking even a modicum of these elements is woefully insufficient and unexcusable." (quotation marks omitted)).  This lack of discussion is particularly frustrating as to Allen's claims because none of the five paragraphs cited by Plaintiffs mentions Allen or is related to her allegations.  In the future, Plaintiffs must fully explain their position and discuss the facts and legal authority that support it — not send the Court on a scavenger hunt through the maze of their complaint.

and certainly put Coulter "on notice" of Plaintiffs' allegations against her. *See Bell Atl. Corp.*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Therefore, we reject the City Defendants' argument that Plaintiffs have alleged no facts pertaining to Coulter and decline to wholesale dismiss their claims against her.

## V.    *Plaintiffs' Remaining Claims*

We address Defendants' remaining arguments claim by claim.

### A.    *Count IV:  § 207 of the FLSA*

The City Defendants move to dismiss Count IV, which alleges violations of § 207 of the FLSA.  (Doc. No. 49 at pp. 78–79.)  Section 207(r)(1) of the FLSA requires employers to provide "a reasonable break time for an employee to express breast milk for 1 year after the child's birth each time such employee has need to express the milk" in a "place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public."  29 U.S.C. § 207(r)(1).

The City Defendants argue that Count IV "fails as a matter of law because at all times relevant" Allen was provided with "a place, other than a bathroom, that was shielded from view and free from intrusion from coworkers and the public" and provided reasonable break time to express breast milk.  (Doc. No. 54 at p. 13.)  They also argue that Allen "has not alleged any injury compensable under the FLSA" on this claim because the FLSA restricts recovery to unpaid minimum wages or unpaid overtime compensation and Allen has not identified any "time worked for which she was not paid."[8]  (*Id.* at pp. 14–16.)  Allen responds that Defendants

---

[8] The City Defendants also argue that Allen's requested relief is not compensable under the Act because liquidated damages under the FLSA are limited to an amount equal to unpaid minimum wages and/or unpaid overtime.  (Doc. No. 54 at pp. 15–16.)  They argue that attorney's fees are only available if judgment is awarded to Allen, and punitive damages are not available under the FLSA.  (*Id.* at p. 16.)

violated her rights under § 207 by (1) failing to provide a reasonable break time for her to express milk, and (2) failing to provide her with a place other than a bathroom that was shielded from public view to express milk.  (Doc. No. 60 at pp. 9–11.)  Allen also argues that she was forced to take extended leave to avoid having to express milk in locations without appropriate nursing rooms.  (*Id.*)

First, the Court easily rejects the City Defendants' argument that Allen has not alleged violations of § 207(r).  According to the second amended complaint, Sergeant Tamika Allen frequently interrupted Allen while she was lactating in the women's locker room and directed Allen to continue pumping in the locker room despite interruptions because "women nurse in front of women all the time."  (Doc. No. 49 at ¶ 162.)  The only other room provided by Sergeant Allen was the interview room, which had a window open to the public.  (*Id.* at ¶ 167.)  When Allen explained that she could not use the interview room because it "was too cold and has a window," Sergeant Allen responded that there "is no other room for you to pump," forcing Allen to use sick leave to pump from home.  (*Id.* at ¶¶ 167–68.)  Officer Allen experienced similar issues when she transferred to NSU, where Sergeant Gibbons instructed Allen and fellow Officer Newsome to pump at the same time in coworkers' offices and eventually to pump in the cafeteria during a specific timeframe.  (*See generally id.* at ¶¶ 255–71.)  In each location, Officer Allen and Officer Newsome experienced pushback from their coworkers who would not allow them to use the designated rooms or would gather outside and knock on the door while asking when they could get inside.  (*Id.*)

Second, we find that Allen has plausibly alleged a compensable injury.  District courts

---

Last, they argue that declaratory relief is unavailable because Allen's child is over one year of age, and therefore, the City has no ongoing obligation to accommodate her need to express milk (i.e., the controversy is moot).  (*Id.*)

are split on what amounts to a compensable injury under § 207(r) of the FLSA.  Section 216(b) of the Act states that any "employer who violates the provisions of . . . section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b); *see also Lico v. TD Bank*, No. 14–CV–4729 (JFB)(AKT), 2015 WL 3467159, at *3 (E.D.N.Y. June 1, 2015) ("To be clear, damages in a private suit under § 207(r) are limited to wages lost as a result of the employer's failure to provide an adequate space for lactation.").  But § 207 states that employers are not required to pay employees for time spent pumping.  29 U.S.C. § 207(r)(2).  "Some courts have read this language as not providing for a private cause of action at all," while others have "read the statute more expansively."  *Newsome v. City of Philadelphia*, Civ. A. 19-5590, 2020 WL 6730946, at *3 (E.D. Pa. Nov. 12, 2020).

For example, some courts have found that a plaintiff states a plausible injury under § 207(r) when she alleges that she was forced to take personal or sick leave to pump.  *See, e.g.*, *Clark v. City of Tucson*, No. CV 14-02543-TUC-CKJ, 2018 WL 1942771, at *6 (D. Ariz. Apr. 25, 2018) ("Plaintiff's sick leave and vacation time are financial assets, which she allegedly spent to avoid being forced to express milk at noncompliant stations."); *cf. Lico*, 2015 WL 3467159, at *3 ("[I]f an employee needed to take longer breaks in order to travel to appropriate areas to take a nursing break, and was docked pay as a result, those lost wages would be compensable.").  In a separate case brought by Officer Newsome, Newsome alleged that the "lack of pumping space caused [her] to take time off work to pump."  *Newsome*, 2020 WL 6730946, at *3 (internal citations omitted).  Because "hours of leave have been held to be financial assets," Judge Baylson found that Newsome "plausibly alleged a compensable injury

under § 207(r)" and denied the City's motion to dismiss.  *Id.*  However, Judge Baylson also recognized that "this is a complicated question," and declined to definitively rule on it "until/if a later stage of litigation is reached."  *Id.* at *4.

Like the plaintiffs in *Newsome*, *Lico*, and *Clark*, Allen alleges that she used leave time to pump.  Specifically, on February 27, 2019, after being denied an appropriate lactation space by Sergeant Allen, Allen was unable to pump and forced to use sick leave for the remainder of her shift that evening.  (Doc. No. 49 at ¶¶ 167–68; *see also id.* at ¶ 161 (alleging that the previous evening Sergeant Allen threatened to "take time away" from Allen if "[Allen] ever went home to pump again").)  Allen's doctor then directed Allen to take four weeks of sick time to address medical issues, including "anxiety, headaches, inability to sleep, and low milk supply."  (*Id.* at ¶ 228.)

At this stage, the Court finds that these allegations plausibly state a compensable injury under § 207(r).  *Cf. Newsome*, 2020 WL 6730946, at *4.  Like Judge Baylson, we decline to rule on this issue definitively until a later stage of litigation.  *Id.*; *see also Lico*, 2015 WL 3467159, at *4 ("[I]t is not the Court's role, in deciding a motion to dismiss, to make specific rulings with respect to the scope of damages available. . . .  It is sufficient . . . that plaintiff has plausibly alleged a legally cognizable injury under § 207(r).").  Therefore, the City Defendants' motion to dismiss Count IV is denied.[9]

---

[9] This issue is limited to Allen's claims in Count IV that the City Defendants violated § 207(r) of the FLSA and does not affect her claims in Count V that the City Defendants violated § 215(a)(3) of the Act by retaliating against her.  Although recovery for violations of § 207 is limited to "unpaid minimum wages . . . unpaid overtime compensation . . . and [ ] an additional equal amount as liquidated damages," recovery for retaliation under § 215 may include "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3)."  29 U.S.C. § 216(b).  District courts in this Circuit and appellate courts in other Circuits have interpreted this section as allowing "non-economic damages, such as emotional distress damages" along with "'a reasonable attorney's fee to be paid by the defendant, and costs of the action.'"  *Green v. Ventnor Beauty Supply, Inc.*, 1:18-cv-15673-NLH-AMD, 2019 WL 2099821, at *1 n.1 (D.N.J. May 14, 2019) (quoting *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062,

**B.**     ***Counts VIII, IX, and X:  Disparate Treatment, Hostile Work Environment, and Retaliation Under § 1981***

In Counts VIII, IX, and X, Plaintiffs bring claims for disparate treatment, hostile work environment, and retaliation under 42 U.S.C. § 1981.  (Doc. No. 49 at pp. 84–91.)  Section 1981 prohibits intentional race discrimination in the making and enforcing of public and private contracts, including employment contracts.  42 U.S.C. § 1981.  "A right to relief under § 1981 can be shown in three ways:  (1) purposeful racial discrimination[10]; (2) a hostile work environment based on racial harassment[11]; or (3) retaliation.[12]"  *Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014).

