**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiffs Audra McCowan and Jennifer Allen*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AUDRA McCOWAN *and* JENNIFER ALLEN,<br><br>                    Plaintiffs,<br><br>    v.<br><br>CITY OF PHILADELPHIA, *et al.*,<br><br>                    Defendants. | Civil Action No. 19-cv-3326-KSM<br><br>**Brief in Support of Plaintiffs' <u>Daubert</u> Motion to Exclude Opinion Testimony of Dr. Reed Goldstein**<br><br>**Federal Rule of Evidence 702** |

## Introduction

The questionable report of Defendants' expert, Dr. Reed Goldstein, who has had his opinion thrown out in the past[1], reflects a basic misunderstanding of expert testimony in civil litigation—in fact, his report is comprised of example after example of what an expert *cannot* do. Although Dr. Goldstein may be an experienced psychologist, not all "opinions" held by an expert are "expert opinions." Even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993). Dr. Goldstein is not qualified to testify as an expert in this case

---

[1] See <u>Ivey v. Lane</u>, 2018 WL 6528161 (E.D. Pa. Dec. 11, 2018).

because his opinions are not based on scientific knowledge, but were instead pulled out of whole cloth. His report offers no factual basis for his "expert" opinion.

### Procedural History

On September 11, 2020, Defendants filed a motion for "an extension of the Court's August 14, 2020 deadline to provide initial expert reports." (See ECF Doc. No. 97.) In support of their motion, Defendants alleged, in relevant part, **"Defendants retained Dr. Reed Goldstein for the purpose of rebutting and contradicting the evidence offered on behalf of Plaintiffs by Dawn N. Sheehan, Psy.D."** (Id., at p. 1.) (emphasis added).

On September 22, 2020, Dr. Goldstein examined Plaintiff Allen (see Ex. A, Dr. Goldstein Report for Plaintiff Allen, at p. 1) and on September 23, 2020, he examined Plaintiff McCowan (see Ex. B, Dr. Goldstein Report for Plaintiff McCowan Report, at p. 1). On November 13, 2020, Defendants served Plaintiffs with Dr. Goldstein's reports. (See id.) On January 21, 2021, Plaintiffs took Dr. Goldstein's deposition. (See Ex. C, Goldstein Deposition Transcript.) Under the guise of "rebuttal testimony" Defendants surreptitiously present Dr. Goldstein as a "generic expert" to speculate and surmise about all things related to the case, including Plaintiffs' credibility.

### Legal Argument

**A.    Legal Standards**

**i.    The <u>Daubert</u> Standard**

The admission of expert testimony is governed by Federal Rule of Evidence 702, explained and refined by the United States Supreme Court in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993) and its progeny. FRE 702 and <u>Daubert</u> articulate the trial court's mandatory gatekeeping role focused on the facts, reasoning and methodology used by a witness to ensure

that speculative, unreliable expert testimony does not reach the jury. Daubert, 509 U.S. at 597; General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

FRE 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient fats or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under Daubert, a trial court must ensure that expert testimony satisfies a "trilogy of restrictions": qualification, reliability and fit. Id. The overriding consideration with regard to these three requirements is that expert testimony should be admitted if it will assist the trier of fact. See United States v. Valasquez, 64 F.3d 844, 850 (3d Cr. 1995). The party offering the expert must prove each of these requirements by a preponderance of the evidence. In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

In Walker v. Gordon, 46 F. App'x. 691 (3d Cir.2002), the Third Circuit Court of Appeals set forth the role of this Court in performing its gatekeeping function, and, in particular, in deciding whether an expert's report meets the reliability factor of the Daubert and Rule 702 analysis. 46 F. App'x. 691, 695. The Court advised that the trial court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein, rather, the district court's role "is simply to evaluate whether the methodology utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact." Id. (citing Daubert, 509 U.S. at 591–93 (noting that the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and that the trial court's determination

"entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue")). This is because FRE 702 and Daubert prohibit expert opinions based on "subjective belief or unsupported conjecture." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590).

While the trial court exercises "broad latitude" in determining how to assess the reliability of an expert opinion, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999), assessing the admissibility of proposed opinion testimony using the principles articulated in FRE 702 and Daubert is crucial because so-called "expert" testimony "can be both powerful and quite misleading." Daubert, 509 U.S. at 595. Although the trial court's threshold inquiry is "flexible," the touchstone established by Daubert is the employment of the scientific method. 509 U.S. at 590.

The starting point for the challenge to expert testimony begins with the burden of proof. The procedural linchpin is Rule 104(a) of the Federal Rules of Evidence, which allows a court to determine "preliminary questions concerning the qualifications of a person to be a witness." Fed. R. Evid. 104(a). Although a Daubert challenge is made by the party challenging the expert's admissibility, the moving party does not bear the burden of proof: the party offering expert testimony bears the burden to establish the admissibility of this testimony by a preponderance of the evidence. See Daubert, 509 U.S. at 592 n. 10; Bourjaily v. United States, 483 U.S. 171 (1987); In re Paoli R.R. Yard PCB Litig., 35 F.3d at 744 & n. 11.

