**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AUDRA MCCOWAN, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-3326-KSM** |
| **CITY OF PHILADELPHIA, et al.**, | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                               **March 10, 2022**

**TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ............................................................................................ 3

  A.   The Evidentiary Record ......................................................................................... 3

  B.   McCowan is Promoted and Transferred to the Intelligence Bureau ............................... 5

     1.   The Intelligence Bureau ................................................................................. 6

     2.   McCowan's Early Experience ........................................................................ 7

  C.   McCowan is Excluded from Training, Meetings, and Email Chains. ............................. 9

  D.   Inappropriate Sexual Comments and Advances from Officer Younger ........................ 11

  E.   McCowan and Allen Complain About Younger ....................................................... 14

  F.   Sergeant Conway's Investigation ......................................................................... 17

  G.   McCowan Reports Younger's Harassment to Police Commissioner Ross .................... 18

  H.   McCowan Asks to be Detailed Out of A&I ............................................................ 19

  I.   McCowan Reports to Police Radio ....................................................................... 22

  J.   McCowan Submits a Hardship Memo and the Union Files a Grievance ...................... 23

     1.   McCowan's Hardship Memo ........................................................................ 23

     2.   Union Grievance ....................................................................................... 24

  K.   McCowan Takes FMLA Leave ............................................................................ 25

  L.   Internal Affairs Completes Its Investigation in July 2019 ........................................ 26

  M.   McCowan Files this Lawsuit and Resigns from the Department ................................. 28

  N.   Systemic Problems at the City and the Department .................................................. 28

|  | 1. | Controller Rhynhart's Audit | 28 |
|  | 2. | Mayor Kenney's Press Release | 30 |
| II. | | PROCEDURAL HISTORY | 30 |
| III. | | STANDARD OF REVIEW | 32 |
| IV. | | DISCUSSION | 33 |
| A. | | Discrimination Claims | 34 |
|  | 1. | Counts I, VIII, XI, XVII, XX:  Disparate Treatment | 34 |
|  | 2. | Counts III, X, XVIII, XXI:  Retaliation | 51 |
|  | 3. | Counts II, XII, XVII, and XX:  Hostile Work Environment | 58 |
|  | 4. | Counts XIX, XXII:  Aiding and Abetting | 72 |
| B. | | Count XIII:  First Amendment Retaliation | 77 |
| C. | | FMLA Claims | 79 |
|  | 1. | Count VI:  FMLA Interference | 80 |
|  | 2. | Count VII:  FMLA Retaliation | 81 |
| D. | | Remaining State Law Claims | 83 |
|  | 1. | Count XIV:  Pennsylvania Whistleblower Law | 83 |
|  | 2. | Count XV:  Intentional Infliction of Emotional Distress | 85 |
|  | 3. | Count XVI:  Assault and Battery | 89 |
| E. | | Counts XXIII, XXIV:  Equitable Claims | 91 |
| V. | | CONCLUSION | 92 |

Plaintiffs Audra McCowan and Jennifer Allen bring claims of discrimination, retaliation, hostile work environment, intentional infliction of emotional distress ("IIED"), assault and battery, violations of the Federal Labor Standards Act ("FLSA"), violations of Pennsylvania's Whistleblower Law, and violations of the Family and Medical Leave Act ("FMLA") against the City of Philadelphia and eleven individually named defendants in their official and individual capacities.  (*See generally* Doc. No. 49.)  Defendants have moved for summary judgment on all claims.  (*See* Doc. Nos. 132, 133, 136.)

Although the facts supporting each Plaintiff's claims overlap, their allegations and injuries are sufficiently distinct that we find it prudent to address them in separate,

contemporaneously filed, Memoranda.  In this Memorandum, we discuss McCowan's claims

against the City and ten of the individual defendants.[1]  For the reasons discussed below,

Defendants' motions for summary judgment are granted in part and denied in part.

## I.   FACTUAL BACKGROUND[2]

We begin by addressing the parties' arguments about the scope of the evidentiary record

before turning to the facts.

### A.     *The Evidentiary Record*

In deciding the pending motions, McCowan urges the Court to consider as evidence the

averments in her verified second amended complaint, arguing that the complaint may be

converted into an affidavit because McCowan verified it under penalty of perjury.  (*See* Draft

H'rg. Tr. at 65:12–67:15.)  Defendants strongly object, arguing that courts convert verified

pleadings into affidavits only in cases involving *pro se* plaintiffs.  (Draft H'rg. Tr. at 12:7–

14:18.)  We agree with Defendants.

Although courts in this Circuit have converted verified pleadings into affidavits in the

past, each of those cases involved a *pro se* plaintiff.  *See Parkell v. Danberg*, 833 F.3d 313, 320

n.2, 322 (3d Cir. 2016) (finding that most of the *pro se* plaintiff's "version of events is supported

solely by his own statements in verified complaints and other court filings.  Because those

documents were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, we

consider them as equivalent to statements in an affidavit"); *Reese v. Sparks*, 760 F.2d 64, 67 (3d

---

[1] The Court previously dismissed McCowan's claims against Sergeant Herbert Gibbons.  (*See* Doc. No. 121.)

[2] During oral argument, Plaintiffs' counsel noted that Defendants failed to respond to Plaintiffs' Counter Statement of Undisputed Material Fact (Doc. No. 163) and asked the Court to consider those facts as true for purposes of summary judgment.  (Draft H'rg Tr. at 45:11–46:1.)  Because the Court has before it an extensive record, Defendants' own statements of undisputed fact, and Plaintiffs' response to those statements of fact, the Court denies Plaintiffs' request.

Cir. 1985) (treating *pro se* prisoner plaintiff's verified amended complaint as an affidavit in opposition to summary judgment); *Boomer v. Lewis*, Civil No. 3:06-CV-0850, 2009 WL 2900778, at *2 n.4, *14 (M.D. Pa. Sept. 9, 2009) (same).  As courts have recognized, this conversion was consistent with the understanding that "*pro se* complaints are held 'to less stringent standards than formal pleadings drafted by lawyers.'"  *Wilson v. Maben*, 676 F. Supp. 581, 583 (M.D. Pa. 1987) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

The Court has not found, nor have Plaintiffs identified, any case where a court viewed a verified complaint as an affidavit outside of the *pro se* context.  *Cf. id.* ("Based on *Haines*, the Third Circuit has treated a *pro se* complaint made under penalty of perjury as an affidavit in opposition to a motion for summary judgment."); *Hodgin v. Agents of Montgomery Cnty.*, 619 F. Supp. 1550, 1552 (E.D. Pa. 1985) ("Because plaintiff is proceeding *pro se*, however, I will construe his submissions and the record evidence in his favor liberally.  I note that plaintiff's complaint concludes with the statement, 'I declare under penalty of perjury that the foregoing is true and correct.'  The Third Circuit has treated a *pro se* complaint containing such a declaration as an affidavit in opposition to summary judgment." (citations omitted)).  Indeed, to do so would seem to run afoul of the Third Circuit's assertion that "[a]t summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  The Court will not allow Plaintiffs' counsel to avoid his obligations at this stage by relying on a rule that was meant to give *pro se* plaintiffs the leniency they are to be afforded.

Finally, the Court notes that discovery (and the inherent disputes that come along with it) would be an incredible waste of clients' money, attorneys' time, and judicial resources if a

counseled plaintiff could always rely on the allegations in her verified complaint at summary judgment. In this case alone, the parties engaged in *years* of discovery — which included *two* depositions of each Plaintiff and an additional *fourteen* depositions of Defendants and witnesses.[3] In addition, more than six months passed between when Defendants filed their motions and when Plaintiffs responded.[4] Despite all that discovery and all that time, Plaintiffs' counsel did little more than cite in passing to his more than 4,000 pages of exhibits. (*See* Doc. Nos. 163–65.) As the Court has warned Plaintiffs' counsel over and over again, it is not our job to sift through thousands of pages of evidence.

For those reasons, the Court will not convert McCowan's verified second amended complaint into an affidavit or consider the unsupported allegations within it in ruling on the pending motions for summary judgment. With this ruling in mind, and viewing the evidence and all inferences to be drawn from that evidence in the light most favorable to McCowan as the non-moving party, we recite the relevant facts below.

### B.    *McCowan is Promoted and Transferred to the Intelligence Bureau*

McCowan worked as a police corporal with the Philadelphia Police Department's Intelligence Bureau from December 2018 to March 2019. Because many of the events underlying McCowan's claims occurred while she and Allen were working in the Intelligence

---

[3] McCowan wishes to rely on the allegations in her second amended complaint even when those allegations are directly contradicted by her deposition testimony. (*Compare* Doc. No. 49 at ¶ 154 ("On February 22, 2019 at 10:46 am, Officer Younger said in the presence of McCowan 'I have some meatballs for you' in reference to his genitals."), *with* City Ex. 13 at 119:10–18 ("McCowan 2020 Depo.") ("Q: Do you allege that after January 31st 2019 that Officer Younger engaged in any other sexually harassing conduct toward you?  A: No, because he got the heads up that I filed a complaint against him, so he knew that he should not.  Q: And in fact, he did not, correct? A: Nope, he did not.").) During oral argument, Plaintiffs' counsel acknowledged the contradiction, but argued that we should nevertheless rely on the allegations in the complaint when they were more favorable to McCowan. (*See* Draft H'rg. Tr. at 65:22–67:15.)

[4] Although there was one outstanding discovery dispute during that six-month period, that dispute had virtually no bearing on the summary judgment briefs.

Bureau, we begin with a brief overview of the Bureau's purpose and hierarchy before turning to McCowan's time there.

### 1.     The Intelligence Bureau

The Intelligence Bureau is "an information and sharing operation coordinated between the Philadelphia Police Department and state and federal partner law enforcement agencies." (*See* City Ex. 4 at ¶ 3 ("McCarrick Aff.").)  The Bureau is housed in the Delaware Valley Intelligence Center ("DVIC") in South Philadelphia and is composed of multiple special units, including the Realtime Crime Center, the High-Intensity Drug Trafficking Area ("HIDTA") Watch Center, the Analysis & Investigations ("A&I") Unit, the Statistical Unit, and the Criminal Intelligence Unit ("CIU").  (McCarrick Aff. at ¶¶ 2–3.)

At all times relevant to this lawsuit, Defendant Chief Inspector Daniel MacDonald oversaw the Bureau. Defendant Inspector Michael McCarrick was immediately below Chief Inspector MacDonald in hierarchy, and at the time, also oversaw all units within the Bureau.[5] (City Ex. 6 at 14:1–16:23 ("MacDonald Depo").)  Each unit had a captain or civilian supervisor who reported to McCarrick.  (*Id.*)  Lieutenants reported to the captain or civilian supervisor; sergeants reported to lieutenants; and corporals reported to sergeants. (*Id.*; Draft H'rg. Tr. at 7:1–8:18 ("Sergeants outrank



Chief Inspector

↑

Inspector(s)

↑

Captains and Civilian Supervisors

↑

Lieutenants

↑

Sergeants

↑

Corporals

↑

Officers and Analysts

---

[5] Chief Inspector MacDonald testified that two inspectors typically report to him, one who oversees the "intelligence division and one for the fusion center side of the house."  (City Ex. 6 at 14:1–

corporals. . . . [A] sergeant . . . would have supervisory authority over a police corporal and a police officer.").)  Police officers and civilian analysts, at the bottom of the hierarchy, reported to corporals, and in some instances, directly to sergeants.  (MacDonald Depo. at 14:1–16:23.)

## 2. McCowan's Early Experience

Audra McCowan is a Black female, who served as an officer in the Philadelphia Police Department for 14 years before being promoted to corporal on November 30, 2018.  (McCowan 2020 Depo. at 20:7–23:11.)  On December 3, 2018, McCowan reported to the DVIC with a group of other recently promoted and transferred officers, sergeants, and corporals for onboarding and assignments.  (*Id*. at 23:23–24:2, 37:7–43:19.)

Although McCowan was initially transferred to HIDTA (*id.* at 40:9–19; City Ex. 19 at 100:4–19 ("Ross Depo."); City Ex. 12 at p. 328), when she arrived at the DVIC on December 3, Chief Inspector MacDonald told her that her placement in HIDTA "was a mistake" (McCowan 2020 Depo. at 143:8–144:5).  He explained that Corporal Neil Wilson, "a black male corporal with extensive experience and training who was already working in HIDTA," was supposed to take that role.  (*See* MacDonald Depo. at 22:19–25:18 ("Corporal Wilson . . . , a highly qualified senior corporal who had trained for months for that position was currently sitting in that position and an administrative error downtown placed Corporal McCowan into that position that she wasn't supposed to go to."); City Ex. 5 at 19:19–21:24 ("McCarrick Depo") (testifying that McCowan was "never" assigned to HIDTA and that the initial posting was an "administrative error").)

---

16:23 ("MacDonald Depo.").)  However, at the time, Inspector McCarrick was overseeing both the intelligence division and the fusion center because the Bureau was short a supervisor.  (*Id.* at 13:16–24.)

After McCowan still lacked a formal assignment at the end of that onboarding week, she and Allen — who had experienced similar scheduling issues — spoke with their friend, Officer Tonetta Dawson, Chief Inspector MacDonald's aide, about the issues they were having and how they believed they were being denied work opportunities. (City Ex. 15 at 54:18–56:8 ("Williford Depo.").) Dawson shared Plaintiffs' concerns with Defendant Sergeant Eric Williford, the administrative supervisor for the Bureau,[6] and Williford followed up with McCowan and Allen later that day. (McCowan 2020 Depo at 138:8–140:3; Williford Depo at 10:1–3, 54:18–59:12 (explaining that he met with McCowan after learning that she complained to another officer about feeling that she did not fit in).) McCowan told Williford that she felt she was being treated differently within the Bureau, explaining that she was the only new supervisor asked to wear her uniform all week, that she was the only promotee who did not yet have an assignment, and that as a result, she did not have a desk and her things were sitting on a cart outside of the Chief Inspector's office. (*See* McCowan 2020 Depo. at 27:21–28:6, 138:8–140:3, 178:3–180:11.) Williford agreed with McCowan that the treatment was "not right and that it absolutely had something to do with [her] being [a] black female." (*Id.* at 145:3–14.) And he told her that he would work on her behalf to ensure things were made right.[7] (*Id.*)

The next Monday, December 10, Chief Inspector MacDonald returned from military leave and spoke with McCowan about her assignment. He explained that McCowan could

---

[6] Sergeant Williford also served as a "fill-in supervisor" for A&I from July 2018 to the beginning of December 2018. (Williford Depo. at 10:12–19.)

[7] Sergeant Williford had a different recollection of their conversation. He remembers McCowan coming to the meeting holding hands with Allen and crying. (Williford Depo. at 56:17–57:4.) After McCowan and Allen explained their concerns, Williford told them that Chief Inspector MacDonald was away on military leave, but that when MacDonald returned, MacDonald or Williford would have answers for them. (*Id.* at 56:10–59:15.) Once Allen left the room, Williford also explained to McCowan that because she was a supervisor, it was not becoming for her to walk in holding hands and crying with a subordinate. (*Id.* at 58:8–59:12.)

remain in HIDTA, but she would have to work the night shift.  (MacDonald Depo. at 31:7–11; City Ex. 26 at 43:23–44:8 ("McCowan 2019 Depo.").)  McCowan, who had worked steady day shifts with weekends off for more than ten years, responded that she preferred to stay on day work for the sake of her children.  (McCowan 2020 Depo. at 31:12–18, 292:16–24.) Considering McCowan's shift preference and the supervisory needs of the Bureau, MacDonald moved McCowan to A&I, the unit that was most in need of a corporal at the time.  (MacDonald Depo. at 25:19–27:11; McCowan 2019 Depo. at 43:23–46:1; *see also* City Ex. 12 at p. 328 (reflecting transfer on December 17, 2018 out of HIDTA); City Ex. 34 at p. 62 (showing change in unit beginning December 10, 2018).)  McCowan later complained to Williford about the switch, but he told her to "leave it alone" because she would not "want to be labeled a troublemaker."  (McCowan 2020 Depo. at 38:5–9, 147:19–148:8.)

### C.     *McCowan is Excluded from Training, Meetings, and Email Chains.*

When McCowan moved to A&I, she was the only Black female supervisor in the unit. (McCowan 2020 Depo. at 33:22–34:13.)  Officers and analysts in A&I review data and create intelligence assessments, called "products," on crime in the City.  (McHugh Depo. at 8:4–7 ("Basically, they write products for shootings that occur inside the City of Philadelphia.").) Although she was a supervisor, McCowan never received any formal training or direction that would enable her to supervise the analysists or review their work product.[8]  (*Id.* at 165:6–176:2; 188:2–9, 209:8–214:9.)  In addition, for most of her time at A&I, McCowan was left off an email chain that the analysts used to submit their product for supervisor review.  (*Id.* at 176:3–178:2, 192:14–194:3, 210:1–5.)  Instead, those emails only went to Defendant Sergeant Kevin O'Brien,

---

[8] McCowan did attend facial recognition training on February 15, 2019.  (McCowan 2020 Depo. at 213:3–23.)  And she admits she was able to ask the analysts questions and that she spent a few days observing and going over the work product with one of the civilian analysts.  (*Id.* at 170:2–175:17.)

Defendant Lieutenant Timothy McHugh, and the civilian supervisors.  (*Id.* at 176:3–178:2, 192:14–194:3, 210:1–5.)  This meant McCowan spent most days doing little more than entering time and overtime for her subordinates.  (*Id.* at 166:23–167:8, 182:1–183:21.)

McCowan also testified that she was frequently excluded from meetings that Lieutenant McHugh and Sergeant O'Brien, two white male supervisors in A&I, were invited to attend.  (*Id.* at 214:10–218:3; *see also id.* at 192:14–193:11 (explaining that she was excluded from meetings but a white male subordinate was included).  *But see* City Ex. 36 at 24:10–31:10 ("McHugh Depo.") (explaining that McCowan was not included in every meeting because she was an administrative supervisor and not all meetings related to administrative issues); Williford Depo. at 44:17–46:18.)  And, on more than one occasion, McCowan saw Chief MacDonald and Inspector McCarrick pull McHugh and O'Brien to the side to discuss supervisory issues, without including McCowan in the conversation.  (*See* McCowan 2020 Depo. at 205:18–207:14.)  On Williford's advice, McCowan started walking in on meetings when she believed she should have been invited.  Each time, she quickly realized that she did not know what was going on and felt even more unconformable and out of the loop.  (*Id.* at 197:23–201:20; *see also id.* at 202:13–203:6, 214:10–218:3.)

In addition, during her first month in A&I, McCowan noticed that one of the officers under her command was misreporting time.  (*Id.* at 81:16–82:19, 160:11–165:5.)  She wanted to give the officer a counseling memo — a training tool that the Department uses before issuing formal discipline — and because it was going to be her first counseling memo, she went to Lieutenant McHugh for support.  (*Id.* at 81:16–82:19, 160:11–165:5.)  McHugh initially "brushe[d] off" her requests and repeatedly asked McCowan if she was "sure [she] want[ed] to"

issue the counseling memo, before finally agreeing to go into the room while she carried out the counseling. (*Id.* at 81:16–82:19, 160:11–165:5.)

### D.      Inappropriate Sexual Comments and Advances from Officer Younger

In addition to the issues she experienced with training and assignments, McCowan also experienced unwelcome and inappropriate comments from one of the analysts in A&I, Defendant Officer Curtis Younger.

First, on January 3, 2019, Younger called McCowan while she was at home to discuss a coworker who had been involved in a motorcycle accident. Toward the end of the conversation, he moved the conversation away from work and told her, "You know I have a crush on you?"[9] (*See* McCowan 2019 Depo. at 81:18–84:11; *see also* McCowan 2020 Depo. at 58:10–60:8.) McCowan, who was surprised by his statement, said "okay," and quickly got off the phone. (McCowan 2020 Depo. at 58:10–60:8.) The next day, McCowan verbally reprimanded Younger, telling him that he was out of line, his comments were inappropriate, and he was not to make similar comments in the future. (*See id.* at 68:13–22.)

McCowan also spoke with Lieutenant McHugh about Younger's comments. (*See* McCowan 2019 Depo. at 81:18–84:11; McCowan 2020 Depo. at 62:22–66:9; McHugh Depo. at 16:16–19:11.) McHugh agreed with her that the comments were "weird." (McHugh Depo. at 16:16–18:18.) McCowan did not ask McHugh to take any action against Younger and told McHugh that she believed she had "handled" the situation by telling Younger he was out of line and his comments were inappropriate. (McCowan 2020 Depo. at 62:22–65:14.)

---

[9] Officer Younger denies making any such comment during this conversation. He did, however, testify that he remembers telling McCowan in person that he had a crush on her years ago. (*See* Younger Depo. at 10:22–17:9, 53:15–24.)

