**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AUDRA MCCOWAN, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-3326-KSM** |
| **CITY OF PHILADELPHIA, et al.**, | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                    **March 10, 2022**

**TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND ........................................................................... 3

A.   The Evidentiary Record ......................................................................... 3

B.   Allen Takes Maternity Leave ................................................................. 5

C.   Inappropriate Sexual Comments and Advances from Officer Younger ....... 11

D.   McCowan and Allen Complain About Younger ..................................... 13

 1.   Williford Speaks with McCowan ....................................................... 13

 2.   McCowan and Allen Talk to Tamika Allen ........................................ 14

 3.   MacDonald Forwards Plaintiffs' Memos to Internal Affairs ............... 15

E.   Sergeant Conway's Investigation .......................................................... 16

F.   Allen's Scheduling Issues Continue ...................................................... 17

 1.   Allen Returns to JET ......................................................................... 17

 2.   Allen Meets with Tamika Allen and McCarrick ................................. 18

G.   Allen Has Issues Pumping in JET ......................................................... 20

H.   Allen is Detailed to the Neighborhood Services Unit ............................. 22

 1.   The Safety Office Sends Allen to "CIU" .......................................... 22

 2.   Tamika Allen Meets with Allen, McHugh, and Muller ....................... 24

 3.   Allen is Assigned to NSU and Given a Counseling Memo .................. 25

I.   Allen's Pumping Problems Continue at NSU .................................................... 27

J.   Internal Affairs Completes Its Investigation in July 2019 ............................... 29

K.   Allen Files this Lawsuit and Allen is Reassigned .......................................... 29

II.    PROCEDURAL HISTORY ................................................................................. 30

III.   STANDARD OF REVIEW ................................................................................. 32

IV.   DISCUSSION ..................................................................................................... 33

   A.   Discrimination Claims ...................................................................................... 34

      1.   Counts I, VIII, XI, XVII, XX:  Disparate Treatment ................................. 34

      2.   Counts III, X, XVIII, XXI:  Retaliation ................................................... 48

      3.   Counts II, IX, XII, XVII, XX:  Hostile Work Environment ....................... 53

      4.   Counts XIX, XXII:  Aiding and Abetting ................................................ 58

   B.   Count XIII:  First Amendment Retaliation ....................................................... 62

   C.   Counts VI, VII: FMLA Interference and Retaliation ........................................ 65

   D.   FLSA Claims ..................................................................................................... 67

      1.   Count IV:  Section  207 ........................................................................... 68

      2.   Count V:  Section 215 ............................................................................. 68

   E.   Remaining State Law Claims ............................................................................ 71

      1.   Count XIV:  Pennsylvania Whistleblower Law ....................................... 72

      2.   Count XV:  Intentional Infliction of Emotional Distress ......................... 73

      3.   Count XVI:  Assault and Battery ............................................................ 76

   F.   Counts XXIII, XXIV:  Equitable Claims ........................................................ 79

V.   CONCLUSION ................................................................................................... 79

Plaintiffs Audra McCowan and Jennifer Allen bring claims of discrimination, retaliation, hostile work environment, intentional infliction of emotional distress ("IIED"), assault and battery, violations of the Federal Labor Standards Act ("FLSA"), violations of Pennsylvania's Whistleblower Law, and violations of the Family and Medical Leave Act ("FMLA") against the City of Philadelphia and eleven individually named defendants in their official and individual capacities.  (*See* Doc. No. 49.)  Defendants have moved for summary judgment on all claims. (*See* Doc. Nos. 132, 133, 136.)

Although the facts supporting each Plaintiff's claims overlap, their allegations and injuries are sufficiently distinct that we find it prudent to address them in separate, contemporaneously filed Memoranda.  In this Memorandum, we discuss Allen's claims against the City and ten of the individual defendants.[1]

## I.   FACTUAL BACKGROUND[2]

We begin by addressing the parties' arguments about the scope of the evidentiary record before turning to the facts.

### A.   The Evidentiary Record

In deciding the pending motions, Allen urges the Court to consider as evidence the averments in her verified second amended complaint, arguing that the complaint may be converted into an affidavit because Allen verified it under penalty of perjury.  (Draft H'rg. Tr. at 65:12–67:15.)  Defendants strongly object, arguing that courts convert verified pleadings into affidavits only in cases involving *pro se* plaintiffs.  (Draft H'rg. Tr. at 12:7–14:18.)  We agree with Defendants.

Although courts in this Circuit have converted verified pleadings into affidavits in the past, each of those cases involved a *pro se* plaintiff.  *See Parkell v. Danberg*, 833 F.3d 313, 320 n.2, 322 (3d Cir. 2016) (finding that most of the *pro se* plaintiff's "version of events is supported solely by his own statements in verified complaints and other court filings.  Because those documents were signed under penalty of perjury in accordance with 28 U.S.C. § 1746, we

---

[1] The Court previously dismissed all of Allen's claims against former Police Commissioner Richard Ross, Jr.  (*See* Doc. No. 121 at ¶ 1.)

[2] During oral argument, Plaintiffs' counsel noted that Defendants failed to respond to Plaintiffs' Counter Statement of Undisputed Material Fact (Doc. No. 163) and asked the Court to consider those facts as true for purposes of summary judgment.  (Draft H'rg Tr. at 45:11–46:1.)  Because the Court has before it an extensive record, Defendants' own statements of undisputed fact, and Plaintiffs' response to those statements of fact, the Court denies Plaintiffs' request.

consider them as equivalent to statements in an affidavit"); *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating *pro se* prisoner plaintiff's verified amended complaint as an affidavit in opposition to summary judgment); *Boomer v. Lewis*, Civil No. 3:06-CV-0850, 2009 WL 2900778, at *2 n.4, *14 (M.D. Pa. Sept. 9, 2009) (treating *pro se* plaintiff's verified complaint as an affidavit in opposition to a motion for summary judgment).  As courts have recognized, this conversion was consistent with the understanding that "*pro se* complaints are held 'to less stringent standards than formal pleadings drafted by lawyers.'"  *Wilson v. Maben*, 676 F. Supp. 581, 583 (M.D. Pa. 1987) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

The Court has not found, nor have Plaintiffs identified, any case where a court viewed a verified complaint as an affidavit outside of the *pro se* context.  *Cf. id.* ("Based on *Haines*, the Third Circuit has treated a *pro se* complaint made under penalty of perjury as an affidavit in opposition to a motion for summary judgment."); *Hodgin v. Agents of Montgomery Cnty.*, 619 F. Supp. 1550, 1552 (E.D. Pa. 1985) ("Because plaintiff is proceeding *pro se*, however, I will construe his submissions and the record evidence in his favor liberally.  I note that plaintiff's complaint concludes with the statement, 'I declare under penalty of perjury that the foregoing is true and correct.'  The Third Circuit has treated a *pro se* complaint containing such a declaration as an affidavit in opposition to summary judgment." (citations omitted)).  Indeed, to do so would seem to run afoul of the Third Circuit's assertion that "[a]t summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).  The Court will not allow Plaintiffs' counsel to avoid his obligations at this stage by relying on a rule that was meant to give *pro se* plaintiffs the leniency they are to be afforded.

Finally, the Court notes that discovery (and the inherent disputes that come along with it) would be an incredible waste of clients' money, attorneys' time, and judicial resources if a counseled plaintiff could always rely on the allegations in her verified complaint at summary judgment.  In this case alone, the parties engaged in *years* of discovery — which included *two* depositions of each Plaintiff and an additional *fourteen* depositions.  In addition, more than six months passed between when Defendants' motions were filed and when Plaintiffs responded.[3] Despite all that discovery and all that time, Plaintiffs' counsel did little more than cite in passing to his more than 4,000 pages of exhibits.  (*See* Doc. Nos. 163–65.)  As the Court has warned Plaintiffs' counsel over and over again, it is not our job to sift through thousands of pages of evidence, and the Court will not do so here.

For those reasons, the Court will not convert Allen's verified second amended complaint into an affidavit or consider the allegations within it in ruling on the pending motions for summary judgment.  With this ruling in mind, and viewing the evidence and all inferences to be drawn from that evidence in the light most favorable to Allen as the non-movant, we recite the relevant facts below.

### B.   *Allen Takes Maternity Leave*

Allen worked as an officer with the Philadelphia Police Department's Intelligence Bureau from December 2010 to February 2019.  Because many of the events underlying Allen's claims occurred when she and McCowan were working in the Intelligence Bureau, we begin with a brief overview of the Bureau's purpose and hierarchy before turning to Allen's time there.

---

[3] Although there was one outstanding discovery dispute during that six-month period, that dispute had virtually no bearing on the summary judgment briefs.

### a.    The Intelligence Bureau

The Intelligence Bureau is "an information and sharing operation coordinated between the Philadelphia Police Department and state and federal partner law enforcement agencies." (*See* City Ex. 4 at ¶ 3 ("McCarrick Aff.").)  The Bureau is housed in the Delaware Valley Intelligence Center ("DVIC") in South Philadelphia and is composed of multiple special units, including the Realtime Crime Center, the High-Intensity Drug Trafficking Area ("HIDTA") Watch Center, the Analysis & Investigations ("A&I") Unit, the Statistical Unit, and the Criminal Intelligence Unit ("CIU").  (McCarrick Aff. at ¶¶ 2–3.)  The CIU, in turn, is composed of subunits, including the Juvenile Enforcement Team ("JET"), a small tactical unit that conducts warrant service and probation searches on high-risk, gang-associated, and violent juveniles on probation.

At all times relevant to this lawsuit, Defendant Chief Inspector Daniel MacDonald oversaw the Bureau. Defendant Inspector Michael McCarrick was immediately below Chief Inspector MacDonald in hierarchy, and at the time, also oversaw all units within the Bureau.[4]  (MacDonald Depo. at 14:1–16:23.) Each unit had a captain or civilian supervisor who reported to McCarrick.  (*Id.*)



---

[4] Chief Inspector MacDonald testified that two inspectors typically report to him, one who oversees the "intelligence division and one for the fusion center side of the house."  (City Ex. 6 at 14:1–16:23 ("MacDonald Depo.").)  However, at the time, Inspector McCarrick was overseeing both the intelligence division and the fusion center because the Bureau was short a supervisor.  (*Id.* at 13:16–24.)

Lieutenants reported to the captain or civilian supervisor; sergeants reported to lieutenants; and corporals reported to sergeants. (*Id.*; Draft H'rg. Tr. at 7:1–8:18 ("Sergeants outrank corporals. . . . [A] sergeant . . . would have supervisory authority over a police corporal and a police officer.")) Police officers and civilian analysts, at the bottom of the hierarchy, reported to corporals, and in some instances, directly to sergeants. (MacDonald Depo. at 14:1–16:23.)

> **b.** **Allen's Maternity Leave and Temporary Assignment to A&I**

Jennifer Allen, a Black Hispanic woman, graduated from the Philadelphia Police Academy in October 2004. (City Ex. 23 at 17:7–10 ("Allen 2020 Depo.").) In December 2010, she transferred to JET. (*Id.* at 19:1–3.) JET is a uniformed assignment, where officers switch between daywork and nightwork. (McCarrick Aff. at ¶ 22i.)

In May 2018, Allen took maternity leave following the birth of her youngest son. (Allen 2020 Depo. at 20:12–15.) Before leaving, she submitted a memo to her supervisor in JET, Sergeant Bradford Williams, requesting that she be transferred to an analyst position at A&I. (*Id.* at 21:23–23:19.) Unlike JET, A&I is not a uniformed assignment, and analysts work steady daytime shifts. (McCarrick Aff. at ¶ 22iii.) When Allen returned from leave on October 22, 2018, she continued reporting to JET (Allen 2020 Depo. at 25:9–14), but she reiterated her desire to move to A&I, telling Chief Inspector MacDonald's aide, Officer Tonetta Dawson, that she was interested in the analyst position and the more stable schedule that it offered (City Ex. 5 at 27:12–28:2 ("McCarrick Depo."); *see also* Allen 2020 Depo. at 30:8–21).

Officer Dawson shared Allen's request with Chief Inspector MacDonald, who discussed it with Inspector McCarrick, and the two men agreed that Allen would remain permanently assigned to JET and would work for JET when it was scheduled for the dayshift, but she would be allowed to temporarily work at A&I when JET was scheduled for the nightshift. This schedule meant Allen consistently worked dayshift, an accommodation for her as she returned to

work, and it also gave her the opportunity to begin learning the analyst position, while allowing A&I the opportunity to see how she performed in that role.  (MacDonald Depo. at 36:14–37:19 ("We did not have anyone available to [place in JET] at the time, so we tried to devise an accommodation for her that we could keep her more stabilized since she had a new child.  And the accommodation that we worked out with her, I believe, was that she would work days, stay on dayshift; when JET was on days, she would work with our JETs team, and when JETs was on night, she would work in A&I and start learning the job."); McCarrick Depo. at 25:18–27:11 ("So I was approached about — that she had some personal issues that she was dealing with after the pregnancy and that she had a desire to go over, and this would help her as she was transitioning with parenthood.  So it gave us an opportunity to view her abilities in that realm."); *see also* City Ex. 15 at 30:16–31:2 ("Williford Depo.") ("I was trying to accommodate Officer Allen. . . .  She had just had a baby.  Her husband was on a flip-flop schedule.  He's on rotating.  And I was basically trying to make sure that she had some kind of normalcy, at the same time give her some kind of training so in the event that she actually put a transfer paper in, it would be an easier transition for her from being a police officer to an analyst.").)

After setting up this arrangement, MacDonald spoke with Defendant Sergeant Eric Williford about Allen's request.  Williford was the administrative supervisor for the Bureau and served as a "fill-in supervisor" for A&I from July 2018 to the beginning of December 2018.  (Williford Depo. at 10:12–19.)  MacDonald explained that Allen would rotate between A&I and JET, working in JET when the unit was scheduled for dayshift, and working at A&I when JET was scheduled for nightshift.  (*Id.* at 19:4–8; MacDonald Depo. at 36:14–37:19.)  When Williford responded that a rotating schedule would not give Allen enough exposure to A&I to

train her as an analyst, MacDonald told him to "make it happen, make her comfortable," and "talk to her supervisors and make it happen." (Williford Depo. at 19:15–20:1.)

At the end of November 2018, Williford told Allen to attend the Intelligence Bureau's onboarding for new promotees and transfers, which was scheduled for the first week of December. (Allen 2020 Depo. at 27:5–16; Williford Depo. at 25:4–27:14.) Although Allen's schedule changed to more consistent day work in December 2018, she continued to "flip flop" between JET and A&I. (Allen 2020 Depo. at 29:12–16, 32:2–3, 34:2–37:8.) Williford explained that Allen would continue to go between the two units while he tried to "figure out" her situation. (*Id.* at 34:2–36:8.) Throughout that first week of December, Williford spoke with Allen multiple times and explained that he was "try[ing] his best to help [her]," but that it seemed like McCarrick did not want Allen to be an analyst. (*Id.*) According to Allen, Williford also noted that "McCarrick has a problem with black women, to be blatant," and suggested that was where the scheduling issues were coming from. (*Id.*; *see also id.* at 150:11–152:13 (testifying that Williford, McHugh, and O'Brien told Allen that the way she was being treated was "not right": "[I]t was something that was not heard of. No one heard of flip-flopping. No one heard of going between two units. I had O'Brien tell me that he's just a small fish. That was in a meeting with Lieutenant McHugh, T'Nea Jones, myself, and Sergeant O'Brien. That they're just doing what they are told.").)

When Allen still lacked a formal assignment the last day of onboarding, she and co-Plaintiff Corporal Audra McCowan — who had experienced similar scheduling issues at the Bureau — told their friend, Officer Dawson, that they believed they were being denied work opportunities. (Williford Depo. at 54:18–56:8.) Dawson shared Plaintiffs' concerns with Sergeant Williford, who followed up with the women later that day. (City Ex. 13 at 138:8–140:3

("McCowan 2020 Depo."); Williford Depo. at 10:1–3, 54:18–59:12 (explaining that he met with McCowan after learning that she'd complained to another officer about feeling that she didn't fit in).)  During that meeting, Williford told Allen that "as of Monday, December 10th, [she] would no longer be flip-flopping per MacDonald" and she would be "steady A&I" without having to "worry about going back and forth" to JET.  (Allen 2020 Depo. at 37:24–28; 39:2–6.)

### c.      New Supervisors at the Bureau

That first week of December, the Bureau also received a wave of newly promoted and/or transferred supervisors.  Of relevance here, Defendant Sergeant Tamika Allen replaced Sergeant Bradford Williams as Allen's supervisor in JET.  (City Ex. 7 at 6:23–7:7:5 ("T. Allen Depo.").)  And McCowan, Defendant Sergeant Kevin O'Brien, and Defendant Lieutenant Timothy McHugh became Allen's supervisors at A&I.  (City Ex. 26 at 46:11–47:12 ("McCowan 2019 Depo."); City Ex. 21 at 37:20–38:23 ("O'Brien Depo."); City Ex. 36 at 7:15–17 ("McHugh Depo.").)

### d.      Allen's Time at A&I

On December 10, Allen appeared for work at A&I.  She was not given a workstation, desk, or formal training at first, and instead, was told to observe the other analysts as a type of informal training.  (*See* Allen 2020 Depo. at 48:14–51:5 (acknowledging that the observations were training); McHugh Depo. at 23:1–11 (explaining that Allen did not need a desk or computer because she was observing the other analysts).)  Although Allen asked questions of the more experienced analysts, she struggled to understand what they were doing.  (Allen 2020 Depo. at 61:2–64:13.)