Employers and individuals can be liable under § 1981.  *See Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001).  But when a plaintiff brings a § 1981 claim against an individual, she "must also plead the defendant's personal involvement in the alleged discriminatory conduct at issue."  *Douglas v. Nesbit*, No. 1:16-cv-01836, 2017 WL 1021680, at *6 (M.D. Pa. Mar. 16, 2017); *see also Johnson v. Res. For Hum. Dev., Inc.*, 843 F. Supp. 974, 978 (E.D. Pa. 1994) ("[A] claim seeking to impose personal liability under Section 1981 must be predicated on the

---

1065 (5th Cir. 2016)).  The City Defendants have not moved to dismiss Count V.

[10] To state a claim for purposeful racial discrimination, a plaintiff must allege:  "(1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts."  *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (quotation marks omitted and alterations adopted).

[11] To state a claim for hostile work environment, the plaintiff must show that "(1) he suffered intentional discrimination because of his race; (2) the discrimination was regular and pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in his position who is in the same protected class; and (5) there is a basis for employer liability."  *Ellis*, 25 F. Supp. 3d at 753 (quotation marks omitted).

[12] To state a claim for retaliation, the plaintiff must allege that "(1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010).  The Third Circuit has also held that in a retaliation case, the plaintiff must allege an underlying section 1981 violation.  *Id.*

actor's personal involvement and there must be some affirmative link to causally connect the actor with the discriminatory action."). "[E]mployees may be held individually liable if they were personally involved in the discriminatory conduct at issue, and either intentionally caused the infringement of plaintiff's § 1981 rights or authorized, directed, or participated in the alleged discriminatory conduct." *Rodrigues v. Motorworld Auto. Grp. Inc.*, Civ. A. No. 3:16-CV-1674, 2017 WL 1036477, at *4 (M.D. Pa. Mar. 17, 2017) (quotation marks omitted). A supervisor is personally involved in discriminatory conduct if he was "grossly negligent in the supervision of his subordinates who committed the wrongful acts or deliberately indifferent to the rights of plaintiff by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (quotation marks omitted and alterations adopted).

### *Plaintiffs' Claims Against the City*

The City argues that the § 1981 claims against it should be dismissed because "a private cause of action cannot be asserted [against] a municipal actor for a violation of Section 1981."[13] (Doc. No. 54 at p. 17.) Instead, the City argues, 42 U.S.C. § 1983 is the exclusive federal remedy for asserting violations of § 1981 against state government units. (*Id.*) Plaintiffs respond that their § 1981 claims should not be dismissed merely because they failed to explicitly invoke § 1983.[14] (Doc. No. 60 at p. 13.)

---

[13] Neither the City's proposed order nor its motion mention § 1981 or seek dismissal of Counts VIII, IX, and X. (*See* Doc. No. 55 at pp. 1–4.) Instead, this argument appears only in the City's supporting brief. (*Id.* at pp. 17–18, 21.) Plaintiffs' response addresses the City's argument (Doc. No. 60 at p. 13), and we also address it in this opinion out of an abundance of caution.

[14] Plaintiffs also argue that this issue is "moot because Plaintiffs expressly invoke § 1983 throughout their complaint." (Doc. No. 60 at p. 13.) The argument is not moot, however, because although Plaintiffs assert their constitutional violations via § 1983, they do not bring their § 1981 claims against the City through the procedural framework provided by § 1983.

The City is correct that "a private cause of action cannot be asserted against a municipal employer for a violation of § 1981." *Lande v. City of Bethlehem*, 457 F. App'x 188, 193 (3d Cir. 2012). Instead, the "express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violations of the rights guaranteed in § 1981 by state governmental units." *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009) (quotation marks omitted). However, "no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim." *Jackson v. City of Shelby*, 574 U.S. 10, 11 (2014). Therefore, we will not dismiss the § 1981 claims for this failure alone.[15] If Plaintiffs choose to file a third amended complaint, they should add a § 1983 citation to Counts VIII, IX, and X as those claims relate to the City. *See id.* ("For clarification and to ward off further insistence on a punctiliously stated 'theory of the pleadings,' petitioners, on remand, should be accorded an opportunity to add to their complaint a citation to § 1983.").

### McCowan's Claims Against Ross

Ross argues that we must analyze McCowan's § 1981 claims against him under the framework of § 1983.[16] (Doc. No. 55-2 at p. 7.) Although the second amended complaint does

---

[15] The City seems to accept Plaintiffs' argument in its reply brief. It does not substantively respond to Plaintiffs' § 1981 argument, and in its conclusion, it calls for dismissal of "Counts XV, XIV, IV, and XI, XII, and XIII," without further mention of Counts VIII, IX, and X. (Doc. No. 66 at p. 3.)

[16] Ross also suggests that we must apply the *McDonnell Douglas* burden shifting framework at this motion-to-dismiss stage and require McCowan to plead a *prima facie* case of race discrimination. (Doc. No. 55-2 at pp. 8–9.) But the Supreme Court has held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788–89 (3d Cir. 2016) ("[A]t least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss" because a "*prima facie* case is an evidentiary standard, not a pleading requirement." (quotation marks omitted)); *Storey v. Burns Intern. Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (refusing to require a *prima facie* showing of discrimination because "[a]t the pleading stage . . . the plaintiff need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief as required by Federal Rule of Civil Procedure Rule 8(a)(2)" (quotation marks omitted)).

not invoke § 1983 in Counts VIII, IX, and X, McCowan's opposition brief suggests that the § 1981 claims are being brought directly under § 1981 and also under § 1983. (*Compare* Doc. No. 59 at p. 13 ("Therefore, Plaintiffs' complaint must not be dismissed because they have pleaded enough facts to show Defendant Ross engaged in race-based discrimination prohibited by Section 1981."), *with id.* at pp. 7–10 (arguing that "Plaintiffs' § 1981 claims cannot be dismissed for failing to explicitly invoke § 1983" and analyzing Ross's motion to dismiss Counts XIII, IX, and X under the § 1983 framework).)

Although § 1983 remains the exclusive remedy for bringing a § 1981 count against a municipality, the Third Circuit has found individual liability under § 1981 "when the defendants intentionally cause an infringement of rights protected by Section 1981, regardless of whether the employer may also be held liable." *Cardenas*, 269 F.3d at 268 (quoting *Al-Khazraji v. Saint Francis Coll.*, 748 F.2d 505, 518 (3d Cir. 1986)) (alterations adopted). But regardless of whether McCowan brings her § 1981 claims against Ross directly under § 1981 or via § 1983, they fail because McCowan has not plausibly alleged that Ross was personally involved in the alleged § 1981 violations. *See Johnson*, 843 F. Supp. at 978 ("[A] claim seeking to impose personal liability under Section 1981 must be predicated on the actor's personal involvement and there must be some affirmative link to causally connect the actor with the discriminatory action."). Specifically, McCowan has not alleged that Ross "intentionally caused [an infringement of Plaintiff's] section 1981 rights," or that he "authorized, directed, or participated in the alleged discriminatory conduct." *Al-Khazraji*, 784 F.2d at 518.

McCowan's race-related allegations are few. She states that she was denied training opportunities and assignments in A&I that would have been available to male and white female employees. (Doc. No. 49 at ¶ 105 (Sergeant Williford confirming that this exclusion seemed to

be "race related").)  She also alleges that she was excluded from supervisory meetings that a subordinate, white, male employee was invited to attend.  (*Id.* at ¶ 73.)  But even if this conduct amounts to purposeful discrimination or racial harassment under § 1981, McCowan does not allege that Ross directed the conduct or that he knew about it and failed to act.