The testimony of Defendants' expert, Dr. Goldstein, does not meet the Daubert standard because it is so fundamentally unsupported that it can offer no assistance to the jury and therefore must be excluded. Elcock v. Kmart Corp., 233 F.3d 734, 755 (3d Cir. 2000) (noting

that an opinion overly reliant on assumptions absent "sufficient factual predicates" is a "castle made of sand"); General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (excluding expert testimony where there was "simply too great an analytical gap between the data and the opinion proffered"); In re Paoli R.R. Yard PCB Litig., 35 F3d at 765  (excluding expert testimony where the expert "place[d] heavy reliance on unreliable . . . data").

    **ii.**    **Rebuttal Witness Standard**

Federal Rule of Civil Procedure 26(a)(2) provides that a party must disclose to the other parties the identity of any witness it may use at trial. Fed. R. Civ. P. 26(a)(2)(A). A party who intends to offer expert testimony is required to disclose a written report for each expert witness, which includes a "complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). A party is required to make these disclosures at the time and in the sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(D).

If the court's scheduling order allows for rebuttal reports, a party may submit expert rebuttal testimony if the evidence is "intended solely to contradict or rebut" other expert testimony. Fed. R. Civ. P. 26(a)(2)(D)(ii). At trial, rebuttal evidence is limited "to that which is precisely directed to rebutting new matter or new theories presented by the [opposing party's] case in chief." Step-Saver Data Sys., Inc. v. Wyse Tech., 752 F. Supp. 181, 193 (E.D. Pa. 1990), aff'd in relevant part and rev'd in part on other grounds, 939 F.2d 91 (3d Cir. 1991); see also In re Asbestos Prod. Liab. Litig. v. Fiberboard Corp., Nos. 09-74351x, 09-74410, 2012 WL 661673, at *3 (E.D. Pa. Feb. 8, 2012) (striking rebuttal report for "presenting few, if any, refuting arguments made by the opposing party").  Rebuttal evidence is only admissible when it will "explain, repel, counteract or disprove the evidence of the adverse party." United States v. Chrzanowski, 502 F.2d 573, 576

(3d Cir. 1974). It is not "an opportunity for the correction of any oversights in the plaintiff's case in chief." <u>Step-Saver Data Sys.</u>, 752 F. Supp. at 193.

While rebuttal and reply reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert, expert reports that simply address the same general subject matter as a previously submitted report, do not qualify as proper rebuttal. <u>Withrow v. Spears</u>, No. 12-06, 2013 WL 4510305, at *12 (D. Del. Aug. 22, 2013); <u>see</u> <u>also</u> <u>Blake v. Securitas Sec. Servs.</u>, 292 F.R.D. 15, 18 (D.D.C. 2013) ("Where a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony goes beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a) and the Court's governing scheduling order."); <u>In re Trasylol Products Liability Litig.</u>, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) ("Rebuttal testimony should not be allowed if it logically belongs in the party's case in chief and goes to the central issue of causation."); <u>Tuscumbia City School System v. Pharmacia Corporation</u>, 2014 WL 12605648, at *1 (N.D. Ala. Sept. 3, 2014) ("rebuttal" testimony should be excluded where expert testifies to a central issue in the case that belongs in the party's case-in-chief).

Under Rule 37(c)(1), exclusion is both "automatic and mandatory" when the disclosed testimony is inadequate unless the proponent of the expert witness can establish that its violation of Rule 26 was either justified or harmless. Fed. R. Civ. P. 37(c)(1); <u>see</u> <u>also</u> Wright, Miller and Marcus, Federal Practice and Procedure: Civil 2d §2031.1 (Rule 37(c)(1) provides for automatic exclusion of information that should have been revealed but was not).

**B.     Under Rule 702 and <u>Daubert</u>, Dr. Goldstein should not be permitted to testify because he omitted significant facts and employed questionable methods in making his findings.**

    **i.     Dr. Goldstein is a professional expert for hire who depends on repeat business from the City of Philadelphia and who bends the rules just to stay employed.**

Dr. Goldstein should be barred from testifying because his opinions are not the result of scientific methodology; rather, he reached his conclusions before ever examining Plaintiffs or reviewing any records in this matter. An expert who "starts his analysis with a conclusion that needs to be established"—rather than an expert who starts with research or testing and then ends with a conclusion—does not utilize methodology that can pass muster under <u>Daubert</u>. <u>See</u> <u>Ind. Ins. Co. v. Valmont Elec., Inc.</u>, 2001 WL 1823587, 2001 U.S. Dist. LEXIS 23256, *24-25 (S.D. Ind. Dec. 27, 2001). As the Seventh Circuit has explained, an expert may not "start[] his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)." <u>Clark v. Takata Corp.</u>, 192 F.3d 750, 757 (7th Cir. 1999).