Despite her reprimand, Younger continued to make inappropriate comments over the next two weeks, telling McCowan, "Damn, you sexy," and "You gonna have to stay away from me," and making suggestive sounds like "Mmm, Mmm, Mmm." (*Id.* at 69:10–20.)  One day during the week of January 7, Younger asked McCowan, "Are you sure there's not room for me to slide in?"; "Do I have any chance with you?"; and "Are you sure you don't want to have sex with me?" (McCowan 2020 Depo. at 76:9–77:7; McCowan 2019 Depo. at 82:1–86:5.)  McCowan responded "no," and Younger stood with his back against the wall and hands out to the sides as if he were a fire extinguisher, telling her, "in case of emergency break the glass." (McCowan 2020 Depo. at 78:5–80:23.  *But see* Younger Depo. at 58:8–60:13 (saying that he only asked if she had an "emergency friend" to "break the glass with," i.e., a "cry on the shoulder friend").)  McCowan responded that she "won't need to break the glass," and once again told him to stop. (McCowan 2020 Depo. at 79:13–80:23.)  In the days that followed, Younger repeatedly told McCowan, "remember, just break the glass." (*Id.* at 83:16–84:1.)

Two weeks later, on January 21, McCowan was speaking to Allen, when Officer Younger came up behind McCowan and said, "Hey, babe." (McCowan 2019 Depo. at 82:1–86:5.)  McCowan responded, "Excuse me.  You mean, Corporal?" (*Id.*)  But Younger just laughed at her and walked away. (*Id.*)  Lieutenant McHugh was sitting nearby when the interaction occurred, but said nothing. (*Id.*  *But see* McHugh Depo. at 36:15–37:10 (denying that he overheard the interaction).)

One week later, on January 28, Officer Younger approached McCowan and began commenting on the photos on her desk, saying "oh, you have a big forehead in that picture," and "you look pregnant in that [one]," while pointing at her wedding photo. (McCowan 2019 Depo. at 87:18–89:1; *see also* McCowan 2020 Depo. at 91:16–23.)  Then, referencing several

photographs of McCowan's husband, Younger said, "You have pictures of this motherfucker all over your desk . . . . [M]y wife doesn't have pictures of me on her desk."  (McCowan 2019 Depo. at 89:2–90:20.)  McCowan responded, "That's between you guys.  That's not my problem.  I don't have anything to do with that," (*id.*), to which Younger said, "I forgot, you are still wet.  It's still new," (McCowan 2020 Depo. at 96:22–97:10).

Younger then grabbed McCowan's left hand and tried to pull her wedding rings off her finger, which hurt her because the rings were tight and did not easily come off.  (McCowan 2019 Depo. at 89:2–90:20; McCowan 2020 Depo. at 97:11–98:9.)  McCowan snatched her hand away, and Younger said, "Oh you don't take those off?  Those don't come off?"  (McCowan 2019 Depo. at 89:2–90:20; *see also* McCowan 2020 Depo. at 101:17–21.)  McCowan responded, "No, my rings don't [come] off," and Younger laughed and walked away.  (McCowan 2019 Depo. at 89:2–90:20; *see also* McCowan 2020 Depo. at 101:22–24.)  That same day, Younger asked McCowan, twice, whether she was sure there was "zero chance" for him, to which she responded, no, "zero chance" and once again told him to stop.  (McCowan 2020 Depo. at 102:1–103:7.)

McCowan did not report Younger's continued comments to anyone at the time they occurred, nor did she take any steps to officially discipline Younger after her initial verbal reprimand.  (*See id.* at 91:22–95:24.)  McCowan felt she could not discipline him because she was the victim in the situation and even though she was Younger's supervisor, he had a reputation of being the "golden child" at the Bureau and was held in "high regard" by Chief MacDonald and Inspector McCarrick.  (*Id.* at 93:24–95:24; *see also* McCowan 2019 Depo. at 99:4–100:5; City Ex. 39 at 111:4–21 ("Conway Depo.") (explaining that in the Police Department "there are situations where lower-ranking employees do have a measure of authority

that a supervisor doesn't have, based on their connections or people that they have associations with within the department").)

### E.     McCowan and Allen Complain About Younger

The day after Younger grabbed her hand, McCowan called out sick from work because she felt depressed and anxious.  (McCowan 2020 Depo. at 72:14–16 ("I was off on the 29th because I was so upset about everything going on."); City Ex. 49, at p. 3 ¶ 6 ("McCowan's Sexual Harassment Complaint") (explaining that she was "physically ill after this last incident with Officer Younger").)  While she was home, McCowan received a call from Officer Allen, who had been experiencing similar unwanted advances from Younger.  (Allen 2020 Depo. at 128:5–129:14.)  McCowan told Allen to write down everything that had happened and said that she would do the same.  (Id.; see also City Ex. 49; City Ex. 42 ("Allen's Sexual Harassment Complaint").)

When McCowan arrived at work the next day, she told Officer Dawson that she needed to speak with Chief Inspector MacDonald when he came into the office because she needed to give him the memos.  (McCowan 2020 Depo. at 72:11–73:20.)  A few minutes later, Sergeant Williford messaged McCowan, "Please see me before you submit that memo.  You know I will never steer you wrong."  (P. Ex. EE; see also Williford Depo. at 84:20–87:9 (explaining that he didn't know what the memo was about, but his discussion with Allen about scheduling was in the "back of [his] mind").)  McCowan responded, "What I have to talk about should go directly to the boss.  It's bigger than what you may think.  It actually involves [Allen]."  (P. Ex. EE.)

Williford then walked over to McCowan's desk and asked her why she needed to speak with Chief Inspector MacDonald.  (McCowan 2020 Depo. at 74:6–75:23.)  McCowan explained that it was an "EEO [equal employment opportunity] situation," and Williford responded that McCowan has to "learn there [are] other supervisors [she] can go to" and that she should go to

Inspector McCarrick before going straight to Chief Inspector MacDonald.  (*Id.*; *see also* Williford Depo. at 84:20–87:9, 94:20–97:8, 112:11–114:2 (explaining that he was trying to help McCowan because he thought the memo was related to Allen's scheduling issues, which to Williford, did not rise to the level of EEO).)  McCowan explained that she did not feel comfortable going to Inspector McCarrick because he refused to acknowledge her, and she justified going to Chief MacDonald because he had an open-door policy and the chain of command does not apply to EEO complaints.  (McCowan 2020 Depo. at 74:6–75:23.)  Williford then warned McCowan that she would be labeled a troublemaker and reminded her that she was on probation and did not want to cause trouble.  (*Id.*)  Williford later drafted a memo to Chief Inspector MacDonald and one to Inspector McCarrick about his interaction with McCowan.  (*See* City Ex. 54; Williford Depo. at 114:4–116:23; MacDonald Depo. at 50:22–53:11; McCarrick Depo. at 50:10–52:9, 63:14–64:21.)

After this encounter, Officer Allen's supervisor, Defendant Sergeant Tamika Allen, found Allen in the locker room, crying with McCowan.  (McCowan 2019 Depo. at 75:24–76:9.)  The women told Sergeant Tamika Allen in general terms that they "wanted to report an EEO situation" and intended to talk to Chief MacDonald.  (*Id.*; City Ex. 23 at 125:23–127:12 ("Allen 2020 Depo.").)  They also spoke with Tamika Allen "about being black women on the job" and "not really having any resolutions within the department with like complaints."  (Allen 2020 Depo. at 125:23–127:12.)  Plaintiffs did not, however, mention their troubles with Officer Younger or the substance of their sexual harassment memos.  (McCowan 2019 Depo. at 76:10–15; Allen 2020 Depo. at 127:20–23.)  After the discussion, Tamika Allen immediately told her supervisor, Captain Robert Heinzeroth, about the conversation, and Tamika Allen and Henzeroth went to Inspector McCarrick, who ordered Tamika Allen to draft a memo detailing the

encounter.  (McCarrick Depo. at 48:20–49:19.)  Once he received her memo and Sergeant
Williford's memo, McCarrick drafted a cover letter requesting an internal investigation and had
the memos hand delivered to the commander of the Department's Internal Affairs group, Chief
Inspector Christopher Flacco.  (*Id.*; *see also* City Ex. 54.)

The next morning, when McCowan and Allen had not heard from Chief Inspector
MacDonald, McCowan emailed her memo and Allen's memo to him, explaining that they had "a
situation that [they] would like for [him] to be made aware of," and that they "tried to meet with
[him] yesterday, but [their] attempt was unsuccessful."  (P. Ex. FF.)  MacDonald immediately
reviewed the Department's policy for EEO complaints ("Directive 8.7") and emailed Plaintiffs'
memos to Chief Inspector Flacco.  (MacDonald Depo. at 42:2–45:9; City Ex. 50.)

MacDonald then told McCarrick to ensure that McCowan and Allen had no contact with
Officer Younger, that Younger was counseled not to have any contact with them, whether
personal or professional, and that all supervisors were on alert that McCowan and Allen were not
to be negatively treated by Younger or anyone else.  (MacDonald Depo. at 45:21–48:13.)
MacDonald did not meet with McCowan or Allen about their complaints, nor did he tell them
that he had forwarded their memos to Internal Affairs.  (*Id*. at 48:17–50:17; McCowan 2020
Depo. at 121:5–122:16.)

Over the next few weeks, Younger stayed away from McCowan and refrained from
making inappropriate comments.  (McCowan 2020 Depo. at 119:10–121:24 ("Q: Do you allege
that after January 31st, 2019 that Officer Younger engaged in any other sexually harassing
conduct towards you?  A: No, because he got the heads up that I filed a complaint against him;
so he knew that he should not.  Q: And, in fact, he did not, correct?  A: Nope, he did not.").)

16

Nevertheless, McCowan continued to supervise Younger and was required to enter his time and overtime.  (*Id.* at 119:19–120:19.)

       **F.**    **Sergeant Conway's Investigation**

      After the memos — Sergeant Tamika Allen's, Sergeant Williford's, Corporal McCowan's, and Officer Allen's — were sent to Internal Affairs, the matter was assigned to Defendant Sergeant Brent Conway for investigation.  (Conway Depo. at 41:5–14.)  As part of his investigation, Conway interviewed McCowan on February 8, 2019, about one week after she submitted her complaint to Chief Inspector MacDonald.  (P. Ex. NNN at CITY 2526; McCowan 2019 Depo. at 118:24–120:19 (describing the interview as an "interrogation").)

      Conway began by telling McCowan that his "wife is Black."  (McCowan 2019 Depo. at 119:23–120:2.)  He then stated that "[t]he Philadelphia Police Department has the highest payouts in lawsuits out of all the City agencies, so these interview questions are worded to assist the City in defending against a lawsuit in case you and Officer Allen decide to sue."  (*See* Doc. No. 49 at ¶ 132; McCowan 2020 Depo at 240:1–23 ("Sergeant Conway told me that his line of questioning was set up to protect the City . . . .").)

      McCowan then detailed her encounters with Younger.  (P. Ex. NNN at CITY 2526–38.)  Reviewing encounter-by-encounter, Conway asked McCowan:  (1) when the comments occurred, (2) why Younger made a given comment, (3) where McCowan and Younger were when each comment was made, (4) whether anyone else was present, (5) whether McCowan took any official action against Younger, (6) why she failed to take official action, and (7) whether she was his supervisor at the time.  (*Id.*)  He then asked, "Do you understand that, as a supervisor, you are required to take appropriate action(s) in the event you hear an employee violate[d] a departmental policy?"  (*Id.* at CITY 2530.)  And after confirming that she had recently been trained on the Department's sexual harassment policy, he asked, "Being that you

are aware that Officer Younger making these comments and sounds was a violation of the Sexual Harassment policy, why did you fail to take any official action against Officer Younger after he made [each] statement to you?"  (*Id.* at CITY 2531; *see also id.* at CITY 2535 ("Are you aware of the supervisor's responsibilities as they relate to EEO and Sexual Harassment complaints?"); *id.* at CITY 2536 ("Do you understand that, as a supervisor, you are required to take official action(s) against employees who violate departmental policies?"); *id.* at CITY 2537 ("Are you aware Directive #8.7 Equal Employment Complaint Procedures states, 'Employment discrimination is a violation of both federal and state law; therefore, supervisors shall submit an EEO complaint/report, regardless of whether the employee desires to officially file a complaint?[']").)[10]

McCowan explained that she did not feel she had the authority to take official action against Officer Younger because "it was a really strange situation . . . he is very well liked [and] I truly believe that nothing would be done about it if I told my lieutenant that he was anything [sic] of these things."  (*Id.* at CITY 2536.)  At the end of the *three-and-a-half-hour* interview, Conway asked McCowan whether there was "anything else [she] would like to add that has not been addressed in this interview?" to which McCowan responded, "No."  (*Id.* at CITY 2537.)

### G.    *McCowan Reports Younger's Harassment to Police Commissioner Ross*

A few weeks later, feeling that her complaint "fell on deaf ears, whether it be inside the DVIC, or Internal Affairs," Corporal McCowan messaged Defendant Police Commissioner Richard Ross on his personal cell phone about the sexual harassment.  (McCowan 2019 Depo. at 96:15–97:1; McCowan 2020 Depo. at 226:14–228:12; Ross Depo. at 67:24–68:14.)  McCowan

---

[10] Notably, Sergeant Conway did not ask Lieutenant McHugh similar questions even though he admitted that McCowan told him about her phone call with Officer Younger, and he is also Younger's supervisor.  (*See* P. Ex. NNN at CITY 2585.)

had a personal relationship with the Police Commissioner, and felt he should know what was

going on.  (McCowan 2019 Depo. at 96:15–97:1; McCowan 2020 Depo. at 226:14–228:12.)

       In response to her complaints about Younger, Ross said that he needed to "school" her on

sexual harassment, (McCowan 2019 Depo. at 97:9–98:9), and that she should "tell [Officer

Younger] to go sit his dumb ass down," (McCowan 2020 Depo. 229:24–230:5; *see also* Ross

Depo. at 67:24–68:14 ("I don't recall exactly what I said to her.  But it would have been advice

to basically tell the person to follow the rules and do what she had to do."); *id.* at 71:11–72:3).

McCowan asked Ross to "[t]hink about how you would feel if it was your daughter.  Would it

matter if it was someone that works for her or not?  If she told the person to repeatedly stop, that

doesn't matter?"  (*See* Doc. No. 49 at ¶ 127; McCowan 2020 Depo. at 236:21–237:10.)  Ross

responded, "I know you don't like for me to be straight with you . . . but I want to offer you some

sage advice as a friend."  (*See* Doc. No. 49 at ¶ 127; Ross Depo. at 72:15–73:2.)  When

McCowan asked him for his advice, he backpedaled, saying, "No, not the time based on your

frame of mind."  (*See* Doc. No. 49 at ¶ 127; Ross Depo. at 73:7–11.)

       **H.      *McCowan Asks to be Detailed Out of A&I***

       Typically, when a complainant and an accused are in the same unit, the Police

Department temporarily details the accused to a different assignment until the Internal Affairs

investigation is complete.  (*See* City Ex. 16 at 55:1–17 ("Coulter Depo.") (confirming that

usually the Department would move the alleged offender); McCarrick Depo. at 42:24–44:12

("[F]irst off, it is pretty much a standard policy that you never move a complainant in regard to

one of these matters, as it could be deemed as it's being punitive.").)  Despite that practice, more

than a month after Conway began investigating McCowan's complaint, she and Younger both

remained at A&I.  (*See* McCowan 2020 Depo. at 259:7–18 (explaining that she was "still having

to work with Officer Younger" and the environment in the unit "was very hostile and uncomfortable").)

Therefore, on March 6, 2019, McCowan drafted another memo, this one titled, "Request to be Detailed Out," and submitted it up the chain of command to Defendant Deputy Commissioner Christine Coulter.  (City Ex. 17.)  In the memo, McCowan explained that "[o]n January 30, 2019, [she] submitted a memorandum detailing some of the on-going sexual harassment and hostile work environment practices within the [DVIC]."  (*Id.*)  She noted that "the accused Officer has not been moved, creating for [her], more of a hostile work environment," and therefore, she "request[ed] to be detailed out of the building to a unit in [her] current chain of command under Deputy Commissioner Christine Coulter[,] pending the adjudication of [her] complaint."  (*Id.*; *see also* McCowan 2019 Depo. at 48:15–17; 50:15–18 ("Since I was not separated from him in any kind of capacity, this was my attempt to remove myself from the situation while it was ongoing."); *id.* at 64:20–65:23.)  Deputy Commissioner Coulter discussed the memo at the weekly Executive Team meeting on March 11, telling the team that she had received the request and planned to immediately detail McCowan to Police Radio, where there were open corporal positions.  (Coulter Depo. at 58:18–62:9; *see also id.* 71:12–72:9 (explaining that the "decision was solely [hers]").)

Meanwhile, Conway scheduled a second interview with McCowan for March 12 to discuss her memo to Deputy Commissioner Coulter.  (Conway Depo. at 145:20–146:11 ("Corporal McCowan was reinterviewed to address if there was something that was still ongoing as it related to sexual harassment . . . .").)  Conway asked McCowan what she meant when she told Coulter there were "hostile work environment practices within the DVIC."  (P. Ex. NNN at CITY 2540.)  McCowan responded that she felt hostility in the unit because the supervisors were

"pick[ing] a part [sic]" her interactions with other officers, Lieutenant McHugh had asked her to speak with Younger about training even though he was aware of the pending complaint, and a civilian in the unit had told McCowan that "she wasn't going to say anything" when interviewed by Conway because "she didn't want to be involved in anyone's mess." (*Id.* at CITY 2540–41.) Conway then rehashed many of his prior questions, confirming that McCowan was a supervisor in January 2019 and had received sexual harassment training before asking:

- "Do you understand that, as a supervisor, you cannot file an EEO complaint against a subordinate?"

- "Do you understand that, as a supervisor, you are given the authority and the responsibility to take appropriate actions against any subordinate who violates departmental policy?"

- "Do you understand that you were required to take official actions each time Officer Younger did or said anything that you believed was inappropriate?"

- "Do you understand that the appropriate course of action for you to address your concerns with Officer Younger's conduct was for you to take disciplinary action against him?"

(*Id.* at CITY 2540–42.)

After the interview, McCowan returned to the DVIC, where Lieutenant McHugh told her that she was being detailed to Police Radio, starting the next day at 7:00 a.m. (McCowan 2020 Depo. at 267:6–269:7; McHugh Depo. at 76:7–77:6; P. Ex. RR.) The transfer meant McCowan's schedule changed from daywork with weekends off (5 squad) to alternating day and night shifts with alternating days off (1 squad). (P. Ex. TT.) As she left work, McCowan messaged Ross about the move, stating, "I am being detailed to Radio 1 squad. You and I both know that is a punishment. This is exactly why people don't speak up when there's any type of harassment going on with an organization." (P. Ex. RR; *see also* McCowan 2020 Depo. at 278:14–279:11 (explaining that she viewed the transfer as a punishment because her hours changed with less than 24 hours' notice and there is a "big rivalry with the civilian personnel and

the police personnel" in Police Radio that made it "discipline city").)  Ross asked McCowan

whether she had submitted a memo to Coulter requesting to be detailed out, and McCowan

confirmed that she had but asked Ross whether her "total work schedule [could] be changed

overnight."  (P. Ex. RR.)  Ross responded, "So the way it works is as follows:  Because you

specifically asked to be detailed out, and to one of Deputy Coulter's units, they are going to work

quickly to provide you relief since the issue is an EEO[ ] matter" and "because you are now a

supervisor, unfortunately, they still have to assign you to a spot that needs a supervisor."

(McCowan 2020 Depo. at 289:3–19.)  McCowan expressed her frustration and told Ross that she

viewed the assignment as retaliation.  (*Id.* at 289:21–290:18.)

### I.     *McCowan Reports to Police Radio*

The next morning, McCowan reported to Police Radio and met her new supervisors,

Lieutenant Gregory Watkins and Captain Matthew Deacon.  (McCowan 2020 Depo. at 271:12–

272:4.)  Both men explained that they "didn't know why [she] was [t]here" because "they had

the full complement for corporals that they needed in that particular squad [Radio 1]." (*Id.*)

They gave McCowan a desk in the tape room, an unheated room among the building's computer

servers where the temperature frequently drops below 50 degrees.  (McCowan 2019 Depo. at

62:7–63:2; McCowan 2020 Depo. at 279:18–280:13 (explaining that she had a desk in the tape

room until May 2019).)  Despite having a workstation, McCowan had nothing to do.  (McCowan

2019 Depo. at 62:7–63:4.)  Her supervisors told her that she was not allowed to do any work

because she did not have the necessary Pennsylvania Emergency Management ("PEMA")

training, and that per Deputy Coulter's office, she was not allowed to receive PEMA training.