A month later, Allen continued to ask her supervisors for a desk and access to certain computer programs, but McHugh and O'Brien told her that she did not need access to the programs because she was still in JET.  (*See id*. at 64:19–68:22.)  Similarly, when Allen asked

10

Lieutenant McHugh about being assigned a workstation, he told her that she was "still in JET and wouldn't need a desk." (*Id.* at 54:1–60:24.) He then offered to share his desk with her. (*Id.*) In mid-January, Allen was finally assigned a workstation and given access to the necessary computer programs. (*Id.* at 52:8–68:22.) But even then, Allen continued to feel that she was being denied formal training opportunities.

### e.      Allen's Breast Milk is Stolen

After returning from maternity leave in October 2018, Allen continued to breast feed her youngest son, and as a result, needed to periodically breast pump while at work. In January 2019, Allen began experiencing issues related to pumping while at the DVIC. For example, on January 10, Allen noticed that someone had stolen some of the breast milk that she had left in a black bag inside the cafeteria refrigerator. (*Id.* at 252:2–254:8.) She reported the incident to Lieutenant McHugh, and because she was not comfortable continuing to use the shared refrigerator, Lieutenant McHugh gave her permission to bring in a personal refrigerator. (*Id.*)

Later, Sergeant Williford approached Allen and joked about the incident, saying something to the effect of, "I guess someone wanted chocolate milk." (*Id.*) Williford then told Allen that he would draft a memo about the incident and send it to the entire building, but the memo was never sent. (*Id. But see* Williford Depo. at 73:5–81:1, 82:5–23 (testifying that he did not send an email because he was told another officer had already sent one).)

### C.      *Inappropriate Sexual Comments and Advances from Officer Younger*

During her A&I observations, Allen trained with analyst Defendant Officer Curtis Younger. (Allen 2020 Depo. at 49:3–7; P. Ex. NNN at CITY 2550 (stating during an interview that she was sitting with Officer Younger "because he was training [her]").) Officer Younger had made advances toward Allen in the spring of 2014, calling her personal phone to tell her, "I have a crush on you," "I like you," and "I'm interested in you." (Allen 2020 Depo. at 72:15–

73:7.)  At the time, Allen's husband — who also works for the Philadelphia Police Department — told Officer Younger not to call Allen again unless it was work related.  (*Id.*)

When Allen transferred to A&I in the winter of 2018, Officer Younger picked up where he had left off.  In December, he told Allen that after their call in 2014, he had wanted to "come to [her] house and handle [her husband]" because "no one talks to him that way."  (*Id.* at 71:13–23).)  Over the next few weeks, Younger continued to make hostile comments to Allen, telling her that "[m]y daughter is gay, and I don't like her girlfriend.  I purposefully hit her in the head with a tailgate."  (Doc. No. 49 at ¶ 62; *see also* Allen 2020 Depo. at 140:20–141:11.)  Younger also told Allen that she was a "sexy motherfucker" and that her breasts looked "big" from needing to pump.  (Allen 2020 Depo. at 84:21–87:24.)  Each time, Allen told him to stop and to focus on work.  (*Id.* at 86:7–89:19.)

Then, in mid-January, while they were leaving the annual sexual harassment training, Allen overheard Younger call the training "bullshit."  (*Id.* at 94:19–95:1.)  A few days later, after a prayer circle that they both attended, Officer Younger turned to Allen, placed his hands on her waist, and said, "You're so small," while trying to pick her up.[5]  (*Id.* at 97:14–102:11 ("Q: After you told Officer Younger to put you down, what did he do?  A:  He put me down.  He released my weightbearing.  [sic]  Q: And he never lifted you up in the air right?  A: Not all the way up in the air, but just slightly.  I didn't let it go that far.").  *But see* Younger Depo. at 32:6–35:17 (testifying that at the end of prayer circle, "everybody in the room hugged each other," and he never attempted to pick up Allen).)  Allen immediately ordered him to put her down.  (Allen 2020 Depo. at 97:14–102:11.)

---

[5] Allen and Younger attended the same daily prayer circle in the Department's cafeteria.  (Allen 2020 Depo. at 97:14–98:2; Younger Depo. at 32:6–35:17.)  After the prayer those in attendance customarily hugged.  (Allen 2020 Depo. at 98:15–99:2; Younger Depo. at 33:20–34:4.)

Younger's inappropriate comments continued in the week after the prayer circle.  Among other things, Younger told Allen that she "lost all of [her] ass after having the baby," and that if she "gained 15 more pounds [she] would be on point."  (Allen 2020 Depo. at 84:21–85:1; 87:20–89:19.)  Younger also asked Allen whether she found it weird for her son to "suck on [her] nipples," and told her that he asked his wife a similar question when she was breastfeeding.  (*Id.* at 79:6–23.)

### D.   *McCowan and Allen Complain About Younger*

On January 29, 2019, Allen for the first time reported Younger's conduct to a supervisor, co-Plaintiff McCowan.  (*Id.* at 128:5–129:14.)  McCowan, who had also experienced unwanted advances from Younger, told Allen to write down everything that had happened to her in a memo and said that she would do the same.  (*Id.*; *see also* City Ex. 42 (Allen's Sexual Harassment Complaint),[6] City Ex. 49 (McCowan's Sexual Harassment Complaint).)

### 1.   Williford Speaks with McCowan

The next morning, McCowan told Officer Dawson that she needed to speak with Chief Inspector MacDonald about her and Allen's memos when he came into the office.  (McCowan 2020 Depo. at 72:11–73:20.)  A few minutes later, Sergeant Williford, wrongly believing the complaints related to the scheduling issues that he was already addressing for Allen, messaged McCowan, "Please see me before you submit that memo.  You know I will never steer you wrong."  (P. Ex. EE; *see also* Williford Depo. at 84:20–87:9 (explaining that he did not know what the memos were about, but his discussion with Allen about scheduling was in the "back of [his] mind").)  Williford then asked to speak with McCowan, and she responded, "What I have to

---

[6] Allen's sexual harassment complaint did not mention Younger's comment about whether she found it weird for her son to "suck on her nipples."  (*See* P. Ex. NNN at CITY 2524–25.)

talk about should go directly to the boss.  It's bigger than what you may think.  It actually involves [Allen]."  (P. Ex. EE.)

Williford walked to McCowan's desk and asked her why she needed to speak with Chief Inspector MacDonald.  (McCowan 2020 Depo. at 74:6–75:23.)  McCowan told him that it was an "EEO [equal employment opportunity] situation," and Williford responded that McCowan had to "learn there [are] other supervisors [she] can go to" and that she should go to Inspector McCarrick before going straight to Chief Inspector MacDonald.  (*Id.*; *see also* Williford Depo. at 84:20–87:9, 94:20–97:8, 112:11–114:2 (explaining that he was trying to help McCowan because he thought the memos were related to Allen's scheduling issues, which to Williford, did not rise to the level of EEO).)  McCowan explained that she did not feel comfortable going to Inspector McCarrick, and she was justified in going directly to MacDonald because he had an open-door policy, and the chain of command does not apply to EEO complaints.  (McCowan 2020 Depo. at 74:6–75:23.)  Williford later drafted a memo to Chief Inspector MacDonald and one to Inspector McCarrick about the interaction.  (*See* City Ex. 54; Williford Depo. at 114:4–116:23; MacDonald Depo. at 50:22–53:11; McCarrick Depo. at 50:10–52:9, 63:14–64:21.)

## 2.   McCowan and Allen Talk to Tamika Allen

While McCowan was speaking with Williford, Officer Allen's JET supervisor, Sergeant Tamika Allen, found Allen crying in the locker room.  (T. Allen Depo. at 193:14–194:24.)  When Tamika Allen asked her if she was okay, Allen responded that she did not want to involve the Sergeant, so Tamika Allen did not push her further.  (*Id.*)  A little while later, Tamika Allen returned to the locker room and again found Allen crying, this time with McCowan.  (McCowan 2019 Depo. at 75:24–76:9; Allen 2020 Depo. at 125:23–128:4.)  The women told the Sergeant in general terms that they "wanted to report an EEO situation" and intended to talk to Chief Inspector MacDonald.  (McCowan 2019 Depo. at 75:24–76:9; Allen 2020 Depo. at 125:23–

14

127:12.)  They also spoke with Tamika Allen "about being black women on the job" and "not really having any resolutions within the department with . . . complaints."  (Allen 2020 Depo. at 125:23–127:12.)  Plaintiffs did not, however, mention their troubles with Officer Younger or the substance of their sexual harassment memos.  (McCowan 2019 Depo. at 76:10–15; Allen 2020 Depo. at 127:20–23.)

After the discussion, Tamika Allen immediately told her supervisor, Captain Robert Heinzeroth, about the conversation, and the two of them went to Inspector McCarrick, who ordered Sergeant Tamika Allen to draft a memo detailing the encounter.  (McCarrick Depo. at 48:20–49:19.)  Once McCarrick received her memo and Sergeant Williford's memo, he drafted a cover letter requesting a formal investigation and had the memos hand delivered to Chief Inspector Christopher Flacco, the commander for the Department's Division of Internal Affairs. (*Id*. at 48:20–51:19; City Ex. 54.)

### 3.    MacDonald Forwards Plaintiffs' Memos to Internal Affairs

The next morning, when McCowan and Allen still had not heard from Chief Inspector MacDonald, McCowan emailed their memos to him, explaining that they had "a situation that [they] would like for [him] to be made aware of" and that they "tried to meet with [him] yesterday, but [their] attempt was unsuccessful."  (P. Ex. FF.)  MacDonald immediately reviewed the Department's policy for EEO complaints ("Directive 8.7") and within 30 minutes emailed both memos to Chief Inspector Flacco.  (MacDonald Depo. at 42:2–45:9; City Ex. 50.) MacDonald did not meet with McCowan or Allen about their complaints, nor did he tell them that he had forwarded them to Internal Affairs.  (MacDonald Depo. at 48:17–50:17; McCowan 2020 Depo. at 121:5–122:16.)

After forwarding the complaints, MacDonald directed McCarrick to ensure that McCowan and Allen had no contact with Officer Younger, that Younger was counseled not to

have any contact, whether personal or professional, with them, and that all supervisors were on

alert that McCowan and Allen were not to be negatively treated by Younger or anyone else.

(MacDonald Depo. at 45:21–48:13.)  MacDonald also held a staff meeting with all personnel in

the Bureau about the Department's harassment policy.  (*Id.* at 55:12–58:4.)

       **E.**       ***Sergeant Conway's Investigation***

After the memos — Sergeant Allen's, Sergeant Williford's, Corporal McCowan's, and

Officer Allen's — were sent to Internal Affairs, the matter was assigned to Defendant Sergeant

Brent Conway for investigation.  (D. Ex. 39 at 41:5–14 ("Conway Depo.").)  As part of his

investigation, Conway interviewed Allen on February 6, 2019.  (Allen 2020 Depo. at 133:15–18;

P. Ex. NNN at CITY 2548.)

Conway began the interview with "small talk," asking Allen if she knew McCowan and

mentioning that he had worked with McCowan in the past.  (Allen 2020 Depo. at 135:3–136:10.)

He told Allen that his son was autistic and that his wife is Black, and he often has to "prove

himself to his wife's family because he's a white man."  (*Id.*)  Conway also noted that "a lot of

the old timers [in the Department] are stuck in their ways in regards to sexually harassing

women," and that "a lot of times fresh meat comes out of the academy and women are sexually

harassed," and he assumed Younger has the same mentality.  (*Id.*)  But when Allen told Conway

that she had been scared to come forward, Conway began talking about previous complainants

and how "a lot of times he initially believes . . . the victims" but that "once he gets to court . . .

the victims are lying."  (*Id.* at 137:13–138:8.)

Allen spent the next three hours describing Younger's conduct for Conway.  (P. Ex. NNN

at CITY 2548–56.)  At the end of the interview, Conway left the room so that Allen could review

his notes from the interview.  (Allen 2020 Depo. at 138:18–139:5.)  However, Allen "felt really

rushed" because Conway repeatedly interrupted her.  (*Id.* at 138:18–140:7 (testifying that

Conway "would go back, come back in, go back, come back in," each time asking if Allen was done).)

Afterward, when asked if there was anything she wanted to add, Allen wrote that the entire situation had "been extremely difficult for [her]," causing her stress and anxiety that directly affected her milk supply and her newborn son. (P. Ex. NNN at CITY 2555; *see also* Allen 2020 Depo. at 140:20–141:11 ("So I was telling Conway. I said that this is a person that I have a complaint against. He already said that he was going to come to my house for my husband and he was telling me that he's gotten physical with his daughter's girlfriend and that I was scared.").) Allen then wrote that she believed it would alleviate her stress if she and Younger were separated pending the conclusion of the investigation. (P. Ex. NNN at CITY 2555.) She also told Conway that even though she wanted to be separated from Younger, she was worried about losing her position at A&I. He told her that she did not need to include her concerns in her written statement because her supervisors "weren't allowed to remove [her] from the situation or from the area because that would be a lawsuit and . . . he w[ould] speak on [her] behalf if that was to occur." (Allen 2020 Depo. at 140:8–19, 141:12–43:8 ("Q: You chose not to add in a comment like that, such as Sergeant Conway told me that they weren't allowed to move me, right? A: Absolutely. Q: Why didn't you include that in your statement? . . . A: Because he's a sergeant. He told me not to do it.").)

### F. *Allen's Scheduling Issues Continue*

Despite Conway's assurances, shortly after Plaintiffs submitted their internal complaints, and while his investigation was ongoing, Allen's scheduling problems resurfaced.

#### 1. <u>Allen Returns to JET</u>

On February 4, 2019, two days before Allen's interview with Conway, Sergeant Tamika Allen told her that per McCarrick, she was to sit on the CIU side of the Bureau instead of with

A&I.  (T. Allen Depo. at 59:16–61:10 (testifying that she told Allen her seating location would

be changing from the A&I side to the CIU side because she "had to be kept separate from

another officer").)  But when McCarrick heard what had happened, he told Tamika Allen that

Allen was not being moved yet because he had not received clearance from Internal Affairs.

(*See* McCarrick Depo. at 163:6–164:15.)  Tamika Allen relayed this information to Allen, telling

her that she could remain at her A&I desk unless she felt uncomfortable.  (*See* McCarrick Depo.

at 163:6–164:15; T. Allen Depo. at 61:14–62:4)

Two weeks later, Allen reported for day shift with the JET team.  (City Ex. 35 at pp. 2–3

("T. Allen Aff.").)  On the 19th, she met with Tamika Allen, who admitted that she was equally

confused about whether Allen should be on JET's Daily Attendance Records ("DAR") or the

A&I DAR and suggested that Allen put in a transfer and in the meantime, "fall back" and "suck

it up."  (Allen 2020 Depo. 147:19–149:9 ("She told me that there is a lot of even

miscommunication or a lot of back and forth and she doesn't understand it.  She said that — like

for me to like suck it up.  Fall back.  Everything will be okay."); 153:1–154:16 ("Q:  Did you ask

her what she meant by fall back?  A: I know what she meant.  I didn't have to ask her.  That

means be quiet, be quiet.  Sit back, little girl, little black girl.  That's what that means.  Obey.

Listen to what they are telling you.  Make no noise.  Don't be a troublemaker.").  *But see*

T. Allen 2020 Depo. at 68:6–78:15, 201:8–202:7 ("I may have used the terminology relax and

fall back, but it had nothing to do with the complaint that was put in by the officer.").)

### 2.   **Allen Meets with Tamika Allen and McCarrick**

The next day, on February 20, Allen had a formal meeting with Inspector McCarrick and

Sergeant Tamika Allen.  (Allen 2020 Depo. at 154:19–158:2.)  McCarrick told Allen that he had

spoken with Captain Carol Abrams in Internal Affairs about her request to return to JET and be

separated from Younger.  (*Id.* at 154:19–155:17; McCarrick Depo. at 41:9–44:12 (explaining

that the Bureau "honored the request immediately upon Captain Abrams clearing us"), 45:10–

17.)  Allen attempted to clarify that she did not want to be moved from A&I, but before she

could finish, McCarrick told her that she had "to go back to JET," "stay away from A&I," and

"[s]tay away from Curt [Younger]."  (Allen 2020 Depo. at 154:19–158:2; McCarrick Depo. at

46:11–24.)

Typically, when a complainant and an accused are in the same unit, the Police

Department temporarily details the accused to a different assignment while the Internal Affairs

investigation is pending.  (*See* City Ex. 16 at 55:1–17 ("Coulter Depo.") (confirming that the

Department usually reassigned the alleged offender); McCarrick Depo. at 42:24–44:12 ("[F]irst

off, it is pretty much a standard policy that you never move a complainant in regard to one of

these matters, as it could be deemed as it's being punitive.").)  McCarrick testified that Allen was

moved in this situation because Younger's permanent assignment was A&I, while Allen was

only temporarily detailed to the unit and her permanent assignment remained in JET.

(McCarrick Depo. at 39:9–40:7 ("So we honored her request to move, which just made sense to

put her back working where she was originally, where she was assigned."), 42:24–44:12 ("I

could not move Officer Younger from an assignment he was assigned to and that she was

detailed to . . . .").)  Because Allen had "her own assignment in the building which would have

relieved the situation," moving Younger would have caused "a union issue, a contractual issue."

(*Id.* at 47:1–14.)  In addition, at the time, JET had "two officers that were indisposed and

unavailable for duty," creating an "officer-safety issue" that the Bureau "had to address

immediately."  (*Id.* at 40:16–24. 42:24–45:9 ("So we would have reassigned her back to her

assignment; put her back where she had originally been assigned, and that would have avoided

them working together.  We didn't do it [earlier] because there was the complaint lodged and we

had to wait for clearance [from A&I].”); MacDonald Depo. at 76:20–78:12 (testifying that Allen

was returned to JET because of safety issues related to JET being understaffed).)