Neither has McCowan alleged that Ross retaliated against her for reporting the alleged race discrimination.  Although McCowan alleges that she told Ross about the sexual harassment she experienced at A&I and that he failed to act on the same, she does not allege that she told Ross about the race discrimination that she was experiencing, and it was not included in either of her EEO complaints.  (*See id.* at ¶¶ 126–28 (alleging that she "texted and called Commissioner Ross on his personal cell phone to inform him that she had been experiencing *sexual* harassment and a hostile work environment in the DVIC) (emphasis added)); *see also id.* at pp. 25–26 (McCowan's "Sexual Harassment Complaint"); *id.* at ¶ 174 (requesting to be detailed out of the building because Younger remained in the DVIC).)

McCowan argues that her § 1981 claims against Ross survive under a theory of intersectional discrimination — i.e., discrimination because she is a Black woman.  (Doc. No. 59 at pp. 12–13.)  But § 1981, "on its face, is limited to issues of racial discrimination in the making and enforcing of contracts."  *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 98 (3d Cir. 1999); *see also Montana v. Amstar Corp.*, 502 F. Supp. 295, 297 (E.D. Pa. 1980) ("Section 1981 is of no aid to plaintiff's claim of sexual harassment since sex discrimination is not cognizable thereunder."). In other words, although Title VII permits claims based on the intersection of protected traits (e.g., race and gender), § 1981 does not.[17]  *Cf. Ellis v. Ohio Mattress Co. Licensing &*

---

[17] McCowan cites four cases in support of her assertion that both "Title VII and Section 1981 prohibit discrimination not only because of race, but also because of the intersection of race and one or more other protected traits."  (Doc. No. 59 at pp. 12–13.)  But none of those cases actually involved claims under § 1981.  *See generally Fucci v. Graduate Hosp.*, 969 F. Supp. 310 (E.D. Pa. 1997)

*Components Grp.*, Civil Action No. 07–cv–00479–LTB, 2007 WL 2381537, at \*2 (D. Col. Aug. 17, 2007) (dismissing gender discrimination claims under § 1981 because "the great weight of authority" holds that "§ 1981 only applies to discrimination based on race, and does not apply to discrimination based on gender" and none of the plaintiff's authorities supported her argument that "§ 1981 allows a remedy for gender discrimination claims merely because they are intertwined with, or inseparable from, race discrimination").

Because the second amended complaint does not allege that Ross was personally involved in the alleged race discrimination, racial harassment, or retaliation, McCowan's § 1981 claims fail against him, regardless of whether they are brought directly under § 1981 or via § 1983. *See Baraka v. McGreevy*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." (quotation marks and citations omitted)); *Douglas*, 2017 WL 1021680, at \*7 (dismissing § 1981 claims brought through § 1983 because "the amended complaint is entirely devoid of factual allegations supporting Defendant Nesbella's personal involvement in the events or occurrences forming the basis of Plaintiff's Section 1981 race discrimination claim").[18] To

---

(analyzing claims under Title VII, the ADA, and ERISA); *Kost v. Dep't of Pub. Welfare*, Civil Action No. 07–2404, 2011 WL 6301956 (E.D. Pa. Dec. 16, 2011) (analyzing claims for discrimination under Title VII, for procedural due process under § 1983, and for conspiracy); *DiBartolo v. City of Philadelphia*, No. Civ.A. 99–CV–1734, 2000 WL 217746 (E.D. Pa. Feb. 15, 2000) (analyzing claims under §§ 1983 and 1985, Title VII, the Pennsylvania Constitution, and Pennsylvania common law); *Reese v. Source 4 Teachers*, CIVIL ACTION NO. 17-4588, 2018 WL 3752987 (E.D. Pa. Aug. 8, 2018) (analyzing discrimination claim under Title VII).

[18] In the alternative, we find that dismissal is warranted on McCowan's § 1981 disparate treatment and hostile work environment claims against Ross because she has not alleged any facts which suggest that Ross acted with a racially discriminatory intent. *See Clarke v. Eisenhower*, 199 F. App'x 174, 175 (3d Cir. 2006) (affirming dismissal of § 1981 claims where the plaintiff did "not allege facts that would support an inference that defendants intended to discriminate on the basis of race"); *Douglas*, 2017 WL 1021680, at \*7 ("Section 1981's proscription against purposeful discrimination thus requires the impact of the alleged adverse employment action be traceable to a discriminatory purpose."); *Rodrigues*,

the extent McCowan's claims in Counts VIII, IX, and X are brought against Ross, those claims

are dismissed without prejudice.[19]

C.      **Counts XI and XII:  § 1983 Claims for Disparate Treatment and Hostile Work Environment in Violation of the Equal Protection Clause**

Plaintiffs bring § 1983 claims for violation of the Equal Protection Clause of the United

States Constitution.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S.

42, 48 (1988).  In turn, the Fourteenth Amendment states:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.  "The Equal Protection Clause reaches only state actors, but § 1983

equal protection claims may be brought against individuals as well as municipalities and certain

other state entities."  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).  "To bring

---

2017 WL 1036477, at *3 ("At bottom, claims brought under § 1981 require proof of purposeful or intentional racial discrimination.").  Instead, the second amended complaint alleges that Ross "indicated" to McCowan during their phone conversation that he "was getting in the way of redressing her complaints in retribution for her breaking off their two-year affair, which lasted from 2009 to 2011."  (Doc. No. 49 at ¶ 128.)  And later, Ross denied McCowan's union grievance allegedly because he believed she was lying about the sexual harassment that she experienced at A&I.  (*See id.* at ¶ 220 (stating that Ross was "mad" because he believed McCowan was "making all this up").)

[19] We do not address Ross' conclusory assertions of qualified immunity in this opinion.

a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990).

Plaintiffs bring claims for disparate treatment and hostile work environment in violation of the Equal Protection Clause. We address each claim in turn.

### 1.   *Count XI:  Disparate Treatment*

To plead a claim for disparate treatment in violation of the Equal Protection Clause, the plaintiff "must demonstrate that they received different treatment from that received by other individuals similarly situated." *Andrews*, 895 F.3d at 1478 (quotation marks omitted and alterations adopted); *see also Boyle v. City of Philadelphia*, CIVIL ACTION NO. 17-262, 2020 WL 4459131, at *7 (E.D. Pa. Aug. 4, 2020) ("A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion . . . ." (quotation marks omitted)); *Rayfield v. City of Paterson*, Civil Action No. 17-5144 (ES) (SCM), 2019 WL 2959899, at *6 (D.N.J. July 9, 2019) ("To state an equal protection claim, a plaintiff must (i) allege facts showing the existence of purposeful discrimination; and (ii) have received treatment different from that received by other individuals similarly situated."). "Supervisory liability cannot be based solely upon the doctrine of respondeat superior" and "there must be some affirmative conduct by the supervisor that played a role in the discrimination." *Andrews*, 895 F.3d at 1478. "The necessary involvement can be shown in two ways, either through allegations of personal direction or of actual knowledge and acquiescence, or through proof of direct discrimination by the supervisor." *Id.* (quotation marks and internal citations omitted).

***Plaintiffs' Claims Against Individual City Defendants***

The individual City Defendants state in a conclusory fashion that Plaintiffs have not alleged their "individual involvement in [a constitutional violation]." (Doc. No. 54 at p. 20.) They do not discuss Plaintiffs' factual allegations, and instead, argue with one paragraph that we should dismiss the disparate treatment claims brought by two plaintiffs against nine individual defendants, all of whom appear throughout the second amended complaint's lengthy recitation of facts. (*Id.*) We remind all of the Defendants that it is *their* burden to show that "no claim has been presented" and that dismissal is warranted. *See Hedges*, 404 F.3d at 750 (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented"); *cf. Miller*, 2010 WL 762312, at *5 ("Pursuant to Local Rule 7.1(c), all litigants are required to address substantive matters in a meaningful manner.") Given the lack of any meaningful discussion by the individual City Defendants, we cannot find that they have met this burden and must deny their motion to dismiss Count XI.