Consequently, courts across the country have refused to admit testimony when the expert "reasoned from an end result in order to hypothesize what needed to be known but was not" instead of "reasoning from known facts to reach a conclusion." <u>Mitchell v. Gencorp Inc.</u>, 165 F.3d 778, 783 (10th Cir. 1999) (quoting <u>Sorensen by and through Dunbar v. Shaklee Corp.</u>, 31 F.3d 638, 649 (8th Cir. 1994)); <u>see</u> <u>also</u> <u>Marsh v. W.R. Grace & Co.</u>, 80 F. App'x 883, 886 (4th Cir. 2003); <u>Ill. Cent. R.R. v. Dupont</u>, No. 00-500-D-M2, 2006 WL 6855107, 2006 U.S. Dist. LEXIS 100793, at *9 (M.D. La. June 30, 2006); <u>In re Meridia Prods. Liab. Litig.</u>, 328 F.Supp.2d 791, 805 (N.D. Ohio 2004), aff'd 447 F.3d 861 (6th Cir. 2006); <u>Agee v. Purdue Pharms., Inc.</u>, No. CIV-03-0787-HE, 2004 WL 5352989, 2004 U.S. Dist. LEXIS 30551, at *11-13 (W.D. Okla. Nov. 22, 2004); <u>Lake Michigan Contractors, Inc. v. Manitowoc Co., Inc.</u>, 225 F.Supp.2d 791, 803 (W.D. Mich. 2002).

In support of Defendants' September 11, 2020 motion requesting additional time to serve their expert report, Defendants admitted they "retained Dr. Reed Goldstein for the purpose of rebutting and contradicting the evidence offered on behalf of Plaintiffs by Dawn N. Sheehan, Psy.D." (ECF Doc. No. 97, at p. 1.) His only objective was to find a way to contradict Plaintiffs' expert:

> Q. You had not conducted an evaluation of either Plaintiff at the time this motion was submitted on September 11, 2020, correct?
> A. That is correct. It was the 22nd and 23rd of September that I conducted the evaluation.
> Q. Counsel for the defense had already retained you as a rebuttal expert to contradict Dr. Sheehan; isn't that correct?
> A. I mean, it seems like, based on what you're showing me, yes.

(See Ex. C, Deposition of Dr. Goldstein, at pp. 59:15-24.) Dr. Goldstein testified that Plaintiffs' knowledge of the fact that he had been hired with a preconceived notion of contradicting Plaintiffs' expert prior to examining them could have impacted their performance during his evaluations. (Id., at pp. 48:18 – 49:04.)

Indeed, the City of Philadelphia has been paying Dr. Goldstein to write reports in legal matters for 15 years. (Id., at pp. 13:20 – 14:02.) During the last year, 10 percent of the legal matters in which he was paid for a report were on behalf of the City of Philadelphia and the City Solicitor's Office. (Id. at pp. 13:13-19.) In the past, he has worked on a number of cases with Defendants' counsel, particularly Nicole Morris and Daniel Unterburger. (Id., at pp. 12:16 – 13:12.) For years, the majority of Dr. Goldstein's income has been derived from services provided to defendants in legal matters "focusing on damages and to what extent, if any, did the [plaintiff] suffer psychological or neuropsychological difficulties." (Id., at pp. 11:13 – 12:05; 33:07-18.) Dr. Goldstein could not list any instances where he provided his client with an unfavorable opinion. (Id., at p. 12:10-15.)

Dr. Goldstein claimed he performed an independent forensic evaluation of the plaintiffs in this matter. (Id., at pp. 50:08-14.) However, when asked whether his evaluations of Plaintiffs were objective and unbiased, Dr. Goldstein was unable to provide a definite unqualified answer, stating "I always try to do that," and "I tried to." (See id., at pp. 50:15-22.) When Dr. Goldstein was asked if he was objective and unbiased when reporting his findings in the form of a written report, he said he "tried to be." (Id. at pp. 50:23 – 51:02.) When asked if there was any reason for either Plaintiff to suspect otherwise, Dr. Goldstein said, "I could see where a plaintiff might wonder about whether the examiner was being objective." (Id., at pp. 51:12-24.)

Because Dr. Goldstein depends on repeat business from the City of Philadelphia, he chose an interpretation that bolsters his pre-conceived conclusions. This type of backwards reasoning "turns scientific analysis on its head" and must be excluded due to the unreliability of its methodology. Sorensen, 31 F.3d at 649. As such, his testimony is must be excluded.

### ii. Dr. Goldstein is not offering legitimate rebuttal testimony.

Dr. Goldstein's opinion amounts to nothing more than a straw man argument that exaggerates Dr. Sheehan's opinions and then attacks his own extreme distortion rather than addressing her opinions head on. As such, his testimony exceeds the scope of rebuttal because he failed to "repel" the opinions of Plaintiffs' expert. Rebuttal evidence is admissible only when it will "explain, repel, counteract or disprove the evidence of the adverse party." Chrzanowski, 502 F.2d at 576.