(*Id*. at 63:5–65:3; McCowan 2020 Depo. at 307:7–312:13.)

In her first few days at Police Radio, McCowan asked Captain Deacon, Lieutenant

Watkins, and a second lieutenant, identified only as "Lieutenant Williams," whether she could be

moved to last out shift, a steady shift from 10:00 p.m. to 6:00 a.m., while she was detailed to the unit. (McCowan 2020 Depo. at 297:23–302:22.) Captain Deacon responded that he did not understand why McCowan was there and that he could not move her without approval from the Deputy's office. (*Id.* at 299:20–300:23.) Lieutenant Watkins told her that he did not understand why "they"[11] were telling him where to put McCowan and reiterated that he did not "need an extra corporal" and "didn't have any work for [McCowan]." (*Id.* at 299:6–19.) Last, Lieutenant Williams responded that he would broach the subject with his superiors, but he knew it would be denied because the inspector over Police Radio, Inspector Michael Gillespie, had already requested to move McCowan to Radio 5 and the request was denied by Deputy Commissioner Coulter's office. (*Id.* at 294:21–297:22, 301:12–302:17.)

During her time at Police Radio, McCowan was given no work assignments and was forced to sit without work for eight hours every day. (*Id.* at 273:5–22 ("Even if there was an opening on paper, I didn't do anything there. They didn't utilize me as a worker.").)

J.     ***McCowan Submits a Hardship Memo and the Union Files a Grievance***

    1.     **McCowan's Hardship Memo**

On April 30, 2019, McCowan submitted a hardship memo addressed to Captain Deacon, asking that she be given a different schedule while at Police Radio. (*See id.* at 315:9–316:3.) The memo described McCowan's detail to Police Radio and schedule change, noting that because she was given less than 24 hours' notice, she had "little to no time to make alternate preparations in the day to day schedules of [her] 2 sons." (P. Ex. TT.) "Not only did this immediate change drastically affect [her] home life, it [also] greatly contributed to health problems that [she was] being treated for." (*Id.*) On May 6, the memo was returned to

---

[11] It is not clear from the record who "they" are.

McCowan and she was told to address it to Deputy Commissioner Coulter and to resubmit it, which she did.  (*Id.*; McCowan 2020 Depo. at 315:9–316:12.)  McCowan also gave a copy of the memo to her Union Vice President, John McNesby, who passed it along to Deputy Commissioner Coulter.  (*See* P. Ex. WW at McCowan-Allen 0046–47; *see also* Coulter Depo. at 73:18–82:23 (testifying that she reviewed the memo).)

As the memo rose through the chain of command, her request for a schedule change was approved by Captain Deacon and Inspector Gillespie, "pending approval of the deputy."  (P. Ex. TT.)  But it was disapproved when it reached Chief Inspector of Communications and Innovations Michael Cochrane, and ultimately disapproved by Deputy Commissioner Coulter.  (*Id.*; McCowan 2020 Depo. at 323:12–326:8.  *Compare* P. Ex. WW at McCowan-Allen 0053 (McGrody explaining that the "Dist/Unit captain can make the call [on whether to grant a hardship memo], but if they don't approve it at their level the memo goes to the P/C [Police Commissioner]"), *with* Coulter Depo. at 101:14–02:1 (testifying that a captain *cannot* choose to approve or disapprove a hardship memo).)

### 2. Union Grievance

During this time, McCowan also spoke with her Union Representative, John McGrody, and Union President, John McNesby, about her belief that the City violated its Collective Bargaining Agreement ("CBA") with the Union by failing to give her 30 days' notice of her shift change.  (*See* P. Ex. WW at McCowan-Allen 0050–67.)  A few days after the City denied McCowan's hardship memo, the Union filed a grievance on her behalf.[12]  (*Id.* at McCowan-Allen 0066–67; McCowan 2020 Depo. at 281:16–24.)

---

[12] As discussed below, McCowan took extended FMLA leave and then resigned before the Union and the City could meet about her grievance.  (McCowan 2020 Depo at 282:1–4.)

### K.     *McCowan Takes FMLA Leave*

After her hardship memo was denied, McCowan's experience at Police Radio continued to decline. She was moved from the tape room to the dispatch floor, and then to the hallway. (*Id.* at 285:2–18, 312:9–13.) And she continued to go without any work assignments. Then, on June 5, 2019, McCowan went to a third interview with Conway, this time to rehash whether McCowan followed up with Lieutenant McHugh after Younger called her "babe." (P. Ex. NNN at CITY 2545–47.)

McCowan's health also continued to deteriorate, and at the end of June, she requested leave under the FMLA. (McCowan 2020 Depo. at 337:11–16.) Per a directive issued by Human Resources ("HR"), McCowan gave her commanding officer a memo stating that she was requesting FMLA leave and paperwork signed by her doctor. (McCaffrey Depo. at 39:7–18 (explaining the FMLA process); McCowan 2020 Depo. at 337:11–338:2.) HR has no record of this paperwork and never formally approved McCowan's FMLA request. (*See* McCaffrey Depo. at 39:19–40:21; *see also* McCowan 2020 Depo. at 343:11–345:17 (testifying that her sergeant said there was no record of the FMLA paperwork even though McCowan's attorney had sent in the paperwork and the physician's evaluation).) Despite never receiving formal approval, McCowan was out on paid leave from June 27, 2019 to September 27, 2019. (McCowan 2020 Depo. at 338:3–5.) And her daily attendance record ("DAR") references FMLA leave as being effective from June 26, 2019 to September 22, 2019. (*See id.* at 340:1–342:2 (acknowledging attendance record); *see also* D. Ex. 34 at pp. 70–71 (McCowan's DAR, which shows that McCowan first left work in mid-June and her supervisors reported it as a mix of sick and FMLA leave); McCaffrey Depo. at 49:21–50:7 (explaining that attendance and absences are processed by each unit, not HR).) By the time McCowan went out on leave, she had spent around 800 hours in Police Radio without any assignments. (McCowan 2020 Depo. at 278:14–279:11.)

**L.**        ***Internal Affairs Completes Its Investigation in July 2019***

McCowan never received the final disposition of her EEO complaint, which was finalized by Inspector Kevin Hall on July 5, 2019.  (*Id.* at 342:22–343:10; P. Ex. NNN at CITY 2493, 2520.)  In addition to interviewing McCowan *three* times and reviewing the memos submitted by McCowan, Plaintiff Allen, McCarrick, Tamika Allen, and Williford, Conway also interviewed co-Plaintiff Jennifer Allen; Defendants Younger, Williford, McHugh, and O'Brien; and multiple potential witnesses.  (*See* P. Ex. NNN at CITY 2495.)  Conway submitted his report and proposed findings to Inspector Hall, and Hall approved the report, concluding that McCowan's allegations of sexual harassment against Younger were unfounded, McCowan's allegations of physical touching were not sustained, and McCowan's allegations of derogatory and offensive language against Younger were sustained.  (*Id.* at CITY 2493.)  The report also sustained a finding *against* McCowan for failure to supervise Younger.  (*Id.*)

In the report's investigatory summary, Inspector Hall highlights the information that he found relevant to the final disposition of the entire investigation into McCowan and Allen's complaints.  (*Id.* at CITY 2514–15.)  All the facts discussed in that section relate to McCowan's position as Younger's superior, as opposed to Younger's alleged conduct:

- "Corporal McCowan was promoted to the rank of corporal on 11-30-18."

- "All of the instances cited by Corporal McCowan, during which Officer Younger made alleged inappropriate comments to or about her, occurred after she was promoted to the rank of corporal."

- "[W]ith the exception of informing Lieutenant McHugh about her phone conversation with Officer Younger on 01-30-19, [McCowan] did not report to a supervisor any of the allegations she made in her complaint."

- "Corporal McCowan stated that she had conversations with Sergeant Williford and Sergeant Allen on 01-30-19, during which she discussed with them her desire to speak to Chief Inspector MacDonald.  Despite having the ability to do so on two separate occasions on 01-30-19, Corporal McCowan did not notify a supervisor of her concerns with Officer Younger."

- "Corporal McCowan stated that she received pre-promotional training that included sexual harassment training prior to being promoted to corporal on 11-30-18. Corporal McCowan added that she was 'very familiar' with the Philadelphia Police Department's disciplinary process because she was previously assigned to the Department Advocate Unit on two separate occasions."

(*Id.*)  And in the conclusions section of the report, Inspector Hall states that because McCowan was Younger's supervisor, she should not have filed an EEO complaint:

> The investigation revealed that Corporal McCowan filing an EEO complaint against Officer Younger in relation to the allegations she set forth during her interview *was not the appropriate course of action for her to take*.  As a supervisor, Corporal McCowan had the authority and the responsibility to request disciplinary action against Officer Younger if she believed he violated a departmental policy. Corporal McCowan did not provide any indication that she was prohibited from taking action against Officer Younger, nor did she provide any information that would suggest a reasonable reason for her failing to take appropriate actions to address Officer Younger's conduct.

(*Id.* at CITY 2516 (emphasis added); *see also id.* at CITY 2518 ("The investigation revealed sustained departmental violations on the part of Corporal Audra McCowan . . . as she failed to properly supervise when she failed to take appropriate actions related to the inappropriate behavior she described in her complaint on the part of Officer Younger.").)

Inspector Hall also suggested that McCowan's sexual harassment claim was unfounded *because* she was Younger's supervisor, stating that "were [Younger] to have made the same comments to an officer of equal rank or to a civilian employee, those comments could have been deemed a form of sexual harassment."  (*Id.* at CITY 2520; *see also id.* at CITY 2518 ("[W]ere Officer Younger to have made all of the comments Corporal McCowan alleged in her complaint in the manner that she alleged, he would have been in violation of Directive #8.7, Employment Discrimination/Equal Employment Opportunity (EEO) – Responsibilities and How to File a Complaint.").)

27

### M.      McCowan Files this Lawsuit and Resigns from the Department

On July 29, 2019, McCowan and Allen filed their initial complaint in this case.  (Doc.

No. 1; *see also* Doc. No. 49 at ¶¶ 276–77.)  On August 20, 2019, Ross resigned as Police

Commissioner.  (P. Ex. H.)  And on October 2, 2019, McCowan resigned from the Police

Department after her doctor told her that her employment conditions were having a detrimental

impact on her mental and physical health.  (McCowan 2020 Depo. at 342:6–346:21.)

### N.      Systemic Problems at the City and the Department

Allen and McCowan allege that their individual experiences are two examples of a wide-

spread problem of discrimination within the City generally and at the Police Department

specifically, pointing to an audit performed by City Controller Rebecca Rhynhart in 2018 and

comments from Philadelphia Mayor James Kenney in 2019.

### 1.      Controller Rhynhart's Audit

In 2018, Controller Rhynhart conducted a performance audit of the City's sexual

harassment policies and procedures "to determine whether the City has clear and effective

procedures for reporting sexual misconduct, performs investigations into employee complaints

appropriately, and dispenses discipline fairly and consistently."  (P. Ex. A at p. 3; *see also* P.

Ex. F. at 12:7–10 ("Rhynhart Depo.").)  Her office reviewed incidents and complaints from July

2012 through April 2018 and found "a troubling picture of a policy and procedures that do not

protect or support victims of sexual misconduct and improperly prepare supervisors to receive,

investigate and resolve complaints."  (P. Ex. A at p. 3 ("Audit Report"); Rhynhart Depo. at

17:18–18:20 ("The findings were that — well, there were many, many, many issues, honestly,

found; that the policy was not adequate, that it lacked instruction.  We found that the City poorly

implemented the policy.  So the policy had issues.").)

Specifically, the audit found that "the City lacks a clear and comprehensive policy, poorly implements the required procedures, administers discipline unevenly across departments for substantiated claims, and likely misses cases of sexual harassment by not properly documenting complaints[.]"  (Audit Report at p. 3; *see also* Rhynhart Depo. at 33:6–20 ("[W]e found that there was not clear guidance on the types of questions that should be asked from the person making the complaint, from participants, from possible witnesses; that there was not adequate guidance to the person conducting the investigation on what they truly should be doing."); *id.* at 38:3–10 ("We found that there was no requirement to follow up with the complainant to let them know what the resolution was, and that the lack of that circling back to the employee, to the complainant, left them unsure of what was going on.").)

At the end of the audit, Controller Rhynhart recommended, among other things, that the City centralize its process for investigating claims of sexual harassment and establish standardized guidelines for recommended discipline.  (Audit Report at p. 3; *see also id.* at p. 6 (recommending that the City also update its sexual harassment policy to give explicit instructions on how to make a claim and what to expect, develop a comprehensive training program, and revise the system for tracking cases and settlement costs to make complaints, lawsuits, and payouts easier to track); Rhynhart Depo. at 23:23–24:17 ("The two main recommendations were to centralize the reporting, investigation, and discipline recommendations into a centralized department or function.").)

After Controller Rhynhart published the audit report, she met with Mayor Kenney to discuss her recommendations.  (Rhynhart Depo. at 63:6–64:3.)  He agreed that the City's process for handling complaints of sexual misconduct needed to change, supported Rhynhart's recommendations, and stated that he intended to implement her recommendations regarding

centralization and a standardized discipline schedule. (*Id.* at 63:6–65:21.) Despite these assurances, as of August 2020, the City had not implemented any of the recommendations in Rhynhart's report apart from minor changes related to training. (*Id.* at 65:13–17.)

### 2.    **Mayor Kenney's Press Release**

In 2018 — before the events at issue in this case — the City did, however, implement "a new sexual harassment prevention policy and a series of internal reforms designed to prevent workplace discrimination and harassment throughout the government." (P. Ex. H. at McCowan-Allen 3159.) Mayor Kenney referenced this policy when he announced the resignation of Commissioner Ross in August 2019. (*Id.*) In a press release, Mayor Kenney stated that although rolling out the new policy was expected to take time, he "[did] not believe the Police Department [had] taken the necessary actions to address the underlying cultural issues that too often negatively impact women — especially women of color." (*Id.*) For that reason, Mayor Kenney explained, he had decided to hire "an independent firm to investigate the recent allegations and to make recommendations to overcome some of the discrimination and harassment within the Department." (*Id.*)

## II.    PROCEDURAL HISTORY

As mentioned above, Plaintiffs filed their initial complaint in this case on July 29, 2019. (*See* Doc. No. 1.) The operative complaint is Plaintiffs' second amended complaint, which was filed on May 21, 2020.[13] (Doc. No. 49.) On January 11, 2021, the Court issued a Memorandum and Order dismissing some of those claims, including all of McCowan's claims against

---

[13] Before filing their second amended complaint, Plaintiffs consented to the dismissal, with prejudice, of their claims against Younger under the FLSA (Counts IV and V), § 1981 (Counts VIII through X), § 1983 (Counts XI through XIII), and the Pennsylvania Whistleblower Law (Count XIV). (*See* Doc. No. 23 at pp. 1–2; *see also* Doc. No. 30.)

Defendant Sergeant Herbert Gibbons.  (*See* Doc. Nos. 120, 121.)  For clarity, the Court has

created a chart outlining McCowan's remaining claims:

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| I | Title VII Disparate Treatment | City of Philadelphia |
| II | Title VII Hostile Work Environment | City of Philadelphia |
| III | Title VII Retaliation | City of Philadelphia |
| VI | FMLA Interference | City of Philadelphia |
| VII | FMLA Retaliation | City of Philadelphia |
| VIII | 42 U.S.C. § 1981 Disparate Treatment | All Individual Defendants, *except* Ross and Younger, in their individual capacity only[14] |
| IX | 42 U.S.C. § 1981 Hostile Work Environment | All Defendants *except* Ross and Younger |
| X | 42 U.S.C. § 1981 Retaliation | All Defendants *except* Ross and Younger |
| XI | Disparate Treatment in Violation of Equal Protection Clause, 42 U.S.C. § 1983 | All Individual Defendants, *except* Ross and Younger, in their individual capacity only |
| XII | Hostile Work Environment in Violation of Equal Protection Clause, 42 U.S.C. § 1983 | All Defendants *except* Younger |
| XIII | Retaliation in Violation of Petition Clause, 42 U.S.C. § 1983 | All Defendants *except* Younger |
| XIV | Pennsylvania Whistleblower Retaliation | All Defendants *except* Younger |
| XV | IIED | All Defendants except the City |
| XVI | Assault and Battery | Younger |
| XVII | PHRA Discrimination | City of Philadelphia |
| XVIII | PHRA Retaliation | All Defendants *except* Younger |

---

[14] In the Court's Memorandum on the motions to dismiss, we declined to dismiss McCowan's § 1981 disparate treatment claim against the City because the City's only argument in favor of dismissal was that the claim should have been brought pursuant to § 1983.  The Court agreed, but mindful of Supreme Court precedent, we declined to dismiss the entire claim on the basis of this procedural hurdle alone.  Later in the opinion, however, we dismissed McCowan's § 1983 claim against the City for race and/or gender disparate treatment because she failed to allege that the City has a policy, practice, or custom of disparate treatment on the basis of race and/or gender.  This effectively also dismissed McCowan's § 1981 claim for disparate treatment against the City, which as mentioned above, must be brought pursuant to § 1983 and therefore, must rely on a policy, practice, or custom of gender and/or race discrimination.  *See Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 477–78 (E.D. Pa. 2013) (explaining that "it remains a necessary prerequisite to municipal liability under § 1983 that the offending personnel were operating under an official policy or practice" and "a failure to bring forward evidence of a policy, practice, or failure to train precludes a § 1981 claim just as it does a § 1983").

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| XIX | PHRA Aiding and Abetting | All Defendants *except* the City of Philadelphia, Ross, and Younger[15] |
| XX | PFPO Discrimination | City of Philadelphia |
| XXI | PFPO Retaliation | All Defendants *except* Younger |
| XXII | PFPO Aiding and Abetting | All Defendants *except* Younger |
| XXIII | Declaratory Relief | All Defendants *except* Ross and Younger |
| XXIV | Injunctive Relief | All Defendants *except* Ross and Younger |

Defendants have filed three motions for summary judgment, each of which requests judgment in Defendants' favor on all of McCowan's remaining claims. (*See* Doc. Nos. 132, 133, 136.) McCowan opposes the motions. (*See* Doc. Nos. 166–68.) For the reasons discussed below, the motions are granted in part and denied in part.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to

---

[15] During oral argument, McCowan's counsel withdrew her PHRA and PFPO aiding and abetting claims against the City. (Draft H'rg Tr. at 57:24–58:4.)

the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV.   DISCUSSION

We begin with McCowan's Title VII and related discrimination claims, before addressing her First Amendment retaliation claim, her claims under the FMLA, the remaining state law

claims, and her claims for equitable relief.

### A.  Discrimination Claims

### 1.  Counts I, VIII, XI, XVII, XX:  Disparate Treatment

McCowan brings claims for disparate treatment based on race and gender against the City of Philadelphia under Title VII (Count I), the PHRA (Count XVII), and the PFPO (Count XX), and against individual Defendants Coulter, MacDonald, McCarrick, McHugh, O'Brien, Williford, Tamika Allen, and Conway (collectively, the "individual City Defendants") under 42 U.S.C. § 1981 (Count VIII) and 42 U.S.C. § 1983 (Count XI).  (Doc. No. 49.)  We use the same legal framework to analyze all five claims.  *See Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020) ("Courts apply the same burden-shifting framework to claims asserted under Title VII, the PHRA, the PFPO, § 1981, and § 1983."); *Williams v. Carson Concrete Corp.*, Civil Action No. 20-5569, 2021 WL 1546455, at *3 (E.D. Pa. Apr. 20, 2021) ("Claims of employment discrimination brought under Title VII, the PHRA, the PFPO, and Section 1981 are analyzed coextensively.").

McCowan's disparate treatment race and gender discrimination claims are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  *Opsatnik v. Norfolk S. Co.*, 335 F. App'x 220, 222 (3d Cir. 2009).  "First, the plaintiff must establish a prima facie case of discrimination."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  To establish a prima facie case of disparate treatment, a plaintiff must show that she is a member of a protected class, that she was qualified for her position, and that she suffered an adverse employment action under circumstances giving rise to an inference of intentional discrimination.  *Id.* at 410–11; *see also Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142, 144–45 (3d Cir. 2007) (framing the fourth element as requiring evidence that "either similarly-situated non-

34

members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination").

If the plaintiff carries her burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Jones*, 198 F.3d at 410–11 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). To demonstrate pretext, a plaintiff must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 412–13 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Here, there is no dispute that McCowan, an African American woman, is a member of a protected class. Nor do Defendants dispute that McCowan had the minimum qualifications for the position that she held and the placements that she sought. (*See* City Ex. 3.) As for the third element, McCowan has identified four adverse employment actions: (1) her move from HIDTA to A&I; (2) the denial of training opportunities and job assignments in A&I; (3) her temporary detail to Police Radio, where her schedule was changed without notice and she was given no

assignments; and (4) the filing of disciplinary charges against her for failing to supervise

Younger "after a sham investigation" into her complaints.[16]  (Doc. No. 167 at p. 7; *see also* Doc.