Two days later, Tamika Allen messaged Allen that she should report for night work with

JET on February 26. (Allen 2020 Depo. at 158:3–8; T. Allen Depo. at 199:14–200:24, 214:10–

218:3.) And because Allen was returning to JET, McHugh told her not to attend training in A&I

that had been scheduled for the 26th. (Allen 2020 Depo. at 110:21–111:14; McHugh Depo. at

51:7–52:13 (explaining that he took away the training because Allen was returning to JET).)

### G.    *Allen Has Issues Pumping in JET*

As mentioned above, when Allen returned from maternity leave, she continued

breastfeeding her newborn son and was thus required to breast pump while at work. When she

was working in the office at the DVIC, she would pump in the women’s locker room. But when

she worked out on the streets with JET, she would typically go home to pump. (Allen 2020

Depo. at 162:15–166:6.) Her previous supervisor, Sergeant Williams, had allowed her to drive

home on her lunch break for this purpose. (*Id*. at 165:17–166:6 (“So whenever we served

warrants I would take my break. And wherever we were at in the City from there, because I had

my pumping bag and everything, my equipment with me, and I would go home.”).) And Allen

continued to pump at home under Tamika Allen’s supervision on the three or four shifts where

she was out on the streets serving warrants with JET.[7] However, Tamika Allen’s response was

drastically different when Allen went home to pump on February 26.

---

[7] There is some dispute about whether Sergeant Tamika Allen was told about this accommodation
when she replaced Sergeant Williams at JET. (*Compare* Allen 2020 Depo. at 162:15–164:12 (“We talked
about that several times. [Tamika Allen] said she didn’t have a problem with [me] going home. She
knew that was what I did when I served warrants with JET. We discussed that for the first time at my old
partner’s grandmother’s funeral.”), *with* T. Allen Depo. at 95:21–23 (“Q: Do you know if she had an
arrangement with Bradford Williams to go home and pump?  A: I know nothing of that arrangement.”).)
For purposes of summary judgment, we must credit Allen’s testimony and therefore, assume that Tamika
Allen was aware of the arrangement and consented to it until February 26.

That night, Allen reported for work with JET as directed — her first night shift since November 2018.[8]  (Allen 2020 Depo. at 160:16–23.)  A few hours into the shift, Allen drove home to breast pump.  (*See id.* at 161:8–14.)  The rest of the JET team continued serving warrants, and Tamika Allen called Allen to ask where she was.  (T. Allen Depo. at 94:16–95:6; 207:2–11.)  Allen responded that she had "just gotten home to pump."  (Allen 2020 Depo. at 161:15–11; *see also* T. Allen Depo. at 95:7–16 (explaining that she "never gave the officer permission to go home, to her house, and [she] had no idea that's where the officer was going").)  At the end of the shift, Tamika Allen approached Allen about the incident and told her that if she needed to go home in the future for any reason, she would have to take her own car, not a City vehicle, and she would have to use leave time and report her comings and goings with Police Radio.  (T. Allen Depo. at 96:2–18; Allen 2020 Depo. at 162:9–164:12.)

Allen then asked if there was a lactation space available at the DVIC, explaining that she was no longer comfortable pumping in the women's locker room because "there were times when [Tamika Allen] walked in on [her].  Several people walked in on[her] when [she] was pumping at work."  (Allen 2020 Depo. at 162:9–166:16.)  Tamika Allen told her that pumping in the locker room "shouldn't be a problem because we're all women," and refused to find her a different room at that time because they were about to get off shift.  (Allen 2020 Depo. at 162:9–164:12 (describing Tamika Allen's behavior as "aggressive," and testifying that she said, "[W]e're about to get off.  I'm not doing that right now.").)  Despite this aggression, before their next shift, Tamika Allen followed up with McCarrick about Allen's request, and McCarrick told

---

[8] At some point in the evening, Allen learned that her request for three weeks' vacation was partially denied.  (*But see* Allen 2020 Depo. at 206:6–207:1.)  But all vacation requests are processed by a central vacation coordinator, so Allen's denial did not come from any of the individual Defendants listed in this lawsuit.

her to have Allen pump in the interview room.  (McCarrick Depo. at 66:19–76:23; *see also* Allen 2020 Depo. at 168:22–170:3; T. Allen Depo. at 20:24–22:3, 26:22–34:17.)  McCarrick chose the interview room because it was the only lockable room available in the DVIC, and although it had a window, the window was often covered with black construction paper.  (McCarrick Depo. at 66:19–76:23.)

When the JET team's shift started on the night of the 27th, Tamika Allen told Allen that she could pump in the interview room by signing out the key from Real Time Crime Center. (Allen 2020 Depo. at 163:23–170:3; T. Allen Depo. at 33:2–5, 34:7–17; McCarrick Depo. at 80:8–84:20 (explaining that the key is stored with the Real Time Crime Center supervisor and given to anyone who needs to use it).)  However, when Allen attempted to use the room that night, it was extremely cold and the window on the door was uncovered.  (Allen 2020 Depo. at 170:17–171:21 ("And when I went to go pump, the place that I went to — it was February and the place that I went to had no heat, extremely cold.  It had a window.  It wasn't an adequate place for someone to be lactating.").)  Allen ultimately took sick leave for the rest of her shift because she needed to go home to pump and was not feeling well.  (Allen 2020 Depo. at 170:17–171:21).)

After this incident, Allen, who had seen her physician multiple times in the previous month for depression and anxiety caused by her work situation, went to a follow-up appointment with her primary care doctor, and her doctor took her out of work for four weeks.  (Allen 2020 Depo. at 173:6–12.)

### H.    *Allen is Detailed to the Neighborhood Services Unit*

#### 1.    The Safety Office Sends Allen to "CIU"

At the end of March, Allen's doctor cleared her to return to work on restricted duty.  (*Id.* 175:21–176:1.)  Allen scheduled an appointment with the City physician's office, which did its

own examination and agreed that Allen could return to work on restricted duty status.  (*See* D. Ex. 27 at 36:17–37:24 ("O'Neill Depo.").)  Allen then went to the Department's Safety Office to receive her restricted duty assignment.  (*Id.* at 37:14–39:6; Allen 2020 Depo. at 176:2–21.)  Because JET is considered a special unit, the Safety Office kept Allen in that assignment. (O'Neill Depo. at 38:5–39:6 (explaining that when a restricted duty officer is "in a special unit, we always send [him or her] back there.  And that's what [the Safety Office] did in this instance . . . ."), 43:12–44:4 ("As I said, since she was restricted in a special unit, we sent her back there.  And on restricted duty they can work whatever hours they need them to work inside as long as they're not out on the street."); *cf.* Allen 2020 Depo. at 177:5–10 (acknowledging that the Safety Office "usually put[s] you back where you are from").)  However, because JET is a subunit of CIU, it has the same DAR code as CIU.  (T. Allen Depo. at 138:16–22; *cf.* O'Neill Depo. at 35:21–36:1.)  Relying on this code, the officer in the Safety Office, accidentally directed Allen to report to "CIU."  (T. Allen Depo. at 138:16–140:8 (testifying that when she followed up with the Safety Office, the officer confirmed that she only put CIU on the paperwork because it shares a code with JET, and she was placing Allen on restricted duty in her permanent assignment); Allen 2020 Depo. at 176:20–179:10; O'Neill Depo. at 38:1–39:6.)  This caused significant confusion.

Because the paperwork referred to CIU, Allen reported to the DVIC, presenting her restricted duty instructions to Lieutenant Muller, the supervisor for CIU.  (Allen Depo. at 178:1–24.)  When Tamika Allen came into work later that morning, Allen showed her the restricted duty status paperwork, as well.  (T. Allen Depo. at 115:7–118:1.)  Sergeant Tamika Allen confronted Allen about her restricted duty status and assignment, asking Allen who put her in criminal intelligence.  (Allen 2020 Depo. at 183:16–187:3 ("As soon as she got in, because I was

there before her, she was asking me like who put me on restricted.  I told her my doctor put me

out restricted.  And she said, well, who put you on Criminal Intelligence.  I said that the safety

office did.  She was saying things like who put my time in.  Just all of these things, and it was

such an aggressive manner."); *see* City Ex. 40, at pp. 208–09.)  Tamika Allen then asked Allen

for her sick paperwork and doctor's note, but Allen told her she did not have them because she

had given them to the Safety Office.  (Allen 2020 Depo. at 189:17–190:23; T. Allen Depo. at

118:2–19, 222:8–223:8 (explaining that she needed Allen's doctor's note because if she did not

"receive the information or it's not turned in, then the officer can be put on the sick abuse list for

not documenting the sick leave").)  Allen answered Sergeant Tamika Allen's questions at first,

but when Tamika Allen began yelling at her, she walked away.  (Allen 2020 Depo. at 183:16–

187:3.  *But see* T. Allen Depo. at 124:17–128:4, 128:11–129:19, 130:17–131:7.)

## 2. Tamika Allen Meets with Allen, McHugh, and Muller

After this conversation, Tamika Allen followed up with the Safety Office and confirmed

that they had not intended to reassign Allen to CIU, but instead were sending her to her

permanent assignment on restricted duty status.  (T. Allen Depo. at 138:16–140:8, 145:22–

146:15.)  Sergeant Tamika Allen returned to the DVIC and called a meeting with Allen,

Lieutenant McHugh, and Lieutenant Muller, during which she told Allen that she was not to

report to Criminal Intelligence, that Allen would be working directly under her, and that Allen

was to sit at Tamika Allen's desk, and she would give Allen her assignments.  (Allen 2020 Depo.

at 183:16–187:3 ("And throughout all of this I want to be very clear that she was very[,] very

aggressive, very like retaliatory, to be honest."), 193:13–196:16.)  Tamika Allen then ordered

Allen to immediately move all of her belongings from her desk, which was still located on the

A&I side of the Bureau.  (*Id.* at 183:16–187:3, 193:13–194:18.)  When Allen asked for time so

that her husband could help her move her refrigerator, Tamika Allen replied, "no, you have to do it right now." (*Id.* at 183:16–187:3.)

### 3.   Allen is Assigned to NSU and Given a Counseling Memo

Later that day, Sergeant Tamika Allen met with McCarrick to discuss the difficulties she would have finding Allen restricted duty work and supervising Allen if Allen had to be in the office while the JET team was out on the streets. (*See* T. Allen Depo. at 144:12–145:21, 147:9–149:8, 174:12–20.) Inspector McCarrick called Safety Officer Margaret O'Neill and told her that there were complaints in the unit and to "diffuse some of the situation," it would be better if Allen was placed in a different restricted duty assignment outside of the DVIC. (O'Neill Depo. at 43:5–44:4, 54:23–56:14 (testifying that McCarrick asked her to move Allen to limit her interactions with Younger and not because there was no room for her in the Bureau as a person on restricted duty).) After confirming that there was an opening and availability in the Neighborhood Services Unit ("NSU"), O'Neill told McCarrick that Allen should report to NSU while she was on restricted duty. (*Id.* at 44:10–45:17 (explaining that she "wanted to make sure [she] put [Allen] in a nice job," and describing the NSU position as "sweet digs," meaning Allen would have "day work, it was inside work, and weekends off, holidays off. I believe there might even have been parking nearby").)

A few hours later, Tamika Allen met with Allen for a third time. (Allen 2020 Depo. at 197:8–11.) Allen testified that Tamika Allen was "irate" during the meeting and yelled at her throughout it. (*Id.* at 199:1–9.) Sergeant Tamika Allen called Allen to the conference room and handed her a counseling memo for insubordination. (*Id.* at 183:16–187:3; *See also* City Ex. 40.) Counseling memos are a training tool used by the Department to give feedback on good and bad behavior; they "are not disciplinary in nature nor is their issuance considered to be disciplinary in action." (Allen 2020 Depo. at 197:22–198:21; MacDonald Depo. at 78:13–19 ("A counseling

memo within the police department would be a memorandum or written memorandum that explained positive, negative, work improvement, work-sustaining activities by an individual. . . . So counseling statement is a training tool."); T. Allen Depo. at 156:15–157:4.)

The memo described Allen's conversation with Tamika Allen about her restricted duty status paperwork.  (*See* City Ex. 40.)  It stated that "while [Tamika Allen] was having a conversation with [Allen] to gain clarity in reference to [Allen's] paper work since returning from sick status, [Allen] walked off during the conversation and stated in a hostile and loud tone, 'I don't see what the problem is, you can call the safety office.'"  (*Id.*)  When Tamika Allen "attempted to continue the conversation and ask[ed her] to come back to the area, . . . [Allen] continued to walk off."  (*Id.*)  According to the memo, Allen's tone was "unprofessional, disrespectful, and [went] against departmental policy." (*Id.*)

After Tamika Allen reviewed the memo's written narrative with Allen, Allen responded that the things written in the memo had not actually occurred and that she wanted to "write down what actually happened."  (Allen 2020 Depo. at 199:19–200:10, 200:24–201:5.)  As Allen drafted her response, Tamika Allen repeatedly interrupted her, telling her to hurry up and asking her whether she was finished and what she was writing.  (*Id.* at 199:19–200:10, 202:2–24; *see also* D. Ex. 40.)  When Allen finished drafting her statement, she handed the memo to Tamika Allen and asked for a copy.  (T. Allen Depo. at 226:4–5.)  Tamika Allen said she "wasn't coming back in here."  (*Id.* at 226:6–9.)  Allen followed her to the copy machine, but once the copy was made, Tamika Allen refused to place it in Allen's hand, placing it on the cabinet instead.  (Allen 2020 Depo. at 162:7–163:5.)

Tamika Allen then told her that she was being detailed to the NSU and was to report there the next morning.  (*Id.* at 204:9–18; T. Allen Depo. at 165:22–167:24 (explaining that McCarrick told her Allen was being moved to NSU), 225:4–8.)

### I.      *Allen's Pumping Problems Continue at NSU*

The next morning, Allen reported to NSU.  (Allen 2020 Depo. at 211:1–6.)  While there, her direct supervisor was Defendant Sergeant Herbert Gibbons.  (*Id.* at 211:18–24; City Ex. 57 at 7:2–10 ("Gibbons Depo.").)  NSU was housed in a different building than the DVIC (so she could no longer use the interview room to pump), so Allen told Gibbons that she was a nursing mother and would need a place to pump.  (Allen 2020 Depo. at 218:14–222:10.)  Gibbons told Allen that there was another nursing mother in the unit, Officer Janelle Newsome, and that she could pump in Officer John Whipple and Officer John Martin's shared office, which was also known as the "abandoned vehicle room."  (*Id.*; Gibbons Depo. at 9:12–23.)

Although the room had a lockable door, a refrigerator, and no windows (Gibbons Depo. at 9:19–23), the NSU stored paperwork and snacks in the room (Allen 2020 Depo. at 229:17–230:9).  And when Allen used the room, she found that other officers at NSU would interrupt her, knocking and saying they needed to get inside.  (Allen 2020 Depo. at 231:1–18 ("Everyday was an interruption.  Everyday someone knocked on the door when I was pumping.").)  They also told Allen that she could not pump in the abandoned vehicle room because they needed to go inside to finish their paperwork.  (Allen 2020 Depo. at 218:14–222:10.)

When Allen and Newsome complained about being interrupted, Gibbons told the officers under his command, along with the supervisors in a nearby unit, that they should not disturb the room when the door was shut.  (Gibbons Depo. at 10:7–15:10.)  He also made a sign that said, "room in use, do not disturb," for the women to post when they were pumping and kept it in his office so it would not be misplaced.  (*Id.* at 15:11–18:19; Allen 2020 Depo. at 218:14–222:10.)

However, he shared the office with two male officers, and the women were not comfortable having to get the sign from there each time they needed to pump.  (Allen 2020 Depo. at 218:14–222:10; Gibbons Depo. at 15:11–21:5.)  When they told Gibbons as much, he gave the two women the sign to keep between them and spoke with his superior, Captain Laverne Vann, about having a permanent sign made.  (Allen 2020 Depo. at 218:14–222:10; Gibbons Depo. at 16:7–13, 19:17–21:5.)  Despite the sign, the ladies continued to experience interruptions, and one officer even told Allen that she should stop pumping in the abandoned vehicle room and should pump in a civilian, Mary Bibbo's, office instead.  (Allen 2020 Depo. at 218:14–222:10.)

When Allen spoke with Gibbons about the other officers' comments, Gibbons confirmed that Allen should pump in Bibbo's office going forward and that he would make sure Bibbo was aware.  (*Id.* at 226:1–228:12.)  For the next two weeks, Allen had no issues using Bibbo's office because Bibbo was on vacation; however, issues arose when Bibbo returned.  (Gibbons Depo. at 18:20–19:10.)  Despite Gibbons's assurances that he would speak with Bibbo about the arrangement, when Allen went to the office to pump, Bibbo refused to leave the room.  (Allen 2020 Depo. at 226:1–228:12.)  When Allen told Gibbons about Bibbo's reaction, he backtracked from his earlier assurances, telling Bibbo that she did not have to leave the office.  (Allen 2020 Depo. at 226:1–228:12.)  Gibbons also told Allen that "the last time he tried to speak up he got 18 [discipline]," so "[h]e's not going to say anything against or to Mary Bibbo because of the way that she is."  (Allen 2020 Depo. at 218:14–222:10.  *But see* Gibbons Depo. at 64:16–66:4 (explaining that he told the officers he wanted to make sure he did not "violate policy directives" when he spoke to Bibbo because "it could lead to me receiving disciplinary action").)