***McCowan's Claim Against Ross***

Ross argues that McCowan has failed to allege that he was personally involved in the alleged disparate treatment. (Doc. No. 55-2 at p. 10.) We agree that McCowan has not alleged any facts which tend to show that Ross treated McCowan differently from similarly situated coworkers because of her sex, race, or the intersection of those traits. Neither has she alleged that he directed such treatment or knew about and acquiesced in it. Although McCowan alleges that Ross knew about Younger's harassing conduct and her EEO complaints against Younger, she does not allege that she told Ross that she was being treated differently than similarly situated coworkers in training opportunities and job assignments. Therefore, we dismiss McCowan's § 1983 disparate treatment claim without prejudice as against Ross.

*Plaintiffs' Claims Against the City*

The City argues that the § 1983 disparate treatment claim should be dismissed against it because Plaintiffs have not identified a municipal custom, policy, or practice that caused their injury.  (Doc. No. 54 at p. 17.)  Plaintiffs respond generally that "[i]n the context of their sex- and race-based discrimination, harassment and retaliation claims, Plaintiffs have pleaded facts sufficient to show the mistreatment Plaintiffs suffered reflected a 'practice' or 'course of conduct' among municipal officials which is 'so permanent and well settled as to virtually constitute law.'"  (Doc. No. 60 at p. 12.)

Local governments and municipalities are considered persons under § 1983 and may be sued directly under that section when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  "[A] government entity may not be held vicariously liable under § 1983 for the acts of its employees under a respondeat superior theory of liability."  *Winn & Sons, Inc.*, 162 F. Supp. 3d at 459 (citing *Monell*, 436 U.S. at 691).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 694; *see also Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself*

causes the constitutional violation at issue.").  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

Under this precedent, Plaintiffs must "identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984); *Brown*, 50 U.S. at 407–08 (explaining that the policy or custom must be the "moving force" behind the plaintiff's alleged injury).  "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict."  *Mulholland*, 706 F.3d at 237 (quotation marks omitted).  And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law."  *Id.* (quotation marks omitted).  "[W]hen the absence of action denies individuals their constitutional rights, the failure to act can amount to a policy or custom."  *Newsome*, 2020 WL 6730946, at *6 (citing *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060–61 (3d Cir. 1991)).

The second amended complaint broadly states that this case "unquestionably involves official policy:  the City, the [Department] and their policymaking officials (1) directed the violations occur, (2) authorized the violations, (3) agreed to subordinates' decisions to engage in the violations, (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations."  (Doc. No. 49 at ¶ 435.)  The Court cannot consider this conclusory assertion in deciding a motion to dismiss.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 208 (3d Cir. 2009) ("After *Iqbal*, it is clear that conclusory or 'bare-

bones' allegations will no longer survive a motion to dismiss:  'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).  Instead, Plaintiffs must "identify a custom or policy, and specify what exactly that custom or policy was."  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).

Plaintiffs have not identified a policy of disparate treatment at the Department.  They also have not alleged any facts which suggest that there is either a policy or a "well settled custom" of disparate treatment at the Department, nor have they alleged that Ross (the relevant policymaker) acquiesced in their own alleged disparate treatment, let alone a custom of such disparate treatment.  Specifically, Plaintiffs have not alleged that the City has a policy or custom of denying individuals training opportunities or assignments in favorable departments because of their race and/or gender.[20]  Instead, Plaintiffs' allegations and explanations focus on the City's alleged custom of sexual harassment.  (*See* Doc. No. 49 at p. 8 (describing the Department's "well-settled custom of sexual harassment"); *see also* Doc. No. 60 at pp. 12–13 (discussing sexual harassment cases).)  Because Plaintiffs have not identified with specificity a municipal custom or policy of disparate treatment, Count XI is dismissed without prejudice as against the City.[21]

---

[20] Although Plaintiffs argue that they "have pleaded enough facts to show Defendant Ross implemented discriminatory policies and practices based on sex and race in his capacity as Police Commissioner," they do not identify those policies, explain why they were discriminatory, or make the causal connection between those policies and the discrimination that they allegedly suffered.  (Doc. No. 59 at p. 16.)

[21] Plaintiffs sue all of the individual Defendants in their individual and official capacities.  (Doc. No. 49 at ¶ 21.)  "A claim against an employee of a municipality in his or her official capacity is essentially a suit against the municipal employer."  *Poli v. SEPTA*, No. Civ.A. 97–6766, 1998 WL 405052, at *12 (E.D. Pa. July 7, 1998).  Therefore, when we dismiss any claim against the City, we also dismiss Plaintiffs' official capacity claims contained in the same Count.  *Cf. Cruz-Smith v. Sinclair*, Civil Action No. 10–3609, 2011 WL 3652462, at *2 n.4 (E.D. Pa. Aug. 19, 2011) ("Claims against government

### 2.      Count XII:  Hostile Work Environment

"To establish the existence of an actionable hostile work environment, a plaintiff must

prove (1) she suffered intentional discrimination because of a protected characteristic; (2) the

discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the

discrimination would detrimentally affect a reasonable person of the same protected class in her

position; and (5) a basis for respondeat superior liability."  *Cruz-Smith*, 2011 WL 3652462, at *4;

*see also Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. May 12, 2003)

("Reduced to its most basic components, an actionable hostile work environment requires proof

that Plaintiff was subjected to a level of gender or race-based harassment which was 'severe or

pervasive' enough to create a working environment which is both subjectively and objectively

abusive or hostile to female or African American employees.").

"The first four elements of this claim establish that a hostile work environment existed."

*Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  In

determining whether harassment rises to the level of an actionable hostile work environment, we

must consider the "totality of the circumstances . . . including the frequency of the discriminatory

conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive

utterance, and whether it reasonably interfere[d] with an employee's work performance."  *Harris*

*v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB*

*v. Vinson*, 477 U.S. 57, 67 (1986)); *Davis*, 285 F. App'x at 902 (same).  In addition, "the advent

of more sophisticated and subtle forms of discrimination requires that [a court] analyze the

aggregate effect of all evidence and reasonable inferences therefrom, including those concerning

---

officials in their official capacities are subject to dismissal as redundant of claims against the government
entity itself . . . .").

incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas*, 269 F.3d at 261–62.

The fifth element "establishes the basis on which to hold the employer liable." *Huston*, 568 F.3d at 104. "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." *Id.* "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* "[A]n employer knew or should have known about workplace sexual harassment if *management level* employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Id.* at 105; *see also Sharp v. Pa. Army Nat'l Guard*, No. 1:11–cv–1262, 2013 WL 1703583, at *7 (M.D. Pa. Apr. 19, 2013) ("[I]f a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." (quotation marks omitted)).

In this context, an "employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer . . . where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager . . . ." *Huston*, 568 F.3d at 107; *cf. Lyles v. District of Columbia*, 17 F. Supp. 3d 59, 70 (D.C. Cir. 2014) ("An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but an employer will not be liable for the sexual harassment of a supervisor by a subordinate where the

supervisor had the ability to stop the harassment," — by, for example, reporting the harassment to her supervisor or reprimanding the offending subordinate — "and failed to do so.").

We find that Plaintiffs have sufficiently alleged that they were subject to a sexually hostile work environment. As described above, Allen and McCowan allege that they were denied positions and training opportunities at least in part because of their sex. (Doc. No. 49 at ¶ 105.) Plaintiffs also allege that they were repeatedly subject to inappropriate sex-based comments by Officer Younger, often in front of Younger's supervisors. (*Id.* at ¶¶ 61–69, 93–100.) They both claim that Younger reached out to them while they were at home to tell them he had "a crush on" them. (*Id.* at ¶¶ 46, 65.) Allen alleges that Younger later called her "one sexy motherfucker" and made numerous comments about her body. (*Id.* at ¶ 63.) Similarly, Younger told McCowan "damn you sexy," repeatedly asked if he had "any chance" with her, and referred to his genitals as "meatballs" in front of her. (*Id.* at ¶¶ 67–69, 100, 154.) Both women allege that these comments escalated into physically aggressive conduct, with Younger lifting Allen off the ground in an embrace and trying to pull McCowan's wedding rings off of her hand while she screamed at him to stop. (*Id.* at ¶¶ 63–99.) Younger's conduct continued after Plaintiffs spoke with their supervisors, including then-Police Commissioner Ross, and formally complained about Younger's conduct. (*Id.* at ¶ 154.)