Dr. Goldstein focused his evaluation and interpretations almost exclusively on whether or not Plaintiffs met the formal criteria for Post-Traumatic Stress Disorder (PTSD) as defined in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"). (See Ex. A, Goldstein Report for Allen, at p. 12-14; Ex. B, Goldstein Report for McCowan, at p. 20-22.) Dr.

Goldstein concluded that Plaintiffs "do not meet the criteria for a formal diagnosis of PTSD." (Ex. A, at p. 14; Ex. B, at p. 22.) Dr. Sheehan's examination of Plaintiffs did not result in a formal diagnosis of PTSD (see Ex. D, Sheehan Report for Allen; Ex. E, Sheehan Report for McCowan), and as such, Dr. Goldstein has failed to rebut her opinions.

The DSM-5 is a diagnostic and statistical manual that provides diagnostic criteria designed to assist clinicians in conducting clinical assessment, case formulation, and treatment planning; and it is also used as a reference for the courts and attorneys in assessing the forensic consequences of mental disorders. (See Ex. C, Goldstein Deposition, at p. 40:06-10.) While the DSM-5 is one of the primary classification systems for mental disorders, it has significant limitations in forensic settings. (Id., at p. 40:11-18.)

The DSM-5 places PTSD in a diagnostic category (Trauma- and Stressor-related Disorders) that is distinctive among psychiatric disorders due to the requirement of exposure to a "stressful event" as a precondition to diagnosis. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), Diagnostic Criteria for PTSD, https://www.ncbi.nlm.nih.gov/books/NBK207191/box/part1_ch3.box16/. According to the current diagnostic criteria, a diagnosis of PTSD is appropriate only if "criterion A" is met, i.e., the individual must have had a qualifying exposure to a "traumatic event" as defined in the DSM-5. Id. The DSM-5 definition of trauma requires "actual or threatened death, serious injury, or sexual violence." Id. Stressful events not involving an immediate threat to life or physical injury, such as psychosocial stressors (e.g., sexual harassment or racial discrimination) are not considered "trauma" by this definition. Id. Without this trauma exposure, psychiatric symptoms reported by an individual would not qualify as PTSD. Id. As a result, Dr. Sheehan's examination

of the Plaintiffs did not result in a formal diagnosis of PTSD. (<u>See</u> Ex. D, Sheehan Report for Ms. Allen, at p. 16; Ex. E, Sheehan Report for Ms. McCowan, at p. 19.)

Instead, Dr. Sheehan's evaluation offered the following diagnoses, which indicate the presence of symptoms that are consistent with or similar to PTSD, but do not formally meet the criteria for PTSD due to the absence of criterion A (definition of traumatic event) as defined in the DSM-5:

- Jennifer Allen was diagnosed with: (1) Other Specified Trauma – and Stressor-Related Disorder with Panic Attacks (posttraumatic stress symptoms with mixed mood lasting more than six months in response to severe, persistent physical and emotionally adverse, hostile, and threatening conditions); (2) Generalized Anxiety Disorder; and (3) Unspecified Anxiety Disorder. (<u>See</u> Ex. D, at p. 17.)

- Audra McCowan was diagnosed with: (1) Other Specified Trauma – and Stressor-Related Disorder with Panic Attacks (posttraumatic stress symptoms with mixed mood lasting more than six months in response to severe, persistent physical and emotionally adverse, hostile, and threatening conditions); and (2) Adjustment Disorder with Anxiety and Depression. (<u>See</u> Ex. E, at p. 21.)

By implying that Dr. Sheehan concluded that Plaintiffs meet the criteria for PTSD, Dr. Goldstein's report gives the impression of refuting her opinions, whereas her actual opinions were not addressed. In fact, Dr. Goldstein testified that Plaintiffs' symptoms were consistent with Dr. Sheehan's diagnoses. (<u>See</u> Ex. C, Goldstein Deposition, at p. 80:05-19; 93:24 – 98:24.) As such, Dr. Goldstein's testimony does not qualify as proper rebuttal and should be excluded.

### iii.      The data underlying Dr. Goldstein's opinions is so lacking in probative force and reliability that no reasonable expert could base an opinion on it.

To reach his conclusion that Plaintiffs do not meet the criteria for PTSD, Dr. Goldstein relied heavily upon the results of the TSI-2, a measure that lacks information and research regarding performance statistics and is not normed on individuals who have experienced sexual harassment and discrimination. See Briere, John, Trauma Symptom Inventory-2 (TSI-2): Professional Manual, Psychological Assessment Resources, Inc. (2011). Briere (2011), who developed the TSI-2 and authored its manual, states that given the diverse range of clinical presentations, utilizing a test that only addresses PTSD related sequelae will likely be limited in its ability to depict an accurate clinical profile of a trauma survivor. Id. Additionally, the TSI-2 is restricted to measuring symptoms within a six-month period prior to administration, thus limiting the interpretation's temporal perspective, which is important in this case:

> Q.      Are you able to discuss the known limitations of the TSI-2?
> A.      Well, the known limitations of the TSI-2 are that it focuses on, you know, symptoms specific to the six-month period leading up to the time of the evaluation.