No. 133 at p. 12.)  *See Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014)

("An adverse employment action can generally be demonstrated by a hiring, firing, failure to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.").

Defendants argue that McCowan cannot make out a prima facie case because she has

failed to show that any adverse employment action was taken under circumstances giving rise to

an inference of discrimination.  (Doc. No. 133 at pp. 11–13.)  And, Defendants argue, even if she

could make out a prima facie case for disparate treatment, McCowan cannot show that

Defendants' legitimate, non-discriminatory reasons for taking each adverse action were pretext

for discrimination.  (*Id.* at pp. 14–16.)  McCowan responds that she has stated a prima facie case

as to each adverse action and shown that Defendants' stated justifications are pretext for

discrimination.  (Doc. No. 167 at pp. 8–12.)  We address each action in turn.

### a.    Move from HIDTA to A&I

Even assuming that McCowan has established a prima facie case of gender[17]

discrimination as it relates to her move from HIDTA to A&I, we agree with Defendants that she

---

[16] McCowan also asserts that she was constructively discharged.  (Doc. No. 167 at p. 7.)  But she does not provide any argument on this issue, nor does she cite record evidence or case law that supports her assertion.  Moreover, the Court notes that the only allegations of constructive discharge contained in the second amended complaint are in relation to McCowan's FMLA claims.  (*See* Doc. No. 49 at ¶¶ 377g, 382b.)  Therefore, the Court does not address the issue.

[17] McCowan has put forth no evidence giving rise to an inference of *racial* discrimination as it relates to her reassignment from HIDTA to A&I.  *See Nardella v. Phila. Gas Works*, 997 F. Supp. 2d 286, 295 (E.D. Pa. 2014) (concluding that the record did not reflect that the plaintiff was terminated "under circumstances which could give rise to an inference of intentional discrimination" where the plaintiff "put forth no evidence to support her assertion that the mistreatment that she allegedly endured was motivated by her race or gender" and to the contrary, the plaintiff conceded that "she never heard [her supervisor] make any derogatory comments about white people," say "anything offensive to women" or make

has failed to show that Chief Inspector MacDonald's legitimate nondiscriminatory reason for the reassignment amounts to pretext. Multiple City employees testified that McCowan's initial assignment to HIDTA was an administrative error originating at Police Headquarters and that Corporal Neil Wilson had spent the previous six months peer training to fill the only day-shift corporal slot in HIDTA.[18] (*See, e.g.*, MacDonald Depo. at 22:19–23:7 (testifying that McCowan was initially sent to HIDTA but he "recognized that was an error, a paperwork error from downtown," because "we had a black male corporal with extensive experience and training who was already working in HIDTA who was supposed to take on that role").) To "prevent duplicative supervision and achieve the organizational goals of the Intelligence Bureau," Chief Inspector MacDonald reassigned McCowan to a different unit in the Bureau: A&I. (*See* MacDonald Depo. at 25:19–27:11 (explaining that A&I was "going to be the place where [the Bureau] needed the most supervisors moving forward," and noting, in support of that assertion, that he "subsequently promoted two civilians, a black female and a white female, to supervisory positions to fill those roles"); McCarrick Depo. at 22:7–23:13 ("We had an opening [in A&I], and [McCowan] went there to perform that administrative function.").)

McCowan argues that MacDonald's reasons for moving her to A&I are pretext for gender discrimination because Corporal Wilson was less qualified than her, MacDonald failed to follow

---

comments to other people about white people or women, nor did he mistreat other white women similarly situated to the plaintiff). And indeed, the HIDTA corporal assignment was given to Corporal Wilson, an African American man. Therefore, we find that McCowan has failed to support a prima facie case of racial discrimination as to this adverse employment action. In the alternative, even if McCowan had satisfied her burden of establishing a prima facie case of racial discrimination, we find, for the reasons discussed in this section, that she has failed to put forth any evidence of pretext.

[18] Although there is some dispute as to whether there was also a night-shift corporal position available in HIDTA, we do not find this dispute material because there is no dispute that there was only one corporal position available for the day-time shift. That is the shift to which McCowan was initially assigned, and from which she was moved so that it could be given to Corporal Wilson.

the proper procedure for transferring her out of HIDTA, and Williford warned her that if she complained about the move, she would be labeled a "troublemaker." (Doc. No. 167 at p. 10.) These arguments are unavailing. First, McCowan has cited no *evidence* that Corporal Wilson was less qualified than her. To the contrary, Chief Inspector MacDonald testified that Wilson was a "highly qualified senior corporal who had trained for months for th[e] position" in HIDTA and was "sitting in that position" when McCowan was transferred to the Intelligence Bureau as a newly promoted corporal.[19] (MacDonald Depo. at 25:4–18.) Although McCowan believed Wilson was less qualified, unsubstantiated beliefs and speculation are insufficient at summary judgment. *See Jones*, 198 F.3d at 413–14 (finding that the plaintiff failed to put forth sufficient evidence of pretext where he made "numerous allegations in his affidavit which he predicates on nothing more than his beliefs without having actual knowledge of them"); *Steele v. Pelmor Labs., Inc.*, 725 F. App'x 176, 179 (3d Cir. 2018) ("'An inference of pretext based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.'" (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014)) (alterations adopted)).

---

[19] Wilson's superior qualifications also suggest that he is not a valid comparator for McCowan. A "plaintiff can use evidence of preferable treatment to satisfy her burden at both the prima facie and pretext stages of the analysis." *Abdul-Latif v. County of Lancaster*, 990 F. Supp. 2d 517, 525 (E.D. Pa. 2014). "To make a comparison of the plaintiff's treatment to that of an employee outside the plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that [s]he and the employee are similarly situated in all *relevant* respects." *Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654 (3d Cir. 2009); *see also Opstanik*, 335 F. App'x at 222–23. "In a failure to transfer or promote case, the relevant factors" for determining whether two employees are similarly situated "may include . . . evidence that the employees possessed analogous attributes, experience, education, and qualifications relevant to the positions sought." *Houston*, 355 F. App'x at 654 (quotation marks omitted). Here, Wilson and McCowan were not similarly situated because he was a senior corporal with substantial on the job training in the HIDTA position, while McCowan was a newly promoted corporal with no training for HIDTA. These differences are relevant because they are the very factors on which MacDonald relied when he moved McCowan to A&I and placed Wilson in HIDTA.

Second, the evidence suggests that when MacDonald assigned McCowan to A&I, he acted within his authority and followed his usual procedure for moving officers within the Intelligence Bureau from one unit to another as needed.  (*See* MacDonald Depo. at 21:6–22:4 ("I have the authority to detail [my subordinates] across to a different position that best suits their skill set."); Williford Depo. at 38:16–39:6 (explaining that "once people got assigned to anywhere under the Intelligence Bureau, they would actually get moved where the chief wanted them"); O'Brien Depo. at 37:20–38:23 (testifying that he was initially assigned to the Statistics Unit in the Intelligence Bureau, but MacDonald moved him to A&I at the end of onboarding).) Because MacDonald consistently moves officers, regardless of race or gender, from one unit to another in this manner, it is immaterial whether the reassignment constitutes a detail, a transfer, or neither.[20]  In other words, there is no evidence that the reassignment — even if a "transfer" that technically should have been approved by the Police Commissioner — was done for discriminatory purposes.

Last, Williford's after-the-fact assertion that McCowan would be labeled a troublemaker if she complained, does not render MacDonald's reasons for moving McCowan "implausible" or reasonably suggest that MacDonald was, in the first instance, motivated by gender discrimination.

Therefore, we grant summary judgment to the City and the individual City Defendants on McCowan's race and gender disparate treatment claims as they relate to her assignment to A&I.

---

[20] A "detail" means the officer is "working temporarily outside of the unit to which [he or she is] permanently assigned," and when the detail is "within a division to which an employee is permanently assigned," it does not require the approval of the Police Commissioner.  (City Ex. 4 at ¶¶ 11–12.)  A "transfer," by contrast, is a "formal and permanent change of assignment that requires the approval of the appointing authority, here the Police Commissioner."  (*Id.* at ¶ 15; *see also* MacDonald Depo. at 24:13–22 (explaining that a change in DAR code could represent a transfer or a detail); *id.* at 25:4–18 ("[I]t wasn't a matter of moving, transferring her in or out [of HIDTA]; it was fixing an error that had occurred.").)

### b.      Job Duties and Opportunities in A&I

Next, McCowan argues that once she moved to A&I, she was denied training

opportunities and assignments that were afforded to white male supervisors in the unit.  (Doc.

No. 167 at p. 8.)  In particular, she argues that she was excluded from meetings, that she was left

off substantive email chains, and that she was denied assignments.[21]  (*See* McCowan 2020 Depo.

at 176:3–178:2 (explaining that she was not included on the email chain that the analysts used to

distribute their work product to the supervisors in the unit); *id.* at 192:1–193:11 (describing

exclusion from emails and meetings to which white male subordinate was invited); *id.* at 197:23–

201:20 (describing how she walked in on multiple meetings to which the other supervisors were

invited, including a group production plan meeting and a grid reduction meeting); *id.* at 202:13–

203:6 (describing similar experience in December and January relating to morning analyst

meetings); *id.* at 214:10–218:3 (describing "secret meetings" among the supervisors).)

As to this adverse employment action, the City and individual City Defendants argue that

McCowan cannot make out a prima facie case of disparate treatment on the basis of race or

gender because she has not identified similarly situated comparators who were treated better than

her.  (Doc. No. 133 at pp. 12–13.)  During oral argument, Plaintiffs' counsel argued that

McCowan did not need to put forth evidence of comparators.  (Draft H'rg. Tr. at 54:10–18 ("The

Court: So your position is that you don't need comparators?  Mr. Bryson: Correct.  Yes.  We

don't need comparators for many reasons . . . .").)  Although this may be technically true, *see*

*Wallace*, 214 F. App'x at 144–45 (framing the fourth element as requiring evidence that "either

---

[21] McCowan also argues that she was denied training, but she has put forth no evidence that she was denied training opportunities that were made available to O'Brien, McHugh, or any other supervisor in A&I.  To the contrary, the evidence shows that all new supervisors to A&I, including McCowan, O'Brien, and McHugh, received the same onboarding, on-the-job training, and access to off-the-job training as it became available.  (*See* MacDonald Depo. at 28:2–14, 31:8–20 (explaining that "[i]nitial training would have been on-the-job training" with "additional training as it became available").)

similarly-situated non-members of the protected class were treated more favorably *or* the adverse job action occurred under circumstances that give rise to an inference of discrimination" (emphasis added)), McCowan has not explained what "circumstances . . . give rise to an inference of discrimination" in relation to this adverse employment action, and therefore, needed to identify comparators.

In the alternative, even if we were to look to O'Brien and McHugh — the two individuals identified by Defendants as comparators (*see* Doc. No. 133 at pp. 12–13 (asserting that Sergeant O'Brien and Lieutenant McHugh were treated identically or worse than McCowan)) — we find that neither is a valid comparator because they were McCowan's supervisors at the time (*see* Draft H'rg. Tr. at 7:1–8:18; *see also* MacDonald Depo. at 14:1–16:23), and McCowan has suggested that they were the ones responsible for treating her differently. McCowan testified that she frequently spoke with both men about being left off the email chain for supervisors to review analyst work product[22] and being excluded from supervisory meetings, but they refused to help her. (*See* McCowan 2020 Depo. at 209:8–213:2 (testifying that she asked McHugh and O'Brien for work and expressed her frustrations about not being able to review work product).) In addition, McHugh testified that O'Brien typically handled the email invitations to the meetings from which McCowan was excluded. (*See* McHugh Depo at 24:10–31:10 (testifying that Sergeant O'Brien typically sent the emails scheduling meetings in A&I).) McCowan has not

---

[22] The evidence suggests that McCowan was placed on this email chain once a different supervisor, Director Kevin Thomas, realized that she had been left off. (*See* McCowan 2020 Depo. at 175:19–177:13 (explaining that Director Thomas added her to the email chain related to reviewing work product after she pointed out that she had been left off of it and told her, "hey, I'm sorry. You haven't been included in the e-mails. From now on, I'll put you in the e-mail chain"); *see also id.* at 170:2–171:2 (testifying that one analyst asked her to review his product).)

explained how we can consider McHugh and O'Brien "similarly situated" to her, when they are the ones directing the allegedly discriminatory acts.[23]

More importantly though, as a lieutenant and a sergeant, McHugh and O'Brien had different job duties and responsibilities than McCowan, and therefore, needed to be included in meetings and given assignments that were not pertinent to McCowan.  Multiple City Defendants testified that as a corporal, McCowan's responsibilities were administrative, not operational. (*See* MacDonald Depo. at 30:11–15 (explaining that his goal was to have McCowan at A&I, where she would "supervise[ ] junior analysts and other *administrative* functions" (emphasis added)); McHugh Depo. at 24:10–30:7; McCarrick Depo. at 22:7–23:13, 32:12–20, 107:9– 109:22, 111:2–21.)  But even if we disregard this testimony, McCowan has not explained with specificity the subject of the meetings from which she was excluded, how those meetings related to her job duties, why she needed to attend the meetings, and whether a similarly situated comparator was invited.  At most, McCowan has identified one meeting where a white, male subordinate was included.  (*See* Williford Depo at 52:9–54:13; P. Ex. BB (text message from Williford to McCowan, "Had to keep reminding them supervisors includes cpl and NOT sean!"); *see also* McCowan 2020 Depo. at 192:1–193:11.)  But again, McCowan has not explained why the subordinate is a valid comparator or otherwise shown that the presence of one subordinate at a meeting for an unknown purpose is evidence of disparate treatment.

---

[23] McCowan also argues that MacDonald and McCarrick are responsible for excluding her from meetings because the two men would speak with McHugh and O'Brien without including McCowan in the discussion.  (McCowan 2020 Depo. at 205:24–207:14 (describing incident where McCarrick pulled O'Brien and McHugh to the side to tell them that he needed a supervisor in a meeting with Younger).) But without more, we cannot find that a handful of informal discussions with McHugh and O'Brien, who outranked McCowan and had different responsibilities than her, gives rise to an inference of discrimination.

Because McCowan has not identified similarly situated comparators, who were treated more favorably than her, or otherwise put forth evidence giving rise to an inference of race or gender discrimination as to her assignments and job duties at A&I, she has not put forth a prima facie case of disparate treatment as to this employment action, and we grant summary judgment in favor of Defendants.

### c.  Detail to Police Radio

Next, we analyze whether McCowan's detail to Police Radio, with its resulting scheduling change, was done under circumstances that give rise to an inference of gender discrimination.[24]  Once again, we note that McCowan's attorney explicitly denied the need for presenting comparator evidence.  (Draft H'rg. Tr. at 54:10–18.)  However, as to this adverse employment action, McCowan has identified evidence that gives rise to an inference of intentional discrimination.

When an employee files a complaint with Internal Affairs, the Police Department has a practice of temporarily relocating the alleged aggressor while the internal investigation is pending.  (*See* Coulter Depo. at 55:1–17 ("Normally, you would go into the complaint and remove the possible offender."); McCarrick Depo. at 42:24–44:12 ("[F]irst off, it is pretty much a standard policy that you never move a complainant in regard to one of these matters, as it could be deemed as it's being punitive.").)  Despite this practice, Coulter detailed McCowan, the female complainant, to Police Radio, while Younger, the male aggressor, was allowed to remain

---

[24] Again, we find that McCowan has neither argued, nor pointed to any evidence that suggests her relocation was based on her *race*, and therefore we grant summary judgment to the City and individual City Defendants to the extent McCowan's disparate treatment claims are premised on race discrimination. *See Daniels*, 982 F. Supp. 2d at 478 ("The defendants note that [the plaintiff] has not put forward evidence to support the elements of a First Amendment or Fourteenth Amendment violation on the part of any defendant.  [The plaintiff] is silent on these arguments, and she does not defend her First and Fourteenth Amendment claims from summary judgment.  We will therefore grant summary judgment in favor of all individual defendants on count nine.").

in his position.  The evidence suggests that this move had multiple negative consequences for McCowan.  McCowan testified that she considered the assignment to Police Radio a punishment because it was "discipline city down there," and Conway confirmed that Police Radio is considered a more difficult assignment by some because the enlisted supervisors have disciplinary disputes with the many civilian employees working there.  (McCowan 2020 Depo. at 278:9–279:11; *see also* Conway Depo. at 272:20–274:12.)  The immediate move also meant McCowan's schedule was changed from a steady day shift with weekends off to a rotating schedule for the first time in 11 years, and the change occurred with less than 24 hours' warning. (McCowan 2020 Depo. at 278:9–279:11.)  This evidence is sufficient to raise a prima facie case of gender discrimination.

Defendants respond that Deputy Commissioner Coulter moved McCowan, instead of Officer Younger, because McCowan requested a temporary detail out of A&I under Deputy Commissioner Coulter's command.  (*See* Coulter Depo. at 56:1–17 ("I approved it because it was her request to be removed from that environment.").)  They also argue that Coulter sent McCowan to Police Radio, not because it was considered a difficult assignment, but because that was the only position immediately available under Coulter's command.  (*Id.* at 56:8–9.)  Last, Defendants argue that Coulter moved McCowan immediately because she asked to be removed from a harmful situation as quickly as possible.  (*See* Doc. No. 133 at pp. 15–16; Coulter Depo. at 59:12–18 ("She requested that she would be detailed out immediately.").)

McCowan points to a number of inconsistencies in Defendants' stated justifications. (Doc. No. 167 at pp. 10–11.)  Beginning with their exigency argument, McCowan notes that Defendants failed to move either McCowan or Younger in the five weeks after McCowan filed her initial complaint, and even if Coulter was trying to expediently address McCowan's

situation, this justification does not explain why she went against the Department's typical procedure and moved McCowan instead of Younger.  (*See id*.)  Second, there is substantial evidence that there were no open corporal positions in Police Radio when McCowan was detailed there.  McCowan testified that she worked at Police Radio for three months — more than 800 hours — without ever receiving an assignment.  (McCowan 2020 Depo. at 278:14–279:11.)  Her superiors in Police Radio frequently told her that they did not know why she had been assigned to them because they did not need another corporal (*see id.* at 299:6–300:23), and when they attempted to move her to a more useful squad with better hours and to have her receive necessary training, their requests were denied (*see id.* at 294:21–302:22).  McCowan's hardship memo requesting a more consistent schedule was also denied.  After weeks of sitting in the cold tape room, McCowan was eventually told to sit in the hallway, and she remained there until she went out on leave.  (*Id.* at 285:2–18, 312:9–13.)  A reasonable jury, viewing this evidence in the light most favorable to McCowan could reasonably disbelieve Defendants' justification for transferring McCowan to Police Radio.  Therefore, we will allow McCowan's Title VII, PHRA, and PFPO gender disparate treatment claims to move forward against the City to the extent they are based on this adverse action.

As for the individual City Defendants, we find that Deputy Commissioner Coulter was the only individual City Defendant personally involved in McCowan's detail to Police Radio, and therefore, grant summary judgment in favor of the other individual City Defendants.  *See Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 540–41 (D.N.J. 2000) (explaining that § 1983 imposes liability against individual defendants only when they are "personally involved in the discrimination against the plaintiff") (collecting cases); *see also Cruz-Smith v. Sinclair*, Civil Action No. 10-3609, 2011 WL 3652462, at *3 (E.D. Pa. Aug. 19, 2011) ("To bring a successful

§ 1983 claim for denial of equal protection against an individual government defendant, a plaintiff must prove the existence of purposeful discrimination by the defendant," meaning the plaintiff must "show some affirmative conduct by the defendant that played a role in the discrimination, and the discrimination must be based on the plaintiff's membership in a protected class.").

Although some of McCowan's other supervisors knew about the move and informed McCowan of her new assignment, they were merely following Coulter's command. McCowan has not shown that any of the other individual City Defendants had the authority to disobey Coulter's orders or played any direct role in sending McCowan to Police Radio. *See Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 480 (E.D. Pa. 2013) (dismissing discrimination claims related to the plaintiff's forced transfer as against one individual defendant because there was no evidence from which a factfinder could reasonably infer the defendant had the power, the opportunity, or the prerogative to make the staffing determination at issue). Finally, we find that Deputy Commissioner Coulter is not entitled to qualified immunity because a jury could find that McCowan's transfer to Police Radio was the result of gender discrimination, and the right to be free from gender discrimination in the workplace was clearly established at the time. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479–80 (3d Cir. 1990) (recognizing that "the right to be free of discrimination based upon sex in the workplace" is "well grounded in the law and widely known to the public"); *see also Cruz-Smith*, 2011 WL 3652462, at *4 n.10. ("Because the right to be free from discrimination in the workplace based on sex and national origin was clearly established at all times relevant to this lawsuit, [the defendant] has not demonstrated an entitlement to qualified immunity at the motion to dismiss stage.").