After this incident, Gibbons told Allen and Newsome to pump in the kitchen area.  (Gibbons Depo. at 36:10–15.)  Gibbons also gave all of the employees in the NSU operations

room a copy of the City's work site lactation support policy (Gibbons Depo. at 36:4–37:21.)
And he again approached Captain Vann, who decided to address the situation herself.  (Gibbons
Depo. at 25:3–24.)  Captain Vann placed a permanent sign on the abandoned vehicle room that
said, "Lactation Room," and Allen returned to pumping there.[9]  (Allen 2020 Depo. at 228:13–23;
Gibbons Depo. at 25:3–24.)

### J.      Internal Affairs Completes Its Investigation in July 2019

Meanwhile, Internal Affairs continued to review Allen's complaint against Younger.
And on July 5, 2019, the investigation was finally completed.  (McCowan 2020 Depo. at
342:22–343:10; P. Ex. NNN at pp. CITY 2493, 2520.)  After reviewing Conway's report and
proposed findings, Inspector Kevin Hall concluded that Allen's allegations of sexual harassment
against Younger were not sustained, but Allen's allegations of inappropriate language (i.e.,
Younger referring to the sexual harassment training as "bullshit") were sustained.  (P. Ex. NNN
at p. CITY 2519.)  Notably, Inspector Hall found that the investigation "revealed no independent
evidence or witnesses that could prove or disprove" Allen's allegations that Younger made
sexual comments toward her.  (P. Ex. NNN at p. CITY 2519.)

### K.      Allen Files this Lawsuit and Allen is Reassigned

On July 29, 2019, McCowan and Allen filed their initial complaint in this case.  (Doc.
No. 1.)  The next day, Lieutenant Waters, another of Allen's supervisors in NSU, told her that
she was being reassigned to the Department's "Tow Squad."  (Allen 2020 Depo. at 240:2–15.)
With the move, her hours were set to change from steady daytime work with weekends off to a
schedule that rotated between dayshift and nightshift.

---

[9] Allen finished nursing her son around the time of his first birthday in May.

Lieutenant Waters told Allen that the reassignment came from the Department's Safety Office.  (*See id.* at 240:2–242:13; *see also* O'Neill Depo. at 25:6–33:3.)  And O'Neill confirmed that a supervisor in NSU called her about "personality conflicts" in the unit and asked the office to "find [Allen] a different assignment."  (O'Neill Depo. at 25:6–27:2.)  O'Neill told the supervisor to get permission from the relevant Deputy Commissioner, and once Deputy Commissioner Dennis Wilson approved the move, O'Neill found Allen a new spot in Tow Squad, believing it "would be a good spot for her because it's low stress, it's nice and quiet, you just have to answer the phone."  (*Id.* (explaining that she also "went out of [her] way to make sure that it was in the same [shift] that [Allen] was permanently assigned to in her regular full duty unit").)  However, before Allen could report to Tow Squad, Commissioner Christine Coulter's office reached out to O'Neill to tell her that the City had reached an agreement with Allen and Allen would remain in NSU during the pendency of this lawsuit.  (*Id.* at 32:15–33:3.)

Allen ultimately resigned from the Department in July 2020.

## II.    PROCEDURAL HISTORY

As mentioned above, Plaintiffs filed their initial complaint in this case on July 29, 2019.  (*See* Doc. No. 1.)  The operative complaint is Plaintiffs' Second Amended Complaint, which was filed on May 21, 2020.[10]  (Doc. No. 49.)  On January 11, 2021, the Court issued a Memorandum and Order dismissing some of Plaintiffs' claims, including all of Allen's claims against Defendant Richard Ross, Jr.  (*See* Doc. Nos. 120, 121.)  For clarity, the Court has created a chart outlining Allen's remaining claims:

---

[10] Before filing their second amended complaint, Plaintiffs consented to the dismissal, with prejudice, of their claims against Younger under the FLSA (Counts IV and V), § 1981 (Counts VIII through X), § 1983 (Counts XI through XIII), and the Pennsylvania Whistleblower Law (Count XIV).  (*See* Doc. No. 23 at pp. 1–2; *see also* Doc. No. 30.)

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| I | Title VII Disparate Treatment | City of Philadelphia |
| II | Title VII Hostile Work Environment | City of Philadelphia |
| III | Title VII Retaliation | City of Philadelphia |
| IV | FLSA § 207 | All Defendants *except* Younger |
| V | FLSA § 215 | All Defendants *except* Younger |
| VI | FMLA Interference | City of Philadelphia |
| VII | FMLA Retaliation | City of Philadelphia |
| VIII | Section 1981 Disparate Treatment | All Individual Defendants, *except* Younger, in their individual capacity only[11] |
| IX | Section 1981 Hostile Work Environment | All Defendants *except* Younger |
| X | Section 1981 Retaliation | All Defendants *except* Younger |
| XI | Section 1983 Disparate Treatment in Violation of Equal Protection Clause | All Individual Defendants, *except* Younger, in their individual capacity only |
| XII | Section 1983 Hostile Work Environment in Violation of Equal Protection Clause | All Defendants *except* Younger |
| XIII | Section 1983 Retaliation in Violation of Petition Clause | All Defendants *except* Younger |
| XIV | Pennsylvania Whistleblower Retaliation | All Defendants *except* Younger |
| XV | IIED | All Defendants *except* the City of Philadelphia |
| XVI | Assault and Battery | Younger |
| XVII | Pennsylvania Human Relations Act ("PHRA") Discrimination | City of Philadelphia |
| XVIII | PHRA Retaliation | All Defendants *except* Younger |
| XIX | PHRA Aiding and Abetting | All Defendants *except* the City of Philadelphia and Younger[12] |

---

[11] In the Court's Memorandum on the motions to dismiss, we declined to dismiss Allen's § 1981 disparate treatment claim against the City because the City's only argument in favor of dismissal was that the claim should have been brought pursuant to § 1983. We agreed, but mindful of Supreme Court precedent, we declined to dismiss the entire claim on the basis of this procedural hurdle alone. Later in the opinion, however, we dismissed Allen's § 1983 claim against the City for race and/or gender disparate treatment because she failed to allege that the City has a policy, practice, or custom of disparate treatment on the basis of race and/or gender. This effectively also dismissed McCowan's § 1981 claim for disparate treatment against the City, which as mentioned above, must be brought pursuant to § 1983, and therefore, must rely on a policy, practice, or custom of race discrimination. *See Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 477–78 (E.D. Pa. 2013) (explaining that "it remains a necessary prerequisite to municipal liability under § 1983 that the offending personnel were operating under an official policy or practice" and "a failure to bring forward evidence of a policy, practice, or failure to train precludes a § 1981 claim just as it does a § 1983").

[12] During oral argument, Allen's counsel withdrew her PHRA and PFPO aiding and abetting claims against the City. (Draft H'rg Tr. at 57:24–58:4.)

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| XX | Philadelphia Fair Practices Ordinance ("PFPO") Discrimination | City of Philadelphia |
| XXI | PFPO Retaliation | All Defendants *except* Younger |
| XXII | PFPO Aiding and Abetting | All Defendants *except* the City of Philadelphia and Younger |
| XXIII | Declaratory Relief | All Defendants *except* Younger |
| XXIV | Injunctive Relief | All Defendants *except* Younger |

Defendants have filed two motions for summary judgment, each of which requests judgment in Defendants' favor on all of Allen's remaining claims. (*See* Doc. Nos. 132, 133.) Allen opposes those motions. (*See* Doc. Nos. 166, 167.) For the reasons discussed below, the motions are granted in part and denied in part.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV.   DISCUSSION

We begin with Allen's claims of discrimination based on a protected characteristic, before addressing her First Amendment retaliation claim, her claims under the FMLA, her claims under the FLSA, the remaining state law claims, and her claims for equitable relief.

### A.   *Discrimination Claims*

#### 1.   <u>Counts I, VIII, XI, XVII, XX:  Disparate Treatment</u>

Allen brings claims for disparate treatment based on race, gender, and pregnancy against the City under Title VII (Count I), the PHRA (Count XVII), and the PFPO (Count XX), and against Coulter, MacDonald, McCarrick, McHugh, O'Brien, Williford, Gibbons, Conway, and Tamika Allen (collectively, "the individual City Defendants") under § 1981 (Count VIII) and § 1983 (Count XI).  (Doc. No. 49.)  We use the same legal framework to analyze all five claims.  *See Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020) ("Courts apply the same burden-shifting framework to claims asserted under Title VII, the PHRA, the PFPO, § 1981, and § 1983."); *Williams v. Carson Concrete Corp.*, Civil Action No. 20-5569, 2021 WL 1546455, at *3 (E.D. Pa. Apr. 20, 2021) ("Claims of employment discrimination brought under Title VII, the PHRA, the PFPO, and Section 1981 are analyzed coextensively.").

#### a.   **Treatment Based on Race and Gender**

Allen's disparate treatment race and gender discrimination claims are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  *Opsatnik v. Norfolk S. Co.*, 335 F. App'x 220, 222 (3d Cir. 2009).  "First, the plaintiff must establish a prima facie case of discrimination."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  To establish a prima facie case of disparate treatment, a plaintiff must show that she is a member of a protected class, that she was qualified for her position, and that she suffered an adverse employment action under circumstances giving rise to an inference of intentional discrimination.  *Jones*, 198 F.3d at 410–11; *see also Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142, 144–45 (3d Cir. 2007) (framing the fourth element as requiring evidence that "either similarly-

situated non-members of the protected class were treated more favorably, or the adverse job action occurred under circumstances that give rise to an inference of discrimination").

If the plaintiff carries her burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Jones*, 198 F.3d at 410–11 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). To demonstrate pretext, a plaintiff must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 412–13 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). "The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000). Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employee's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (quotation marks omitted).

Here, there is no dispute that Allen, an African American and Hispanic woman, is a member of a protected class based on her race and gender. Nor do Defendants dispute that Allen had the minimum qualifications for the positions she held or the placement she sought. As for

the third element, Allen has identified seven adverse employment actions:  (1) the denial of training opportunities in A&I; (2) her placement on a rotating schedule between JET and A&I; (3) her return to JET full time; (4) the counseling memo; (5) the decision to not sustain her complaint against Younger for sexual harassment; (6) her detail to Tow Squad, along with the resulting schedule change; and (7) the City's decision to take adverse action against her husband.[13]  (Doc. No. 167 at p. 7; *see also* Doc. No. 133 at p. 12.)  We find that only some of these actions constitute "adverse employment actions" and are actionable in a claim for disparate treatment.  *See Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) ("An adverse employment action can generally be demonstrated by a hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Notably, the counseling memo was not an adverse employment action because counseling memos are training tools, not formal discipline.  (*See* MacDonald Depo. at 78:13–19 ("A counseling memo within the police department would be a memorandum or written memorandum that explained positive, negative, work improvement, work-sustaining activities by an individual. . . .  So a counseling statement is a training tool."); T. Allen Depo. at 156:15–157:4.)  *See Rosati v. Colello*, 94 F. Supp. 3d 704, 718 (E.D. Pa. 2015) ("Roasati's 2014 counseling form is not an adverse employment action."); *cf. Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 (3d Cir. 2014) (finding oral and written warnings, even when combined with docked pay, were not adverse employment actions because the warnings would remain in the

---

[13] Allen also asserts that she was constructively discharged.  (Doc. No. 167 at p. 7.)  But she does not provide any argument on this issue, or identify record evidence or legal citations that support her assertion.  Moreover, the Court notes that the only allegations of constructive discharge contained in the Second Amended Complaint are in relation to Allen's FMLA claims.  (*See* Doc. No. 49 at ¶¶ 377g, 382b.)  Therefore, the Court does not discuss the issue further.

plaintiffs file only temporarily and they did not effect a material change in the terms or conditions of his employment and the docked pay was negligible); *Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2006) (holding that a "corrective performance review" was not an adverse action under the broad standard applied in retaliation cases because the plaintiff failed to "identify, much less establish, any harm or injury produced by the corrective performance review," and it "did not result in any economic loss to [him] or any change to the terms of his employment").

Nor has Allen explained how Internal Affairs's conclusion not to sustain her EEO complaint against Younger caused a significant change in her responsibilities or benefits at work. Finally, Allen has failed to put forth evidence of any adverse employment action taken against her husband for supporting her in this lawsuit.[14]  That leaves four adverse employment actions: (1) the denial of training opportunities in A&I; (2) Allen's placement on a rotating schedule between JET and A&I; (3) her return to JET full time; and (4) her detail to Tow Squad.

Defendants argue that Allen cannot make out a prima facie case because she has failed to show that any adverse employment action was taken under circumstances giving rise to an inference of discrimination.  And, Defendants argue, even if she could make out a prima facie case for disparate treatment, Allen cannot show that Defendants' legitimate, non-discriminatory reasons for taking each adverse action were pretext for discrimination.  (Doc. No. 133 at pp. 11, 13.)  Allen responds that she has stated a prima facie case as to each adverse action and shown

---

[14] For this claim, Allen relies on the allegations in her Second Amended Complaint.  (*See* Doc. No. 49 at ¶¶ 282–86 (alleging that Allen's husband received hostile phone calls from his superiors when he attended her deposition).)  For the reasons discussed above, allegations in a complaint are not *evidence* for purposes of summary judgment.  *See supra* Part I.  And even if we were to consider these allegations, angry, even hostile, phone calls  on their own do not amount to an adverse employment action.

that Defendants' stated justifications are pretext for discrimination.  (Doc. No. 167 at pp. 7–12.)

We address each action in turn.

i.  *Training Opportunities in A&I*

First, Allen argues that for the few weeks she worked with A&I, she was denied training

opportunities that were made available for her white male colleagues.  (Doc. No. 167 at p. 8.)

The City Defendants argue that Allen cannot make out a prima facie case of disparate treatment

on the basis of race or gender because she has not identified similarly situated comparators who

were treated better than her.  (Doc. No. 133 at pp. 12–13.)  We agree.

Allen has put forth no evidence suggesting that she was denied training opportunities that

were made available to similarly situated officers.  To the contrary, during oral argument,

Plaintiff's counsel argued that Allen did not need to put forth evidence of comparators.  (Draft

H'rg. Tr. at 54:10–18 ("The Court: So your position is that you don't need comparators?  Mr.

Bryson:  Correct.  Yes.  We don't need comparators for many reasons . . . .").)  Counsel is

correct that a plaintiff can make out a prima facie case of discrimination without identifying

comparators, so long as she points to some evidence showing that "the adverse job action

occurred under circumstances that give rise to an inference of discrimination."  *Wallace*, 214 F.

App'x at 144–45.  Allen has not, however, identified any evidence related to her *training* that

gives rise to such an inference.

Instead, the evidence shows that Allen received the same training as all new transfers to

A&I through onboarding, observing other analysts, and attending formal trainings (such as facial

recognition training) as they became available.  (*See* MacDonald Depo. at 28:2–14, 31:8–20

(explaining that the initial training for all new analysts is "on-the-job training" with "additional

training as it became available").)  In light of this evidence, we cannot find that Allen has met

her burden at the prima facie stage. *Cf. Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479

38

(E.D. Pa. 2013) ("[A] plaintiff may come forward with evidence of circumstances giving rise to an inference of intentional discrimination by showing that, for example, similarly situated individuals outside of the protected class were treated differently." (quotation marks omitted)); *Frazier v. City of Philadelphia*, 441 F. Supp. 3d 76, 92 (E.D. Pa. 2020) ("Vann specifically identifies at least four meetings from [sic] which other supervisors attended but she was excluded . . . . [A] reasonable jury could find the exclusions significantly impaired Vann's ability to do her job within the Bureau.").

### ii.      Rotating Schedule

Next, Allen argues that she was subjected to discriminatory treatment because she was the only employee that was "flip flopping" between two units, and her white male colleagues were not given a similar rotating schedule.  The record evidence confirms that Allen was asked to rotate between A&I and JET and that her white, male colleagues were not given a rotating schedule, but instead, were assigned to A&I full time.  (Indeed, it appears no one else in the Bureau, regardless of gender or race, was given a rotating schedule.)  Although Allen has not identified comparators with specificity, we assume for the sake of argument that this is sufficient to state a prima facie case of race and gender disparate treatment.

Defendants respond that Allen was placed on a rotating schedule as an accommodation because she had just had a baby, and her husband was already working a rotating schedule in his position with the Police Department.  Rotating between A&I and JET meant Allen consistently worked dayshifts.  It also meant she could begin training for the analyst position that she sought, while allowing the A&I unit to judge her skills.  (*See* MacDonald Depo. at 36:14–37:19; McCarrick Depo. at 25:18–27:11; *see also* Williford Depo. at 30:16–31:2.)

Allen's only response to the City's justification is that Defendants admit such an arrangement was "unheard of" in the PPD.  But it is not enough to show that an assignment was

"unique"; instead, Allen must point to evidence that suggests "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones*, 198 F.3d at 410–11. Although Allen has demonstrated that the Department struggled to execute her rotating schedule, she has not shown that discriminatory animus motivated her supervisors' decision to allow her to switch between the two units. *See Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). At most, Allen has provided evidence that Williford, on one occasion, theorized that McCarrick caused the scheduling problems because of Allen's race and gender (*see* Allen 2020 Depo. at 34:2–36), but stray remarks are not enough to establish pretext. *See Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 196 (3d Cir. 2014) ("The evidence actually produced amounts to a collection of stray remarks and unconnected, coincidental circumstances, and related speculation and conjecture. Even in sum, and considered in the light most favorable to [the plaintiff], such evidence does not a causal connection make." (cleaned up)).