Plaintiffs' allegations also call into question the adequacy of the City's avenue for complaint, with one supervisor attempting to keep Plaintiffs from filing their EEO complaints with Chief Inspector MacDonald and another supervisor reporting some of Plaintiffs' claims but omitting their allegations about Younger. (*Id.* at ¶¶ 110–15.) Plaintiffs also allege that once submitted, their reports of harassment were not taken seriously by the City and that they were subject to a biased and openly hostile investigation by Conway. (*Id.* at ¶¶ 129–32, 187.) Finally,

Plaintiffs allege that after they complained, they were transferred to undesirable positions with undesirable schedules, their colleagues were openly hostile toward them, and they were labeled "troublemakers."  (*Id.* at ¶¶ 152, 190–91, 247, 278, 250–53, 295–97.)

At this stage, having considered the totality of the circumstances, we find Plaintiffs have alleged that their coworkers and supervisors subjected them to severe and pervasive harassment because of their gender.  *Cf. Aman*, 85 F.3d at 1083 (finding that overtly racial comments and seemingly neutral, isolated events, when viewed together, created a "complex tapestry of discrimination").  Because Ross and other supervisors knew about — and in some instances, directed — the harassment, Plaintiffs have also alleged vicarious liability on the part of the City.  *See Hargrave*, 262 F. Supp. at 428–29 ("[A]n employer is, as a general rule, 'subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998))); *Lyles*, 17 F. Supp. 3d at 70 ("An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action . . . .").

Next, we must determine whether Plaintiffs have plausibly alleged that Defendants can be held liable for the sexually hostile work environment.  For the individual Defendants, Plaintiffs must allege that they were personally involved in creating the hostile work environment, and for the City, Plaintiffs must allege that the harassment was caused by a City policy, practice, or custom.

***Plaintiffs' Claims Against Individual City Defendants***

As before, we find that the individual City Defendants have not carried their burden of showing that dismissal is warranted because they state, without discussion, that Plaintiffs have not alleged their "individual involvement in [a constitutional violation]." (Doc. No. 54 at p. 20.) Therefore, we deny their motion to dismiss Count XII.

***McCowan's Claims Against Ross***

Ross argues that McCowan's claim fails because she has not alleged that he personally acted against her or that he was motivated by racial animus. (Doc. No. 55-2 at pp. 10–11.) McCowan responds that Ross has failed to address her claim for hostile work environment based on gender-bias, as opposed to racial animus. (Doc. No. 59 at p. 14.)

We agree with McCowan, and in any event find that she has sufficiently alleged that Ross was personally involved in creating the sexually hostile work environment because he acquiesced in the sexual harassment that McCowan experienced at the hands of Younger and the supervisors in A&I. McCowan alleges that she told Ross that she "had been experiencing sexual harassment and a hostile work environment in the DVIC." (Doc. No. 49 at ¶ 126.) Ross "declined to act on her report" and said he was going to "school" McCowan on sexual harassment. (*Id.* at ¶ 128.) The allegedly harassing conduct continued after her conversation with Ross, and when McCowan was transferred to Police Radio, Ross denied her hardship memo and her union grievance, leaving McCowan in a position that many viewed as a punishment because he believed she was "making all this up." (*Id.* at ¶ 220.)

These allegations are sufficient at the pleading stage to show that Ross was personally involved in creating the sexually hostile work environment. *See Andrews*, 895 F.3d at 1478 (explaining that personal involvement of a supervisor can be "shown in two ways, either through

allegations of personal direction or of actual knowledge and acquiescence, or through proof of direct discrimination by the supervisor"); *cf. Sharp v. Pa. Army Nat'l Guard*, No. 1:11–cv–1262, 2012 WL 3202939, at *10 (M.D. Pa. Aug. 3, 2012) ("Because Plaintiff has alleged that she informed Defendant Charpentier of Defendant Sica's conduct and that the conduct continued after she informed him . . . she has alleged sufficient facts to support a finding that Defendant Charpentier acquiesced in Defendant Sica's conduct.").

For those reasons, we will allow McCowan's hostile work environment claim to proceed against Ross.

### Plaintiffs' Claims Against the City

The City argues that the hostile work environment claim should be dismissed against it because Plaintiffs have not identified a municipal custom, policy, or practice that caused their injury. (Doc. No. 54 at p. 17.) The City also argues that Plaintiffs have failed to allege that the Department's policymaker, then-Police Commissioner Ross, had knowledge of and acquiesced to a practice that deprived them of a constitutional right. (*Id.* at p. 20.) Plaintiffs respond that the "Second Amended Complaint demonstrates a well-settled custom of sexual harassment within the Philadelphia Police Department," which "Mayor Kenney later blamed on the Police Department's failure to take the necessary actions to address the underlying cultural issues that too often negatively impact women — especially women of color." (Doc. No. 60 at p. 2 (quotation marks omitted).)

We find that Plaintiffs have sufficiently pled a custom of sexual harassment within the Police Department. In the second amended complaint, Plaintiffs reference a 2018 audit by City Controller Rebecca Rhynhart, which concluded that the City has a "broken system for reporting, investigating, and resolving sexual misconduct complaints." (Doc. No. 49 at ¶ 41.) And the day

after Plaintiffs filed their complaint in this case, Mayor Kenney publicly opined that although "the City implemented a new sexual harassment prevention policy . . . [he] does not believe the Police Department has taken the necessary actions to address the underlying cultural issues that too often negatively impact women—especially women of color."  (*Id.* at ¶ 291.)

In addition to these broad allegations, Plaintiffs' personal experiences suggest a Department custom of failing to address sexual harassment.  Aside from the harassment that they experienced in 2018 and 2019, Plaintiffs allege that they were harassed throughout their careers at the Police Department.  (*Id.* at ¶¶ 42–46.)  They also allege that supervisors were aware that men frequently skipped out on the Department's sexual harassment training, that they did not know how to report the harassment that they experienced at the hands of Younger, and that when they tried to report Younger's conduct, a supervisor attempted to stop them.  (*Id.* at ¶¶ 88–91, 114.)  Additionally, when Conway interviewed them about their EEO complaints, he told McCowan that the "interview questions are worded to assist the City in defending against a lawsuit . . . and to determine that you didn't do what you were supposed to do," and said McCowan "may be liable for failing to properly report this because the City is tired of paying out settlement money."  (*Id.* at ¶ 132.)  When McCowan asked for an attorney, she was directed to the City attorney already representing Younger, who likewise informed McCowan that she would have to "take a hit" on the sexual harassment claim.  (*Id.* at ¶ 186.)  Finally, McCowan alleges that she told Ross — who both sides agree was a Department policymaker —about the sexual harassment that she allegedly experienced in this case, but he refused to act on it.  (*Id.* at ¶¶ 126–28.)  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.").

At this stage, we find that Plaintiffs have alleged facts which plausibly suggest the Department has a custom of failing to properly address sexual harassment, and we will allow the § 1983 hostile work environment claim to move forward as against the City.

> ### D.    Count XIII:  § 1983 Claim for Violation of Petition Clause

In their final § 1983 count, Plaintiffs allege that all Defendants, except Younger, violated the Petition Clause of the First Amendment, which protects "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  This Clause protects the "right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  "To make out a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must establish:  (1) she engaged in First Amendment protected activity, (2) the defendant took adverse action sufficient to deter a person of ordinary firmness from exercising her First Amendment rights, and (3) the adverse action was prompted by the plaintiff's protected activity." *Rossiter v. City of Philadelphia*, 674 F. App'x 192, 196 (3d Cir. 2016).