(See Ex. C, Goldstein Deposition, at p. 80:06-10.) The TSI-2 is most suitably utilized in clinical settings and should be administered cautiously in forensic settings. (See id., at p. 80:17-21.)

Dr. Goldstein focused his evaluation and interpretations almost exclusively on whether or not Plaintiffs met the formal criteria for PTSD at the time of his evaluation. He did not opine as to whether Plaintiffs may have previously met the criteria for or exhibited symptoms of PTSD outside of the 6-month period prior to his examination. Before the 6-month period leading up to Dr. Goldstein's examination, both Plaintiffs had resigned from their positions with the Philadelphia Police Department (and as a result, likely had minimal exposure to stimuli that would trigger symptomatic response), and both had been actively participating in psychotherapy:

Q.   What can an individual do in order to minimize psychological sequelae related to a stressful or traumatic event?

A.   Engage in treatment including medication and/or psychotherapy.

Q.   Okay. In other words, how can somebody minimize any emotional damage they may have suffered from any given situation?

A.   Well, one can participate in treatment.

Q.   Is that something that's expected in cases involving emotional damages?

A.   I wouldn't know how to answer that. It's recommended for people that have symptoms.

Q.   Do you believe Plaintiffs took action that was meant to minimize any damage they feel they may have suffered in this case?

A.   Yes. My understanding is that they both entered treatment.

Q.   In your opinion, what were some of these actions that Plaintiffs took?

A.   Well, they both said that they left their jobs.

Q.   And they both engaged in treatment, correct?

A.   Yes.

(See Ex. C, Goldstein Deposition, at pp. 99:18 – 100:19.)

Given Plaintiffs' mitigation efforts, Dr. Goldstein admitted there would be a logical and expected reduction in symptoms and anticipated increase in functioning between their resignations from employment and the date of their examinations with him. (Id.) Yet, through cleverly executed sight of hand (employing the TSI-2 which is restricted to measuring symptoms within the six-month period prior to administration), Dr. Goldstein utilizes Plaintiffs' symptom reduction and improved functioning to conclude that emotional distress either never existed or no longer exists.

Because Dr. Goldstein's interpretation of the TSI-2 is unreliable, his testimony must be excluded. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 at 748 ("If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.").

iv.     **Dr. Goldstein never discussed any alternative interpretations and simply chose an interpretation that bolsters his preconceived impression.**

With any psychological evaluation, and especially with forensic evaluations, interpretation of objective measures such as the TSI-2 must be considered within the context of the evaluation. An evaluator must take into consideration the examinee, the context of the evaluation, and explore the most probable alternative sources of the results of any objective measures.

FRE 702 excludes testimony by opinion witnesses who have not "adequately accounted for obvious alternative explanations." Miller v. United States, 287 F. App'x 982, 984 (3d Cir. 2008) (citing Claar v. Burlington N.R.R. Co., 29 F.3d 499, 502 (9th Cir.1994)). Scientific methodology is empirical, and therefore, "whether the theory or technique can be (and has been) tested" is a prime indicator of reliability. Daubert, 509 U.S. at 593-94. In Claar, for example, the court approved of a district court's rejection of testimony from doctors who did not attempt to rule out other possible causes for the injuries that the plaintiffs claimed. See 29 F.3d at 501-03.

The Pennsylvania Legislature has adopted a code of ethical principles for psychologists in the Commonwealth, which also requires that psychologists, "in publishing reports of their work, never suppress disconfirming data, **and acknowledge the existence of alternative hypotheses and explanations of their findings.**" 49 Pa. Code § 41.61 (emphasis added). The American Psychological Association's *General Guidelines for Providers of Psychological Services* (APA Guidelines) also require psychologists to explore alternative explanations for their findings. See American Psychological Association, Ethical principles of psychologists and code of conduct (2002, amended effective June 1, 2010, and January 1, 2017), https://www.apa.org/ethics/code/; see also Ex. C, Goldstein Deposition, p. 68:13-17. The Pennsylvania Code provides "psychologists shall adhere to APA standards and guidelines." 49 Pa. Code § 41.62.

Dr. Goldstein apparently neglected this process, never discussed any alternative interpretations, and simply chose an interpretation that bolsters his impression. Dr. Goldstein concluded that Plaintiffs' current symptoms did not meet the criteria for PTSD and concluded that they both suffered from longstanding "maladaptive personality characteristics," which he implies cause them to be mistrustful, misunderstand or misinterpret the intentions of others, blame others for their difficulties, fail to take responsibility and cause anger or entitlement. (See Ex. A, Allen Report, at p. 13; Ex. B, McCowan Report, at p. 22.)