### d.    Disciplinary Charge Against McCowan[25]

At the end of Conway's investigation, Defendants sustained findings against McCowan

for failure to supervise Younger, and based on that finding, the City issued a Police Board of

Inquiry ("PBI") charge against McCowan.  (*See* City Ex. 33 (PBI charge against McCowan for

failure to supervise).)  McCowan argues that the Internal Affairs investigation was conducted

under circumstances giving rise to an inference of gender[26] discrimination because the

investigator, Sergeant Conway, told her that his questions, which were reviewed and approved

by his superiors, were designed to protect the City and find that she had done something wrong.

(*See* McCowan 2020 Depo. at 240:1–23 ("Sergeant Conway told me that his line of questioning

was set up to protect the City . . . .").)  Consistent with this assertion, Conway's interview

questions read like an interrogation into McCowan's supervisory duties instead of an interview

about whether Younger committed the allegedly harassing conduct.  (*See* P. Ex. NNN, at pp.

_____

[25] The City Defendants seem to concede for purposes of this motion that the disciplinary charge issued against McCowan at the end of the internal investigation constituted an adverse employment action.  (*See* Doc. No. 133 at p. 12.)  *See Daniels*, 982 F. Supp. 2d at 481 ("The disciplinary memorandum is an adverse employment action" because it "constituted an official reprimand" that "altered the 'terms and conditions of employment.'").  *But see Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90–91 (3d Cir. 2015) (finding the plaintiff failed to allege an adverse employment action because she argued only that she was subject to "disciplinary accusations," and failed to allege that she received "any type of discipline, demotion, decrease in salary, written warning[,] nor was she placed on a performance improvement plan"); *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 410–11 (E.D. Pa. 2014) ("Neither of the disciplinary warnings Deans was issued altered the terms of his employment in any way.  Although they were part of a progressive discipline schedule, and thus may have remained in his personnel record and could conceivably in the future form the basis for an adverse action, the two warnings here did not lead to his termination, nor did they otherwise affect the compensation, terms, conditions or privileges of his employment.").  Conway testified that had McCowan remained employed with the Department, the PBI charge against her would have proceeded to a PBI hearing, after which a PBI board would have determined whether she was innocent or guilty of failure to supervise.  (Conway Depo. at 29:20–32:16; *see* Doc. No. 33 (PBI charge for failure to supervise against McCowan).)  And if she was found guilty, McCowan could have received discipline ranging from "training and counseling" to "multiple days' worth of suspension."  (Conway Depo. at 165:18–167:10.)

[26] Again, we find that McCowan has neither argued, nor pointed to any evidence that suggests. the disciplinary charge was issued because of her *race*, and therefore, we grant summary judgment to the City and individual City Defendants to the extent McCowan's disparate treatment claims are premised on race discrimination.  *See Daniels*, 982 F. Supp. 2d at 478.

CITY 2526–38; *see also* McCowan 2019 Depo. at 118:24–123:7 (describing the February 8 interview as a "[three-and-a half-hour] interrogat[ion]" where "she was made out to be the doer instead of the complainant").)  As we discuss further below, Conway did not put McHugh — Younger's male supervisor — through a similar "interrogation" even though he also knew about Younger's conduct and failed to reprimand Younger.  Given this evidence, we find McCowan has met her prima facie burden.

The City asserts that it had a legitimate justification for sustaining a finding of failure to supervise against McCowan and issuing a PBI charge to that effect — the investigation revealed that McCowan violated the City's Department's policies on EEO complaints, Directive 8.7. (Doc. No. 133 at p. 16.)  McCowan counters that this is pretext for gender discrimination because her McHugh committed a similar violation without being similarly questioned or charged.  (Doc. No. 167 at p. 8.)

"A violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence."  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000); *cf. Daniels*, 982 F. Supp. 2d at 481–82 (finding no inference of discrimination where the plaintiff failed to present "any evidence that her receipt of the [disciplinary] memo constituted any treatment of her different from that of any other teacher under similar circumstances").  Here, when the evidence is viewed in the light most favorable to McCowan, Conway's investigation revealed that Lieutenant McHugh[27] knew Younger called McCowan at home to say that he had a crush on her, and a

---

[27] Here, unlike above, *see supra* Part IV.A.1.b., we find that McHugh was similarly situated to McCowan in all relevant respects.  First, in this instance, it is the City's Internal Affairs Department, not McHugh, who is responsible for the identified adverse employment action.  Second, Directive 8.7's supervising reporting obligations apply equally to McCowan and McHugh because it is broadly directed to all "supervisors," and both McCowan and McHugh supervised Younger in A&I.

couple of weeks later, referred to her as "babe" while at work.  (*See* P. Ex. NNN at CITY 2497 ("Corporal McCowan also informed Lieutenant Timothy McHugh #180 about her conversation with Officer Younger."); *id.* at CITY 2498 ("Corporal McCowan stated that on 01-21-19, she and Officer Allen were at Lieutenant McHugh's desk talking to Lieutenant McHugh, when Officer Younger . . . said to her (Corporal McCowan), 'Hey babe.' . . .  Corporal McCowan stated that she looked at Lieutenant McHugh; however, he did not say anything."); *id.* at CITY 2508 (McHugh agreeing that McCowan told him about the "crush" comment and that he "did not take any further action related to Officer Younger . . . because he did not believe it was an EEO matter," and because "McCowan was a supervisor at the time of the phone call and that she informed him she was going to address the matter").)  If McHugh knew about either or both comments, Directive 8.7 suggests he was required to report the incident to Internal Affairs.  (*See* P. Ex. M at CITY 3144 (Directive 8.7, which states supervisors must "initiate a complaint/report to the EEO Officer, anytime they believe an employee, regardless of assignment, is experiencing or *possibly experiencing* any form of employment discrimination, harassment or retaliation from *any member* of the department, *regardless of rank or assignment*" (emphasis added)).)

Despite this evidence, Conway never asked McHugh whether he was a supervisor when he learned about Younger's comments, whether McHugh had received sexual harassment training, or whether McHugh understood that "as a supervisor, [he was] required to take appropriate action(s) in the event [he] hear[d] an employee violated any section of Directive #8.7."  (*Compare* P. Ex. NNN at CITY 2583–88 (showing that Conway did not ask these questions during his one-hour interview with McHugh), *with id.* at CITY 2529–31 (asking McCowan these questions during her three-and-a-half-hour interview).)  Nor did Inspector Hall sustain a finding of failure to supervise against McHugh, even though Internal Affairs "always

wants to make sure that [Department] supervisors are properly filing a complaint on behalf of the employees immediately." (*See* Conway Depo. at 124:10–125:12. *Contra* P. Ex. NNN at CITY 2518 (concluding that McCowan, as Younger's supervisor, "was responsible for ensuring Officer Younger's conduct was such that it was in accordance with the guidelines set forth in Directive #8.7" and for "taking appropriate actions against Officer Younger *each time* she believed that he violated any section of the directive" (emphasis added)).)  A reasonable jury considering this evidence, in combination with Conway's assertion that the City was looking to protect itself instead of help McCowan and Inspector Hall's conclusion that McCowan should have disciplined Younger instead of filing a complaint, could find that the City's proffered justification is pretext for gender discrimination.

Although we allow McCowan's Title VII, PHRA, and PFPO gender-based disparate treatment claims to move forward against the City to the extent they relate to her disciplinary charge, we dismiss McCowan's § 1983 claim against all individual Defendants because they were not personally involved in the discrimination.  Sergeant Conway is the only individual Defendant arguably involved in the investigation and disciplinary charge against McCowan. However, the undisputed evidence shows that his interview questions were approved and, in some instances, directed by, his superiors, that he wrote his recommendation to be consistent with the conclusion that he knew his superiors wanted him to reach, that he held almost daily meetings with his direct supervisor about this case, and that the ultimate conclusions are Inspector Hall's.  (*See* Conway Depo. at 182:2–187:4 (explaining that he met with Captain Carol Abrams three to four times per week and Inspector Hall around once per week to discuss this and other investigations, including the "contents of [each] interview that [Conway] was producing, the questions that [he] was producing," and any "corrections that had to be made to the" final

report); *id.* at 187:5–22 ("Q: And who was the final decision-maker here regarding signing off on this; was that Inspector Flacco or Inspector Hall?  A: Our procedures — Inspector Hall is responsible for the actual investigation and the conclusion.  Chief Inspector Flacco just approves that everything was done.  So ultimately, it would come to Inspector Hall.  Q: And Inspector Hall is the one who you were referencing before, when you said you wrote this up because you knew what he wanted, essentially?  A: Yes, sir.  That was — Q: That was in reference to Inspector Hall, correct?  A: Yes, sir."); *id.* at 220:23–221:17 (explaining that the investigation "had to cite Corporal McCowan" because "in [his] supervisor's opinion, had Corporal McCowan taken action in the beginning, potentially Officer Allen may not have experienced those issues").)

\* \* \*

In sum, we deny summary judgment on McCowan's gender disparate treatment claims against the City as to her detail to Police Radio and her disciplinary charge.  We also deny summary judgment on McCowan's § 1983 disparate treatment claim against Coulter as to McCowan's detail to Police Radio.  Otherwise, we grant summary judgment to the City and individual City Defendants on McCowan's disparate treatment claims.

### 2.      Counts III, X, XVIII, XXI:  Retaliation

The *McDonnell Douglas* burden shifting framework also governs McCowan's gender-based retaliation claims against the City under Title VII (Count III), the PHRA (Count XVIII), and the PFPO (Count XXI), and against Ross and the individual City Defendants under the PHRA (Count XVIII) and the PFPO (Count XXI).[28]  *See Tomaszewski*, 460 F. Supp. 3d at 593; *Abdul-Latif*, 990 F. Supp. 2d at 526.

---

[28] McCowan also brings claims for race-based retaliation under § 1981 (Count X).  To state a prima facie case of retaliation under § 1981, the plaintiff must put forth evidence of an underlying § 1981 violation, i.e., evidence that the plaintiff complained about race discrimination or participated in a proceeding about race discrimination and was retaliated against because of it.  *Estate of Oliva ex rel.*

To state a prima facie case for retaliation, McCowan must show:  "(1) that [s]he engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) [ ] that there was a causal connection between the employee's protected activity and the employer's adverse action." *Miller*, 158 F. Supp. 2d at 412; *Abdul-Latif*, 990 F. Supp. 2d at 529.  McCowan argues that there are genuine issues of material fact as to whether the City moved her to Police Radio because she filed an EEO complaint against Younger.[29]

We agree that McCowan's complaint against Younger constitutes protected activity, and that her transfer to Police Radio was an adverse employment action.  *See Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 175 (3d Cir. 2014) ("The anti-retaliation provision of Title VII covers only those employer actions that are 'materially adverse to a reasonable employee or job

_____

*McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010); *see also Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) ("In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation.  In doing so, the plaintiff must have acted under a good faith, reasonable belief that a violation existed." (cleaned up)).  Here, however, McCowan complained to the City about Younger's *sexually* harassing conduct and did not, for example, report her belief that she was being denied assignments and opportunities on the basis of her race.  *See Saint Francis Coll. v. AlKhazraji*, 481 U.S. 604, 611 (1987) ("Although § 1981 does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts."); *Laurel Mgmt. Grp., LLC v. White Sheep Corp.*, 2:18cv1000, 2019 WL 4597745, at *3 (W.D. Pa. Sept. 23, 2019) ("Plaintiff's § 1981 claim fails as a matter of law because the statute does not encompass gender discrimination.").  Because McCowan has not identified a protected activity founded on a reasonable belief that her § 1981 rights were violated, her § 1981 retaliation claim fails.  *See Daniels*, 982 F. Supp. 2d at 484 ("[The plaintiff] lodged no complaint of racism at [the school], official or unofficial, until October 28, 2010, over four months after she had left the school.  Daniels therefore has not met her burden of bringing forward any evidence of race-related protective activities for the purposes of establishing a *prima facie* retaliation case against the School District and [her supervisor] for her time at [the school].").  Therefore, we grant summary judgment to the City and individual City Defendants on McCowan's § 1981 retaliation claim.

[29] There are multiple points where McCowan engaged in protected activity.  *See Daniels*, 982 F. Supp. 2d at 482 ("The first element of a *prima facie* retaliation case is satisfied by a showing of 'complaints to the employer, whether oral or written, formal or informal.'") (quoting *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)).  The City identifies a few of these in its initial brief.  (Doc. No. 133 at p. 23.)  But in her response brief, McCowan relies solely on her EEO complaint, which she submitted to MacDonald on January 31, so we do the same.  (Doc. No. 167 at p. 20.)

applicant' and would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))); *Daniels*, 982 F. Supp. 2d at 482 ("As to the second element, 'adverse action' in the retaliation context encompasses a larger class of circumstances than the narrower 'adverse employment action' concept in substantive discrimination case."); *see also Rosh v. Gold Standard Café at Penn, Inc.*, Civil Action No. 16-1676, 2016 WL 7375014, at *6 (E.D. Pa. Dec. 19, 2016) (finding that the plaintiff suffered an adverse action when the business owner stopped talking to her and the other business owner reduced her hours of work after she told them that she was being sexually harassed by her coworkers because the owners' actions "would certainly dissuade a reasonable person from reporting harassment in the future").

We also find sufficient causal connection between McCowan's charge and transfer. The Third Circuit recognizes two tests for determining whether a plaintiff has alleged a causal connection between the protected activity and the alleged retaliation. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). First, when "the temporal proximity between the protected activity and adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.* Second, when the temporal proximity is not "unusually suggestive," the court asks whether the factual allegations, "looked at as a whole, may suffice to raise the inference." *Id.* (quotation marks omitted). Among other things, we must consider whether the plaintiff has alleged "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons . . . , or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

Here, we find the record sufficient to support a finding of causation under the second test.[30]  A little over a week after McCowan submitted her memo to Chief Inspector MacDonald, Sergeant Conway conducted the first of three hostile interviews with McCowan, emphasizing in each that McCowan, as Younger's supervisor, was wrong to file an EEO complaint and should have disciplined Younger instead.  While that investigation was ongoing, McCowan continued to supervise Younger, and when she requested to be temporarily detailed out because the Unit had failed to remove Younger per the typical practice, Coulter detailed McCowan to a difficult assignment and changed her schedule with almost no notice.  When McCowan arrived at the new assignment, her new supervisors told her they had no position for her and failed to give her any assignments for the three months that she remained there.  Finally, during that three-month period, Coulter denied McCowan's hardship memo requesting better hours.  Given these facts, we find that the record suggests a pattern of antagonism after McCowan filed her complaint and that this pattern gives rise to an inference of retaliation.

Defendants once again respond that the City had legitimate reasons for detailing McCowan to Police Radio.  (Doc. No. 133 at pp. 23–24.)  However, for the reasons discussed in the previous section, we find that McCowan has identified significant inconsistencies and implausibilities in that justification and pointed to evidence from which a jury could find that an invidious discriminatory reason was more likely than not a motivating or determinative cause for the reassignment.  *See supra* Part IV.A.1.c.

In light of this evidence, we deny summary judgment as to McCowan's gender-based retaliation claims against the City under Title VII, the PHRA, and the PFPO.  In addition, when

---

[30] McCowan cannot rely on temporal proximity because more than a month passed between when she filed her internal complaint and when she was detailed to Police Radio.  *See Abdul-Latif*, 990 F. Supp. 2d at 531 ("[S]ix days is at the long end of what has been held to be unusually suggestive.").

the evidence is viewed in the light most favorable to McCowan, it shows that Coulter was

personally involved in McCowan's detail to Police Radio and the ensuing denial of her hardship

memo, so we also deny summary judgment as to McCowan's PHRA and PFPO gender-based

retaliation claims as against her.  *See EEOC v. Fed. Express Corp.*, 537 F. Supp. 2d 700, 712

(M.D. Pa. 2005) (finding evidence supported the jury's verdict in favor of female employee on

her retaliation claims where she was given a different work assignment at a lower wage shortly

after she complained to management about coworker harassment).

McCowan has not, however, shown that the other individual City Defendants or Ross

were personally involved in her detail to Police Radio and resulting schedule change.  Although

most, if not all, of the individual Defendants knew about McCowan's complaint and the internal

investigation, there is no evidence that any of them, except for Ross and Coulter, had the

authority to reassign McCowan to Police Radio or deny her hardship memo.  *See Daniels*, 982 F.

Supp. 2d at 488 ("[N]one of the individual defendants in this case had the power to terminate

[the plaintiff's] employment.  Therefore, none of the individual defendants may be liable for [the

plaintiff's] termination."); *see also Caver*, 420 F.3d at 257 ("[The plaintiff] does not dispute that

Chief Williams and Deputy Chief Meyer transferred him because they saw reports from trained

professionals indicating that he was not fit for duty, and not because they resented him for

'blowing the whistle' on the radio room.  The only individuals that [the plaintiff] alleges were

directly motivated by his whistle-blowing activities were Valdora and McKee.  They were not,

however, in a position to demote, transfer, or terminate Davis.").

Although a closer call, we also find that McCowan has not presented a genuine dispute of

fact about whether Ross was personally involved in the decision to place her in Police Radio, to

deny requests from McCowan's supervisors that she be given a schedule change and training, or

to deny her hardship memo.  Even if Ross ultimately had the authority to reassign McCowan, Coulter testified that the decision to place McCowan in Police Radio was "solely" hers and that she "wouldn't have asked other people in the executive team where to put her in my command." (Coulter Depo. at 71:12–20; *see also id.* at 71:21–18:9 (testifying that at most she may have told the executive team that she was "going to move [McCowan] until the investigation was done")).) And Coulter and Ross both testified that they had no recollection of Ross reviewing McCowan's hardship memo.  (*Id.* at 81:20–22 ("Q: Did you discuss this memo with former Commissioner Ross?  A: I don't believe I did."); *see also id.* at 99:15–100:4 ("Q: Did former Police Commissioner Richard Ross tell you whether it was his opinion the memo should be approved or disapproved?  A: I don't remember one way or another, to be honest.  I think if he was at the table, he would have offered whether he thought it was or not.  But I don't even know if he was at the table that day.  There's usually one or two days a week that somebody is missing from the table based on other meetings or commitments. . . ."); *id.* at 108:19–109:1 ("Q: Did you talk to former Commissioner Richard Ross regarding Ms. McCowan's hardship memo?  A: I don't believe I had a conversation with just him.  I probably brought it to the executive team, and I could not tell you if he was there that day or not."); Ross Depo. at 77:2–22 ("Q: [D]o you admit that in May of 2019 you attended an executive team meeting where you discussed a hardship memo dated May 6th, 2019 from Ms. McCowan?  A: I don't recall that, no. . . .  Q: Do you recall telling Ms. McCowan that she was making up a reason for making a hardship memo?  A: I never even knew about the hardship memo to have that conversation."); *id.* at 101:18–21, 102:4–20.)

In support of her argument, McCowan relies on an allegation in her second amended complaint about comments Ross allegedly made during a meeting between the Union and the Department about her *grievance* (i.e., a "first step meeting").

> On June 21, 2019, John McGrody from FOP called Ms. McCowan to tell her that [the Union] and [the Department] had a First Step Meeting on June 19, 2019 and that the [Department] denied her request for shift change.  Mr. McGrody said, "You worked in the building long enough to know how it works.  Once you're out of the clique they ostracize you.  Between you and me, this is all coming from Commissioner Ross, who he said he was mad because he thinks you're making all this up."

(Doc. No. 49 at ¶ 220.)  We find this argument unpersuasive for multiple reasons.  First, as discussed at the beginning of this Memorandum, the allegations in McCowan's second amended complaint are not evidence for purposes of summary judgment.  Second, McCowan failed to put forth *any* evidence suggesting that Ross denied her grievance because he was "mad" or believed McCowan was "making all this up."  Indeed, neither party has pointed to *any* evidence of a first step meeting, let alone that Ross and McGrody were both present, and Ross made the alleged comment while voting to deny McCowan's request for a shift change.[31]  (Draft H'rg. Tr. at 73:20–78:23, 83:5–24; *see also* McCowan 2020 Depo. at 282:1–4 ("Q: Do you know what the outcome of the grievance was?  A: I was off the job before there was any meetings about that.").)  On this record, we cannot find that Ross was personally involved in McCowan's transfer to Police Radio and the ensuing denial of her request for a better shift.

Therefore, although we are allowing McCowan's retaliation claims to proceed against the City and Coulter, we grant summary judgment in favor of Ross and the remaining individual City Defendants on McCowan's PHRA and PFPO retaliation claims.