### iii.        *Returning to JET Full Time*

Next, we find that Allen has failed to put forth a prima facie case of gender-based disparate treatment[15] as to her return to JET. We note once again that Allen has not only failed to identify any comparators (beyond a vague assertion that her white male colleagues received

---

[15] Allen has neither argued nor pointed to any evidence that suggests her return to JET was based on her race, and therefore, we grant summary judgment to the City Defendants to the extent this claim is premised on a theory of race discrimination. *See Daniels*, 982 F. Supp. 2d at 478 ("The defendants note that [the plaintiff] has not put forward evidence to support the elements of a First Amendment or Fourteenth Amendment violation on the part of any defendant. [The plaintiff] is silent on these arguments, and she does not defend her First and Fourteenth Amendment claims from summary judgment. We will therefore grant summary judgment in favor of all individual defendants on count nine.").

better treatment), but goes so far as to argue that she does not need to show comparators because she can rely on Defendants' failure to follow policies and procedures when returning her to JET. (*See* Draft H'rg. Tr. at 54:10–18 ("The Court:  So your position is that you don't need comparators?  [Plaintiff's counsel]:  Correct.  Yes.  We don't need comparators for many reasons; one, failure to follow policy and procedures . . . .").)

The Police Department has a practice of temporarily relocating the alleged aggressor while an internal investigation is ongoing.  (*See* Coulter Depo. at 55:1–17 ("Normally, you would go into the complaint and remove the possible offender."); McCarrick Depo. at 43:10–44:12 ("[I]t is pretty much standard policy that you never move a complainant in regard to one of these matters, as it could be deemed as it's being punitive.").)  Despite this practice, when Allen submitted her complaint against Younger, she was returned to her position in JET with its rotating shifts, while Younger, the aggressor, was allowed to remain an analyst at A&I.  Allen argues that this failure to follow procedures gives rise to an inference of gender discrimination, sufficient to overcome the prima facie hurdle.  But multiple federal courts, including the Third Circuit, have explained that the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision are pretextual.'"  *Maull v. Division of State Police*, 39 F. App'x 769, 774 (3d Cir. 2002) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)) ("We agree with the District Court that simply pointing to violations is inadequate without 'evidence that white State Troopers were treated differently by Defendants with respect to these policies.'" (citation omitted)); *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001) (same); *see also Greene v. U.S. Dep't of Veterans Affairs*, 605 F. App'x 501, 507 (6th Cir. 2015) ("An

41

employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." (quotation marks omitted)); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993) ("Proof that an employer did not follow correct or standard procedures in the termination of an employee may well serve as the basis for a wrongful discharge action under state law. . . .  A discharge may well be unfair or even unlawful yet not be evidence of age bias under the ADEA.").

Without any additional argument, we cannot find that Allen has satisfied her burden at the prima facie stage.

### iv.        *Detail to Police Tow Squad*

Last, Allen points to her detail to Police Tow Squad in July 2019.  But Allen again fails to identify any comparators or otherwise point to evidence that suggests she was detailed under circumstances giving rise to an inference of intentional discrimination.  *Jones*, 198 F.3d at 410–11; *see also Wallace*, 214 F. App'x at 144–45 (framing the fourth element as requiring evidence that "either similarly-situated non-members of the protected class were treated more favorably, or the adverse job action occurred under circumstances that give rise to an inference of discrimination").

\* \* \*

In sum, we grant summary judgment in favor of the City Defendants on Allen's claims for disparate treatment based on race and gender.

b.       **Claims Based on Pregnancy Discrimination[16]**

Allen also argues that she was subject to disparate treatment when Defendants denied her

nursing accommodations.  (Doc. No. 167 at p. 7.)  This argument is, in essence, a disparate

treatment claim for the denial of an accommodation in violation of the Pregnancy Discrimination

Act ("PDA").

"[A]n individual pregnant worker who seeks to show disparate treatment through indirect

evidence may do so through application of the *McDonnell Douglas* framework."  *Young v.*

*United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353 (2015).  "Thus, a plaintiff alleging that the

denial of an accommodation constituted disparate treatment . . . may make out a prima facie case

by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought

accommodation, that the employer did not accommodate her, and that the employer did

accommodate others 'similarly situated in their ability or inability to work.'"  *Id.* at 1354; *see*

*also Dajti v. Penn Cmty. Bank*, Civil Action No. 20-1483, 2021 WL 1209835, at *4 (E.D. Pa.

Mar. 31, 2021) (applying this test at the motion to dismiss stage).  "The employer may then seek

to justify its refusal to accommodate the plaintiff by relying on legitimate, nondiscriminatory

reasons for denying her accommodation."  *Young*, 135 S. Ct. at 1354.  If the employer puts forth

a legitimate, nondiscriminatory reason for the denial, "the plaintiff may in turn show that the

employer's proffered reasons are in fact pretextual."  *Id.*

Here, Allen has satisfied the first three prongs of the prima facie case.  As a breastfeeding

mother, she belonged to a protected class under the PDA.  *Cf. Maldonado-Torres v. Customized*

*Distrib. Servs., Inc.*, Civil Action No. 19-0400, 2020 WL 5645686, at *7 (E.D. Pa. Sept. 21,

---

[16] "Courts analyze PDA claims as sex discrimination under Title VII."  *Brown v. Aria Health*,
Civil Action No. 17-1827, 2019 WL 1745653, at *5 (E.D. Pa. Apr. 17, 2019).

2020) ("First, the parties do not dispute that, as a pregnant woman, Plaintiff satisfies the first element of the prima facie test.").  Allen requested accommodations for her need to pump while at work, asking her supervisors at JET and NSU for a designated lactation space and/or the opportunity to go home to pump while out in the field.  And Allen testified that the provided lactation spaces were insufficient for her purposes — being either too cold or subject to frequent interruption — and that Sergeant Allen limited her ability to drive home to pump.

Allen has not, however, put forth any evidence under the fourth element — proof that other employees "similarly situated in their ability or inability to work" were granted accommodations.  As to this element, *Young* provides a helpful example.  In *Young*, the plaintiff was working as a part time driver for United Parcel Service ("UPS"), when she learned that she was pregnant.  135 S. Ct. at 1346.  Her doctor recommended that she not "lift greater than 20 pounds for the first 20 weeks of pregnancy and no greater than 10 pounds thereafter," and the plaintiff shared this restriction with UPS.  *Id.* (quotation marks omitted).  Because UPS required its drivers to be able to lift packages weighing as much as 70 pounds, UPS's occupational health manger told the plaintiff that "she could not return to work during her pregnancy."  *Id.*  The plaintiff brought a claim for disparate treatment against UPS, and at summary judgment, put forth "that UPS had accommodated several [non-pregnant] individuals when they suffered disabilities" that resulted in lifting restrictions similar to hers, including individuals with foot, knee, and arm injuries.  *Id.* at 1347. The Supreme Court held that given this evidence, there was "a genuine dispute as to whether UPS provided more favorable treatment to at least some employees whose situation cannot reasonably be distinguished from [the plaintiff's]," and thus, the plaintiff put forth sufficient evidence to satisfy the fourth element of her prima facie case.  *Id.* at 1355.

Unlike the plaintiff in *Young*, Allen has not identified any employees who were "similarly situated in their ability or inability to work" and accommodated by the Department. Allen has not, for example, shown that non-breastfeeding officers were allowed to drive home in the middle of a shift to accommodate a medical condition.  Without that comparator evidence, we cannot find that Allen has satisfied her burden at the prima facie stage.  *See Gilbert v. Kroger Co.*, Civil Action No. 19-0496, 2020 WL 2549700, at *6 (W.D. La. May 19, 2020) ("Gilbert's opposition brief does not identify a comparator who did receive an accommodation. Without a comparator, Gilbert cannot establish a prima facie case of discrimination based on an alleged failure to provide a reasonable accommodation. Accordingly, Gilbert's discrimination claim based on the lack of a reasonable accommodation must be dismissed."); *Everett v. Grady Mem. Hosp. Corp.*, Civil Action File No. 1:15-CV-173-SCJ, 2016 WL 9651268, at *30 (N.D. Ga. May 12, 2016) ("Here, the Court finds that Everett cannot demonstrate a prima facie case because she has not proffered any similar non-pregnant employees similar in their ability or inability to work whom Grady did accommodate."); *Lawson v. City of Pleasant Grove*, Case No. 2:14-cv-0536-JEO, 2016 WL 2338560, at *10 (N.D. Ala. Feb. 16, 2016) ("And because Lawson does not argue in her summary judgment materials that the evidence supports that the City gave any other similarly situated, non-pregnant employee a light duty assignment, she fails to make out a prima facie case under the four-element *McDonnell Douglas* formulation."); *cf. Legg v. Ulster County*, 820 F.3d 67, 74 (2d Cir. 2016) ("Legg has, however, established a prima facie case of discrimination under *Young*. She sought a light duty accommodation while pregnant. The County did not accommodate her. And, as a matter of policy, the County provided light duty accommodations to other employees who were similar in their ability or inability to work, namely, those who were unable to perform non-light-duty tasks as a result of injuries incurred

on-duty."); *Gonzalez v. Marriott Int'l, Inc.*, 142 F. Supp. 3d 961, 978 (C.D. Cal. 2015) ("[The plaintiff] further alleges not only that other lactating employees were allowed breaks but that defendants 'accommodate other employees with disabilities or medical conditions that require reasonable accommodations, including breaks, during the workday.'"); *Poague v. Huntsville Wholesale Furniture*, 7:18-cv-0005-LSC, 2020 WL 6363983, at *10 (N.D. Ala. Oct. 29, 2020) ("As to element four, HWF accommodated employees similar to Poague in their inability to work . . . .  HWF accommodated three non-pregnant employees who, like Poague, could not work full-time hours or hit full-time sales goals.").

In addition to failing to identify comparators, Allen has also failed to identify any non-comparator evidence that raises a reasonable inference of intentional discrimination."  To the contrary, the evidence shows that each time Allen complained about her lactation accommodations, her supervisors worked diligently to provide a solution.  When Allen complained about using the locker room, Tamika Allen found her a new location within twenty-four hours.  She also allowed Allen to continue to go home to pump, so long as Allen used her personal car to do so, took leave time, and checked in and out with Police Radio.  Similarly, when Allen moved to NSU, Gibbons consistently worked to accommodate her needs and addressed each of her concerns as they were brought to his attention.

Although the rooms provided were not Allen's preferred method of accommodation, federal courts have consistently held that Title VII and the PDA do *not* require special accommodations for breastfeeding mothers.  *See Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1260 (11th Cir. 2017) ("The line between discrimination and accommodation is a fine one. Taking adverse actions based on woman's breastfeeding is prohibited by the PDA but employers are not required to give special accommodations to breastfeeding mothers."); *EEOC v. Houston*

46

*Funding II, Ltd.*, 717 F.3d 425, 429 n.6 (5th Cir. 2013) ("The issue here is not whether Venters was entitled to special accommodations — at the time, she was not entitled to special accommodations under Title VII — but, rather, whether Houston Funding took an adverse employment action against her, namely discharging her, because she was lactating and expressing breast milk."); *Lawson*, 2016 WL 2338560, at *10 ("But again, and more to the point, even if a light duty job could have been created or similarly made 'available' in some sense, pregnant employees are not entitled to special accommodations generally speaking, so the City would be liable under the PDA for denying Lawson's request for light duty *only if* the City would have granted such an accommodation to a similarly situated non-pregnant employee.").

For example, in *Hicks v. City of Tuscaloosa*, a breastfeeding mother requested "a place to breastfeed her child or to express milk for use later."  Case No. 7:13-cv-02063-TMP, 2015 WL 6123209, at *21 (N.D. Ala. Oct. 19, 2015).  Her supervisors suggested that she use the female locker room to do so and refused her request to use the records room instead.  *Id.*  The locker room was not an FLSA-compliant lactation room, and the plaintiff was frequently interrupted while pumping there.  *Id.*  The United States District Court for the Northern District of Alabama found that this evidence failed to "establish any discrimination under the PDA with respect to breastfeeding or lactating" because the "refusal to provide a special accommodation not made available to other employees is not actionable under the PDA, and there is no evidence that plaintiff was denied any facility or opportunity made available to other WANS employees."  *Id.*

Likewise, in *Dudhi v. Temple Health Oaks Lung Center*, the plaintiff requested a private area in which to pump and break time to do so.  Civil Action No. 18-3514, 2019 WL 426145, at *6 (E.D. Pa. Feb. 4, 2019).  Her employer refused, and she ultimately had to "cut short her lunch breaks, . . . pump in her car, and be constantly interrupted by other employees."  *Id.*  However,

because the plaintiff failed to "show that any other employee received an accommodation," the court found that she could not state a claim for failure to accommodate. *Id.*

In sum, Allen has not made out a prima facie case of disparate treatment based on pregnancy discrimination, and we grant summary judgment to Defendants to the extent Allen's disparate treatment claims are based on Defendants' failure to provide Allen's preferred nursing accommodations.

\* \* \*

For the reasons discussed above, we grant summary judgment in favor of the City on Allen's disparate treatment claims in Counts I, XVII, and XX.  And we grant summary judgment in favor of the individual City Defendants on Allen's claims in Counts VIII and XI.

### 2.      Counts III, X, XVIII, XXI:  Retaliation

The *McDonnell Douglas* burden shifting framework also governs Allen's retaliation claims under Title VII, § 1981, the PHRA, and the PFPO.  *See Tomaszewski*, 460 F. Supp. 3d at 593; *Abdul-Latif v. City of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014).

To state a prima facie case for retaliation, Allen must show:  "(1) that [s]he engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) [ ] that there was a causal connection between the employee's protected activity and the employer's adverse action." *Miller v. Del. Dep't of Probation & Parole*, 158 F. Supp. 2d 406, 412 (D. Del. 2001); *Abdul-Latif*, 990 F. Supp. 2d at 529.  The Third Circuit recognizes two tests for determining whether a plaintiff has alleged a causal connection between the protected activity and the alleged retaliation.  *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). First, when "the temporal proximity between the protected activity and adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and

defeat summary judgment." *Id.* Second, when the temporal proximity is not "unusually suggestive," the court asks whether the factual allegations, "looked at as a whole, may suffice to raise the inference." *Id.* (quotation marks omitted). Among other things, we must consider whether the plaintiff has alleged "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons . . . , or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

Allen argues that there are genuine issues of material fact as to whether the City returned her to JET because she filed an internal complaint against Younger and as to whether the City detailed her to Police Tow Squad because she filed her complaint in this case. We address each assignment in turn.

### a.      Return to JET Full Time

Beginning with Allen's return to JET full time, we find that Allen's internal complaint against Younger constituted protected activity, *see Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 599 (E.D. Pa. 2017) (viewing formal and informal complaints as protected activities), and that her return to JET could be considered an adverse employment action because its rotating schedule and less desirable assignments could dissuade a reasonable worker from making a charge of discrimination, *see Greer*, 590 F. App'x at 175 ("The anti-retaliation provision of Title VII covers only those employer actions that are 'materially adverse to a reasonable employee or job applicant' and would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *Daniels*, 982 F. Supp. 2d at 482 ("As to the second element, 'adverse action' in the retaliation context encompasses a larger class of circumstances than the narrower 'adverse employment action' concept in substantive discrimination case.").

We also find sufficient causal connection between her complaint and her return to JET. McCarrick and Tamika Allen consistently stated that Allen was returning to JET full time *because of her complaints against Younger*. (*See* McCarrick Depo. at 39:9–18 ("[W]hen given the guidance that she could be moved back, she was moved back immediately to alleviate any further exposure or work, potential work interactions between herself and Curt Younger."); T. Allen Depo. at 59:16–61:10 (testifying that she told Allen on February 4th that her seating location would be changing from the A&I side to the CIU side because Allen "had to be kept separate from another officer").) And although more than three weeks passed between when Allen filed her internal complaint and when she returned to JET, we cannot find this delay dispositive because McCarrick testified that he would have immediately returned Allen to JET but was waiting for clearance from Internal Affairs. (McCarrick Depo. at 42:9–44:12 ("Once again, the decision would have been made immediately; however, because there was an active investigation, we had to await clearance from our EEO unit, Captain Abrams.").) Taken together, we find this evidence establishes the requisite causal connection.

Defendants argue that McCarrick had a legitimate nonretaliatory reason for returning Allen to JET, i.e., JET was down two officers, which created a safety problem in the unit. (Doc. No. 133 at pp. 16–17.) But as we discussed above and as Allen notes in her brief, the evidence suggests McCarrick actually returned Allen to JET to separate her from Younger. (*See* McCarrick Depo. at 39:9–18 ("[W]hen given the guidance that she could be moved back, she was moved back immediately to alleviate any further exposure or work, potential work interactions between herself and Curt Younger."), 42:9–44:12 ("Once again, the decision would have been made immediately; however, because there was an active investigation, we had to

await clearance from our EEO unit, Captain Abrams.").)  Given this testimony, we find that Allen has identified significant inconsistencies in the City's stated reasoning.

In light of this evidence, we must deny the City Defendants' motion for summary judgment as to Allen's gender-based[17] retaliation claims against the City under Title VII (III), PHRA (XVIII), and PFPO (XXI).  In addition, and as discussed above, McCarrick was the only individual Defendant personally involved in Allen's return to JET.  Therefore, we deny summary judgment as to him on Allen's PHRA (XVIII) and PFPO (XXI) retaliation claims.  We grant summary judgment on these claims in favor of the remaining individual Defendants.