### Plaintiffs' Claims Against the Individual City Defendants

As before, the individual City Defendants state in conclusory fashion that Plaintiffs have not alleged "individual involvement in [a constitutional violation] by the individually-named City Defendants."  (Doc. No. 54 at p. 20.)  They do not mention the Petition Clause or the First Amendment in their briefing.  Indeed, they suggest that all of Plaintiffs' § 1983 claims are brought under the Equal Protection Clause:  "Counts XI, XII, and XIII of Plaintiffs' Second Amended Complaint, alleging Section 1983 violations of the Equal Protection Clause of the Fourteenth Amendment."  (*Id.* at p. 17.)  As explained earlier, it is not for the Court to do Defendants' job for them. *See Hedges*, 404 F.3d at 750 (explaining that on a Rule 12(b)(6)

motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").  Plaintiffs' Petition Clause claims against the individual City Defendants may proceed.

***McCowan's Claims Against Ross***

Ross argues that McCowan's claim fails because she has not shown that he took any adverse action against her or otherwise shown that their conversation about Younger's conduct was a substantial or motivating factor in any adverse employment action.  (Doc. No. 55-2 at p. 18.)  We disagree.

An act of retaliation rises to the level of an adverse employment action if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Vandegrift*, 228 F. Supp. 3d at 489 (quotation marks omitted).  "In determining whether a reasonable worker would be deterred, context matters" because "an act that would be immaterial in some situations is material in others."  *Id*. (quotation marks omitted).  For instance, "a schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).  In determining whether there is a causal connection between the protected activity and the alleged retaliation, the court may consider the timing of the two activities.  *See Estate of Smith v. Marasco*, 318 F.3d 497, 512–13 (3d Cir. 2003).  And where the "timing of the alleged retaliatory action" is "unusually suggestive of retaliatory motive . . . a causal link will be inferred."  *Id*.  In cases where the temporal proximity is close but "not so close as to be unduly suggestive," the court has also recognized that "timing plus other evidence may be an appropriate test."  *Id.* at 512 (quotation marks omitted).

According to the second amended complaint, in mid-February 2019, McCowan told Ross

that she was being sexually harassed by Younger and had filed an EEO complaint related to that harassment.  (Doc. No. 49 at ¶¶ 126–28.)  Then in May, after McCowan was transferred to a less-desirable position at Police Radio, she alleges that Ross, Coulter, and Patterson denied her hardship memo and union grievance and that Ross allegedly did so because he was "mad" and believed McCowan was "making all this up."  (*Id.* at ¶ 220.)  Viewing these allegations broadly and in the light most favorable to McCowan — as we must at this stage — it is reasonable to believe that Ross was referring to McCowan's claims of sexual harassment and that he denied her requests because of those claims.  With her hardship memo and union grievance denied, McCowan was forced to remain in a position that many viewed as a "punishment," where she was not given any job responsibilities or training, and where, for many months, she was forced to sit in the hallway without a desk, a computer, or anything to do.  (*Id.* at ¶¶ 190–218.)  She stayed in that position until she finally resigned.  (*Id.* at ¶ 292.)

If true, these allegations suggest that McCowan's transfer to Police Radio and subsequent treatment would dissuade a reasonable worker from making or supporting a charge of discrimination.  And the timing between McCowan's complaints and the denial of her hardship memo and union grievance, when combined with Ross's alleged statement, plausibly suggests a causal connection between McCowan's petitions and the adverse action.  *See Estate of Smith*, 318 F.3d at 512–13 ("[T]iming plus other evidence may be an appropriate test . . . .").

Therefore, we deny Ross's motion to dismiss McCowan's Petition Clause claim.

### Plaintiffs' Claims Against the City

As with its other § 1983 claims, the City argues that Plaintiffs have failed to identify a policy, practice, or custom of First Amendment retaliation.  (Doc. No. 54 at p. 19.)  Although Plaintiffs' allegations as to a policy or custom of retaliation are thin, we will allow them to go

forward at this stage.  In addition to the allegations related to Ross described above, Plaintiffs also allege that Deputy Commissioner Coulter and multiple other supervisors transferred them to less-desirable positions after they filed their complaints.  (*Id.* at ¶¶ 120, 190, 242.)  *See Pembaur*, 475 U.S. at 481 ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.").  They also allege that their supervisors and other employees warned them that if they complained about discrimination or harassment, they would be labeled "troublemakers" and ostracized to less-desirable positions, both of which allegedly occurred in this case.  (*Id.* at ¶¶ 56, 114, 220, 295–97.)  *See Mulholland*, 706 F.3d at 237 (explaining that a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law").

For those reasons, we will allow Plaintiffs' Petition Clause claims to move forward against the City at this time.

### E.     Count XIV:  Pennsylvania Whistleblower Law

The Pennsylvania Whistleblower Law prohibits employers from discharging, threatening, discriminating, or retaliating against an employee with regard to his or her "compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."  43 Pa. Stat. Ann. § 1423(a).  To make out a claim under the Whistleblower Law, a plaintiff must allege that she reported an instance of wrongdoing or waste to an appropriate authority and a causal connection between the report and the alleged retaliation.  *Golaschevsky v. Commonwealth, Dep't. of Envtl. Prot.*, 720 A.2d 757, 758–60 (Pa. 1998); *see also Frazier v. City of Philadelphia*, F. Supp. 3d 76,

96 (E.D. Pa. 2020) ("Recovery under the Act requires evidence that Plaintiffs: (1) reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation.").

The City Defendants, citing Plaintiffs' allegations that officers skipped sexual harassment training, argue that Plaintiffs failed to report any instance of wrongdoing to an appropriate authority or that they were "about to report" wrongdoing. (Doc. No. 54 at p. 13 (citing Doc. No. 49 at ¶¶ 88–91, which detail forging of attendance sheets at sexual harassment training).) Plaintiffs respond that "wrongdoing" encompasses violations of state and federal statutes and regulations, including violations of state and federal discrimination laws. (Doc. No. 60 at p. 8.) We agree with Plaintiffs.

In *Golaschevsky*, the Pennsylvania Supreme Court explained that the Whistleblower Law is implicated when an "employee alleges that there has been illegal activity within his own agency," and in this context, "'wrongdoing' includes . . . violations of any federal or state statute or regulation, other than violations that are 'of a merely technical or minimal nature.'" *Id.*; *see also Frazier*, 441 F. Supp. 3d at 96 ("Ultimately, all a Plaintiff must do is 'demonstrate she made a report of some action by her employer or its agent, which, if proven, would constitute a violation of a law or regulation.'" (quoting *Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 434 (Pa. Super. Ct. 2018))). Plaintiffs allege that they "blew the whistle" on discrimination, harassment, and retaliation within the Department, and that the Defendants transferred them to less-desirable positions after they reported these violations. Therefore, we deny the City Defendants' motion to dismiss Count XIV.[22]

---

[22] In his motion, Ross asks the Court to "dismiss with prejudice all claims in Plaintiffs' Second Amended Complaint," including McCowan's claim under the Pennsylvania Whistleblower Law. (Doc. No. 55-1.) However, Ross does not discuss the Whistleblower Law in his supporting brief or otherwise

### F.        Count XV:  Intentional Infliction of Emotional Distress

All of the Defendants have moved to dismiss Plaintiffs' IIED claims.  To state a claim for IIED under Pennsylvania law, "the plaintiff must plead that the defendant's conduct:  (1) was intentional or reckless; (2) was extreme and outrageous; (3) actually caused the distress; and (4) caused distress that was severe."  *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999).

"[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988); *see also Hoy v. Angelone*, 770 A.2d 745, 754 (Pa. 1998) (explaining that IIED cases "in the employment context have been few").  That said, courts have found plausible IIED claims in sexual harassment cases where the plaintiff alleged repeated sexual harassment along with retaliation.