Dr. Goldstein failed to substantiate that Plaintiffs suffer longstanding maladaptive personality characteristics. While at first blush it appears his assessment was a result of certain objective measures (e.g., the TSI-2), he failed to explain how these results are likely attributable to Plaintiffs' past experiences as opposed to their more recent experiences. (See id.) When asked why he failed to consider any alternative interpretations, Dr. Goldstein was unable to provide a coherent response:

> Q.   How come you didn't discuss any alternative interpretations?
> A.   I mean, I sort of did the calculus, you know, in my head in terms of thinking through the alternatives. I thought them through or, you know, thought though possible alternative explanations before I wrote the final report, but I understand the report itself doesn't state what those other possibilities might have been.
> Q.   Are you going to be offering an opinion at trial regarding your thinking around the alternative explanations that were not mentioned in your report?
> A.   I don't know how to answer that question.

(Ex. C, Goldstein Deposition, p. 115:08 – 116:05.)

> Q.   The APA guidelines . . . state that you have to offer or explore alternative explanations, correct?
> A.   Yes.

(Id. at p. 68:13-17.)

Because Dr. Goldstein failed to "adequately account for obvious alternative explanations,"
his report does not pass scientific rigor, or the ethical principles governing the practice of
psychology in Pennsylvania and therefore must be excluded. See Miller, 287 F. App'x at 984.

> **v.    Dr. Goldstein's report is filled with analytical gaps, unsupported conclusions and inappropriate extrapolations, which expose his flawed methodology.**

Dr. Goldstein failed to substantiate either through history, observation or objective testing
that these "longstanding maladaptive personality characteristics" were manifesting at the time of
his evaluation, present or manifesting prior to or at the time Plaintiffs were employed at the
Police Department, or if these characteristics ever rose to the level of clinical significance of a
personality disorder that would cause such gross misinterpretation of the actions or intent of
others to the extent symptoms would develop in the absence of the reported events with the
Police Department:

Q.    Was there anything other than the testing that led to your impression and conclusion about either claimant's personality traits?

A.    I did rely on the testing to a large degree, but I also tried to understand each of the individuals' prior history, and there were some treatment notes as well.

Q.    So let me be a little bit more specific. What objective evidence other than the testing did you rely on to form your impression and conclusion about the plaintiffs' personality traits?

A.    Well, the plaintiffs' self-report of their history and whatever was documented in the records that I also included in my report.

Q.    How about during your evaluation of the plaintiffs? What objective evidence did you rely upon other than testing that led to your impression about their personality traits?

A.    Well, it was the totality of the information that I had.

Q.    Did either claimant present with indicators of maladaptive personality traits?

A.    During the time of my evaluation, not necessarily

Q.    During your clinical evaluation, did the plaintiffs present with any subtle nuances in their personality traits -- for example, being a little bit standoffish or cooperative but defensive in their answers?

A.    Not necessarily. I mean, I -- but I can't form those opinions on the basis of one -- you know, one contribution.

Q.    Did either plaintiff appear standoffish at all?

A.    Standoffish to whom?
Q.    Toward you.
A.    Not necessarily, no.
Q.    Did either plaintiff appear defensive in their answers?
A.    Not necessarily.

(Ex. C, Goldstein Deposition, p. 61:01 – 63:02.)

Q.    Was Ms. McCowan cooperative and appropriate during the evaluation
      process?
A.    Yes.
Q.    Did she appear to be open and honest?
A.    Yes, she did.
Q.    Your report indicated she endorsed moderate symptoms of anxiety,
      correct?
A.    Yes.
Q.    She produced a valid test result with no indication of overreporting,
      correct?
A.    Of overreporting of symptom, yes, correct.
Q.    So there was no evidence of malingering, feigning, or attempt to present
      herself with exaggerated psychological distress?
A.    No evidence.
Q.    Were her scores similar to individuals who experience despair, anxiety,
      and tension or worry about their health?
A.    Yes.
Q.    Were her scores similar to individuals who endorse feeling low energy and
      are unable to meet demands of day-to-day life or have trouble with
      concentration, memory, and decision-making?
A.    Yes.
Q.    You stated she experiences some depressed and anxious mood, but those
      symptoms could not be directly linked to the alleged workplace events,
      correct?
A.    Yes.
Q.    How can you substantiate that conclusion?
A.    Because on the basis of all the test data and information that I had
      available, Ms. McCowan-Brown has made some good progress and that
      there are other stressors or concerns in her life that she's sort of denied or
      glossed over. Furthermore, my understanding is that she was working well
      in her new job.
Q.    Okay. If you don't link her depressed and anxious mood to the workplace
      events, what do you believe better accounts for those symptoms?
A.    Well, her personality style and her -- you know, the combination of effects
      of stressors over the years of her life.
Q.    I want go to Ms. Allen. Was she cooperative and appropriate during the
      evaluation process?
A.    Yes, Ms. Allen was.

Q.      Did she appear to be open and honest?

A.      Yes.

Q.      Am I correct that your report indicated she endorsed moderate to severe symptoms of depression and anxiety?

A.      Yes.

Q.      Am I correct that she produced valid test results with no indication of overreporting such as malingering, feigning, or attempting to present herself with exaggerated psychological distress?