---

[31] The evidence also contradicts any suggestion that Ross made such a comment in relation to McCowan's hardship memo.  (*See* Coulter Depo. at 109:2–20 ("Q: Regarding Ms. McCowan's hardship memo, do you recall telling McGrody, 'This is all coming from Commissioner Ross'?  A: No.  I don't remember telling McGrody that.  And I'm sure that never happened.  Q: Do you recall telling McGrody that the decision to disapprove the memo, 'Was coming from Commissioner Ross'?  A: No I don't.  Q: You don't remember or you didn't say it?  A: I didn't say it. . . ."); *see also* Ross Depo. at 102:6–8 ("Q: Did you have any conversations with Mr. McGrody regarding Ms. McCowan?  A: Absolutely not.").)

### 3.       Counts II, XII, XVII, and XX:  Hostile Work Environment

Next, McCowan claims that the City created a sexually hostile work environment in violation of Title VII (Count II), the Equal Protection Clause (Count XII (brought pursuant to § 1983)), the PHRA (Count XVII), and the PFPO (Count XX), and that Ross and the individual City Defendants were personally involved in creating that hostile work environment in violation of Equal Protection Clause (Count XII (brought pursuant to § 1983)).[32]  We use the same standard for all four claims.  *See, e.g.*, *Cruz-Smith*, 2011 WL 3652462, at *4 n.9 ("Hostile work environment claims are subject to the same standards under Title VII, the PHRA, and the Equal Protection Clause.").

#### a.       Legal Standard

To state a claim for hostile work environment, a plaintiff must show:  (1) she "suffered intentional discrimination" because of her sex; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of respondeat superior liability, meaning the employer is responsible."  *Castleberry*, 863 F.3d at 26; *see also Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. 2003) ("Reduced to its

---

[32] McCowan also brings a claim for *racially* hostile work environment against the City and the individual City Defendants under § 1981 (Count IX).  Defendants argue that they are entitled to summary judgment on these claims because there is no evidence that the City or any individual Defendant intentionally discriminated against McCowan on the basis of her race, and to the extent McCowan can demonstrate intentional discrimination, that discrimination was not severe or pervasive. (Doc. No. 133 at pp. 18–19.)  The City also argues that McCowan's race-based hostile work environment claim fails as against it because the City took reasonable steps to end any race-based harassment once it was reported to the City. (Doc. No. 133 at pp. 19–20.)  McCowan does not respond to these arguments, and focuses instead on her sex-based hostile work environment claim.  (*See* Doc. No. 167 at p. 12 ("[T]here are genuine issues of material fact regarding whether Defendants subjected Plaintiffs to a sexually hostile work environment."); *id.* at p. 14 ("Plaintiffs have demonstrated that they were subject to a sexually hostile work environment.").)  Because McCowan has not responded to these arguments, and we agree with the City Defendants that McCowan cannot demonstrate severe or pervasive racial discrimination on the part of the City or any individual City Defendant, we grant summary judgment in favor of Defendants as to McCowan's claims for racially hostile work environment.

most basic components, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender- or race-based harassment which was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile to female or African American employees.").

"The first four elements of this claim establish that a hostile work environment existed." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). In determining whether harassment rises to the level of an actionable hostile work environment, we must consider the "totality of the circumstances . . . including the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with an employee's work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Davis*, 285 F. App'x at 902 (same). In addition, "the advent of more sophisticated and subtle forms of discrimination requires that [a court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas*, 269 F.3d at 261–62.

The fifth element "establishes the basis on which to hold the employer liable." *Huston*, 568 F.3d at 104. "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." *Id.* "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.*; *see also Greer*, 950 F. App'x at 174 ("For respondeat superior liability to exist, a plaintiff must demonstrate that the employer failed

to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate action." (quotation marks omitted)). "[A]n employer knew or should have known about workplace sexual harassment if *management level* employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Huston*, 568 F.3d at 105; *see also Sharp v. Pa. Army Nat'l Guard*, No. 1:11–cv–1262, 2013 WL 1703583, at *7 (M.D. Pa. Apr. 19, 2013) ("[I]f a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." (quotation marks omitted)).

This standard applies even if the harassment is committed by a subordinate against a supervisor. *See Lyles v. District of Columbia*, 17 F. Supp. 3d 59, 70 (D.C. Cir. 2014) ("An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action."). However, in this scenario, an employer is not liable if "the supervisor had the ability to stop the harassment," — by, for example, reporting the harassment to her supervisor or reprimanding the offending subordinate — "and failed to do so." *Id.*

### b.     Existence of a Hostile Work Environment

McCowan has put forth sufficient evidence that she was subjected to a sexually hostile work environment at the hands of Younger and her supervisors. *See Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010) ("[T]he severity and pervasiveness evaluation is particularly unsuited for summary judgement because it is quintessentially a question of fact." (quotation marks omitted)).

McCowan testified that her supervisors, McCarrick, McHugh, and O'Brien, frequently excluded her from meetings and denied her assignments in A&I despite her requests to be

included. *See Cardenas*, 269 F.3d at 261–62 (requiring consideration of "facially neutral mistreatment"). In addition, in early January 2019, Younger called McCowan to say he had a "crush on her." The next day at work, McCowan verbally reprimanded Younger and told her supervisor, Lieutenant McHugh, about the incident, but over the next few weeks, Younger's inappropriate sexual comments continued, as he told McCowan, "damn, you sexy," made suggestive noises when she walked by his desk, called her "babe," and asked her whether she would have sex with him and whether he stood "any chance." Younger also repeatedly asked McCowan if he could "slide in," acted like a fire extinguisher, and told her to "break the glass in case of emergency."[33] The comments escalated when Younger approached McCowan's desk, made comments about her appearance and her sexual relationship with her husband, and then grabbed her hand, attempting to pull her wedding rings off her finger.

After this last incident, McCowan submitted her EEO complaint, cataloguing Younger's conduct. A week later, she sat through the first of three openly hostile interviews with Conway — all of which focused on her role as Younger's supervisor and the errors that *she* made. Afterward, McCowan reached out to then-Police Commissioner Ross and attempted to share her concerns about Younger's harassing conduct, but Ross dismissed her worries and said he was going to "school" her in sexual harassment — again suggesting McCowan was in the wrong. Meanwhile, McCowan remained in her position at A&I, where she was surrounded by unsupportive supervisors and coworkers[34] and forced to continue supervising Younger. After a

---

[33] The City and Younger suggest that this exchange was not sexual because Younger was merely asking to use the copy machine and seeing whether McCowan had an "emergency friend." But at summary judgment we construe the facts in McCowan's favor, and the reasonable inference to be drawn from Younger's comments is that he was yet again sexually propositioning McCowan.

[34] In the weeks between when McCowan filed her EEO complaint and her transfer to Police Radio, McCowan's supervisors reprimanded her for a friendly interaction that she had with one of the officers. (*See* McCarrick Depo. at 169:11–173:13 (testifying that after McCowan filed her complaint, he told Sergeant Williford to "address" an incident where McCowan's friend, Officer Caesar, placed his arm

month in that position, Deputy Commissioner Coulter detailed McCowan to Police Radio, changing McCowan's schedule with less than 24 hours' notice.  McCowan then spent three months at Police Radio, sitting in the cold tape room or in the hallway with no work assignments.  Finally, at the close of Conway's investigation, Internal Affairs sustained findings of failure to supervise *against McCowan*, concluding that "she failed to take appropriate actions related to the inappropriate behavior she described in her complaint on the part of Officer Younger" and that "filing a EEO complaint against Officer Younger in relation to the allegations she set forth during her interview was not the appropriate course of action for her to take." (P. Ex. NNN at CITY 2516, 18.)  All of these actions occurred within a seven-month period.

Viewing the evidence in the light most favorable to McCowan, and considering the totality of the circumstances, we find that McCowan has raised a question of fact about whether she suffered pervasive and intentional sexual harassment.  *See Andrews*, 895 F.2d at 1486 ("The evidence in this case includes not only name calling, pornography, displaying sexual objects on desks, but also the recurrent disappearance of plaintiffs' case files and work product, anonymous phone calls, and destruction of other property.  The court should view this evidence in its totality . . . and then reach a determination."); *Rorrer*, 712 F. Supp. 2d at 429 (concluding at the summary judgment stage that a jury could find the plaintiff experienced pervasive sexual harassment where her coworker stared at her breasts "all the time," held a utility knife to her

---

around Corporal McCowan); Williford Depo. at 160:7–162:1 (same); *see also* McCowan 2019 Depo. at 57:3–60:12 (testifying that she told Williford that Officer Caesar did not put his arm around her, that there was nothing untoward in the incident, and that she felt McCarrick was "minimizing the real issue" with Younger).).  McCowan's supervisors also placed her in the awkward position of having to give subordinates orders from Internal Affairs to attend interviews related to Plaintiffs' complaints against Younger, and at least one subordinate told McCowan that she would not support McCowan when interviewed by Conway.  (*See* McCowan 2019 Depo. at 57:3–59:23 (testifying that Civilian Eula Collier told McCowan that "she was going to claim plausible deniability" when Conway interviewed her because she did not "want to be in anybody's mess").)

breast on one occasion, and asked her to bend over in a suggestive manner); *Fed. Express Corp.*, 537 F. Supp. 2d at 708–09 (holding that the evidence supported the jury verdict finding a hostile work environment where a female employee's male coworker regularly used "sexually crude, vile, and offensive language in front of her, . . . grabbed his genitals in front of [her], as did another male employee," "referred to [her] in vulgar and sexually offensive and derogatory terms," told her that "she looked like a porn star," "spoke in [her] presence about having sexual relations with his wife, and talked about potentially having sex with [her]," and when she complained to management, they "took limited action").

The record also shows that McCowan was detrimentally affected by the discrimination she experienced.  (*See* McCowan 2020 Depo. at 129:8–18 ("Q: Describe for me how, if at all, how your ability to perform your responsibilities at A&I were affected by Officer Younger being in A&I after January 31st, 2019. . . .  A: I was physically sick almost every day coming into work.  I was emotional.  I was crying.  I don't know how anyone can work like that."); *id.* at 320:7–22 ("Q: Can you elaborate now on the reasons why you were seeking this hardship?  A: Well, the entire situation was affecting me adversely.  I was gaining weight rapidly because I was stress eating all the time.  I was really depressed.  I didn't want to go to work.  I was very, very, very anxious and suffering from panic attacks before I would go to work almost daily.  Just emotionally drained by the entire situation.  My physical health was declining.  My blood pressure was high for me.  It was high.  It just wasn't a good situation health-wise.").)

And we find that a reasonable person in McCowan's circumstances would be so affected. *See Rorrer*, 712 F. Supp. 2d at 430 ("Rorrer has pointed to evidence that could establish that after two separate incidents involving Gilbert, and his constantly staring at her breasts, he held a utility knife with a protruding blade to her breast.  Given these facts, a jury should be left to

determine whether a reasonable person would have been detrimentally affected by this conduct."); *Rosh*, 2016 WL 7375014, at *3 (finding that a reasonable person would be detrimentally affected, and that the plaintiff was so affected, where her "co-workers grabbed her crotch area, made sexually inappropriate comments towards her, and attempted to touch Plaintiff's breast and body on multiple occasions," despite her repeated requests to stop). This conclusion is bolstered by the evidence that Younger engaged in similar harassing conduct toward Allen. *See Rorrer*, 712 F. Supp. 2d at 430 ("Evidence that others were harassed may serve to bolster objective reasonableness of a plaintiff's claims.").

McCowan has satisfied the first four elements of her hostile work environment claim.

### c.     Respondeat Superior Liability

That leaves the fifth element. Because McCowan was Younger's supervisor at the time of his harassing conduct, the City will be liable only if: (1) it "knew or should have known of the harassment and failed to implement prompt and appropriate action," and (2) McCowan was unable to "stop the harassment" — by, for example, reporting the harassment to her supervisor or reprimanding Younger. *Lyles*, 17 F. Supp. 3d at 70; *cf. Rorrer*, 712 F. Supp. 2d at 430 ("When the 'hostile work environment' is allegedly created by a victim's non-supervisory co-worker, as is the case here, employer liability 'exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'" (quoting *Huston*, 568 F.3d 100)).

The City argues that McCowan's claims fail because the City took reasonable steps to end any harassment once McCowan lodged her complaint. (Doc. No. 133 at pp. 19–20.) It asserts that MacDonald, McCarrick, Williford, and Tamika Allen immediately reported McCowan's concerns to Internal Affairs for investigation. (*See id.* at p. 20 ("The moment they

64

knew of Plaintiffs' hostile work environment complaints, the City Defendants acted immediately to address the allegations.").)  But this alone does not show that the City took adequate remedial action.

"A remedial measure is considered adequate if 'reasonably calculated' to end the harassment and prevent further misconduct."  *Rorrer*, 712 F. Supp. 2d at 435.  Under this standard, liability arises, for example, when "'an employer merely investigates the complaint without taking any remedial action, or the investigation is so flawed that any remedial measures are destined to fail.'"  *Id.* (quoting *Hall v. Pa. Dept. of Corr.*, No. 102825, 2006 WL 2772554, at *12 (M.D. Pa. Sept. 27, 2006)).  We find a dispute of fact exists as to whether the City's investigation and remedial measures were "reasonably calculated" to end the harassing conduct. In particular, we find overwhelming evidence that McCowan's EEO complaint was not taken seriously by the City and that McCowan was subjected to an openly hostile response from her supervisors and coworkers at the Bureau and Internal Affairs, Police Commissioner Ross, and Deputy Commissioner Coulter.  *See Rosh*, 2016 WL 7375014, at *3 (finding that the defendants failed to "take prompt and appropriate actions reasonably calculated to prevent further harassment" where her supervisors did little to address her first complaints that she was being harassed by her coworkers, and then stopped speaking to the plaintiff altogether after telling her to "fix the situation on her own").  In addition, although Department practice is to complete all investigations within 90 days, it took Internal Affairs twice that amount of time to finish the investigation into McCowan's complaint.  And even then, Inspector Hall ultimately sustained findings of failure to supervise *against McCowan*, and found her sexual harassment claims against Younger "unfounded" because she was Younger's supervisor:

> The investigation revealed that Corporal McCowan filing an EEO complaint against Officer Younger in relation to the allegations she

> set forth during her interview was not the appropriate course of
> action for her to take.
>
> . . . .
>
> It should be noted that were Officer Younger to have made all of the
> comments Corporal McCowan alleged in her complaint in the
> manner that she alleged, he would have been in violation of
> Directive #8.7, Employment Discrimination/Equal Employment
> Opportunity (EEO) — Responsibilities and How to File a
> Complaint.

(P. Ex. NNN at CITY 2516; *see also id.* at CITY 2518.)  Considering that the investigation

concluded by finding that McCowan was *not* subject to sexual harassment solely because she

was Younger's supervisor, we struggle to see how the City can argue that its investigation was

"reasonably calculated to prevent further harassment."  *See Greer*, 950 F. App'x at 174

(Although an "employer's investigation into a harassment complaint need not be perfect," it must

be "reasonably calculated to prevent further harassment." (quotation marks omitted)); *Rorrer*,

712 F. Supp. 2d at 436 ("[W]e find that sufficient questions have been raised about the

appropriateness of [the plaintiff's alleged harasser] being allowed to work in close proximity to

[the plaintiff] after the incident and the sufficiency of [the employer's] investigation.  Therefore,

whether the response of [the employer] to the August 1, 2006 incident was appropriate is a

question of fact for the jury.").

In the alternative, the City argues that McCowan, as Younger's supervisor, had authority

to discipline Younger and stop the harassment that she was experiencing.  *See Lyles*, 17 F. Supp.

3d at 70 (holding that an employer will not be liable for "the harassment of a supervisor by a

subordinate" if "the supervisor had the ability to stop the harassment" — by, for example,

reporting the harassment to her supervisor or reprimanding the offending subordinate — "and

failed to do so").  We find a dispute of fact as to whether McCowan had the ability to discipline

Officer Younger and stop the harassment.  Specifically, there is a dispute about whether Younger had implied authority over McCowan, despite her being of higher rank than him.  McCowan testified that Younger was considered the "golden child" at the Bureau, and that Chief Inspector MacDonald gave him the best assignments.  (*See* McCowan 2019 Depo. at 93:24–95:24 ("They joke around in the building that he's the golden child.  He can't do anything wrong. . . .  [H]e's the go to guy. . . .  Like I was saying before, Inspector McCarrick would walk past me and not speak.  The Chief could walk past me and not speak.  They wouldn't dare do that to Curtis.  It's almost like they bow down to him.").)  Conway's testimony confirms that "there are individuals within the department who are not supervisory rank or not high-ranking supervisors that do have a significant amount of power because of who they work for, who they know, which could cause supervisors to be afraid to take action against them."  (Conway Depo. at 263:24–264:15.)

In addition, Younger's conduct toward McCowan shows that he did not view her as his superior and repeatedly attempted to undermine her authority.  McCowan testified that she verbally reprimanded Younger after his initial phone call and that she repeatedly told him his comments were inappropriate and to stop.  Yet, Younger's comments not only continued, but escalated to an explicit sexual proposition and him grabbing her hand and attempting to pull off her wedding rings.  Although there is no evidence that McCowan took additional steps to formally discipline Younger after each incident, she testified that she failed to do so because she lacked any support from her own supervisors.  McCowan was newly promoted and newly assigned to A&I, and McHugh had failed to support her in the past.  (*See* McCowan 2020 Depo. at 81:16–82:19 (describing how McHugh failed to support her when she issued her first counseling memo against an officer misreporting time); *id.* at 160:11–165:5; *cf.* P. Ex. NNN at

CITY 2584 (documenting that during his interview with Conway, McHugh described McCowan as "competent," while referring to Younger as an "[e]xcellent" employee).)

Viewing the entire record in the light most favorable to McCowan, we find she has put forth sufficient evidence for a finding of respondeat superior, and therefore, deny the City's motion for summary judgment on her gender-based hostile work environment claims.[35]

### d.     Individual Liability Under § 1983

Having found the City liable, we must next determine which individual Defendants were personally involved in creating the hostile work environment. The individual City Defendants and Ross argue that they are not individually liable for McCowan's § 1983 sexually hostile work environment claim because (1) there is no evidence that any individual Defendant intentionally discriminated against McCowan; and (2) each individual defendant is entitled to qualified immunity.[36]

---

[35] To establish municipal liability under § 1983 against the City, McCowan must also demonstrate that the violation of her Fourteenth Amendment rights was caused by a City policy, practice or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Cruz-Smith*, 2011 WL 3652462, at *5 ("A plaintiff seeking to impose liability on a municipality under § 1983 must 'identify a municipal policy or custom that caused the plaintiff's injury.'") (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). However, the City has not raised a *Monell* defense in its briefing on summary judgment. And even if the City had, we find that McCowan has put for sufficient evidence that at the time of the underlying events, the Philadelphia Police Department had a policy or custom of sexual harassment, and more importantly, the City had a policy or custom of failing to properly investigate and address sexual harassment once it was reported.

[36] The individual City Defendants also argue that there is no evidence that any individual defendant engaged in severe or pervasive conduct. But this conflates the issues. First, we must determine whether, under the totality of the circumstances, a plaintiff was subject to severe or pervasive harassment. As part of that analysis, we consider direct discrimination as well as facially neutral actions. If we find that the plaintiff was subject to a hostile work environment (i.e., was subject to severe or pervasive harassment), then we consider, for each individual defendant, whether they were personally involved in creating that environment such that they can be held liable under § 1983.

"To bring a successful § 1983 claim for denial of equal protection against an individual government defendant, a plaintiff must prove the existence of purposeful discrimination by the defendant," meaning the plaintiff must "show some affirmative conduct by the defendant that played a role in the discrimination, and the discrimination must be based on the plaintiff's membership in a protected class." *Cruz-Smith*, 2011 WL 3652462, at *3. "Supervisory liability cannot be based solely upon the doctrine of respondeat superior, but there must be some affirmative conduct by the supervisor that played a role in the discrimination." *Andrews*, 895 F.2d at 1478. This personal involvement can be shown "through allegations of personal direction or of actual knowledge and acquiescence, or through proof of direct discrimination by the supervisor." *See Andrews*, 895 F.2d at 1478 (affirming verdict against one supervisor because there was "evidence that he personally participated in the harassment of [the plaintiff]," and affirming verdict against second supervisor because the evidence, "although insufficient to prove direct discrimination, d[id] suffice to support a finding that he acquiesced to it").

Beginning with Ross, we find that he was personally involved in creating the sexually hostile work environment that McCowan experienced. McCowan testified that when she told Ross that she "had been experiencing sexual harassment and a hostile work environment in the DVIC," Ross refused to take any official action and said he was going to "school" McCowan on sexual harassment. (*See* McCowan 2019 Depo. at 97:9–98:9; *see also* McCowan 2020 Depo. 229:24–230:5; Ross Depo. at 67:24–68:14, 71:11–72:3.) McCowan again reached out to Ross when she was transferred to Police Radio with virtually no notice, expressing her frustration and belief that the transfer was punishment for having submitted an EEO complaint. Ross again dismissed McCowan's concerns and took no action to assist her.