### b.       Detail to Police Tow Squad

Next, we turn to Allen's detail to Police Tow Squad.  Like her internal complaint, Allen's federal complaint constituted a protected activity in that it raised, among other things, claims for race and gender discrimination.  Allen's detail to Police Tow Squad — which required a schedule change from consistent dayshifts to a less desirable, rotating schedule of dayshifts and nightshifts — also constitutes an adverse employment action.  *See Greer*, 590 F. App'x at 175; *Rosh v. Gold Standard Café at Penn, Inc.*, Civil Action No. 16-1676,  2016 WL 7375014, at *6 (E.D. Pa. Dec. 19, 2016) (finding that the plaintiff suffered an adverse action when a co-owner of

---

[17] Allen also brings claims for race-based retaliation under § 1981 (Count X).  To state a prima facie case of retaliation under § 1981, the plaintiff must put forth evidence of an underlying § 1981 violation.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010); *see also Castleberry*, 863 F.3d at 267 ("In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation.  In doing so, the plaintiff must have acted under a good faith, reasonable belief that a violation existed." (cleaned up)).  Here, however, Allen complained to the City about Younger's *sexually* harassing conduct and did not, in her EEO complaint, report her belief that she was treated negatively because of her race.  Because this protected activity was not founded on a reasonable belief that her § 1981 rights were violated, her § 1981 retaliation claim fails as to this adverse employment action.  *See Daniels*, 982 F. Supp. 2d at 484 ("[The plaintiff] lodged no complaint of racism at [the school], official or unofficial, until October 28, 2010, over four months after she had left the school.  Daniels therefore has not met her burden of bringing forward any evidence of race-related protective activities for the purposes of establishing a *prima facie* retaliation case against the School District and [her supervisor] for her time at [the school].").

the business stopped talking to her and the other co-owner reduced her hours of work after she told them that she was being sexually harassed by her coworkers because the owners' actions "would certainly dissuade a reasonable person from reporting harassment in the future"). However, we cannot find that Allen has demonstrated a causal connection between her protected activity and adverse employment action.

Typically, a temporal proximity of less than 24 hours would be sufficient on its own to suggest a causal connection.[18]  *See EEOC v. Fed. Express Corp.*, 537 F. Supp. 2d 700, 712 (M.D. Pa. 2005) (finding evidence supported the jury's verdict in favor of a female employee on her retaliation claims where she was given a different work assignment at a lower wage shortly after she complained to management about coworker harassment).  But although less than a day passed between the filing of the complaint in this case and Allen's reassignment, there is no evidence that the anyone involved in reassigning her was aware that the complaint had been filed.

Safety Officer O'Neill testified that a supervisor at NSU — "Lieutenant Waters or one of the sergeants" — told her that there "were some personality conflicts" and asked her to "find [Allen] a different assignment."  (O'Neill Depo. at 25:14–27:2.)  Once Deputy Commissioner Wilson approved the move, O'Neill found Allen another spot on the restricted duty list.  (*Id.*)

---

[18] Defendants, relying on O'Neill's testimony, argue that Allen's transfer to Tow Squad was initiated two days before Allen filed her complaint in this action.  (*See* Doc. No. 133 at p. 17; Doc. No. 134 at ¶¶ 278–79.)  But this argument misstates the record:

> Q: So this occurred on July 30th of 2019.  Did you receive a call from the NSU supervisor that day?  Did you transfer or did you — was Ms. Allen moved to Tow Squad the same day that you got the call from the supervisor saying there was a personality conflict.
>
> Ms. Morris:  Objection
>
> [O'Neill]:  *I don't recall* if it was the same day or a day or two later.

(O'Neill Depo. at 28:17–29:1 (emphasis added).)

O'Neill testified that *she* chose Tow Squad because she believed it "would be a good spot for [Allen]" as "it's low stress, it's nice and quiet, you just have to answer the phone." (*Id.*)  As for the change in hours, O'Neill explained that she went "out of [her] way to make sure" that Allen was assigned to "the same group that she was permanently assigned to in her regular full-duty unit." (*Id.*)  Although this resulted in a less desirable schedule for Allen, there is no indication that O'Neill knew that at the time.

Because O'Neill decided to place Allen in Tow Squad and there is no evidence that O'Neill knew the complaint had been filed, Allen has failed to demonstrate a causal connection, and we grant summary judgment as to this adverse action.  *See Bailey v. Commerce Nat'l Intelligence Servs., Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008) ("[H]ere the District Court correctly entered summary judgment in favor of Commerce because it was Corcoran's decision to fire Bailey, and she was unaware of the protected action.").

\* \* \*

For those reasons, we deny summary judgment as against the City and McCarrick on Allen's gender-based retaliation claims to the extent they arise out of Allen's return to her full-time position in JET.  Otherwise, summary judgment is granted as to all Defendants.

### 3.      Counts II, IX, XII, XVII, XX:  Hostile Work Environment

Next, Allen claims that the City and the individual City Defendants created a sexually hostile work environment in violation of Title VII (Count II), § 1983 (Count XII), the PHRA (Count XVII), and the PFPO (Count XX).[19]  We use the same standard for all four claims.  *See*

---

[19] Allen also brings a claim for hostile work environment based on race against the City Defendants under § 1981 (Count IX).  The City Defendants argue that they are entitled to summary judgment on these claims because there is no evidence that the City or any individual defendant intentionally discriminated against Allen on the basis of her race, and to the extent Allen can demonstrate intentional discrimination, that discrimination was not severe or pervasive.  (Doc. No. 133 at pp. 18–19.)  The City also argues that Allen's race-based hostile work environment claim fails as against it because the

*Cruz-Smith v. Sinclair*, Civil Action No. 10–3609, 2011 WL 3652462, at *4 n.9 (E.D. Pa. Aug. 19, 2011) ("Hostile work environment claims are subject to the same standards under Title VII, the PHRA, and the Equal Protection Clause.").

### a.   Legal Standard

To state a claim for hostile work environment, a plaintiff must show:  (1) she "suffered intentional discrimination" because of her sex; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of respondeat superior liability, meaning the employer is responsible." *Castleberry*, 863 F.3d at 26; *see also Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 411 (D.N.J. May 12, 2003) ("Reduced to its most basic components, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender- or race-based harassment which was 'severe or pervasive' enough to create a working environment which is both subjectively and objectively abusive or hostile to female or African American employees.").

"The first four elements of this claim establish that a hostile work environment existed." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  In determining whether harassment rises to the level of an actionable hostile work environment, we must consider the "totality of the circumstances . . . including the frequency of the discriminatory

---

City took reasonable steps to end any race-based harassment once it was reported to the City.  (*Id.* at pp. 19–20.)  Allen does not respond to these arguments and focuses instead on her sex-based hostile work environment claim.  (*See* Doc. No. 167 at pp. 12 ("[T]here are genuine issues of material fact regarding whether Defendants subjected Plaintiffs to a *sexually* hostile work environment."), 14 ("Plaintiffs have demonstrated that they were subject to a *sexually* hostile work environment.") (emphases added).)  Because Allen has not responded to these arguments, and we agree with the City Defendants that Allen cannot demonstrate severe or pervasive racial discrimination on the part of the City or any individual Defendant, we grant summary judgment in favor of Defendants as to Allen's race-based claims for hostile work environment.

conduct, its severity, whether it [was] physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interfere[d] with an employee's work performance." *Harris v. SmithKline Beecham*, 27 F. Supp. 2d 569, 577 (E.D. Pa. 1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Davis v. City of Newark*, 285 F. App'x 899, 902 (3d Cir. 2008) (same).  In addition, "the advent of more sophisticated and subtle forms of discrimination requires that [a court] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas*, 269 F.3d at 261–62.

The fifth element "establishes the basis on which to hold the employer liable." *Huston*, 568 F.3d at 104.  "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." *Id.*  "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.*

### b.      Analysis

The record shows that Allen "suffered intentional discrimination" because of her sex.  In the couple months that she worked with A&I, Younger made multiple offensive comments about Allen's body, calling her a "sexy motherfucker," describing her breasts as "big," telling her that she "lost all of [her] ass after having the baby," and saying that if she "gained 15 more pounds [she] would be on point."  He also asked Allen whether she found it weird for her son to "suck on her nipples."  In addition to these comments, Younger grabbed Allen's waist during the hugging portion of a prayer circle they both attended.  Allen also testified that Younger made violent comments about how he had previously wanted to "handle" her husband and about getting into a fight with his daughter's girlfriend.  Last, we note that in addition to Younger's

conduct, Allen has also put forth evidence that McCarrick retaliated against her for complaining about Younger's conduct.

Having found that Allen was subjected to intentional sex discrimination, we must next determine whether the discrimination created a hostile work environment. "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Here, although Younger's conduct was certainly crude and inappropriate, we cannot find that Allen's workplace was "permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of [Allen's] employment and create an abusive working environment." *Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019) (quoting *Morgan*, 536 U.S. at 116). Notably, Allen testified that Younger touched her on only one occasion, placing his hands on her waist during the portion of the prayer circle when all participants hugged each other, and she conceded that he immediately let go when she asked him to stop. *Contra Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 214–15 (3d Cir. 2017) (finding supervisor's sexual harassment of subordinate could be considered severe or pervasive where he made sexually charged comments toward her, grabbed her, called her into his office while sitting naked on a chair, attempted to take her shirt off, and showed up uninvited to her house where he pressured her into having sex with him by threatening her job).

Moreover, when we consider Younger's comments, we note that although they were sexual, offensive, and occurred frequently during the two months that Allen worked at A&I,

there is no evidence that Younger explicitly propositioned Allen, and Younger was also the only

City employee who made inappropriate sexual comments to Allen.  This case is, therefore,

distinguishable from those where courts in this Circuit found that repeated harassment over a

short period of time at the hands of multiple supervisors and coworkers gives rise to a hostile

work environment claim.  *Compare Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129,

132–34 (3d Cir. 2011) (finding that a female employee alleged severe or pervasive harassment

where the evidence showed that, for a four-month period, she was subject to comments and

conduct at the hands of multiple coworkers and employees including jokes with sexual overtones

made about her, comments in her presence that had a sexual connotation, comments and rumors

about her that were sexual in nature, berating and insulting remarks directed at her and other

women based on their gender, and rude conduct because of her gender); *Hayes v. Silvers,*

*Langsam & Witzman, P.C.*, 441 F. Supp. 3d 62, 68 (E.D. Pa. 2020) (finding genuine issues of

material fact where the plaintiff claimed she was "regularly harassed and identifies at least *seven*

incidents *within an eight-week period*, as well as regular unwanted touching" at the hands of

multiple supervisors and coworkers), *with Bacone v. Phila. Hous. Auth.*, No. Civ. A. 01-CV-419,

2003 WL 21223822, at *3 (E.D. Pa. 2003) (finding harassment was not severe or pervasive

where a male employee worked periodically with a female coworker, who over a one-month

period, "grabbed his groin," "badgered him about when he was 'going to go home with her,'"

"exposed her breasts to him," and called "him profane names").

For those reasons, we cannot find that Allen was subject to "severe or pervasive" harassment, and we grant summary judgment in favor of all Defendants on her hostile work environment claims (Counts II, IX, XII, XVII, and XX).[20]

### 4.    Counts XIX, XXII:  Aiding and Abetting

Next, Allen brings aiding and abetting claims under the PHRA and PFPO against the individual City Defendants (Counts XIX and XXII).  Defendants argue that they are entitled to summary judgment on these claims because Allen has failed to show that any individual harbored a discriminatory intent, let alone that any individual shared a discriminatory intent with the City.  (Doc. No. 133 at pp. 31–32.)  Before we can determine whether any individual aided and abetted the discriminatory conduct in this case, we must first determine the appropriate legal standard.

### a.    Legal Standard

The PHRA and PFPO prohibit "any person" from:

> aid[ing], abet[ting], incit[ing], or coerc[ing] the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice.

43 Pa. Stat. & Con. Stat. § 955(e); *see also* Phila. Fair Practices Ordinance § 9-1103(1)(h) (making it unlawful for "any person to aid, abet, incite, induce, compel or coerce the doing of any unlawful employment practice . . . .").  In *Failla v. City of Passaic*, the Third Circuit analyzed a nearly identical aiding and abetting provision in New Jersey's Law Against Discrimination ("NJLAD" or "LAD") and concluded that "the New Jersey Supreme Court would

---

[20] Because we find that Allen has failed to establish a genuine issue of material fact as to whether she was subject to "severe or pervasive" harassment, we need not address whether she has satisfied the remaining elements of a hostile work environment claim.

follow the Restatement of Torts to define aiding and abetting liability" under that provision. 146
F.3d 149, 157–58 (3d Cir. 1998). In reaching this conclusion, the appellate court began by
reviewing and rejecting a District of New Jersey case, *Tyson v. CIGNA Corp.*, which held that
the NJLAD encompasses a *criminal* standard for aiding and abetting. *See Tyson v. CIGNA
Corp.*, 918 F. Supp. 836, 849 (D.N.J. 1996) ("Because *Baliko*," an opinion from an intermediate
New Jersey state court, "analogizes explicitly to the criminal context, we believe a comparable
finding of intent is required in order to find accomplice liability [under the NJLAD]. Thus, in
order to aid or abet another to commit an unlawful act, it is necessary that the defendant wilfully
[sic] and knowingly associate himself in some way with the unlawful act, and that he wilfully
[sic] and knowingly seek by some act to help make the unlawful act succeed."). The Third
Circuit disagreed with *Tyson*'s analysis, noting that a later New Jersey Supreme Court decision
had refused to apply a *criminal* standard of shared intent to a *civil* claim for aiding and abetting
liability. *See Failla*, 146 F.3d at 157–59 (explaining that "in *Tyson*, the court found that the
defendant's supervisory status satisfied the element of shared intent that it thought necessary for
aiding and abetting liability," but concluding that "the issue of shared intent is irrelevant under
the LAD" and the proper standard is that outlined in § 876(b) of the Restatement); *see also
Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 126 (3d Cir. 1999) ("[W]e have rejected a
requirement that an individual and an employer share the same discriminatory intent in order to
find aiding and abetting liability . . . .").

We find that Pennsylvania courts would similarly apply the standard for aiding and
abetting outlined in the Restatement § 876(b). In reaching this conclusion, we acknowledge that
in *Dici v. Pennsylvania* — a Third Circuit opinion issued before *Failla* — the court referenced
*Tyson*'s shared intent analysis in the context of an aiding and abetting claim under the PHRA.

*See* 91 F.3d 542, 553 (3d Cir. 1996) (finding that a supervisor may be guilty of aiding and abetting an employer if the supervisor knew about the alleged harassment and failed to take prompt remedial action).[21]  Nevertheless, we find that the same reasoning that animated the Third Circuit's decision in *Failla* applies in the context of the PHRA.  *See Failla*, 146 F.3d at 158 ("The [district] court's [jury] instruction, requiring only knowledge [by the supervisor] of Failla's circumstances of having a handicap and being in need of an accommodation, combined with [the supervisor's] inaction, falls short of th[e correct aiding and abetting] standard [because t]he court did not advise the jury that [the supervisor] could be liable as an aider and abettor *only* if he knew the failure to accommodate Failla's handicap was a breach of his employer's duty and *if his inaction actually assisted or encouraged the unlawful act*." (emphases added)).

First, the aiding and abetting provisions in the PHRA and NJLAD use nearly identical language, suggesting that the two statutes may be interpreted coextensively.  Indeed, the *Dici* court relied on *Tyson because* the language of the two statutes was "nearly identical."  *Dici*, 91 F.3d at 553.  And other courts interpreting similar provisions in other antidiscrimination statutes have rejected *Tyson*'s reasoning and followed *Failla* instead.  *See Matthews v. Eichorn Motors, Inc.*, 800 N.W.2d 823, 830 (Minn. Ct. App. 2011) (discussing *Tyson*, *Failla*, and *Dici* and holding that "[t]o the extent that the criminal and civil standards differ" under Minnesota law, "the legal standard established in the Restatement (Second) of Torts should govern aiding-and-

---

[21] Frequently, federal district courts applying Pennsylvania law have relied on *Dici* and *Tyson* when stating the standard for aiding and abetting liability under the PHRA.  *See, e.g.*, *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." (citing *Dici*, 91 F.3d at 552–53 and *Tyson*, 918 F. Supp. at 841)); *D'Altilio v. Dover Twp.*, Civil Action No. 1:06-CV-1931, 2009 WL 2948524, at *12 (M.D. Pa. Sept. 14, 2009) ("Case law from the Third Circuit explains that an individual can be liable under § 955(e) . . . for 'refusing to take prompt remedial action against any discrimination suffered by' and employee." (quoting *Dici*, 91 F.3d at 552–53)).

abetting claims under the [Minnesota Human Rights Act]"); *see also, e.g.*, *Larry v. Marion Cnty Coal Co.*, 302 F. Supp. 3d 763, 777 (N.D. W.V. 2018) ("Based on the consistent application by other courts of the Restatement (Second) § 876(b) to aiding-and-abetting claims under similar statutes, as well as West Virginia's own application of the standard in other civil causes of action, this Court is persuaded that West Virginia would apply § 876(b) of the Restatement (Second) of Torts when a construing a claim for aiding and abetting under the [Human Rights Act]."); *Lovell v. United Airlines, Inc.*, No. CIV. 09-00146 ACK-LE, 2009 WL 3172729, at *3–4 (D. Hi. 2009) (finding that § 876(b) governs whether "a person aids and abets an unlawful discriminatory practice" under Hawaii law); *Ellison v. Plumbers & Steam Fitters Union Local 375*, 118 P.3d 1070, 1077–78 (Alaska 2005) (applying § 876(b) to "aiding and abetting discrimination claim" under Alaska statute).