For example, in *Pryor v. Mercy Catholic Medical Center*, the plaintiff was a technician in the psychiatric unit of the hospital, and the defendants were a physician at the hospital and various hospital entities.  No. CIV. A. 99–0988, 1999 WL 956376 at *1 (E.D. Pa. Oct. 19, 1999).  The physician was plaintiff's direct supervisor and also provided psychiatric care to the plaintiff.  *Id.*  The court found that the plaintiff stated a plausible IIED claim against the hospital and the physician where the physician subjected her to "physical force and the display of genitalia, foundling, [sic] and masturbation," and the hospital retaliated against her for filing complaints with administrative agencies about the sexual assaults.  *Id.* at *3; *see also Warmkessel v. E. Penn Mfg. Co.*, No. Civ.A.03-CV-02941, 2004 WL 838133, at *1 n.4 (E.D. Pa. Mar. 19, 2004)

---

provide a basis for dismissing this claim against him.  (*See generally* Doc. No. 55-2.)  Therefore, we deny Ross's motion to dismiss to the extent it seeks dismissal of Count XIV.

(denying the employer's motion to dismiss the plaintiff's IIED claim where the plaintiff alleged that he was sexually harassed by his supervisor, that he told defendant's human resources department about the conduct, and that the "defendant allegedly did nothing"); *McLaughlin v. Rose Tree Media Sch. Dist.*, 1 F. Supp. 2d 476, 483 (E.D. Pa. 1998) (finding the plaintiff stated a plausible IIED claim where she "alleged a pattern of sexual harassment" and retaliation).

***Plaintiffs' Claims Against Younger, Ross, and the Individual City Defendants***

Here, Plaintiffs allege that over the course of a year, their coworkers and supervisors subjected them to a sexually hostile work environment and that multiple levels of management, including the Police Commissioner and Deputy Commissioner, retaliated against them for complaining about the harassment. The second amended complaint also explains in detail the extreme emotional distress that Plaintiffs experienced as a result of Defendants' actions. Given the allegations described at length throughout this opinion, we cannot at this stage say that Plaintiffs are incapable of asserting IIED claims against the individual Defendants.[23] Therefore, we deny the motions to dismiss to the extent Plaintiffs' IIED claims are asserted against Younger, Ross, and the individual City Defendants. We make no comment at this time about the likelihood that Plaintiffs will ultimately prevail on these claims and find only that they have survived the motion to dismiss stage.

***Plaintiffs' Claims Against the City***

We will, however, dismiss Plaintiffs' IIED claims against the City. The City argues that it is immune from Plaintiffs' IIED claim under Pennsylvania's Political Subdivision Tort Claims

---

[23] Younger argues that Plaintiffs' IIED claims fail because they have not alleged that he retaliated against them. (Doc. No. 53 at pp. 9–10.) But in *Pryor*, the court allowed the IIED claim to move forward against the physician even though the hospital, and not the physician, was alleged to have retaliated against the plaintiff. 1999 WL 956376, at *1. Younger may raise this argument again at summary judgment, but in doing so, he should address *Pryor* and similar cases.

Act ("PSTCA").  (Doc. No. 54 at p. 12.)  Plaintiffs do not address this argument in their

opposition brief,[24] thus, we can grant the City's motion to dismiss this count as uncontested.

*See, e.g.*, *Ghoubrial*, 2006 WL 8459472, at *2 n.6 ("[P]laintiff filed a response but did not

address the sovereign immunity argument made by the United States.  The motion to dismiss by

the United States could, therefore, be granted as uncontested.").

        In the alternative, we agree with the City that it is immune under the PSTCA.  *See* 42 Pa.

Stat. & Con. Stat. § 8541 ("Except as otherwise provided in this subchapter, no local agency

shall be liable for any damages on account of any injury to a person or property caused by any

act of the local agency or an employee thereof or any other person."); *Panas v. City of*

*Philadelphia*, 871 F. Supp. 2d 370, 376 (E.D. Pa. 2012) ("[T]he Tort Claims Act shields local

government entities from liability for the intentional torts of their employees."); *Passalacqua v.*

*City of Philadelphia*, Civ. A. No. 14-5618, 2016 WL 7049051, at *14 (E.D. Pa. Dec. 2, 2016)

("Under [the Tort Claims Act], the City of Philadelphia is immune from suit for Intentional

Infliction of Emotional Distress . . . .").[25]  For those reasons, Plaintiffs' IIED claims against the

City are dismissed with prejudice.

---

        [24] Although Plaintiffs allege that the individual employees have waived their immunity, they do
not address the City's argument that it is itself immune under the PSTCA.  (*See* Doc. No. 60 at pp. 6–7;
Doc. No. 66 at p. 2.)

        [25] Ross also argues that McCowan's IIED claim against him is barred by the PSTCA.  (Doc. No.
55-2 at pp. 12–13.)  Public employees are immune from suit under the PSTCA.  42 Pa. Stat. & Con. Stat.
§ 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or
property caused by the acts of the employee which are within the scope of his office or duties only to the
same extent as his employing local agency and subject to the limitations imposed by this subchapter.").
However, that immunity is waived when a plaintiff alleges that the employee's actions amounted to
willful misconduct.  42 Pa. Stat. & Con. Stat. § 8550; *see also Walker v. N. Wales Borough*, 395 F. Supp.
2d 219, 231 (E.D. Pa. 2005) ("Individual public employees sued in their personal capacities do not enjoy
immunity under Pennsylvania law for willful, intentional torts.").  "By the very nature of the tort [of
IIED], it is a claim of willful misconduct . . . ."  *K.A. ex rel. J.A. v. Abington Heights Sch. Dist.*, 28 F.
Supp. 3d 356, 376; *see also, e.g.*, *L.H.*, 130 F. Supp. 3d at 930 ("The plaintiffs' claim for [IIED] in Count
III, however, by its very nature, is a claim of willful misconduct.  Therefore, defendant Garzella is not

**G.      Counts XVIII, XIX, XXI, & XXII:  Retaliation and Aiding and Abetting Under the PHRA and PFPO**

Ross and Younger have moved for dismissal of Plaintiffs' PHRA and PFPO claims for retaliation and for aiding and abetting.  (Doc. No. 55-2 at pp. 12–13; Doc. No. 53 at pp. 6–8.)

The PHRA and PFPO "make it illegal for any 'person' to retaliate against an individual for attempting to enforce his or her rights under the statute or to aid and abet the discriminatory conduct."[26]  *Phillips v. Heydt*, 197 F. Supp. 2d 207, 223 (E.D. Pa. 2002).  Under the retaliation provisions, it is unlawful for "any person . . . to discriminate in any manner against any individual because such individual has opposed," made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing related to an unlawful discriminatory practice.  43 Pa. Stat. & Con. Stat. § 955(d); *see also* Phila. Fair Practices Ordinance § 9-1103(1)(g).  To make out a claim for retaliation under the PHRA and PFPO, the plaintiff must allege that (1) she engaged in a protected activity; (2) the individual took an adverse employment action against her; and (3) there is a causal connection between her participation in the protected activity and the adverse employment action.  *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).  "Protected activities include informal protests to the employer, so long as they specifically allege that discrimination occurred," and the plaintiff "had an objectively reasonable belief that the actions he or she opposed constituted discrimination."  *Ahern v. Eresearch Tech.*, 183 F. Supp. 3d 663, 670 (E.D. Pa. 2016).

The PHRA and PFPO also prohibit "any person" from:

aid[ing], abet[ting], incit[ing], or coerc[ing] the doing of any act declared by this

---

entitled to immunity as to this claim pursuant to the PSTCA.").  Therefore, we reject Ross's claim for immunity and allow McCowan's IIED claim to go forward as against him.

[26] Because "claims under the Philadelphia Fair Practices Ordinance are analyzed under the same framework as . . . PHRA claims," we analyze these claims together.  *Vandegrift*, 228 F. Supp. 3d at 486 n.206.

section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice.

43 Pa. Stat. & Con. Stat. § 955(e); *see also* Phila. Fair Practices Ordinance § 9-1103(1)(h) (making it unlawful for "any person to aid, abet, incite, induce, compel or coerce the doing of any unlawful employment practice . . . .").