A.      Yes.

Q.      Am I correct that her results were similar to individuals vulnerable to becoming concerned about their health and that she endorsed having trouble with memory, concentration, and decision-making?

A.      Yes.

Q.      Am I correct that her results were similar to individuals vulnerable to experiencing anxiety?

A.      Yes.

Q.      Am I correct that her scores on the MMPI-2 scales related to PTSD were elevated?

A.      Give me a second to double-check . . . Yes.

Q.      Doesn't that suggest that she report feeling upset in response to perceived stress circumstances?

A.      Yes, it does.

Q.      Ms. Allen's scores on the MCMI-IV posttraumatic scale were elevated, correct?

A.      Yes.

Q.      And doesn't that suggest the presence of some posttraumatic symptomology?

A.      Yes, it does.

(Ex. C, Goldstein Deposition, p. 103:01 – 106:11.)

While in his report Dr. Goldstein claims to have considered objective data in reaching his conclusions, his deposition testimony reveals that he simply put together a laundry list of "objective evidence" and then drew unsupported conclusions about it. At his deposition, he admitted that his findings were consistent with Dr. Sheehan's. (See id, at p. 80:05-19; 93:24 – 98:24.) Additionally, while his evaluation revealed Plaintiffs were in fact experiencing symptoms, he failed to offer solid impressions regarding this—other than to say they could not be directly linked to the alleged workplace events and do not cause impairment. (See Ex. A, Allen Report, at p. 14-15; Ex. B, McCowan Report, at p. 23.) Moreover, despite his insinuation

that Plaintiffs' alleged "maladaptive personality characteristics" are so salient and pervasive that they created the nexus in this case, Dr. Goldstein failed to diagnose either Plaintiff with a personality disorder. In fact, neither Plaintiff has a history of personality disorder nor have they ever received a diagnosis that could be even remotely suggestive of a personality disorder:

> Q.  Did either examinee have a history of personality disorder?
> A.  Not that's been diagnosed by any of the treating clinicians.
> Q.  So they never received a diagnosis that could be suggestive of a personality disorder?
> A.  Correct.

(Ex. C, Goldstein Deposition, p. 114:23 – 115:07.)

There is no evidence to suggest either examinee suffered ongoing or sustained psychological symptoms associated with experiences prior to those alleged in the complaint. Id. There is no evidence that prior functioning was significantly impaired for a sustained period of time. Id. Available diagnostic history occurring prior to the work-related incidents was deemed to be relatively short lived, transient, and ultimately resolved. (See Ex. A, Allen Report; Ex. B, McCowan Report.)

Dr. Goldstein's evaluation revealed that multiple medical and mental health professionals have described Plaintiffs as having suffered significant emotional distress and impairment related to their distressing work environment, and both were prescribed psychotropic medication in an attempt to alleviate the psychiatric symptoms of distress. Id. Dr. Goldstein reported that Plaintiffs showed no evidence of malingering or overreporting symptomology, that their assessment and test results indicated they were in fact experiencing symptoms of anxiety, depression, tension, troubles with concentration, and elevation on specific scales associated with posttraumatic stress or other related symptoms. (Ex. C, Goldstein Deposition, pp. 61:01 – 63:02; 103:01 – 106:11.) As such, there is no evidence to suggest Plaintiffs are fabricating, exaggerating, or feigning

events, their experiences or reported symptomology. Because Dr. Goldstein failed to base his

testimony on "sufficient facts or data," his testimony must be excluded under FRE 702.

> **vi.   Dr. Goldstein's testimony about the merits of the underlying action must be
> limited by Rule 403 because its probative value is substantially outweighed by
> the danger of unfair prejudice.**

Dr. Goldstein stated in his deposition that "determining the merits of the allegations, you

know, extends beyond the scope of my report." (Ex. C, Goldstein Deposition, p. 69:24 – 70:02.)

But in his report, Dr. Goldstein attempts to shoehorn in sweeping conclusions about Plaintiffs'

credibility under the guise of medical opinion:

> The determination of the merits of Ms. Allen's allegations falls outside the scope
> of my report. Whatever those merits, Ms. Allen's subjective stress is in part because
> of her characteristic distorted way of viewing and processing information. On tests
> of emotional and personality functioning, she scored similarly to individuals who
> want to be seen as beyond reproach but are psychologically naïve. They are prone
> to misinterpret the intentions of others, do not take personal responsibility and
> blame others for their problems, and fail to recognize their own role in their
> perceived difficulties. These individuals feel entitled and are likely to become angry
> or carry a grudge when they sense they are not getting what they want.
> …
> I was not asked to evaluate the merits of Ms. McCowan-Brown's allegations.
> However, Ms. McCowan-Brown's subjective stress is in part because of her
> characteristic distorted way of viewing and processing information. Her pattern of
> item endorsement on tests of emotional and personality functioning is identified in
> individuals lacking psychological insight into their motives or behavior and
> wanting to be seen as beyond reproach. They tend to misunderstand or misinterpret
> the intentions of others, and blame others and do not take personal responsibility
> for their perceived difficulties. These individuals feel embittered, owed, and
> entitled and can become angry or contentious.