In light of this evidence, we find that there is a dispute of fact about whether Ross was personally involved in creating the sexually hostile work environment. *See Andrews*, 895 F.3d at 1478 (affirming verdict against second supervisor because the evidence, "although insufficient to prove direct discrimination, d[id] suffice to support a finding that he acquiesced to it," because he was "aware of the problems concerning foul language and pornographic materials but did nothing to stop them" and because he took no efforts to investigate the plaintiffs' allegations that their male colleagues were sabotaging their work, and told the plaintiffs, "You have to expect this working with the guys"); *cf. Sharp*, 2012 WL 3202939, at *10 ("Because Plaintiff has alleged that she informed Defendant Charpentier of Defendant Sica's conduct and that the conduct continued after she informed him . . . she has alleged sufficient facts to support a finding that Defendant Charpentier acquiesced in Defendant Sica's conduct."). We also reject Ross's argument that he is entitled to qualified immunity. *See Cruz-Smith*, 2011 WL 3652462, at *4 n.10 ("Because the right to be free from discrimination in the workplace based on sex and national origin was clearly established at all times relevant to this lawsuit, [the defendant] has not demonstrated an entitlement to qualified immunity . . . ."); *Andrews*, 895 F.2d at 1480 ("We are constrained to hold that Liciardello and Doyle objectively should have known the applicable legal standard, and thus are not protected by qualified immunity in treating or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment.").

Turning to the individual City Defendants, we will also allow McCowan's § 1983 hostile work environment claim to proceed against Coulter because, as discussed above, we find questions of fact exist as to whether she retaliated against McCowan on the basis of gender, and thus, contributed to the sexually hostile environment that McCowan experienced in early 2019.

70

*See Andrews*, 895 F.2d at 1478 (holding that personal involvement can be shown "through allegations of personal direction or of actual knowledge and acquiescence, or *through proof of direct discrimination by the supervisor*" (emphasis added)).

However, we grant summary judgment as to MacDonald, McCarrick, McHugh, Conway, Williford, O'Brien, and Tamika Allen.  There is no evidence that MacDonald, McCarrick, or Tamika Allen knew about Younger's conduct until the end of January, at which point Tamika Allen immediately referred the matter to her supervisor and MacDonald and McCarrick referred Plaintiffs' complaints to Internal Affairs for investigation.  Similarly, the evidence suggests that Conway, Williford, and O'Brien only learned about Younger's conduct *after* the matter had been referred.  And although McCowan told McHugh about Younger's phone call, we cannot find that McHugh acquiesced in Younger's conduct given McCowan's assurances that she had addressed the situation.[37]  Finally, although Conway conducted the investigation against McCowan, all evidence suggests that his supervisors directed his investigation, that they reviewed and edited his interview questions, and that the ultimate conclusions were theirs.  Because McCowan has not produced any evidence that these individual Defendants were personally involved in creating the sexually hostile work environment, we grant summary judgment in their favor.

\* \* \*

In sum, we deny summary judgment as to the City, Ross, and Coulter on McCowan's sexually hostile work environment claims.  We grant summary judgment to the remaining individual City Defendants.

---

[37] McCowan also claims that McHugh overheard Younger call her "babe," but on its own, this does not amount to acquiescence in Younger's repeated unwelcome sexual advances.

### 4.      __Counts XIX, XXII:  Aiding and Abetting__

Next, McCowan brings aiding and abetting claims under the PHRA and PFPO against

Ross and the individual City Defendants.  The PHRA and PFPO prohibit "any person" from:

> aid[ing], abet[ting], incit[ing], or coerc[ing] the doing of any act
> declared by this section to be an unlawful discriminatory practice,
> or to obstruct or prevent any person from complying with the
> provisions of this act or any order issued thereunder, or to attempt,
> directly or indirectly, to commit any act declared by this section to
> be unlawful discriminatory practice.

43 Pa. Stat. & Con. Stat. § 955(e); *see also* Phila. Fair Practices Ordinance § 9-1103(1)(h)

(making it unlawful for "any person to aid, abet, incite, induce, compel or coerce the doing of

any unlawful employment practice . . . .").  Before we can determine whether any individual

aided and abetted the discriminatory conduct in this case, we must first determine the appropriate

legal standard.

### a.      **Legal Standard**

In *Failla v. City of Passaic*, the Third Circuit analyzed a nearly identical aiding and

abetting provision in New Jersey's Law Against Discrimination ("NJLAD" or "LAD") and

concluded that "the New Jersey Supreme Court would follow the Restatement of Torts to define

aiding and abetting liability" under that provision.  146 F.3d 149, 157–58 (3d Cir. 1998).  In

reaching this conclusion, the appellate court began by reviewing and rejecting a District of New

Jersey case, *Tyson v. CIGNA Corp.*, which held that the NJLAD encompasses a *criminal*

standard for aiding and abetting.  *See Tyson v. CIGNA Corp.*, 918 F. Supp. 836, 849 (D.N.J.

1996) ("Because *Baliko*," an opinion from an intermediate New Jersey state court, "analogizes

explicitly to the criminal context, we believe a comparable finding of intent is required in order

to find accomplice liability [under the NJLAD].  Thus, in order to aid or abet another to commit

an unlawful act, it is necessary that the defendant wilfully [sic] and knowingly associate himself

in some way with the unlawful act, and that he wilfully [sic] and knowingly seek by some act to help make the unlawful act succeed.").  The Third Circuit disagreed with *Tyson*'s analysis, noting that a later New Jersey Supreme Court decision had refused to apply a *criminal* standard of shared intent to a *civil* claim for aiding and abetting liability.  *See Failla*, 146 F.3d at 157–59 (explaining that "in *Tyson*, the court found that the defendant's supervisory status satisfied the element of shared intent that it thought necessary for aiding and abetting liability," but concluding that "the issue of shared intent is irrelevant under the LAD" and the proper standard is that outlined in § 876(b) of the Restatement); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999) ("[W]e have rejected a requirement that an individual and an employer share the same discriminatory intent in order to find aiding and abetting liability . . . .").

  We find that Pennsylvania courts would similarly apply the standard for aiding and abetting outlined in the Restatement § 876(b).  In reaching this conclusion, we acknowledge that in *Dici v. Pennsylvania* — a Third Circuit opinion issued before *Failla* — the court referenced *Tyson*'s shared intent analysis in the context of an aiding and abetting claim under the PHRA. *See* 91 F.3d 542, 553 (3d Cir. 1996) (finding that a supervisor may be guilty of aiding and abetting an employer if the supervisor knew about the alleged harassment and failed to take prompt remedial action).[38]  Nevertheless, we find that the same reasoning that animated the

---

[38] Frequently, federal district courts applying Pennsylvania law have relied on *Dici* and *Tyson* when stating the standard for aiding and abetting liability under the PHRA.  *See, e.g.*, *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." (citing *Dici*, 91 F.3d at 552–53 and *Tyson*, 918 F. Supp. at 841)); *D'Altilio v. Dover Twp.*, Civil Action No. 1:06-CV-1931, 2009 WL 2948524, at *12 (M.D. Pa. Sept. 14, 2009) ("Case law from the Third Circuit explains that an individual can be liable under § 955(e) . . . for 'refusing to take prompt remedial action against any discrimination suffered by' and employee." (quoting *Dici*, 91 F.3d at 552–53)).

Third Circuit's decision in *Failla* applies in the context of the PHRA.  *See Failla*, 146 F.3d at 158 ("The [district] court's [jury] instruction, requiring only knowledge [by the supervisor] of Failla's circumstances of having a handicap and being in need of an accommodation, combined with [the supervisor's] inaction, falls short of th[e correct aiding and abetting] standard [because t]he court did not advise the jury that [the supervisor] could be liable as an aider and abettor *only* if he knew the failure to accommodate Failla's handicap was a breach of his employer's duty and *if his inaction actually assisted or encouraged the unlawful act*." (emphases added)).

First, the aiding and abetting provisions in the PHRA and NJLAD use nearly identical language, suggesting that the two statutes may be interpreted coextensively.  Indeed, the *Dici* court relied on *Tyson because* the language of the two statutes was "nearly identical."  *Dici*, 91 F.3d at 553.  And other courts interpreting similar provisions in other antidiscrimination statutes have rejected *Tyson*'s reasoning and followed *Failla* instead.  *See Matthews v. Eichorn Motors, Inc.*, 800 N.W.2d 823, 830 (Minn. Ct. App. 2011) (discussing *Tyson*, *Failla*, and *Dici* and holding that "[t]o the extent that the criminal and civil standards differ" under Minnesota law, "the legal standard established in the Restatement (Second) of Torts should govern aiding-and-abetting claims under the [Minnesota Human Rights Act]"); *see also, e.g.*, *Larry v. Marion Cnty Coal Co.*, 302 F. Supp. 3d 763, 777 (N.D. W.V. 2018) ("Based on the consistent application by other courts of the Restatement (Second) § 876(b) to aiding-and-abetting claims under similar statutes, as well as West Virginia's own application of the standard in other civil causes of action, this Court is persuaded that West Virginia would apply § 876(b) of the Restatement (Second) of Torts when a construing a claim for aiding and abetting under the [Human Rights Act]."); *Lovell v. United Airlines, Inc.*, No. CIV. 09-00146 ACK-LE, 2009 WL 3172729, at *3–4 (D. Hi. 2009) (finding that § 876(b) governs whether "a person aids and abets an unlawful

discriminatory practice" under Hawaii law); *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1077–78 (Alaska 2005) (applying § 876(b) to "aiding and abetting discrimination claim" under Alaska statute).

Second, courts in Pennsylvania, like those in New Jersey, have repeatedly relied on § 876 in civil claims for aiding and abetting claims.  *See Linde v. Linde*, 220 A.3d 1119, 1145 (Pa. Super. Ct. 2019) (applying § 876 to claim against company directors for aiding and abetting majority shareholder's breach of his fiduciary duty to a minority shareholder); *HRANEC Sheet Metal, Inc. v. Matlico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. Ct. 2014) (holding that "a concerted tortious conduct claim [under § 876] is a viable cause of action in Pennsylvania"); *Sovereign Bank v. Valentino*, 914 A.2d 415, 427 (Pa. Super. Ct. 2006) ("Based upon the foregoing, we hold that concerted tortious action, as defined in Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law.").

Considering this authority and the Third Circuit's precedential opinion in *Failla*, we find that to make out a PHRA claim for aiding and abetting against an individual employee, the plaintiff must show that the defendant knew about and either substantially assisted or encouraged the discrimination that the plaintiff experienced.  *Failla*, 146 F.3d 157–58 ("[A]n employee aids and abets a violation of the LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer."); *Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 162–63 (3d Cir. 1973) (explaining that § 876(b) outlines three elements "required for liability:  (1) that an independent wrong exists; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong").

### b.     Analysis

Applying that standard here, we find that McCowan has not shown that MacDonald, McCarrick, McHugh, Conway, Williford, O'Brien, or Tamika Allen knew about and

substantially assisted the discrimination, harassment, and retaliation that McCowan experienced

at the hands of the City, Ross, Coulter, and Younger.  Therefore, we grant summary judgment in

their favor on McCowan's aiding and abetting claims.

That leaves Ross and Coulter.  As discussed above, Ross and Coulter knew about

McCowan's complaints against Younger, and there are genuine issues of material fact about

whether either or both supervisors played a role in creating the hostile work environment that she

experienced at the Department.  Therefore, we must determine whether their actions and

inactions substantially assisted Younger's harassment or the City's failure to promptly address

that harassment.[39]  *See Failla*, 146 F.3d at 159 ("Employees are not liable as aider[s] and

abettor[s] merely because they had some role, or knowledge or involvement.  Rather, the degree

of involvement, knowledge and culpability required as a basis for liability is heightened by the

standard that the Restatement sets forth and we adopt.").

Beginning with Ross, the evidence shows that Ross knew that McCowan was

experiencing harassment at the hands of Younger and that she believed her transfer to Police

Radio was a punishment.  Yet, each time McCowan spoke with Ross — the head of the

Philadelphia Police Department at the time — he dismissed McCowan's concerns, belittled her,

and turned the problem on her instead of taking steps to address her complaints.  In light of this

evidence, we find a genuine issue of fact as to whether Ross substantially assisted the City in

failing to remedy the sexually hostile work environment that McCowan experienced at the hands

of Younger and others.  *Compare Hurley*, 174 F.3d at 127 (finding that a supervisor's aiding and

---

[39] The comments to § 876(b) outline five factors that some courts consider when determining whether a defendant provided substantial assistance:  "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other, and his state of mind."  Restatement (Second) of Torts § 876(b), cmt. d; *see also Hurley*, 174 F.3d at 127 n.27 (outlining factors and describing the primarily "wrongful conduct" as the Atlantic City Police Department's "inaction — its tolerance of sexual harassment").

abetting liability could be "grounded in his failure to stop the harassment, which included both active and passive components," such as telling "her that she should stop complaining or it would only get worse," suggesting that "sleeping with him might protect her," "laughing at the drawings and graffiti about her," and otherwise, "demeaning her as an officer on a daily basis"), *with Horvath v. Rimtec Corp.*, No. CIV. A. 99-6700(JEI), 2000 WL 1030357, at *5 (D.N.J. July 19, 2000) (finding the inaction of plaintiff's supervisor did not rise to the level of substantial assistance where the evidence showed only that the supervisor "was aware of plaintiff's general complaints that he was treated unfairly [and] that he was denied certain positions" and passed those complaints on to the plant manager without any independent investigation).

As for Coulter, the evidence shows that she knew about McCowan's complaint against Younger and went against Department practice to transfer McCowan to Police Radio. Once in Police Radio, Coulter denied McCowan's hardship memo along with McCowan's supervisors' requests that she be moved to a better schedule and receive necessary training. In light of this evidence, we find genuine disputes of material fact about whether Coulter substantially assisted the City in failing to remedy the sexually hostile work environment experienced by McCowan and in retaliating against McCowan for filing her internal complaint against Younger.

For those reasons, we deny summary judgment on McCowan's aiding and abetting claims against Ross and Younger.

### B.    *Count XIII:  First Amendment Retaliation*

In her final § 1983 count, McCowan contends that all Defendants, except Younger, retaliated against her in violation of the Petition Clause of the First Amendment. That clause protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. To make out a claim for retaliation in violation of the First Amendment, a plaintiff "must show that his conduct was constitutionally protected" and that his "protected

activity was a substantial or motivating factor in the alleged retaliatory action." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 492 (3d Cir. 2002). If the plaintiff succeeds, then the "defendant may defeat the plaintiff's case by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (quotation marks omitted).

"[A] public employee's expressive conduct is constitutionally protected only when . . . [it] address[es] a 'matter of public concern,' which is to be determined by the 'content, form, and context of a given statement, as revealed by the whole record.'" *Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir. 1997) (quoting *Connick*, 461 U.S. at 147–48). The City argues that McCowan was not speaking on a matter of public concern when she filed her internal complaint against Younger because "garden-variety sexual harassment or day-to-day employment grievances do not implicate matters of public concern." (Doc. No. 133 at pp. 20–21.) In response, McCowan fails to discuss any of the facts in her case, and instead, unhelpfully (and ironically) argues in a conclusory fashion that the Court "should find Defendants' conclusory allegations insufficient to grant summary judgment." (Doc. No. 167 at p. 16.) Because McCowan's legal citations focus on when speech is on a matter of public concern, the Court assumes that she disagrees with the City's characterization of her EEO complaint.

The Court finds as a matter of law that McCowan was not speaking on a matter of public concern when she filed her EEO complaint against Younger. *See Azzaro*, 110 F.3d at 978–79 (finding that a report of "sexual harassment by an assistant to the Commissioner which occurred in the Commissioner's office during the course of an appointment [the plaintiff] had made, in her capacity as the spouse of an employee" was a matter of public concern, but declining to express an opinion on "a situation in which a public employee has filed a complaint about an isolated incident of what he or she perceived to be inappropriate conduct on the part of a non-supervisory

co-worker," which "would presumably be less important to an evaluation of the performance of the public office involved"); *Cruz-Smith*, 2011 WL 3652462, at *5 ("Because Cruz-Smith does not allege her claims for worker's compensation and Heart and Lung Act benefits sought anything other than an award of individual benefits, the filing of such claims cannot form the basis of a First Amendment retaliation claim."). McCowan's EEO complaint focused solely on Younger's comments and actions. Younger holds the lowest position in the Police Department's paramilitary hierarchy; he does not hold public office; his comments and actions toward McCowan were not witnessed by anyone who holds public office; and he was McCowan's subordinate at the time he made those comments. Moreover, McCowan's complaint was filed internally, triggering a confidential investigation into a matter of employment discrimination.

In light of these facts, we find that McCowan's EEO complaint was not constitutionally protected speech, and we grant summary judgment to all Defendants on Count XIII.

### C.    *FMLA Claims*

Under the FMLA, "an eligible employee is granted the right to 12 workweeks of leave over any 12-month period, in order to care for a spouse, child, or parent who has a serious health condition, or because a serious health condition makes the employee unable to perform the functions of his or her position, among other things." *Gibson v. Lafayette Manor, Inc.*, Civil Action No. 05–1082, 2007 WL 951473, at *15 (W.D. Pa. Mar. 27, 2007) (adopting R&R); *see also* 29 U.S.C. § 2612(a)(1)(D); *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). McCowan brings claims against the City for interference and retaliation in violation of the FMLA (Counts VI and VII). The City moves for summary judgment on both claims, arguing that McCowan received the FMLA leave that she requested and that she has not identified any adverse employment action taken by the City after she requested and received that leave. (Doc. No. 133 at pp. 25–26.)

1.      **Count VI:  FMLA Interference**

The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the Act.  29 U.S.C. § 2615(a)(1). To show FMLA interference, McCowan must prove:  (1) she was an eligible employee under the Act; (2) the City was "an employer subject to the FMLA's requirements;" (3) she was entitled to FMLA leave; (4) she "gave notice to the defendant of . . . her intention to take FMLA leave;" and (5) the City denied her benefits to which she was entitled under the Act.  *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (quoting *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)).  Because FMLA interference is not about discrimination, the Court does not apply the *McDonnell Douglas* burden-shifting analysis when analyzing McCowan's claim.  *Id.* at 192; *see also id.* ("Under an interference claim, 'the employee need not show that he was treated differently than others, and the employer cannot justify its actions by establishing a legitimate business purpose for its decision.'"  (quoting *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006))).

Here, McCowan has not demonstrated that there is a genuine issue of fact about whether she was actually denied FMLA leave.  *See Sommer*, 461 F.3d at 399–400 ("To assert an interference claim, 'the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them.'" (quoting *Callison*, 430 F.3d at 119)).  McCowan asserts that her FMLA leave was never approved, pointing to testimony from the City's Human Resources Manager, Heather McCaffrey, that her office has no record of McCowan's request or documents showing that the request was processed.  (Doc. No. 167 at p. 23.)  Although McCaffrey testified that there is no record of McCowan's paperwork at HR, this alone does not suggest that McCowan was actually denied benefits under the FMLA, especially in light of McCowan's testimony that she believed she was out on FMLA leave and the fact that her DAR

reports her absences as "FMLA."[40]  Although McCowan theorizes that the City may have used

sick leave to cover her absences, she has put forth no *evidence* that her sick days were in fact

used.  *See Steele*, 725 F. App'x at 179 ("'An inference of pretext based upon a speculation or

conjecture does not create a material factual dispute sufficient to defeat entry of summary

judgment.'" (quoting *Halsey*, 750 F.3d at 287) (alterations adopted)); *cf. Callison*, 430 F.3d at

120 ("The FMLA is meant to prohibit employers from retaliating against employees who

exercise their rights, refusing to authorize leave, manipulating positions to avoid application of

the Act, or discriminatorily applying policies to discourage employees from taking leave.  In the

instant case, the City did not engage in any of these prohibited acts." (internal citations omitted)).

Here, the undisputed evidence shows that McCowan left at the end of June 2019, that her

absences were marked "FMLA," and that she received pay the entire time she was gone.  *Cf.*

*Ross*, 755 F.3d at 192 ("Because Ross received all of the benefits to which he was entitled by

taking leave and then being reinstated to the same position from which he left, and thus cannot

satisfy the fifth prong of the interference analysis, he fails to make a prima facie showing of

interference . . . .").

Therefore, the Court grants summary judgment in favor of the City on McCowan's

FMLA interference claim.