Second, courts in Pennsylvania, like those in New Jersey, have repeatedly relied on § 876 in civil claims for aiding and abetting claims.  *See Linde v. Linde*, 220 A.3d 1119, 1145 (Pa. Super. Ct. 2019) (applying § 876 to claim against company directors for aiding and abetting majority shareholder's breach of his fiduciary duty to a minority shareholder); *HRANEC Sheet Metal, Inc. v. Matlico Pittsburgh, Inc.*, 107 A.3d 114, 120 (Pa. Super. Ct. 2014) (holding that "a concerted tortious conduct claim [under § 876] is a viable cause of action in Pennsylvania"); *Sovereign Bank v. Valentino*, 914 A.2d 415, 427 (Pa. Super. Ct. 2006) ("Based upon the foregoing, we hold that concerted tortious action, as defined in Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law.").

Considering this authority and the Third Circuit's precedential opinion in *Failla*, we find that to make out a PHRA claim for aiding and abetting against an individual employee, the plaintiff must show that the defendant knew about and either substantially assisted or encouraged

the discrimination that the plaintiff experienced.  *Failla*, 146 F.3d 157–58 ("[A]n employee aids

and abets a violation of the LAD when he knowingly gives substantial assistance or

encouragement to the unlawful conduct of his employer."); *Landy v. Fed. Deposit Ins. Corp.*,

486 F.2d 139, 162–63 (3d Cir. 1973) (explaining that § 876(b) outlines three elements "required

for liability:  (1) that an independent wrong exists; (2) that the aider or abettor knows of that

wrong's existence; and (3) that substantial assistance be given in effecting that wrong").

### a.      Analysis

Applying that standard here, we find that McCowan has not shown that Coulter,

MacDonald, McHugh, Conway, Williford, O'Brien, Gibbons, or Tamika Allen substantially

assisted the retaliation that Allen experienced at the hands of the City and McCarrick.  Therefore,

we grant summary judgment in their favor on McCowan's aiding and abetting claims.

That leaves McCarrick.  As discussed above, there are genuine issues of material fact

about whether the City returned Allen to JET full time in retaliation for her filing an EEO

complaint against Younger.  *See supra* Part IV.A.2.a.  Because McCarrick ordered the

reassignment, there is a question of fact about whether he substantially assisted the City in this

retaliation.  Therefore, we deny summary judgment as to McCarrick on these claims.

### B.      Count XIII:  First Amendment Retaliation

In her final § 1983 count, Allen contends that the City and individual City Defendants

retaliated against her in violation of the Petition Clause of the First Amendment (Count XIII).

That clause protects "the right of the people . . . to petition the Government for a redress of

grievances."  U.S. Const. amend. I.  To make out a claim for retaliation in violation of the First

Amendment, a plaintiff "must show that his conduct was constitutionally protected" and that his

"protected activity was a substantial or motivating factor in the alleged retaliatory action."

*Ambrose v. Twp. of Robinson*, 303 F.3d 488, 492 (3d Cir. 2002).  If she succeeds, then the

"defendant may defeat the plaintiff's case by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (quotation marks omitted). Here, Allen has identified two potentially protected activities: her internal complaint against Younger and her federal complaint in this case. We address each in turn.

"[A] public employee's expressive conduct is constitutionally protected only when . . . [it] address[es] a 'matter of public concern,' which is to be determined by the 'content, form, and context of a given statement, as revealed by the whole record.'" *Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir. 1997) (quoting *Connick*, 461 U.S. at 147–48)). The public concern requirement applies regardless of whether the plaintiff submits a confidential, internal grievance or files a formal court complaint. *See Morgan v. Covington Twp.*, 563 F. App'x 896, 900 (3d Cir. 2014) ("While the Petition Clause protects a public employee's use of the courts, a First Amendment retaliation claim under the Petition Clause will not succeed unless the employee used the courts to address matters of public concern.").

Beginning with Allen's EEO complaint against Younger, the City argues that Allen was not speaking on a matter of public concern when she filed her internal complaint because "garden-variety sexual harassment or day-to-day employment grievances do not implicate matters of public concern." (Doc. No. 133 at pp. 20–21.) We agree. Allen's EEO complaint focused solely on Younger's comments and actions. Younger holds the lowest position in the Police Department's paramilitary hierarchy. He does not hold public office; his comments and actions toward Allen were not witnessed by anyone who holds public office; and he was Allen's coworker at the time he made those comments. Moreover, Allen's complaint was filed internally, triggering a confidential investigation into a matter of employment discrimination. In light of these facts, we find that Allen's EEO complaint was not constitutionally protected

speech. *See Azzaro*, 110 F.3d at 978–79 (finding that a report of "sexual harassment by an assistant to the Commissioner which occurred in the Commissioner's office during the course of an appointment [the plaintiff] had made, in her capacity as the spouse of an employee" was a matter of public concern but declining to express an opinion on "a situation in which a public employee has filed a complaint about an isolated incident of what he or she perceived to be inappropriate conduct on the part of a non-supervisory co-worker," which "would presumably be less important to an evaluation of the performance of the public office involved"); *Cruz-Smith*, 2011 WL 3652462, at *5 ("Because Cruz-Smith does not allege her claims for worker's compensation and Heart and Lung Act benefits sought anything other than an award of individual benefits, the filing of such claims cannot form the basis of a First Amendment retaliation claim.").

The same cannot be said about Allen's federal complaint in this case.  Unlike her internal complaint, Allen's federal complaint was almost 100 pages long and alleged a detailed pattern and practice of race and gender discrimination, retaliation, and hostile work environment, along with numerous statutory and constitutional violations by the City of Philadelphia and eleven Police Department employees, including the Police Commissioner and the Deputy Police Commissioner.  (*See* Doc. No. 1.)  The public import of her complaint is reflected in the press circulating this case.  Given these facts, we find Allen was speaking on a matter of public concern when she filed her complaint on July 29, 2019.  However, for the reasons discussed earlier in this opinion, Allen has failed to identify any evidence suggesting O'Neill knew about Allen's federal complaint or detailed Allen to Police Tow Squad because of that complaint.

Therefore, we grant summary judgment to all Defendants on Allen's First Amendment retaliation claim (Count XIII).

### C.     Counts VI, VII: FMLA Interference and Retaliation

Next, Allen brings claims against the City for interference and retaliation in violation of the FMLA.  The City moves for summary judgment on both claims.  Under the FMLA, "an eligible employee is granted the right to 12 workweeks of leave over any 12-month period, in order to care for a spouse, child, or parent who has a serious health condition, or because a serious health condition makes the employee unable to perform the functions of his or her position, among other things."  *Gibson v. Lafayette Manor, Inc.*, Civil Action No. 05–1082, 2007 WL 951473, at *15 (W.D. Pa. Mar. 27, 2007) (adopting R&R); *see also* 29 U.S.C. § 2612(a)(1)(D); *see also Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  To be eligible for leave under the Act, the employee must have worked at least 1,250 hours for the employer in the preceding 12-month period.  29 U.S.C. § 2611(2)(a)(ii) ("The term 'eligible employee' means an employee who has been employed . . . for at least 1,250 hours of service with such employer during the previous 12-month period.").

The City argues that it could not have interfered with Allen's FMLA rights in February 2019 because at the time, she had not worked 1,250 hours in the preceding 12 months, and therefore, was not eligible to take FMLA leave.  (Doc. No. 133 at pp. 25–26.[22])  In response, Allen states only that "Defendants have . . . failed to demonstrate that Plaintiff Allen was ineligible for FMLA leave."[23]   (Doc. No. 167 at p. 23.)

---

[22] The City incorrectly argues that Allen must have worked 1,250 hours from the time that she returned from FMLA leave in October 2018 to the time that she went out for medical reasons in February 2019.  (*Id.*)  But the Act clearly states that we consider the previous 12 months when measuring the 1,250 hour service requirement.  *See* 29 U.S.C. § 2611(2)(a)(ii) ("The term 'eligible employee' means an employee who has been employed . . . for at least 1,250 hours of service with such employer during the previous 12-month period.").

[23] Notably, Allen's conclusory, one-sentence response, which lacks any citation to the law or the record evidence, is inconsistent with her burden at this stage.  To make out an FMLA interference claim, a plaintiff must show, among other things, that she was entitled to FMLA leave.  The City has argued that there is no evidence to support Allen's position that she was entitled to receive FMLA leave in February

Allen's Daily Attendance Records show that from March 11, 2018 to February 27, 2019, Allen worked 934 hours.  (*See* City Ex. 24 at pp. 409–22.)  Although Defendants have not provided Allen's DARs for February 28, 2018 through March 10, 2018, even if we assume Allen worked every hour of every day during that eleven day period, that amounts to only 264 hours. Adding the two amounts together, Allen worked, at most, 1,198 hours, in the 12 months preceding her absence beginning February 27, 2019.  That is insufficient.  *See Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 207 (7th Cir. 2008) ("Here, the Postal Service submitted Pirant's payroll records as objective evidence of Pirant's hours of service, and Pirant presented no evidence to refute the accuracy of her records.  As the district court noted, the question of Pirant's eligibility under the FMLA does not turn on any issues of credibility or evidence-weighing; it is established (or not) by the total hours of work reflected in her payroll records."); *Ross v. Kraft Foods N. Am., Inc.*, 347 F. Supp. 2d 200, 203 (E.D. Pa. 2004) (granting summary judgment on the plaintiff's FMLA claim because "[e]mployees are only eligible for FMLA protection if they have been employed with their employer for at least 1,250 hours of service within the twelve months prior to their requested leave" and the plaintiff admitted "that he did not work sufficient hours in the twelve months prior to his request").  *Contra Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 506 (3d Cir. 2009) ("Counting all the hours that Erdman worked at home prior to that date, the record indicates that Erdman accumulated 1,282.25 total

---

2019 because her daily attendance reports show that she failed to meet the 1,250 hour requirement.  The burden then shifted to Allen to identify evidence in the record that showed she was entitled to FMLA leave in February 2019.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A]party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  The burden then shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." (quotation marks omitted)).  Allen has not done so, and the Court is neither inclined nor required to pan the extensive record for the proverbial gold that would make out her claim.

hours in the year before her requested leave was scheduled to begin.  Therefore, Erdman was eligible for FMLA leave for purposes of summary judgment.").

Because Allen was not entitled to FMLA leave in February 2019, the City is entitled to summary judgment on Allen's FMLA interference claim (Count VI).[24]  In addition, Allen has failed to put forth evidence that the City retaliated against her for taking FMLA leave in 2018 after the birth of her youngest son.  Therefore, the City is entitled to summary judgment on Allen's FMLA retaliation claim (Count VII) as well.

### D.    FLSA Claims

Next, Defendants move for summary judgment on Allen's failure to accommodate and retaliation claims brought pursuant to the nursing mother provisions of the FLSA (Counts IV and V).

---

[24] The City also argues that Allen was not entitled to FMLA leave in February 2019 because she exhausted her available leave in 2018.  We cannot decide this issue on the record before us. As mentioned above, "an eligible employee is granted the right to 12 workweeks of leave over any 12-month period." *Gibson*, 2007 WL 951473, at *15; *see also* 29 U.S.C. § 2612(a)(1)(D).  Under the Act's implementing regulations, an employer has four options for measuring the 12-month period:  the calendar year, any fixed 12-month period, a "12-month period measured forward from the date of any employee's first FMLA leave," or a "'rolling' 12-month period measured backward from the date an employee uses any FMLA leave." 29 C.F.R. § 825.200.  Therefore, Allen's entitlement to leave in 2019 depends on how the City measures the "12-month period"; a fact about which neither party submitted evidence.

If the City measures its 12-month FMLA period by the calendar year, then Allen was entitled to 12 additional weeks of FMLA leave beginning January 1, 2019, and it is immaterial that she took 12 weeks of leave in 2018.  *See* 29 C.F.R. § 825.200(c) (explaining that if the employer measures its 12-month year by the calendar year or some other fixed 12-month period for all employees, then "an employee would be entitled to up to 12 weeks of FMLA leave at any time in the fixed 12-month period selected," and the employee could, for example, "take 12 weeks of leave at the end of the yar and 12 weeks of leave at the beginning of the following year"); *Weidner v. Unity Health Plans Ins. Corp.*, 606 F. Supp. 2d 949, 955 (W.D. Wis. 2009) ("As the Secretary has recognized, under this method, an employee could effectively be entitled to 24 consecutive weeks of FMLA leave by taking 12 weeks of leave at the end of the year and 12 weeks at the beginning of the follow year.")  If, however, the City measures its 12-month period on a forward- or backward-looking basis, then Allen had exhausted her statutorily allotted 12 weeks and was not entitled to additional FMLA leave when she left work for medical reasons in February 2019.  *See Smith v. Medpointe Healthcare, Inc.*, 338 F. App'x 230, 233 (3d Cir. 2009) ("Under the FMLA, an employee may take a leave of absence of up to twelve workweeks *during any one-year period* because of a serious health condition or the birth of a child . . . ." (emphasis added)).

### 1.    Count IV:  Section  207

First, Defendants state without explanation that they are entitled to summary judgment on Allen's FLSA accommodations claims because "Allen was at all times accommodated within the requirements of the law" and it "is immaterial that Allen chose to express in the DVIC locker room." (Doc. No. 133 at pp. 30–31 (citing 34 paragraphs of the City's statement of undisputed material fact without providing any discussion of those facts).)  In response, Allen cites the relevant statutory sections before parroting word-for-word, the pertinent portion of the Court's opinion on the motions to dismiss.  (Doc. No. 167 at pp. 26–27.)  The Court is almost at a loss to determine which brief is more unhelpful.  And the Court is particularly frustrated with the lackluster and unprofessional response by Plaintiffs' counsel given the Court's previous Order, which reserved ruling on whether a private cause of action even exists under § 207(r).  (*See* Doc. No. 120 at p. 35 ("[W]e decline to rule on this issue definitively until a later stage of litigation.").)

The Court will give the parties one more chance to adequately brief the issues related to this claim.  Should Defendants continue to move for summary judgment and Allen chooses to oppose the motion, counsel should put far more effort into those briefs than they put into their current briefs.  To remove any doubt, the Court expects Defendants to analyze the evidence in light of the relevant case law and *explain* why they are entitled to summary judgment on this claim.  Allen, in turn, is expected to substantively respond to Defendants' arguments, mindful of the concerns raised in the Court's Memorandum ruling on the motions to dismiss.  Should Plaintiffs' counsel continue to plagiarize the Court's previous opinion, the Court will strike those portions of Allen's response.

### 2.    Count V:  Section 215

Defendants also move for summary judgment on Allen's FLSA retaliation claim.

Under § 215(a)(3) of the FLSA, employers are prohibited from retaliating against employees for asserting their rights under the Act.  29 U.S.C. § 215(a)(3).  FLSA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 850 (D.N.J. 2019).

To make out a prima facie case of FLSA retaliation, a plaintiff must show:  "(1) that she engaged in an activity protected by the FLSA; (2) that she suffered adverse action by the employer subsequent to or contemporaneous with such protected activity;[25] and (3) a causal connection exists between the employee's activity and the employer's adverse action."  *Newsome*, 500 F. Supp. 3d at 341 n.5; *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008); *see also Berrada v. Cohen*, 792 F. App'x 158, 164 (3d Cir. 2019) ("An FLSA retaliation claim requires a plaintiff to prove, among other things, that the employer took an adverse action either after or contemporaneous with the employee's protected activity." (quotation marks omitted) (citing *Darveau*, 515 F.3d at 340)).

The City and Allen seem to agree that Allen asserted her rights under the FLSA on two occasions:  (1) when she requested an appropriate lactation space in the DVIC on February 26 and 27, 2019, and (2) when she requested an appropriate lactation space during her first few weeks at NSU in March and April 2019.  (*See* Doc. No. 133 at pp. 24–25 ("Here, Allen asserted her rights under the FLSA on two occasions: On February 26–27, 2019 while working at the

---

[25] The second element of an FLSA retaliation claim is narrower than the same element in a Title VII retaliation claim.  "Under Title VII, the plaintiff need not prove an ultimate adverse employment action, because the scope of Title VII's provision extends beyond employment-related retaliatory acts," and the plaintiff need only show that the adverse action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Newsome v. City of Philadelphia*, 500 F. Supp. 3d 336, 341 n.6. (E.D. Pa. 2020).  By contrast, an FLSA plaintiff must show that the employer took an "adverse employment action," i.e., "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).

DVIC, and over a two-week period following her detail to NSU on March 28, 2019.); Doc. No.

167 at p. 22 ("After Plaintiff Allen requested a private lactation space at the DVIC and

NSU . . . .").)  Allen then recites a litany of "retaliatory conduct" that she claims occurred "in

close proximity" to those requests.[26]  From that litany, three actions arguably rise to the level of

adverse employment actions "after or contemporaneous with the employee's protected activity,"

is:  (1) Defendants' denial of Allen's vacation requests; (2) Tamika Allen's order subjecting

Allen to certain restrictions if she traveled home to pump; and (3) Allen's detail to Police Tow

Squad.  The Court finds Allen has failed to state a prima facie case of retaliation as to any of

these actions.

First, on the night of February 26, 2019, Allen learned that one week of her three-week

vacation request had been denied.  The evidence suggests, however, that Allen learned about that

denial *before* she asked Tamika Allen at the end of the shift for an appropriate lactation space.

And even if Allen could overcome this timing issue, she has not established a causal connection

between the partial denial of her vacation request and her request for a lactation room.  The

undisputed evidence shows that Tamika Allen has no role in vacation requests, which are

"scheduled through the vacation coordinator" and dependent on manpower needs.  (T. Allen

Depo. at 206:6–207:1.)