### *Plaintiffs' Claims Against Younger*

Officer Younger argues that the PHRA and PFPO retaliation claims brought against him fail because Plaintiffs do not allege that he acted in a retaliatory manner or was involved in the allegedly retaliatory scheduling changes. (Doc. No. 53 at p. 8.) He also asserts that as an officer, he could not have been involved in those decisions because he does not have "any control over decisions related to Plaintiffs' job assignments or work conditions." (*Id.*) Similarly, Younger argues that Plaintiffs' aiding and abetting claims fail because only a supervisor may be liable for aiding and abetting, and he was not Plaintiffs' supervisor, nor did he have control over their hiring, firing, terms and conditions of employment, schedules or job reassignments. (*Id.* at p. 7.) Plaintiffs do not substantively respond to Younger's arguments. Instead, they state in conclusory fashion that they "have pleaded facts sufficient to show he aided and abetted sex-based discrimination, harassment and retaliation." (Doc. No. 61 at p. 4.) They do not reference specific paragraphs of the complaint or discuss how those allegations, if true, would amount to violations of the PHRA and PFPO.

We agree with Younger that Plaintiffs have failed to state a claim against him for retaliation or aiding and abetting under the PHRA and PFPO. The second amended complaint does not allege that Younger took any adverse employment actions against them after they reported his inappropriate conduct to supervisors or submitted their internal complaints.

Therefore, we dismiss the retaliation claims as against him.  As for the aiding and abetting claims, Younger is not a proper defendant because he was not Plaintiffs' supervisor and Plaintiffs have alleged only direct incidents of harassment by Younger and not that he aided or abetted the other Defendants' discriminatory or retaliatory conduct.  *See Clinkscales v. Children's Hosp. of Phila.*, Civil Action No. 06-3919, 2007 WL 3355604, at *8 (E.D. Pa. Nov. 9, 2007) ("[T]he Third Circuit has distinguished between coworkers, who cannot be held liable under section 955(e), and supervisors, who can be held liable under that section."); *cf. Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) ("Dici has alleged no facts that would indicate that [her coworker] aided or abetted Dici's employer in refusing to take prompt remedial action against any discrimination suffered by Dici.  Rather, her complaint alleges only direct incidents of Brison's harassment.  Such incidents are not covered by the terms of § 955(e).").  Therefore, Counts XVIII, XIX, XXI, and XXII are dismissed without prejudice as against Younger.

### *McCowan's Claim Against Ross*

Ross states in conclusory fashion that McCowan's PHRA "claims are duplicative of the federal claims brought under §§ 1981 and 1983" and "should be dismissed for the same reasons why the federal claims alleging race-based discrimination and retaliation fail to survive a motion to dismiss."  (Doc. No. 55-2 at p. 13.)  Although we dismissed McCowan's § 1981 claims and § 1983 disparate treatment claims against Ross, we have allowed her § 1983 hostile work environment claim to go forward.  For similar reasons, we allow McCowan's PHRA and PFPO claims to proceed.  *Cf. Dici*, 91 F.3d at 553 ("For example, in paragraph 14 of the complaint, Dici states 'although Sergeant Monaco knew or should have known that the Plaintiff was being subject to harassment, he repeatedly refused to take prompt action to end the harassment directed at Plaintiff.' . . .  Such conduct, if proven, would constitute aiding and abetting." (alterations

adopted)); *Ahern*, 183 F. Supp. 3d at 671 (individual liability for aiding and abetting may be "imposed for a supervisor's own discriminatory conduct or their failure to take action against discrimination experienced by the employee"); *Clinkscales*, 2007 WL 3355604, at *8 (denying motion to dismiss on aiding and abetting claim where the plaintiff's "allegations, when read generously, assert that Green, Dudley, and Outlaw, as human resources officials, had the authority to stop the discriminatory conduct but failed to do so, thus aiding and abetting the discrimination in violation of section 955(e)").[27]  For those reasons, Ross' motion to dismiss Counts XVIII, XIX, XXI, and XXII is denied without prejudice.

### H.      Counts XXIII & XXIV:  Declaratory Judgment and Injunctive Relief

Plaintiffs' last two counts are stand-alone claims for declaratory judgment and injunctive relief.  (Doc. No. 49 at pp. 110–11.)  Younger and Ross have moved to dismiss both counts. Younger argues that these claims are not legally cognizable against him because he is not a supervisory employee and therefore, has no control over Plaintiffs' current or former work status or job assignments.  (Doc. No. 53 at p. 11.)  He also asserts that "the basis for these claims and the relief sought by Plaintiffs is entirely unclear" and therefore, fails to satisfy Rule 8's federal pleading standard.  (*Id.*)  Ross argues that these counts must be dismissed as to him because Ross

---

[27] Ross also argues that McCowan's PFPO claims are barred by the PSTCA.  (Doc. No. 55-2 at pp. 12–13.)  However, he does not explain this argument as it applies to the PFPO specifically, nor does he cite any cases where a court found that the PSTCA immunized a municipal employee from liability under the PFPO.  McCowan, citing cases related to the PHRA, responds that Ross is not entitled to immunity because the PFPO expressly covers employees of "the City, its departments, boards and commissions" and such employees are liable as "persons" under the Ordinance.  *Cf. City of Philadelphia v. Pa. Hum. Relations Comm'n*, 684 A.2d 204, 208 (Pa. Commw. Ct. 1996) ("[B]ecause the legislature included 'any political subdivision' in the PHRA's definition of 'employer,' the legislature clearly intended to permit a public employee to bring a *private* action against a political subdivision as an 'employer'" and therefore, "the PSTCA does not prevent an action under the PHRA."); *Boone v. Pa. Office of Vocational Rehab.*, 373 F. Supp. 2d 484, 495–96 (M.D. Pa. 2005) (finding similar language in PHRA amounted to a waiver of sovereign immunity).  Given the parties' limited discussion and the weighty implications of any ruling on issues of immunity, we will not rule on this argument at this time. Ross may raise his immunity argument again at the summary judgment stage.

is no longer Police Commissioner.  (Doc. No. 55-2 at p. 14.)  Plaintiffs do not respond to either

Defendant's argument.  (*See* Doc. Nos. 59, 61.)

Because Plaintiffs do not respond to Younger and Ross' arguments, their motions to

dismiss Counts XXIII and XXIV are granted as uncontested.  *See, e.g.*, *Ghoubrial*, 2006 WL

8459472, at *2 n.6 ("[P]laintiff filed a response but did not address the sovereign immunity

argument made by the United States.  The motion to dismiss by the United States could,

therefore, be granted as uncontested."); *Bowser*, 2010 WL 1462548, *5.  We also agree with

Ross that because he is no longer employed at the Department, the request for injunctive relief is

not properly brought against him.  *See Coller v. Missouri*, 965 F. Supp. 1270, 1276 (W.D. Mo.

Feb. 13, 1997) ("The Court cannot grant injunctive relief governing an official's conduct who is

no longer working as a public servant for [the state department].").

## VI.    *Conclusion*

In sum, the Court grants in part and denies in part the motions to dismiss.  The following

claims are dismissed with prejudice:

- McCowan's claims against Gibbons;

- Allen's claims against Ross;

- Plaintiffs' IIED claims (Count XV) against the City;

- Plaintiffs' stand-alone claims for declaratory relief (Count XXIII) and injunctive
  relief (Count XXIV) against Ross and Younger.

The following claims are dismissed without prejudice:

- McCowan's § 1981 claims (Counts VIII, IX, and X) against Ross;

- Plaintiffs' § 1983 disparate treatment claims (Count XI) against Ross, the City, and
  the individual City Defendants in their official capacity;

- Plaintiffs' PHRA and PFPO claims for retaliation and aiding and abetting (Counts
  XVIII, XIX, XXI, and XXII) against Younger.

Otherwise, the motions to dismiss are denied.  If Plaintiffs can resolve the issues addressed in this Memorandum, they may file a third amended complaint as to the claims that the Court has dismissed without prejudice.  If Plaintiffs choose to file a third amended complaint, they must do so within fourteen days of the date of this Memorandum and the accompanying Order. Defendants shall file their answers within twenty-one days of Plaintiffs filing a third amended complaint or informing the Court that they do not intend to file a third amended complaint.

An appropriate order follows.