(Ex. A, Allen Report, at p. 15; Ex. B, McCowan Report, at p. 22-23.)

The Third Circuit has made it clear that "[a] doctor ... cannot pass judgment on the

[examinee's] truthfulness in the guise of a medical opinion, because it is the jury's function to

decide credibility." <u>Coney v. NPR, Inc.</u>, 312 F. App'x 469, 474 (3d Cir. 2009) (citing <u>United

States v. Whitted</u>, 11 F.3d 782, 785–86 (8th Cir. 1993)); <u>see also</u> <u>Gray v. Ratanchandani</u>, 2017

WL 4969338, *2 (M.D. Pa. Nov. 1, 2017) ("we note that court decisions suggest that such testimony [concerning 'symptom magnification'] may be best characterized as a credibility determination, ordinarily reserved to the jury." ). Opinions of this type create a serious danger of confusing or misleading the jury, causing it to substitute the expert's credibility assessment for its own common-sense determination. Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891) ("determining the weight and credibility of [a witness'] testimony .... belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men...."; see also Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (stating that the "[e]valuation of witness credibility is the exclusive function of the jury") (citation omitted); United States v. Canalichio, 369 F. Supp. 3d 625, 637 (E.D. Pa. 2019) (noting problems arise when an expert witness testifies to facts, e.g., the witness's expertise may confer upon him an "aura of special reliability and trustworthiness"; and the testimony may stray from that which is based on reliable methodology to sweeping conclusions).

Defendants may not "filter fact evidence and testimony through their expert merely to lend credence to the same" nor may expert testimony "'be used merely to repeat or summarize what the jury independently has the ability to understand.'" Kia v. Imaging Scis. Int'l, Inc., No. CIV.A 08-5611, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010) (quoting Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir.2005).

Accordingly, "[c]redibility is not a proper subject for expert testimony [because] the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." United States v. Benson, 941 F.2d 598, 604 (7th Cir.1991) (citations omitted); see also Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir.1995) ("[A]n expert may not go so far as to usurp the exclusive function of the jury to

weigh the evidence and determine credibility.") (citations omitted); Nimely, 414 F.3d at 398 (noting that Courts of Appeals have "consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702") (citations omitted).

Dr. Goldstein's unsubstantiated opinions about Plaintiffs' "maladaptive personality traits" are unfairly prejudicial and should be excluded under FRE 403, which provides that relevant evidence should not be allowed if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The probative value of Dr. Goldstein's unsubstantiated opinions is substantially outweighed by the prejudicial effect under Rule 403. Nichols v. American Nat. Ins. Co., 154 F.3d 875, 883 (8th Cir. 1998) (remanding for a new trial where a psychiatrist expert witness "did more than explain psychiatric terms and the situations in which they may arise. She provided her own opinion that Nichols' statements to Dr. Tyndall were influenced by recall bias, secondary gain, and malingering"); see also Gray v. Ratanchandani, 2017 WL 4969338, *2 (M.D. Pa. Nov. 1, 2017) ("we note that court decisions suggest that such testimony [concerning 'symptom magnification'] may be best characterized as a credibility determination, ordinarily reserved to the jury."); Kidd v. Wal-Mart Stores, Inc., 2009 WL 3805584, *3 (E.D. Va. Nov. 12, 2009) ("Even if they possess the requisite expertise, the Court will not permit these doctors to opine as to whether Kidd has [symptom magnification or somatoform disorder]. Such testimony far too easily invades the province of the jury or comments on the credibility of the Plaintiff" and "[n]either doctor ... may opine as to whether or not [the plaintiff] herself has somatoform disorder because such testimony could comment on Kidd's veracity and such testimony extends beyond the area of expertise identified for these doctors.").

Dr. Goldstein's testimony should not be permitted because his opinions involve conclusory findings that Plaintiffs suffered "maladaptive personality characteristics" and the law is clear that he cannot make credibility determinations under the guise of medical opinion. No expert, including Dr. Goldstein, can be permitted to opine on the credibility or consistency of others' testimony. As such, his testimony must be excluded.

**C.     Conclusion**

Under the guise of "rebuttal testimony" Defendants surreptitiously present Dr. Goldstein as a "generic expert" to speculate and surmise about all things related to the case, whose testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'" Amco Ukrservice & Prompriladamco v. Am. Meter Co., No. CIV.A.00-2638, 2005 WL 1541029, at *5 (E.D. Pa. June 29, 2005) (quoting United States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003)); see also Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); SEC v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

For the reasons stated above, Plaintiffs respectfully request the Court enter an Order precluding Dr. Goldstein's testimony.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

_/s/ Ian M. Bryson, Esquire_
IAN M. BRYSON, ESQUIRE
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com

Dated: March 5, 2021                    _Attorneys for Plaintiffs_

23