## 2.    Count VII:  FMLA Retaliation

The FMLA also prohibits "discrimination based on the exercise of the[ ] rights" provided

by the Act.  *See Callison*, 430 F.3d at 119; *see also* 29 C.F.R. § 825.220(c) ("The Act's

---

[40] McCowan does not argue that the City discouraged her from requesting FMLA benefits.  *See*
*Gibson*, 2007 WL 951473, at *17 (explaining that "an employee can prove the [fifth] element of an
interference claim, denial of benefits, by showing that the employer discouraged her from using FMLA
leave, such that her desire to use such leave was 'chilled'").

prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights."); *Gibson*, 2007 WL 951473, at *18 ("Under FMLA, Congress also grants employees a cause of action against employers who discriminate against them based on the exercise of their FMLA rights; these claims are referred to as 'retaliation claims.'").  Unlike interference claims, retaliation claims are grounded in allegations of discrimination, so the *McDonnell Douglas* framework applies.  *See Ross*, 755 F.3d at 193 ("Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law.  Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green* . . . .").

To make out a prima facie case of FMLA retaliation, McCowan must show that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.  *Id.*  The City argues that it is entitled to summary judgment on this claim because McCowan has not identified any adverse employment actions that occurred after she submitted FMLA paperwork and began leave at the end of June or early July.  (Doc. No. 133 at p. 26.)  McCowan does not respond to this argument.  *See Daniels*, 982 F. Supp. 2d at 478.  And, in any event, we agree with the City.  The only adverse employment action that McCowan claims occurred after she left for FMLA leave is her alleged constructive discharge.  However, as discussed above, *see supra* n.16, McCowan has neither argued nor shown that she was constructively discharged or that her alleged constructive discharge occurred because of her request for FMLA leave.  (*Cf.* McCowan 2020 Depo. at 252:6–22 (explaining that she "was on family medical leave and then right after that [she]

resigned so there was no opportunity for the department to officially reprimand [her] in any sort of way").)

Therefore, the Court grants summary judgment in favor of the City on McCowan's FMLA retaliation claim.

### D.    *Remaining State Law Claims*

Next, we analyze McCowan's state law claims for:  (1) retaliation under Pennsylvania's Whistleblower Law against all Defendants except Younger (Count XIV), (2) IIED against all of the individual Defendants (Count XV), and (3) assault and battery against Younger (Count XVI). Defendants move to dismiss all three counts.  We address each in turn.

### 1.    <u>Count XIV:  Pennsylvania Whistleblower Law</u>

The Pennsylvania Whistleblower Law prohibits employers from discharging, threatening, discriminating, or retaliating against an employee with regard to his or her "compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."  43 Pa. Stat. Ann. § 1423(a).  The *McDonnell Douglas* burden shifting framework applies to retaliation claims brought pursuant to this provision.  *See Anderson v. Bd. of Sch. Directors of Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173 & n.4 (3d Cir. 2014).  To make out a prima facie case, the plaintiff must put forth evidence that she reported an instance of wrongdoing or waste to an appropriate authority and a causal connection between the report and the alleged retaliation.  *Golaschevsky v. Commonwealth, Dep't. of Envtl. Prot.*, 720 A.2d 757, 758–60 (Pa. 1998); *see also Frazier v. City of Philadelphia*, 441 F. Supp. 3d 76, 96 (E.D. Pa. 2020) ("Recovery under the Act requires evidence that Plaintiffs:  (1) reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation.").

Defendants argue that McCowan's whistleblower claim fails for the same reason that her other retaliation claims fail — namely, because McCowan has put forth no evidence of a causal connection, and even if she could make out a prima facie case of retaliation, Defendants have identified a legitimate non-retaliatory reason for each adverse employment action.  (Doc. No. 133 at pp. 28–29.)  In response, McCowan parrots (word-for-word and without appropriate citation) the portion of this Court's prior opinion on the motions to dismiss that analyzed Plaintiffs' Whistleblower Act claims.  This intellectual laziness provides little assistance to the Court in deciding the issue before it.  A court requires legal briefing on motions for summary judgment — and indeed, legal briefing on all motions — so that it can understand each party's position and the legal and factual support for that position.  By merely copying the Court's prior opinion, counsel has failed to provide any explanation for, among other things, whether our analysis at the motion to dismiss stage applies equally at the summary judgment stage.  He has also failed to explain how any portion of the substantial record in this case supports McCowan's Pennsylvania Whistleblower Law claims because the Court issued its prior opinion on the motions to dismiss without the benefit of that record.

Because McCowan has provided virtually no helpful discussion on this claim, the Court is limited to her assertion that she "'blew the whistle' on discrimination, harassment, and retaliation within the Department" and was "transferred . . . to [a] less-desirable position[ ] after [she] reported these violations."  (Doc. No. 167 at p. 23.)  The only discussion of retaliatory transfer in McCowan's brief is in relation to her transfer to Police Radio.  The only Defendants implicated by that argument are the City and Deputy Commissioner Coulter.  Therefore, we grant summary judgment in favor of Ross and the other individual City Defendants.

As discussed above, *see supra* Part IV.A.2, we find that McCowan has put forth a prima facie case of retaliation.  Her sexual harassment complaint about Younger's conduct constitutes a "good faith report of wrongdoing," and when the record is viewed as a whole there is a question of fact about whether Coulter transferred McCowan to Police Radio and later denied her hardship memo because of that complaint.  *See McAndrew v. Bucks Cnty. Bd. of Com'rs*, 982 F. Supp. 2d 491, 503–07 (E.D. Pa. 2013) (applying the same standard of causation as that applied in Title VII context and finding the plaintiff's allegations of causation were sufficient to state a retaliation claim under the Whistleblower Law).  McCowan has also pointed to inconsistencies in the City's justification for placing McCowan in Police Radio and denying her requests.

Therefore, the Court denies summary judgment as to Count XIV as against the City and Coulter.  *See Frazier*, 441 F. Supp. 3d at 98 ("Because Plaintiffs Frazier and Vann introduced evidence of a potentially viable Whistleblower claim by City of Philadelphia employees Evers and Boyle, their claim against the City also can move forward.").

## 2.      Count XV:  Intentional Infliction of Emotional Distress

McCowan also brings IIED claims against all of the individual Defendants, each of whom moves for summary judgment.

To recover on an IIED claim under Pennsylvania law, a plaintiff must prove that the defendant's conduct was (1) intentional or reckless and (2) extreme and outrageous, and that (3) the conduct actually caused distress that (4) was severe.  *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999).  Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that any individual Defendant engaged in

outrageous conduct.[41]  (Doc. No. 132-1 at p. 8; Doc. No. 133 at pp. 32–33; Doc. No. 136 at p. 22.)

As we explained in our Memorandum on the motions to dismiss, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988); *see also Hoy v. Angelone*, 770 A.2d 745, 754 (Pa. 1998) (noting that there "have been few" IIED cases "in the employment context"); *Schaffhouser v. Transedge Truck Ctrs.*, CIVIL ACTION NO. 19-5811-KSM, 2020 WL 2847935, at *6 (E.D. Pa. June 2, 2020) ("Conduct may rightly be characterized as bullying, abusive, improper, and highly offensive and yet still not be extreme or outrageous enough to allow for recovery on an IIED claim.").  "[A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress."  *Andrews*, 895 F.2d at 1487.  "The extra factor that is generally required is retaliation for turning down sexual propositions."  *Id.*  Although "retaliation is an important

---

[41] Ross also argues that he is entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA").  (Doc. No. 136 at p. 20.)  Public employees are immune from suit under the PSTCA.  42 Pa. Stat. & Con. Stat. § 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by the acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.").  However, that immunity is waived when the employee's actions amounted to willful misconduct.  42 Pa. Stat. & Con. Stat. § 8550; *see also Walker v. N. Wales Borough*, 395 F. Supp. 2d 219, 231 (E.D. Pa. 2005) ("Individual public employees sued in their personal capacities do not enjoy immunity under Pennsylvania law for willful, intentional torts.").  "By the very nature of the tort [of IIED], it is a claim of willful misconduct . . . ."  *K.A. ex rel. J.A. v. Abington Heights Sch. Dist.*, 28 F. Supp. 3d 356, 376 (M.D. Pa. 2014); *see also, e.g.*, *L.H.*, 130 F. Supp. 3d at 930 ("The plaintiffs' claim for [IIED] in Count III, however, by its very nature, is a claim of willful misconduct. Therefore, defendant Garzella is not entitled to immunity as to this claim pursuant to the PSTCA.").  In other words, if McCowan has raised a question of fact about whether Ross engaged in conduct that amounts to IIED, there is also a question of fact about whether he engaged in willful conduct that is exempt from the protections of the PSTCA.  Because the two are intertwined, our analysis focuses on the substantive elements of the IIED claim.

element, the Pennsylvania Supreme Court has stated that consideration of retaliation in the

context of an IIED claim 'is one of a number of factors to be used in assessing such a claim.'"

*Rorrer*, 712 F. Supp. at 438 (quoting *Hoy*, 720 A.2d at 754).  "'By regarding retaliation as a

weighty factor, but not a mandated factor, we allow for the rare case in which a victim of sexual

harassment is subjected to blatantly abhorrent conduct, but in which no retaliatory action is

taken.'"  *Id*. at 438–39 (quoting *Hoy*, 720 A.2d at 754).

Here, McCowan has put forth no evidence that any individual Defendant sexually

propositioned her and retaliated against her for rejecting those advances.  The only evidence of

sexual propositioning is McCowan's testimony that Younger asked her if she would ever have

sex with him.  However, there is no evidence that Younger, who was McCowan's subordinate,

could or did retaliate against her after she rejected him.  *See Andrews*, 895 F.2d at 1487 (finding

that because "there is only one contention of direct sexual propositioning, the propositioning of

Conn by Stock, and that was confessed to be a minor incident in which [the plaintiff's

supervisor] played no role," the case "is different from those cases where sexual harassment

made out a claim for intentional infliction of emotional distress").

Neither can we find Younger's actions so "blatantly abhorrent" that they rise to the level

of IIED.  *See, e.g.*, *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 2d 456, 465 (E.D. Pa. 2013)

(granting summary judgment on plaintiff's IIED claim against her coworker where the evidence

showed that he "would put his hands around her at work, flip her upside down, and describe

different sexual activity positions to her," as well as "sexually proposition[ ] her, engage[ ] her in

sexually explicit conversations, and show[ ] her pornographic images," but never retaliated

against her for reporting this conduct); *Rorrer*, 712 F. Supp. 2d at 439 (granting summary

judgment to a coworker defendant, who frequently stared at the plaintiff's breasts, suggestively

asked the plaintiff to bend over, and held a knife to her breast, because this evidence was

insufficient to support a claim for IIED); *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 311

(M.D. Pa. 1988) ("If the only allegations supporting [the plaintiff's] claim for intentional

infliction of emotional distress were those concerning [her immediate supervisor's] sexual

harassment of her, the court would be forced to" dismiss her IIED claim because although the

supervisor's conduct — displaying sexually explicit posters and newspaper clippings, placing his

hands in his pants, and making statements about his sexual virility, his outings to strip joints, the

sexual performance of other female employees, the plaintiff's ability to have sex after surgery,

and the plaintiff's sexual performance — was "insulting, undignified, annoying, and perhaps

representative of the 'rough edges of our society,'" it did not "constitute the type of extreme and

outrageous conduct" needed for an IIED claim.); *cf. Pryor v. Mercy Catholic Med. Ctr.*, No.

CIV. A. 99–0988, 1999 WL 956376 at *1, *3 (E.D. Pa. Oct. 19, 1999) (allowing IIED claim

against plaintiff's direct supervisor, who was also her treating psychiatrist, where he subjected

her to "physical force and the display of genitalia, foundling, [sic] and masturbation").

        In sum, although Defendants' actions, when viewed collectively, support a claim for

hostile work environment, when viewed individually, there is no evidence that any one

Defendant engaged in conduct that gives rise to an actionable IIED claim.  *See Andrews*, 895

F.2d at 1487 ("Although we agree that some of the actions alleged might form a basis for this

tort, most specifically the covering of Andrews' shirt with lime, there was no proof that any of

these were perpetrated directly or indirectly by Liciardello or Doyle.  They should not be held

accountable for each individual incident regardless of their lack of participation.  Their acts of

acquiescence may have contributed to the general environment at AID, but it cannot be said that

they personally encouraged, endorsed, or sponsored every incident."); *Graudins v. Retro Fitness,*

*LLC*, 921 F. Supp. 2d 456, 465 n.5 (E.D. Pa. 2013) ("Although [the owner of the company] allegedly retaliated against [the plaintiff] for reporting [her coworker's] assault, he did not personally harass her, and his conduct is thus insufficiently outrageous to support a claim for intentional infliction of emotional distress."). Therefore, we grant summary judgment in favor of each individual Defendant on McCowan's IIED claim.

### 3.   Count XVI:  Assault and Battery

McCowan's final state law claim is for assault and battery against Younger (Count XVI). We address her battery claim first.

#### a.   Battery

Younger argues that he is entitled to summary judgment on McCowan's battery claim because there is no evidence that he intended to harm her or cause offensive bodily contact when he reached for her hand.  (Doc. No. 132-1 at p. 14.)  We disagree.

"[A] cause of action for battery requires offensive contact with the individual." *Quinn v. Limited Exp., Inc.*, 715 F. Supp. 127, 130 (W.D. Pa. 1989).  "A bodily contact is offensive if it offends a reasonable sense of *personal dignity*." *Herr v. Booten*, 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990) (quoting Restatement (Second) of Torts § 19); *see also* Restatement (Second) of Torts § 19, cmt. a (explaining that for a contact to be "offensive to a reasonable sense of personal dignity," it must be "unwarranted by the social usages prevalent at the time and place at which it is inflicted").  "The physical contact giving rise to battery need not be major or cause physical injury." *Sims v. Peace of Mind Living Habilitative Servs., LLC*, Civil Action No. 2:19-cv-413, 2021 WL 5629974, at *14 (W.D. Pa. Dec. 1, 2021) ("Any offensive contact, however minor, constitutes a battery."); *see also* Restatement (Second) of Torts § 19, illustration 1 to cmt. a ("A flicks a glove in B's face.  This is an offensive touching of B.").

Here, McCowan has put forth sufficient evidence to support her claim for battery. She testified that Younger made numerous inappropriate comments about photographs on her desk and her sexual relationship with her husband before grabbing her hand and attempting to pull her wedding rings off her finger, while she screamed that they did not come off. Although Younger remembers the interaction differently, at this stage we must view the evidence in the light most favorable to McCowan. So viewed, we find that Younger's attempt to forcibly remove McCowan's wedding rings was an offensive contact made without her consent. *Sims*, 2021 WL 5629974, at *1 ("Sims has proven by a preponderance of the evidence that P. Hunter committed a battery. It is undisputed that P. Hunter kissed Sims and that he intended to do so. The record establishes that the kiss was unanticipated by Sims, that no consent was given, and that the kiss was offensive to her."). Therefore, the Court denies summary judgment as against Younger on this claim.[42]

---

[42] McCowan argues that the contact was offensive *because* Younger grabbed her without her consent. (Doc. No. 166 at p. 5.) Although this argument seems to conflate the element of offensive or harmful contact with the defense of consent, *see Quinn v. Limited Exp., Inc.*, 715 F. Supp. 127, 130 (W.D. Pa. 1989) ("Consent is a defense to the intentional torts of assault and battery."); *Nayak v. Herbison*, CIVIL NO. 1:14-CV-02211, 2015 WL 13738992, at *6 (M.D. Pa. June 4, 2015) ("Under Pennsylvania law, the intentional tort of battery has been described as an unconsented touching that is either harmful or offensive."), we must acknowledge that the Pennsylvania Supreme Court appears to have held as much in a medical battery case, *see Cooper ex rel. Cooper v. Lankenau Hosp.*, 51 A.3d 183, 191 (Pa. 2012) ("[S]urgery performed without the patient's consent constitutes intentional and offensive touching, and satisfies the elements of battery."). Some trial courts have expanded the scope of that rule to apply to battery cases generally. *See Nace v. Pennridge Sch. Dist.*, 185 F. Supp. 3d 564, 584 (E.D. Pa. 2016) (explaining that the "fact that contact occurs without consent is sufficient to establish that it is 'offensive,' and no intent to harm the plaintiff need be established," and holding that because "consent [was] legally impossible," a high school softball coach's admitted sexual contact with a student "was necessarily offensive for tort purposes and a battery occurred each time he had sexual contact with E.N." (cleaned up)); *Zapach v. Dismuke*, No. CIV. A. 00–CV–3972, 2001 WL 35948685, at *1 (Pa. Ct. Comm. Pl. Apr. 24, 2001) (denying summary judgment where the plaintiff put forth video evidence that the defendant, a zoning board chairperson, "struck the plaintiff's right arm twice" during a zoning board hearing, and then "grabbed onto Plaintiff's arm to lead him away from the microphone" because "[a]lthough the force of these contacts appears to be slight, there is no denying that the contact occurred, that it was intentional, and that it was not consented to"). To the extent the rule applies in all cases of common law battery, it supports our denial of summary judgment because the evidence shows that Younger grabbed McCowan's hand, and he did so intentionally and without her consent.

### b. Assault

Assault, unlike battery, is an act "intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Nace v. Pennridge Sch. Dist.*, 185 F. Supp. 3d 564, 584 (E.D. Pa. 2016); *see also D'Errico v. DeFazio*, 763 A.2d 424, 431 n.2 (Pa. Super. Ct. 2000) ("An assault has been described as an act intended to put another in reasonable apprehension of an immediate battery, which succeeds in causing an apprehension of such a battery."). Younger argues that he is entitled to summary judgment as to this claim because there is no evidence that McCowan expressed fear or apprehension of bodily harm. (Doc. No. 132-1 at p. 14.) McCowan responds that she was "put in imminent apprehension" of Younger's contact and that this apprehension "concluded with actual, nonconsensual bodily contact." (Doc. No. 166 at p. 6.) This suggests that McCowan experienced the assault in the moments leading up to Younger grabbing her hand. However, McCowan fails to identify any evidence suggesting that she apprehended that contact, and we could find none. Therefore, we grant Younger's motion for summary judgment on Count XVI as to the assault claim. *See Picariello v. Fenton*, 491 F. Supp. 1026, 1037–38 (M.D. Pa. 1980) ("The Court has found that no Plaintiff was threatened with a pick handle and that no threats were made by any correctional officers on April 14 or April 15, 1978. Plaintiffs, therefore, were not assaulted while at Lewisburg.").

### E. Counts XXIII, XXIV: Equitable Claims

Last, the City and individual City Defendants move for summary judgment on McCowan's claims for declaratory and injunctive relief, arguing that because McCowan is no longer employed with the Philadelphia Police Department, her request for future relief is moot. (Doc. No. 133 at p. 33.) McCowan does not respond to this argument, and in any event, the Court agrees with Defendants that because she no longer works for the City, there is no risk of

McCowan being subjected to ongoing discriminatory practices.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed.  As a state employee subject to Article XXVIII, Yniguez had a viable claim at the outset of the litigation in late 1988. . . .  Yniguez left her state job in April 1990 to take up employment in the private sector where her speech was not governed by Article XXVIII.  At that point, it became plain that she lacked a still vital claim for prospective relief. . . .  Yniguez's changed circumstances — her resignation from public sector employment to pursue work in the private sector — mooted the case stated in her complaint." (cleaned up)).  Because McCowan's claims for equitable relief are moot, we grant summary judgment in favor of the City Defendants on Counts XXIII and XXIV.

## V.    CONCLUSION

In sum, MacDonald, McCarrick, McHugh, O'Brien, Williford, Tamika Allen, and Conway are entitled to summary judgment on all of McCowan's remaining claims.  The City of Philadelphia, Ross, Coulter, and Younger are entitled to summary judgment on some but not all the claims asserted against them.  Below is a revised chart that outlines the remaining counts against these four Defendants.

| Count | Claim | Defendants |
|-------|-------|-----------|
| I | Title VII Disparate Treatment | City of Philadelphia |
| II | Title VII Hostile Work Environment | City of Philadelphia |
| III | Title VII Retaliation | City of Philadelphia |
| XI | Section 1983 Disparate Treatment in Violation of Equal Protection Clause | Coulter |
| XII | Section 1983 Hostile Work Environment in Violation of Equal Protection Clause | City of Philadelphia, Ross, and Coulter |

| XIV | Pennsylvania Whistleblower Retaliation | City of Philadelphia and Coulter |
|---|---|---|
| XVI | Battery | Younger |
| XVII | PHRA Discrimination | City of Philadelphia |
| XVIII | PHRA Retaliation | City of Philadelphia and Coulter |
| XIX | PHRA Aiding and Abetting | Ross and Coulter |
| XX | PFPO Discrimination | City of Philadelphia |
| XXI | PFPO Retaliation | City of Philadelphia and Coulter |
| XXII | PFPO Aiding and Abetting | Ross and Coulter |

An appropriate Order follows.