---

[26] Specifically, Allen argues that around this time:  (1) Allen's milk was stolen from the refrigerator; (2) Tamika Allen frequently walked in on her while she was pumping in the locker room; (3) Allen's vacation requests were denied; (4) Tamika Allen "took away Plaintiff's accommodations"; (5) "Defendant Conway made negative remarks about Plaintiff Allen's accommodations to Plaintiff McCowan"; (6) Allen was forced to go on restrictive duty; (7) Allen was treated with disrespect by her coworkers when she needed to pump; and (8) Allen was detailed to Police Tow Squad.  (Doc. No. 167 at p. 22.)  Most of these actions either occurred before Allen requested an appropriate lactation space or do not rise to the level of a material adverse employment action. *See, e.g.*, *Cohen*, 119 F. Supp. 3d at 852 ("'Under the FLSA, retaliatory conduct rises to the level of a materially adverse action if the conduct alters the employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" (citation omitted)).

Second, Allen argues that Tamika Allen "took away Plaintiff's accommodation" to go home to pump when JET was out on the streets serving warrants. As an initial matter, we note that Tamika Allen never prohibited Allen from travelling home to pump; she merely required Allen to follow certain reasonable conditions, including driving her personal car, reporting her comings and goings to Police Radio, and taking leave. And again, the evidence shows that Tamika Allen told Allen she would have to follow those conditions *before* Allen requested an appropriate lactation space in the DVIC.

Third, Allen argues that she was detailed to Police Tow Squad in retaliation for requesting an appropriate lactation space at NSU. We find Allen has not pointed to facts that establish the requisite causal connection between her requests for an appropriate lactation room and her detail to Tow Squad. Notably, Allen stopped breast pumping in May 2019. Her detail to Police Tow Squad was not initiated until many weeks later, at the end of July 2019. In addition, there is no evidence that Safety Officer O'Neill knew about Allen's requests when she placed Allen in Tow Squad. Therefore, Allen cannot rely on temporal proximity to establish causation, and she has not identified any circumstantial evidence that suggests she was detailed to Tow Squad because of her prior requests.

Because Allen cannot make out a prima facie case of FLSA retaliation, we grant summary judgment to Defendants on this claim (Count V) as well.

### E.    *Remaining State Law Claims*

Next, we analyze Allen's state law claims for: (1) retaliation under Pennsylvania's Whistleblower Law against all Defendants except Younger (Count XIV), (2) intentional infliction of emotional distress against all of the individual Defendants (Count XV), and (3) assault and battery against Younger (Count XVI). Defendants move for summary judgment on all three counts. We address each in turn.

1.     **Count XIV:  Pennsylvania Whistleblower Law**

The Pennsylvania Whistleblower Law prohibits employers from discharging, threatening, discriminating, or retaliating against an employee with regard to his or her "compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."  43 Pa. Stat. Ann. § 1423(a).  The *McDonnell Douglas* burden shifting framework applies to retaliation claims brought pursuant to this provision.  *See Anderson v. Bd. of Sch. Directors of Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173 & n.4 (3d Cir. 2014).  To make out a prima facie case, the plaintiff must put forth evidence that she reported an instance of wrongdoing or waste to an appropriate authority and prove a causal connection between the report and the alleged retaliation. *Golaschevsky v. Commonwealth, Dep't. of Envtl. Prot.*, 720 A.2d 757, 758–60 (Pa. 1998); *see also Frazier*, 441 F. Supp. 3d at 96 ("Recovery under the Act requires evidence that Plaintiffs: (1) reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal connection between the report and the alleged retaliation.").

Defendants do not dispute that Allen's internal complaint against Younger and federal complaint in this case were "reports of waste or wrongdoing."  Instead, they argue that Allen's whistleblower claims fails because Allen has put forth no evidence of a causal connection between a report of waste or wrongdoing and an adverse employment action, and even if she could make out a prima facie case of retaliation, Defendants have identified a legitimate non-retaliatory reason for each adverse employment action.  (Doc. No. 133 at pp. 28–29.)  In response, Allen's counsel again parrots (word-for-word and without appropriate citation) the portion of this Court's prior opinion on the motions to dismiss that analyzed Plaintiffs'

Whistleblower Act claims.  (Doc. No. 167 at pp. 23–24.)  Again, this provides little assistance to the Court in deciding the issue before it.

Because Allen has provided virtually no helpful discussion on this claim, we are limited to her plagiarized assertion that she "'blew the whistle' on discrimination, harassment, and retaliation within the Department" and was "transferred . . . to [a] less-desirable position[ ] after [she] reported these violations."  (*Id.* at p. 23.)  The only discussions of retaliatory transfer in Allen's brief are found in relation to her return to JET full time and her detail to Police Tow Squad.  The only Defendants implicated by that argument are the City and McCarrick. Therefore, we grant summary judgment in favor of the other individual City Defendants.

As discussed above, we find that Allen has put forth a prima facie case of retaliation as to her return to JET full time but not her assignment to Tow Squad.  *See supra* Part IV.A.2.  When the record is viewed as a whole there is a question of fact about whether McCarrick returned Allen to JET full time because of her complaints about Younger's conduct.  *See McAndrew v. Bucks Cnty. Bd. of Com'rs*, 982 F. Supp. 2d 491, 503–07 (E.D. Pa. Nov. 8, 2013) (applying same standard of causation as that applied in Title VII context and finding the plaintiff's allegations of causation were sufficient to state a retaliation claim under the Whistleblower Law).  Allen has not, however, shown that O'Neill detailed her to Tow Squad *because* of her federal complaint.

Therefore, we deny summary judgment as to Count XIV as against the City and McCarrick to the extent Allen's claim is based on her return to JET full-time.  Otherwise, Defendants' motion is granted.

## 2.   Count XV:  Intentional Infliction of Emotional Distress

Allen also brings IIED claims against all of the individual Defendants, each of whom moves for summary judgment.

To recover on an IIED claim under Pennsylvania law, a plaintiff must prove that the defendant's conduct was (1) intentional or reckless and (2) extreme and outrageous, and that (3) the conduct actually caused distress that (4) was severe. *Regan v. Twp. of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999). Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that any individual Defendant engaged in outrageous conduct. (Doc. No. 132-1 at p. 8; Doc. No. 133 at pp. 32–33; Doc. No. 136 at p. 22.)

As we explained in our Memorandum on the motions to dismiss, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988); *see also Hoy v. Angelone*, 770 A.2d 745, 754 (Pa. 1998) (noting that there "have been few" IIED cases "in the employment context"); *Schaffhouser v. Transedge Truck Ctrs.*, Civil Action NO. 19-5811, 2020 WL 2847935, at *6 (E.D. Pa. June 2, 2020) ("Conduct may rightly be characterized bullying, abusive, improper, and highly offensive and yet still not be extreme or outrageous enough to allow for recovery on an IIED claim."). "It is the court's responsibility to determine if the conduct alleged in a cause of action reaches the requisite level of outrageousness." *Andrews*, 895 F.2d at 1487. "[A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress." *Id*. "The extra factor that is generally required is retaliation for turning down sexual propositions." *Id*. Although "retaliation is an important element, the Pennsylvania Supreme Court has stated that consideration of retaliation in the context of an IIED claim 'is one of a number of factors to be used in assessing such a claim.'" *Rorrer*, 712 F. Supp. at 438 (quoting *Hoy*, 720 A.2d 745). "'By regarding retaliation as a weighty factor, but not a mandated factor, we allow for the rare

case in which a victim of sexual harassment is subjected to blatantly abhorrent conduct, but in which no retaliatory action is taken.'" *Id.* at 438–39 (quoting *Hoy*, 720 A.2d 745).

Here, Allen has put forth no evidence that any individual Defendant sexually propositioned her and retaliated against her when she turned him or her down. Indeed, Allen has put forth no evidence of sexual propositioning. *See Andrews*, 895 F.2d at 1487 (finding that because "there is only one contention of direct sexual propositioning, the propositioning of Conn by Stock, and that was confessed to be a minor incident in which [the plaintiff's supervisor] played no role," the case "is different from those cases where sexual harassment made out a claim for intentional infliction of emotional distress"). Neither can we find that any Defendant's actions were so "blatantly abhorrent" that they rise to the level of IIED. *See, e.g.*, *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 2d 456, 465 (E.D. Pa. 2013) (granting summary judgment on plaintiff's IIED claim against her coworker where the evidence showed that he "would put his hands around her at work, flip her upside down, and describe different sexual activity positions to her," as well as "sexually proposition[ ] her, engage[ ] her in sexually explicit conversations, and show[ ] her pornographic images," but never retaliated against her for reporting this conduct); *Rorrer*, 712 F. Supp. 2d at 439 (granting summary judgment to a coworker defendant, who frequently stared at the plaintiff's breasts, had suggestively asked the plaintiff to bend over, and who held a knife to her breast, because this evidence was insufficient to support a claim for intentional infliction of emotional distress); *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 311 (M.D. Pa. 1988) ("If the only allegations supporting [the plaintiff's] claim for intentional infliction of emotional distress were those concerning [her immediate supervisor's] sexual harassment of her, the court would be forced to" dismiss her IIED claim because although the supervisor's conduct — including statements about his sexual virility, his outings to strip joints,

the sexual performance of other female employees, the plaintiff's ability to have sex after surgery, and her sexual performance, and also including his display of sexually explicit posters and newspaper clippings and his placing hands in his pants in front of her — was "insulting, undignified, annoying, and perhaps representative of the 'rough edges of our society,'" it did not "constitute the type of extreme and outrageous conduct" needed for an IIED claim); *cf. Pryor v. Mercy Catholic Med. Ctr.*, No. CIV. A. 99–0988, 1999 WL 956376 at *1, *3 (E.D. Pa. Oct. 19, 1999) (allowing IIED claim to go forward against plaintiff's direct supervisor, who was also her treating psychiatrist, where the physician subjected her to "physical force and the display of genitalia, foundling, [sic] and masturbation").

For those reasons, we grant summary judgment to all Defendants on Allen's IIED claims.

### 3.   Count XVI:  Assault and Battery

Allen's final state law claim is for assault and battery against Younger.  We address her battery claim first.

#### a.   Battery

Younger argues that he is entitled to summary judgment on Allen's battery claim because there is no evidence that he acted with the intent to harm or cause offensive bodily contact with Allen.  (Doc. No. 132-1 at p. 14.)

"[A] cause of action for battery requires offensive contact with the individual." *Quinn v. Limited Exp., Inc.*, 715 F. Supp. 127, 130 (W.D. Pa. 1989).  "A bodily contact is offensive if it offends a reasonable sense of *personal dignity*." *Herr v. Booten*, 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990) (quoting Restatement (Second) of Torts § 19); Restatement (Second) of Torts § 19, cmt. a (explaining that for a contact to be "offensive to a reasonable sense of personal dignity," it must be "unwarranted by the social usages prevalent at the time and place at which it is inflicted").  "The physical contact giving rise to battery need not be major or cause physical

injury." *Sims v. Peace of Mind Living Habilitative Servs., LLC*, Civil Action No. 2:19-cv-413, 2021 WL 5629974, at *14 (W.D. Pa. Dec. 1, 2021) ("Any offensive contact, however minor, constitutes a battery."); *see also* Restatement (Second) of Torts § 19, illustration 1 to cmt. a ("A flicks a glove in B's face.  This is an offensive touching of B.").

Here, the evidence shows that at the end of prayer circle, when all of the participants, including Allen, were hugging each other, Younger placed his hands on Allen's waist, attempted to (but did not actually) lift her off the ground, said "You're so small," and then, let go when she told him to stop.  Allen testified that she and Younger were regulars at the prayer circle, that she always hugged the other participants, and that Younger also frequently hugged the other attendees.  Given this context, we cannot find that Younger's contact was "offensive to a reasonable sense of personal dignity."  *Contra. Sims*, 2021 WL 5629974, at *14 ("Sims has proven by a preponderance of the evidence that P. Hunter committed a battery.  It is undisputed that P. Hunter kissed Sims and that he intended to do so.  The record establishes that the kiss was unanticipated by Sims, that no consent was given, and that the kiss was offensive to her."). [27]

---

[27] Allen argues that the contact was offensive *because* Younger grabbed her without her consent. (Doc. No. 166 at p. 5.).  Although this argument seems to conflate the element of offensive or harmful contact with the defense that the touching was consensual, *see Quinn*, 715 F. Supp. at 130 ("Consent is a defense to the intentional torts of assault and battery."); *Nayak v. Herbison*, Civil No. 1:14-CV-02211, 2015 WL 13738992, at *6 (M.D. Pa. June 4, 2015) ("Under Pennsylvania law, the intentional tort of battery has been described as an unconsented touching that is either harmful or offensive."), we must acknowledge that the Pennsylvania Supreme Court appears to have held as much in at least one medical battery case, *see Cooper ex rel. Cooper v. Lankenau Hosp.*, 51 A.3d 183, 191 (Pa. 2012) ("[S]urgery performed without the patient's consent constitutes intentional and offensive touching, and satisfies the elements of battery.").  Some trial courts have expanded the scope of that rule to apply to battery cases generally.  *See Nace v. Pennridge Sch. Dist.*, 185 F. Supp. 3d 564, 584 (E.D. Pa. 2016) (explaining that the "fact that contact occurs without consent is sufficient to establish that it is 'offensive,' and no intent to harm the plaintiff need be established," and holding that because "consent [was] legally impossible," a high school softball coach's admitted sexual contact with a student "was necessarily offensive for tort purposes and a battery occurred each time he had sexual contact with E.N." (cleaned up)); *Zapach v. Dismuke*, 2021 WL 35948685, at *1 (Pa. Ct. Comm. Pl. Apr. 24, 2001) (denying summary judgment where the plaintiff put forth video evidence that the defendant, a zoning board chairperson, "struck the plaintiff's right arm twice" during a zoning board hearing, and then "grabbed onto Plaintiff's arm to lead him away from the microphone" because "[a]lthough the force of these contacts appears to be slight, there

#### b.  Assault

Assault, unlike battery, is an act "intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Nace v. Pennridge Sch. Dist.*, 185 F. Supp. 3d 564, 584 (E.D. Pa. 2016); *see also D'Errico v. DeFazio*, 763 A.2d 424, 431 n.2 (Pa. Super. Ct. 2000) ("An assault has been described as an act intended to put another in reasonable apprehension of an immediate battery, which succeeds in causing an apprehension of such a battery."). Younger argues that he is entitled to summary judgment as to this claim because there is no evidence that Allen expressed fear or apprehension of bodily harm as a result of the touching. (Doc. No. 132-1 at p. 14.)

Allen responds that she was "put in imminent apprehension" of Younger's contact and that this apprehension "concluded with actual, nonconsensual bodily contact." (Doc. No. 166 at p. 6.) This suggests that Allen experienced the assault in the moments leading up to Younger grabbing her waist. However, Allen fails to cite to any evidence that she apprehended that contact. *See Picariello v. Fenton*, 491 F. Supp. 1026, 1037–38 (M.D. Pa. 1980) ("The Court has found that no Plaintiff was threatened with a pick handle and that no threats were made by any correctional officers on April 14 or April 15, 1978. Plaintiffs, therefore, were not assaulted while at Lewisburg.").

---

is no denying that the contact occurred, that it was intentional, and that it was not consented to"). But even if this is the rule of law in Pennsylvania, we do not think it changes the result in this case. The undisputed facts show that Younger grabbed Allen's waist at the end of prayer circle, when everyone in the group, including Allen, was hugging everyone else. *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 148 (3d Cir. 1998) ("Express consent may be given by words or affirmative conduct and implied consent may be manifested when a person takes no action, indicating an apparent willingness for the conduct to occur."); *Dorley v. S. Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 242 (W.D. Pa. 2015) (discussing nature and scope of consent in battery case). And by Allen's own account, once she revoked that consent and told him to let go, he immediately did so.

For those reasons, we grant summary judgment in favor of Younger on Allen's claim for assault and battery (Count XVI).

### F.        Counts XXIII, XXIV:  Equitable Claims

Last, the City Defendants move for summary judgment on Allen's claims for declaratory relief (Count XXIII) and injunctive relief (Count XXIV), arguing that because Allen is no longer employed with the Philadelphia Police Department, her request for future relief is moot.  (Doc. No. 133 at p. 33.)  Allen does not respond to this argument, and in any event, we agree with Defendants that because she no longer works for the Department, there is no risk of Allen being subjected to ongoing discriminatory practices.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed. As a state employee subject to Article XXVIII, Yniguez had a viable claim at the outset of the litigation in late 1988. . . .  Yniguez left her state job in April 1990 to take up employment in the private sector where her speech was not governed by Article XXVIII.  At that point, it became plain that she lacked a still vital claim for prospective relief. . . .  Yniguez's changed circumstances — her resignation from public sector employment to pursue work in the private sector — mooted the case stated in her complaint." (cleaned up)).  Because her claims for equitable relief are moot, we grant summary judgment in favor of the City and individual City Defendants on Counts XXIII and XXIV.

## V.    CONCLUSION

In sum, we await further briefing on Allen's claim for violations of § 207 of the FLSA. Otherwise, summary judgment is granted as to Coulter, MacDonald, McHugh, O'Brien, Williford, Tamika Allen, Gibbons, Conway, and Younger on all of Allen's remaining claims. The City of Philadelphia and McCarrick are entitled to summary judgment on some but not all of

the claims asserted against them.  Below is a revised chart that outlines the remaining counts

against these two Defendants, as they relate to Allen's return to JET full time.

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| III | Title VII Retaliation | City of Philadelphia |
| XIV | Pennsylvania Whistleblower Retaliation | City of Philadelphia, McCarrick |
| XVIII | PHRA Retaliation | City of Philadelphia, McCarrick |
| XIX | PHRA Aiding and Abetting | McCarrick |
| XXI | PFPO Retaliation | City of Philadelphia, McCarrick |
| XXII | PFPO Aiding and Abetting | McCarrick |

An appropriate Order follows.