# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **AUDRA MCCOWAN, et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 19-3326-KSM** |
| **CITY OF PHILADELPHIA, et al.**, | |
| Defendants. | |

## MEMORANDUM

**MARSTON, J.**                                                                            **May 16, 2022**

Plaintiffs Audra McCowan and Jennifer Allen bring employment discrimination claims against their former employer, the City of Philadelphia.  (*See generally* Doc. No. 49.)  Trial is set to begin May 17, 2022.  This opinion addresses the parties' numerous last-minute objections to certain trial exhibits, witnesses, and claims.

## I.    TRIAL EXHIBITS

The City raises numerous objections to Plaintiffs' exhibits, arguing that they are inadmissible hearsay under Federal Rule of Evidence 802 or that their probative value is substantially outweighed by the danger of unfair prejudice or undue delay.[1]

---

[1] The City also objects to thirteen exhibits, identified as Plaintiffs' text messages, on authenticity grounds.  (Doc. No. 203 at p. 4.)  Plaintiffs likewise object to the City's use of an email from Chief Inspector Daniel MacDonald to Chief Inspector Christopher Flacco, arguing that the City cannot properly authenticate it.  (Doc. No. 198 at p. 4.)  The Court withholds ruling on issues of authenticity until it has seen the testimony at trial.  *See* Fed. R. Evid. 901(b)(1) (providing a nonexhaustive list of evidence that a proponent can use to authenticate an exhibit, including testimony from a witness with knowledge that "an item is what it is claimed to be").  However, we remind both parties that the burden to authenticate evidence is "slight."  *United States v. Mebrtatu*, 543 F. App'x 137, 140 (3d Cir. 2013) ("All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be."  (quoting *United States v. Reilly*, 33 F.3d 1396, 1425 (3d Cir. 1994))).  If appropriate, either party may renew its objection when each exhibit is offered into evidence.

A.      **Hearsay**

The City objects to three of Plaintiffs' exhibits as inadmissible hearsay:  an op-ed by City

Controller Rebecca Rhynhart, a press release by the City Controller's office, and a press release

by City Mayor's Office.[2]  (Doc. No. 203 at p. 5.)

1.      <u>**Controller Rhynhart's Op-ed (P. Ex. 3)**</u>

Rhynhart's op-ed was printed in the *Philadelphia Inquirer* in March 2019.  (*See* P. Tr.

Ex. 3.)   It begins by describing the City Controller's 2018 audit of the City's sexual misconduct

policies, procedures, and payouts, including the audit's two "most important

recommendations"—that the City centralize the reporting process and create a disciplinary

schedule for sexual misconduct.  (*Id.*)  Rhynhart then goes on to say that she is "disappointed at

the progress the administration has made on these two recommendations," and that the City's

efforts have fallen "woefully short."  (*Id.* ("To put it simply, the city hasn't done enough to

protect its workers from sexual misconduct or to support them if they are a victim.").)

The City objects to the exhibit as inadmissible hearsay.[3]  (Doc. No. 203 at p. 5.)

Plaintiffs disagree, arguing that the op-ed is "definitionally not hearsay," or in the alternative,

that it falls under one of Rule 801(d)'s hearsay exclusions or one of the hearsay exceptions listed

---

[2] In addition to the authenticity objection mentioned above, *see supra* n.1., the City objects to Plaintiffs' text messages as containing inadmissible hearsay.  (Doc. No. 212 at p. 1.)  Without knowing how or why Plaintiffs intend to introduce the messages, the Court is not inclined to find them inadmissible hearsay at this juncture.  The City may renew its objection, if appropriate, when each exhibit is introduced at trial.

[3] Because Rhynhart authored the op-ed, this does not present the double hearsay issues typically found in newspaper articles.  *See Rivera v. Inc. Village of Farmingdale*, 29 F. Supp. 3d 121, 130 (E.D.N.Y. 2013) ("There is no doubt that articles authored by Graf, during his tenure as mayor, are admissible in their entirety as statements of a party-opponent.  Articles that contain quotations from Graf, but are authored by someone else, present a more complex question of admissibility.  Graf's quotations, like the articles he personally authored, are statements of a party-opponent that fall outside the definition for hearsay; however, their 'repetition in the newspapers' raises a separate hearsay issue, in that it reflects the 'implicit statement' of other out-of-court declarants, i.e., the reporters, that Graf actually said those things." (citations omitted)).

in Rule 803.  (P. Supp. Tr. Memo at p. 2.)

### a.  "Definitionally Not Hearsay"

First, Plaintiffs argue that the op-ed is "definitionally not hearsay" because it is

Rhynhart's prior statement, and she will testify and be subject to cross-examination about it at

trial.  (*Id.*)  This argument misunderstands the nature of hearsay.  It is not enough for the

proponent to show that the speaker is currently available for cross examination at trial.  Rule 801

defines "hearsay" as "a statement that . . . the declarant does not make while testifying at the

*current* trial or hearing."  Fed. R. Evid. 801(c) (emphasis added).  Because Rhynhart's op-ed was

made before the current trial, and Plaintiffs plan to use it to prove the truth of the matter

asserted—i.e., that Mayor Kenney's administration has fallen "woefully short" at implementing

Rhynhart's recommendations for revising the City's sexual harassment policies and

procedures—it is definitionally hearsay.  (P. Ex. 3.)

### b.  Rule 801(d) Hearsay Exclusions

Next, Plaintiffs argue that the op-ed is nonetheless exempt under one of the two hearsay

exclusions outlined in Rule 801(d).  Again, we disagree.  Rule 801(d) outlines two hearsay

exclusions.  Under the first, a statement is not hearsay if the "declarant testifies and is subject to

cross-examination about a prior statement," the statement is "consistent with the declarant's

testimony," and the statement is "offered:  (i) to rebut an express or implied charge that the

declarant recently fabricated it or acted from a recent improper influence or motive in so

testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another

ground[.]"  Fed. R. Evid. 801(d)(1).  Plaintiffs have not shown that they will be offering

Rhynhart's op-ed to rebut an allegation of recent fabrication, improper influence, or motive or to

otherwise rehabilitate her, so Rhynhart's op-ed does not fall into the hearsay exclusion for prior

consistent statements.  *See Tome v. United States*, 513 U.S. 150, 157 (1995) (discussing the

admissibility of certain prior statements by a witness and noting that "[t]he Rules do not accord this weighty, nonhearsay status to all prior consistent statements").

Under the second exclusion, a statement is "not hearsay" if it "is offered against an opposing party and . . . was made by a person whom the party authorized to make a statement on the subject [or] was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2). Other than their conclusory assertion that the op-ed is "a party's own statement [and a] statement by an authorized agent," Plaintiffs have not provided argument or cited cases in support of this position. (*See* P's Supp. Tr. Memo at p. 2.) That said, the Court's finds that Controller Rhynhart is neither authorized to speak on behalf of the City about her audit, nor was she speaking as an agent of the City when she wrote the op-ed.

Rhynhart is City Controller, an elected position whose office describes itself as "the independent financial watchdog for the City of Philadelphia." *See* https://controller.phila.gov/. To fulfill that goal, the Controller's office has the stated mission to "audit every department, every year to cut waste and root out fraud and mismanagement." *Id.*; *see also* Doc. No. 163-3, P. Ex. F at 7:11–16 (Rhynhart testifying that the "city controller is the financial watchdog of the City, as well as given the responsibility under the charter to ensure that the City's operating efficiently and effectively. So it's a watchdog function"). Given the independent and importantly, adversarial, nature of the Controller's office, we cannot find that Rhynhart is an "agent" of the City, nor "authorized" to speak on its behalf of the City of Philadelphia as to the Controller's office's audits of the City's affairs.

### c.    Rule 803 Hearsay Exceptions

Last, Plaintiffs argue in the alternative that the op-ed falls under one of several hearsay exceptions:  (1) Rule 803(5) recorded recollection, (2) Rule 803(6) record of a regularly

4

conducted activity, (3) Rule 803(8) record or statement of a public office, and (4) Rule 807's residual exception for statements supported by sufficient guarantees of trustworthiness.  (P. Supp. Tr. Memo at p. 2.)

### i.     *Rule 803(5) Recorded Recollection*

Rule 803(5) allows a party to use a record that would otherwise qualify as hearsay, if it "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately," "was made or adopted by the witness when the matter was fresh in the witness's memory," and "accurately reflects the witness's knowledge."  Fed. R. Evid. 803(5).  There is no indication that the op-ed "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately."  Fed. R. Evid. 803(5).  To the contrary, Rhynhart discussed her report, and the City's failure to implement her recommendations, at length in her deposition, suggesting she can fully "recall" the matter.  *See, e.g.*, Doc. No. 163-3, P. Ex. F at 12:17–15:22, 17:4–18:20, 23:23–24:17, 31:5–5:24, 65:13–21.

### ii.     *Rule 803(6) Record of a Regularly Conducted Activity*

Rule 803(6) allows use of a "record of an act, event, condition, opinion, or diagnosis" if five conditions are met: (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" (3) "making the record was a regular practice of that activity;" (4) "all of these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification;" and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).

Plaintiffs argue that the op-ed is a record of a regularly conducted activity because newspapers regularly publish op-eds.  This argument again misses the mark.  The fact that a newspaper regularly publishes articles does not render the substance of those articles records of a regularly conducted activity.  *Cf. Greene v. Scott*, 637 F. App'x 749, 752 (4th Cir. 2016) (distinguishing between the "the Mayor's statement in the newspaper article," which is not hearsay, and "the conveyance of that statement in the newspaper article, which is hearsay").  Here, Plaintiffs fail to distinguish between Rhynhart's opinion and the conveyance of that opinion via a newspaper.

### iii.        *Rule 803(8) Record or Statement of Public Office*

Next, Plaintiffs argue that Rhynhart's op-ed qualifies as a record or statement of a public office.  Rule 803(8) provides an exception for such statements if "(A) it sets out:  (i) the office's activities; (ii) a matter observed while under a legal duty to report . . . ; or (iii) in a civil case . . . , factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).

Rhynhart's op-ed does not qualify as a record or statement of public office for at least two reasons.  First, the op-ed recites Rhynhart's individual opinion, not an official statement of the Office of the Controller.  *See Patterson v. Central Mills, Inc.*, 64 F. App'x 457, 462–63 (6th Cir. 2003) ("The public records exception, however, extends only to opinions of the agency or public office *itself*, not to those of its individual members contained within those records.  Given this, the district court did not abuse its discretion by ordering plaintiffs to redact from official publications the statements of individual commissioners contained therein."  (citations omitted)).

Second, the article does not satisfy any of Rule 803(8)(A)'s subcategories.  Notably,

Rhynhart criticizes what she views as shortcomings by the administration of Mayor James Kenney and a failure to quickly implement the recommendations given in her 2018 audit. The op-ed neither sets out the activities of the Controller, nor does it describe a "matter observed while under a legal duty to report." The only exception that arguably applies is the third—statements of "factual findings from a legally authorized investigation." But here, the Controller is not discussing the results of her 2018 audit, but instead, giving her unexplained opinion that Mayor Kenney failed to act on the findings of the audit. *Cf. Washington-El v. Beard*, Civil Action No. 08–1688, 2013 WL 706194, at *4 (W.D. Pa. Feb. 16, 2013) ("Defendants' Exhibit 9 is a press release issued by the U.S. Department of Justice dated September 21, 2007, in reference to aforementioned indictments issued against the SCI-Graterford prison officials. . . . While it is hearsay, the press release falls under the hearsay exception set out in Federal Rule of Evidence 803(8) for public records, because it is a statement that sets out either 'the office's activities' or 'in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation.'").

<em>iv.      Rule 807 Residual Exception</em>

Last, Rule 807 provides a residual exception, allowing admission of otherwise hearsay statements so long as "the statement is supported by sufficient guarantees of trustworthiness," and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Neither requirement is satisfied here.

First, because this opinion is an op-ed by an elected individual and gives opinions divorced from her initial investigation, the Court questions its trustworthiness. *See Ellis ex rel. Lanthorn v. Jamerson*, 174 F. Supp. 2d 747, 752, n.3 (E.D. Tenn. 2001) ("While a statement bottomed on a completed report is presumably trustworthy even though it does not recite first-

7

hand knowledge, a statement based neither on a completed investigation nor on an identifiable source of information is inherently untrustworthy.  To suggest otherwise ignores the purpose of the hearsay rules and strains credulity.").  Second, Plaintiffs have indicated that they will rely on other evidence probative of the City's sexual harassment policies and procedures, including the 2018 audit and Rhynhart's testimony, suggesting that the op-ed is not the most probative evidence on this issue.

* * *

Because it is inadmissible hearsay, the Court sustains the City's objection and will preclude use of Rhynhart's op-ed (P. Ex. 3) at trial.

### 2.    Controller's Office Press Release (P. Ex. 5)

Next, the City objects to a press release issued by the Office of the Controller that discusses the resignation of former Police Commissioner Richard Ross, sexual harassment lawsuits brought by other female officers, and the City's alleged failure to implement the recommendations of the 2018 audit.  Plaintiffs again argue that the press release is "definitionally not hearsay because it is an opposing party's statement under FRE 801(d)(2)." (P. Supp. at p. 3.)  As mentioned above, the Court finds as a general matter that Controller Rhynhart is neither an agent of the City nor authorized to speak on the City's behalf when it comes to matters about which she conducts independent audits of the City or one of its departments.  The Controller's office's "watchdog function" makes this an adversarial process that runs counter to the idea that the Controller could be viewed as authorized to speak on the City's behalf.  Therefore, Rule 801(d)(2)'s exclusion does not apply.

In the alternative, Plaintiffs argue that the press release is a record or statement of a public office under Rule 803(8).  Although the press release, unlike Rhynhart's op-ed, is an official statement from the Office of the Controller, it does not satisfy any of Rule 803(8)(A)'s

8

subcategories.  The press release does not set out either the activities of the Controller's Office,

describe a "matter observed while under a legal duty to report," or present "factual findings from

a legally authorized investigation."  *See Kars 4 Kids, Inc. v. Am. Can!*, Civil Action No. 3:14-cv-

7770 (PGS) (DEA), *et al.*, 2019 WL 1755912, at *4 (D.N.J. Apr. 18, 2019) ("Here, the press

releases do not set forth 'findings from a legally authorized investigation' in that both press

releases discuss a settlement without support or substance behind the content.  As such, the

motion *in limine* to bar admission of the Pennsylvania and Oregon press releases is granted."); *cf.*

*Washington-El*, 2013 WL 706194, at *4 ("Defendants' Exhibit 9 is a press release issued by the

U.S. Department of Justice dated September 21, 2007, in reference to aforementioned

indictments issued against the SCI-Graterford prison officials. . . .  While it is hearsay, the press

release falls under the hearsay exception set out in Federal Rule of Evidence 803(8) for public

records, because it is a statement that sets out either 'the office's activities' or 'in a civil case or

against the government in a criminal case, factual findings from a legally authorized

investigation.'").

Because it is inadmissible hearsay, the Court sustains the City's objection to this exhibit

as well and will preclude use of the press release (P. Ex. 5) at trial.

### 3.  Mayor's Office Press Release (P. Ex. 4)[4]

Last, the City moves to exclude a press release published by the Office of the Mayor to

---

[4] Plaintiffs also ask the Court to take judicial notice of comments made by Mayor Kenney in 2019
regarding systemic problems of discrimination and harassment at the City.  (Doc. No. 198 at p. 4.)  It is
unclear whether Plaintiffs are referring to the press release itself or other statements made by Mayor
Kenney.  Either way, this is not the type of information over which courts typically take judicial notice.
*See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute
because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately
and readily determined from sources whose accuracy cannot reasonably be questioned."); *cf. Victaulic
Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007 (finding the district court erred when it took judicial
notice of statements on the plaintiff company's website because "a company's website is a marketing

announce Ross's resignation and the appointment of Deputy Commissioner Christine Coulter as Acting-Commissioner.  Plaintiffs argue that the press release is "definitionally not hearsay because it is an opposing party's statement under FRE 801(d)(2)."  (P. Supp. Tr. Memo. at p. 3.) We agree.

Because the press release was published directly by the Office of the Mayor and is being offered against the City, it falls under Rule 801(d)(2)'s exclusion for statements "made by the [opposing] party's agent or employee on a matter within the scope of that relationship."  *See Palma v. Borough of Lansdale*, Civ. A. No. 89–4647, 1991 WL 91557, at *10 n.6 (E.D. Pa. May 28, 1991) ("The Mayor [of Lansdale]'s statement is either not hearsay—being offered for proof that threat was made, not for proof of the matter asserted in the threat—or admissible hearsay as the admission of a party opponent."); *see also Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007) (finding deputy mayor's statement was an admission by a party opponent—the District—and therefore, admissible under Rule 801(d)(2)(D)); *Libertad v. Welch*¸ 55 F.3d 428, 443 & n.12 (1st Cir. 1995), *abrogated on other grounds by United States v. Velazquez-Fonanez*, 6 F.4th 205 (1st Cir. 2021) ("Appellants have submitted a press release written in Spanish and issued by [one of the defendants.]  We reject [the defendants'] contention that the press release is inadmissible hearsay.  The press release is not hearsay, but admissible evidence as an admission of a party-opponent under Fed. R. Evid. 801(d)(2)(A)."); *cf. Greene v. Scott*, 637 F. App'x 749, 752 (4th Cir. 2016) ("Greene's argument that the Mayor's statements in the newspaper article should be admitted as a non hearsay statement by a party-opponent under Fed. R. Evid. 801(d)(2) fails to distinguish the Mayor's statement, *which is not hearsay*, from the conveyance of that

---

tool" that is likely "full of imprecise puffery that no one should take at face value" and therefore, is not the sort of source "whose accuracy cannot reasonably be questioned").  The request is denied.

statement in the newspaper article, which is hearsay." (emphasis added)).

Therefore, the Court overrules the City's objection and will not preclude use of this press release (P. Ex. 5) at trial.

* * *

In sum, Rhynhart's op-ed (P. Ex. 3) and the press release from the Controller's Office (P. Ex. 5) are precluded as inadmissible hearsay. However, the press release from the Mayor's Office (P. Ex. 4) is admissible as a statement by a party opponent.

### B.   *Probative Value Substantially Outweighed*

The City also objects to three of Plaintiffs' exhibits—the 2018 audit issued by the Controller's Office (P. Ex. 1), the press release from the Mayor's Office (P. Ex. 4), and a memo summarizing ten internal investigations at the Police Department (P. Ex. 13)—under Federal Rule of Evidence 403.[5]  Under Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  "When determining whether evidence violates Rule 403, district courts must balance the probative value of the evidence against its prejudicial effect, clarifying its reasoning on-the-record." *United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016).

### 1.   <u>2018 Audit Report (P. Ex. 1)</u>

The City argues that the 2018 audit report is inadmissible under Rule 403 because the report looks at the City's sexual harassment policies, not the Police Department's, and the results predate Plaintiffs' internal complaints.  (Doc. No. 203 at p. 5.)  Plaintiffs respond that the report

---

[5] The City similarly objects to the Controller's Office press release (P. Ex. 5) as unfairly prejudicial under Rule 403.  However, because the press release is inadmissible hearsay, we do not address whether it is also unfairly prejudicial.

is relevant to their *Monell* claim and the City's *Faragher-Ellis* defense.  (P. Supp. at p. 2.)  They

argue that the Controller's report "squarely addresses these issues at the City, of which the Police

Department is a part, and even though it predates Plaintiffs' complaints, [the report] shows a

policy or custom existed around the same time Plaintiffs' complained and that Defendants' [sic]

had notice of same and failed to exercise reasonable care to prevent sexual harassment and

retaliation in the workplace."  (*Id.*)  Therefore, Plaintiffs' conclude, the report is "not *unfairly*

prejudicial."  (*Id.*)

We agree with Plaintiffs.  Although the report focuses on the City's policies and is not

specific to the Police Department, the results have implications for every department at the City,

including the Police Department.  The Controller's 2018 audit found that one of the major

problems with the City's sexual harassment policies and procedures is that the City does not

have a centralized procedure for reporting, investigating, and disciplining sexual harassment.

Instead, it allows each department to handle these aspects in house.  Here, McCowan argues that

the Police Department's Equal Employment Office ("EEO") unit failed to adequately investigate

her complaint or discipline Officer Younger when the findings against him were sustained, and

that this failure is the product of a City policy, procedure, or custom.  Rhynhart's findings are

highly probative on that issue, even if they were issued a few months before the harassing

conduct occurred.  *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343–44 (3d Cir. 2002)

("[T]here is a strong presumption that relevant evidence should be admitted, and thus for

exclusion under Rule 403 to be justified, the probative value of evidence must be 'substantially

outweighed' by the problems in admitting it.  As a result, evidence that is highly probative is

exceptionally difficult to exclude.").

As for unfair prejudice, the audit report is only prejudicial to the same extent that it is

probative—it suggests the City has systemic problems related to investigating and punishing sexual harassment. *See United States v. Schweitzer*, Criminal No. 84–00097, 1985 WL 2630, at *7 (E.D. Pa. Sept. 9, 1985) ("Although this testimony was prejudicial to defendant, all highly probative evidence is prejudicial to one party or another."). And given the City-wide scope of the report and its different timeline, there is less concern that jurors will merely adopt Rhynhart's conclusions without deciding the *Monell* issue themselves.

For those reasons, the Court overrules the City's objection to the 2018 audit report (P. Ex. 1). The Court will, however, give a limiting instruction. The City is directed to meet and confer with Plaintiffs' counsel and jointly propose an instruction.

## 2.   Mayor's Office Press Release (P. Ex. 4)

Next, the City again objects to the press release issued by the Mayor's Office, this time arguing that it is inadmissible under Rule 403. As mentioned above, the press release discusses Ross's resignation, allegations of sexual harassment, and the City's sexual harassment policies and procedures. (*See* P. Ex. 4.) A statement by the Mayor, as a final policymaker for the City, that he does not "believe the Police Department has taken the necessary actions to address the underlying cultural issues that too often negatively impact women—especially women of color," is clearly very probative to Plaintiffs' *Monell* claim. Again, any prejudicial effect is caused by the fact that it is so probative. *See Coleman*, 306 F.3d at 1343–44; *Schweitzer*, 1985 WL 2630, at *7.

The Court overrules the City's objection to this exhibit as well.

## 3.   EEO Summary Memo (P. Ex. 13)

Last, the City asks the Court to exclude Plaintiffs Exhibit 13, a 2020 internal memo summarizing ten EEO matters, including the Police Department's investigation of Plaintiffs' complaints. (Doc. No. 203 at p. 5.) Plaintiffs respond that this evidence is "relevant to

Plaintiffs' *Monell* claims, hostile work environment claims, and retaliation claims" because it "shows that no discipline has been given to any individual against whom the Internal Affairs division has sustained a finding of sexual misconduct, including but not limited [to] Defendant Younger."  (P. Supp. at p. 3.)  We disagree.

Beginning with relevance, the memo is a little over one page and includes a two- to four-sentence paragraph summarizing each claim that was investigated, stating whether it was sustained, and noting whether and to what extent the target was punished.  (P. Ex. 13.)  These short summaries give virtually no details related to the investigations.  And the details we do have suggest that the circumstances of the nine unrelated cases are sufficiently different to render the document of little relevance.  Notably, none of the other cases involved the exact charge sustained against Younger, "verbal abuse-Derogatory/Offensive Language," and most if not all of them involved individuals other than Defendants.  *See Lawler v. Richardson*, Civil Action No. 10–196, 2012 WL 2362383, at *4 (E.D. Pa. June 20, 2012) ("Courts will typically only admit evidence of prior incidents when they come in a narrow period of time and are of a similar nature to the incident at issue."); *see also id.* (excluding testimony of two witnesses under Rule 403 because "none of the Defendant Officers involved in Plaintiff's claim were involved in the incidents involving [the two witnesses], which renders the relevance of their testimony questionable at best"); *cf. Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (discussing the relevance of a "series of actual written civilian complaints of similar nature, most of them before and some after the Beck incident, containing specific information pertaining to the use of excessive force and verbal abuse by Officer Williams").

In addition, five of the unrelated cases involved targets who retired before they could go to a trial before the Police Bureau of Investigations ("PBI").  Of the remaining four, one was not

14

sustained, one remains open, one involved a non-employee who could not be tried by PBI, and the last one had his punishment rescinded after the Union filed a grievance.  In other words, the memo does not, as Plaintiffs argue, show "that no discipline has been given to any individual against whom the Internal Affairs division has sustained a finding of sexual misconduct."  Given the lack of similarities between this case and the other nine complaints, the summaries are of minimal probative value.  *See United States v. Bailey*, 840 F.3d 99, 119 (3d Cir. 2016) ("When the probative value of evidence is tenuous, a relatively minor risk of substantial undue prejudice should counsel against admitting it."); *see also Smith v. City of Philadelphia*, Civil Action No. 06–4312, 2009 WL 3353148, at *5 (E.D. Pa. Oct. 19, 2009) (admitting a prior internal investigation into one of the defendants, but excluding "[a]ll other IAU investigations, incident reports and allegations that did not result in a finding of misconduct" because they lacked reliability or "lack[ed] sufficient similarity to the instant action").

This minimal probative value is outweighed by the likelihood that the memo's introduction will cause undue delay, confuse the issues, and unfairly prejudice the City.  Admitting it into evidence is likely to result in "mini-trials" on the facts of each unrelated claim and whether the City appropriately investigated those claims and disciplined the targets.  *See Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1347 (3d Cir. 2002) ("We are satisfied that the EEOC Letter of Determination wrongly classified Coleman as 'highly experienced' . . . and that it was of such low probative value that the Court could have found that it was 'substantially outweighed' by the fact that Home Depot would have had to rebut the EEOC's finding that the company engaged in a pattern of race and gender discrimination by presenting information about numerous former Home Depot employees."); *Strauss v. Springer*, 817 F. Supp. 1211 (E.D. Pa. 1992) (excluding evidence of "shooting books"—which discussed the City's investigation into

25 unrelated shootings—because the facts surrounding each shooting were starkly different from the shooting at issue in the case and because "testimony concerning these twenty-five (25) shooting books would have required a separate mini-trial for each to determine whether the decision of the Philadelphia Police Review Board as to each one was right or wrong"); *Clarke v. City of Philadelphia*, No. CIV. A. 92–4700, 1994 WL 388559, at *10 (E.D. Pa. July 27, 1994) ("The six citizen complaints against Officer McArthur involve his conduct in a variety of circumstances over a period of years. If I would allow plaintiffs to present evidence of the complaints, I also would have to allow defendants opportunity to rebut that evidence. This would have confused the central issue of the case, and misled the jury by introducing factual scenarios not related to the facts of the case." (quotation marks omitted)).

Therefore, the Court finds that the probative value of the memo is substantially outweighed by the likelihood of undue delay and confusion of the issues. The City's objection is sustained.

* * *

In sum, the Court sustains the City's objection to the EEO summary memo (P. Ex. 13) because its probative value is substantially outweighed by the likelihood of undue delay and confusion of the issues. However, the Court overrules the City's objection to the 2018 audit report (P. Ex. 1) and the press release from the Mayor's Office (P. Ex. 4).

### C. Conclusion

The Court reserves ruling on the parties' authenticity arguments and the City's argument that Plaintiffs' text messages are inadmissible hearsay. The Court sustains the City's objections to Rhynhart's op-ed (P. Ex. 3) as inadmissible hearsay, the press release from the Controller's Office (P. Ex. 5) as inadmissible hearsay, and the EEO summary memo (P. Ex 13) as likely to cause undue delay and confuse of the issues. The City's objections to the admission of the 2018

audit (P. Ex. 1) and the press release from the Mayor's Office (P. Ex. 4) are overruled.[6]

## II.   WITNESSES

Each side also objects to witnesses identified by the opposing party.  Plaintiffs object to the City's use of witnesses not identified in the City's initial disclosures, and the City objects to Plaintiffs' attempt to call Controller Rhynhart.  We discuss each objection in turn.

### A.   *City Witnesses Not Included in Initial Disclosures*

Plaintiffs object to multiple City witnesses—Chief Inspector Christopher Flacco, Inspector Kevin Hall, Captain Matthew Deacon, Captain Edward Appleton, Lieutenant Ezekiel Williams, Inspector Michael Gillespie, and Chief Inspector Michael Cochrane.  (P. Supp. at p. 4.)  Plaintiffs argue that "[n]ot a single one of these proposed witnesses have been identified in Defendants' Initial Disclosures" and that the City "now expect[s] to conduct a trial by surprise." (*Id.*)  The City responds that it will not call Hall, Appleton, or Cochrane.  (Doc. No. 212 at p. 1.) As for the remaining four witnesses, the City argues that each individual was listed in Plaintiffs' initial disclosures and made known during discovery, and therefore, the City's failure to disclose is harmless and does not meet the elements of exclusion under Rule 37.  (*Id.* at pp. 1–4.)

Federal Rule of Civil Procedure 26 states that a party's initial disclosures "must" include "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i).  In addition, when a party "learns that in some material respect the disclosure or response is incomplete or incorrect," and "the additional or corrective information has not otherwise been made known to the other

---

[6] The City also objects to the Police Department Directive 8.7 (P. Ex. 7), effective January 22, 2020, arguing that it is evidence of subsequent remedial measures and therefore, inadmissible under Rule 407.  Plaintiffs have agreed to substitute this exhibit for the version of Directive 8.7 that was in effect during the relevant time period.  (*See* P. Supp. Tr. Memo at p. 3.)

parties during the discovery process or in writing," that party "must supplement or correct its disclosures." Fed. R. Civ. P. 26(e)(1)(A); *Holley v. Port Auth. of N.Y.*, Civil No. 14-7534 (BRM)(DEA), 2018 WL 11413338, at *2 (D.N.J. May 3, 2018) ("[T]he parties are required to supplement or correct their initial disclosures, as well as any discovery responses, in accordance with Fed. R. Civ. P. 26(e)(1)(A)."). "A majority of courts, the leading treatises, and the Advisory Committee Note to Rule 26 agree that an individual's existence or knowledge can 'otherwise be made known,' and thus be sufficiently disclosed for Rule 26 purposes, through deposition testimony." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, No. 07-3770, 2010 WL 1849913, at *3 (D.N.J. May 7, 2020) (collecting references). Nevertheless, the disclosure must be "clear and unambiguous," i.e., more than "the mere mention of an individual's identity." *Id.* at *4 (quotation marks omitted)).

If a party was required to supplement its disclosures and failed to do so, then Rule 37 sanctions come into play, and "the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The decision to exclude evidence is discretionary. *Holley*, 2018 WL 11413338, at *3. However, the Third Circuit has identified four factors relevant to this analysis:

> (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pa. State. Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).

The Court will allow Flacco, Deacon, Williams, and Gillespie to testify at trial. First, each witness was identified and discussed throughout discovery, such that Plaintiffs should have known that they have information relevant to McCowan's transfer and the investigation into her

complaint.  In other words, each witness was "made known" to Plaintiffs, such that the City was not obligated to update its initial disclosures.  Second, even if the Court were to find that the City had an obligation to supplement its initial disclosures and look to Rule 37, the *Nicholas* factors lean in favor of allowing the four individuals to testify.  Because the four witnesses were identified in *Plaintiffs* initial disclosures, the City's failure to identify them in its initial disclosures could "hardly have caused surprise" to Plaintiffs.  *Holley*, 2018 WL 11413338, at *3 (allowing seventeen witnesses to testify and finding that the court did not need to "examine whether Plaintiff's actions were sufficient to constitute disclosure or 'substantially justified'" because "[d]espite Defendants' assertions to the contrary, the inclusion of these individuals" in the defendants' own initial disclosures "is sufficient for the purpose of demonstrating that any alleged error by Plaintiff was harmless under Rule 37").

Plaintiffs argue that if the City had also identified these four individuals, Plaintiffs would have deposed them, and therefore, they are being subjected to a trial by surprise.  But notably, Plaintiffs went beyond the allotted number of depositions in this case—suggesting that counsel made strategic decisions related to depositions and would not have been able to also depose these four individuals even if Plaintiffs had wanted to.  *See* Fed. R. Civ. P. 30(a)(2) ("A party must obtain leave of court, and the court must grant leave . . . if the parties have not stipulated to the deposition and . . . the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by plaintiffs . . . ."); *Holley*, 2018 WL 11413338, at *3 ("[T]he failure to depose these individuals appears to be the result of Defendants' own decision, not any prejudice stemming from Plaintiff's lack of compliance with Rule 26.").  The second and third *Nicholas* factors, though weighing against the witnesses' admission, are of little weight here.  To cure the perceived prejudice, Plaintiffs presumably would want the opportunity to depose each

witness, which would undoubtedly delay trial—but again, Plaintiffs knew that all four witnesses had relevant knowledge but chose not to depose them, and Plaintiffs have already taken more depositions than allowed.  Last, the City appears to have acted negligently, not in bad faith, further suggesting that the four individuals should be allowed to testify.

For those reasons, the Court overrules Plaintiffs' objections to the testimony of Flacco, Deacon, Williams, and Gillespie.

### B.    *Rebecca Rhynhart*

Next, the City moves to preclude Plaintiffs from calling Controller Rhynhart to testify at trial, arguing that "Plaintiffs intend to ask Controller Rhynhart . . . to usurp the role of the jury and make determinations about the alleged misconduct of Curtis Younger, as well as the Police Department's response to Plaintiffs' allegations."  (Doc. No. 215 at p. 3.)  The City asserts that her testimony is improper under Federal Rule of Evidence 702 because Rhynhart is, according to her own testimony, not an expert in the field of sexual harassment.  (*Id.*)  The City also asserts that Rhynhart's testimony is improper under Rule 701 because her opinions are not based on first-hand knowledge of Plaintiffs, their complaints, or the Police Department's sexual harassment prevention policies.  (*Id.*)  Despite the Court's direction at the final pretrial conference, Plaintiffs' counsel has not responded to this argument.  Because there is no dispute that Rhynhart was not proffered as an expert witness under Rule 702, and counsel has failed to show good cause for that failure, the Court limits its analysis to whether Rhynhart's testimony is permissible lay testimony under Rule 701.

Rule 701 states that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R.

Evid. 701.  Relatedly, Rule 602 limits lay witness testimony to matters about which "the witness has personal knowledge."  Fed. R. Evid. 602.  The two rules are considered together to determine the permissible scope of lay testimony.

"When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."  *United States v. Fulton*, 837 F.3d 281, 301 (3d Cir. 2016) (quoting *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009)).  In other words, "so long as the technical components of the testimony are based on the lay witness's personal knowledge, such testimony is usually permissible."  *Id.*  Before admitting such testimony, however, the proponent must lay a proper foundation, i.e., show that the lay witness's conclusions are in fact based on personal knowledge.  *See United States v. Harris*, 788 F. App'x 135, 150–51 (3d Cir. 2019) (explaining that although "an agent is not free to give summary testimony based on the observations of others, a foundation can be laid through an agent's extensive personal involvement in a case," and finding that "such a foundation was laid" where the two agents testified to their experiences as part of the investigation, including surveilling the neighborhood, participating in controlled buys, and conducting wiretaps").

With this understanding in mind, the Court will limit, but not exclude, Rhynhart's testimony.  Plaintiffs' pretrial memo states that Rhynhart will testify about: (1) "her audit of the City's sexual harassment policies and procedures," including her findings and recommendations, (2) "her March 2019 statement that the City has done nothing to implement the recommendations set forth in her audit report," (3) her public statements regarding the City's conduct in this case, and (4) about "systemic problems of discrimination/ harassment at the City."  (Doc. No. 198 at

p. 3.)  If Plaintiffs are able to lay the proper foundation, then Rhynhart may testify as to the first

and fourth categories of information (her audit, its findings and related recommendations) to the

extent those matters fall within *her* personal knowledge and are based on *her* own observations.

*See Teen-Ed, Inc. v. Kimball Intern., Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("The personal

knowledge of appellant's balance sheets acquired by [the witness] as Teen-Ed's accountant was

clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to

his opinion of how lost profits could be calculated and to inferences that he could draw from his

perception of Teen-Ed's books."); *United States v. Walker*, 824 F. App'x 124, 128–29 (3d Cir.

2020) ("Agent Kuc's testimony was based on his personal knowledge of the investigation against

Walker and experience in controlled deliveries. The testimony was helpful to the jury in

understanding the circumstances surrounding the attempted controlled delivery, including

reasons for delay in moving from one location to another. Further, Agent Kuc did not ultimately

provide an opinion as to why Walker changed the meeting location; instead, he allowed the jury

to draw its own conclusions. And the testimony did not involve any specialized or technical

knowledge, rather Agent Kuc made commonsense observations based on his personal

experience. Thus, the testimony was properly admitted as lay testimony."); *Acosta v. Cen.

Laundry, Inc.*, 273 F. Supp. 3d 553, 557 (E.D. Pa. 2017) ("[The witness's] experience as a wage

and hour investigator as well as her extensive investigation of the facts of this case satisfy the

particularized knowledge required to testify as a lay witness under 701(a).").

However, the Court will preclude Rhynhart from discussing the second and third

categories of information (her March 2019 statement and other public statements about this

case).  The March 2019 statement is inadmissible hearsay.  And the specifics of Plaintiffs'

complaints and the resulting investigation fall outside of the scope of the 2018 audit and are not

based on Rhynhart's personal knowledge and observations.  *See Corner Pocket, Inc. v. Travelers Indem. Co.*, Civil Action No. 12–288, 2014 WL 657610, at *2 (W.D. Pa. Feb. 20, 2014) ("Here, Mr. Morrell cannot provide a lay opinion under Rule 701 because Mr. Morrell's opinion is not based on his personal perception or his direct observations of the roof decking at issue in this case.  Rather than basing his opinion on direct observations of the roof decking at issue, Mr. Morrell's opinion is based on his understanding of certain email correspondence and expert analysis produced by both parties.  Accordingly, Plaintiff has run afoul of Rules 701 and 702.").

Last, we remind Plaintiffs that unlike expert witnesses, lay witnesses cannot testify as to hypotheticals.  *Teen-Ed, Inc.*, 620 F.3d at 404 ("Testifying as a layman, Zeitz would be more restricted than if he were proffering opinion evidence as an expert. The essential difference, however, is that a qualified expert may answer hypothetical questions. (citations omitted)").

In sum, the City's objection is sustained in part.  Rhynhart is permitted to testify as to her 2018 audit and matters within her personal knowledge (after Plaintiffs have laid the necessary foundation), but she is precluded from testifying about the other matters identified by Plaintiffs.

### C.    *Conclusion*

The Court overrules Plaintiffs' objections to the testimony of Flacco, Deacon, Williams, and Gillespie.  The City's objection to Rhynhart's testimony is sustained in part and overruled in part.  Rhynhart's testimony is limited to matters within her personal knowledge.

## III.    SCOPE OF CLAIMS AND DEFENSES

Last, each party objects to the extent to which the opposing party can submit substantive evidence.  Specifically, Plaintiffs argue that the City should be precluded from asserting affirmative defenses at trial, and the City argues that the Plaintiffs abandoned their claim for constructive discharge.  We address each issue in turn.

### A.       Affirmative Defenses

Plaintiffs argue in conclusory fashion that "[t]he City should be precluded from asserting any affirmative defenses at trial" because it "failed to assert any defenses at the summary judgment stage and failed to develop any defenses during the litigation." (Doc. No. 216 at p. 14.) A defendant is not required to pursue its defenses through summary judgment. *See Dyson v. Kocik*, 564 F. Supp. 109, 114 (M.D. Pa. 1983) ("If the defendant asserts one defense on a motion for summary judgment and the motion is denied because a material issue of fact exists, then he can hardly have waived another defense."); *Peet v. Beard*, Civil No. 3:10-CV-482, 2015 WL 7568300, at *1 (M.D. Pa. Nov. 15, 2015) ("Despite the defendants having waited more than five years to advance this issue after first raising this defense in an answer filed in June 2010, and despite the defendants having declined to raise this as an issue in their timely motion for summary judgment filed in September 2014, we find that the current case law compels a finding that the defendants have not waived this affirmative defense under the PLRA."); *cf. Drippe*, 604 F.3d at 782 (declining to read into the PLRA a requirement that "the defense of exhaustion is waived if it is not prosecuted by the deadline imposed by the court for dispositive motions").

Therefore, the Court overrules Plaintiffs' objection and will allow the City to present evidence on affirmative defenses.

### B.       Constructive Discharge

The City objects to any mention of the term "constructive discharge" in the Court's jury instructions, arguing that "Plaintiffs did not plead, argue, or advance a constructive discharge theory beyond conclusory allegations in their FMLA claims, upon which this Court granted summary judgment in Defendants' favor." (*Id.* at pp. 2, 4–5; *see also* Doc. No. 215 at p. 4.) The City also argues that Plaintiffs cannot prove a constructive discharge claim, asserting that as the Court ruled at summary judgment, Plaintiffs failed to argue that they were constructively

discharge, cite the record for evidence of discharge, and the only claims for which they had alleged constructive discharged were dismissed." (*Id.* at p. 5.)

Plaintiffs respond that they "clearly pleaded constructive discharge in their Verified Second Amended Complaint," but "Defendants failed to argue for dismissal of Plaintiffs' constructive discharge claim at the summary judgment stage, and the Court specifically stated in its opinion . . . that it was not addressing the issue." (P. Supp. at pp. 4–5.) In their trial brief, Plaintiffs discuss constructive discharge as it relates to their argument for hostile work environment, noting that an "employer is strictly liable for supervisor harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'" (Doc. No. 216 at p. 9.) Plaintiffs also argue that if they are allowed to pursue constructive discharge at trial, they will show that "McCowan's mental and physical health deteriorated to the point where she was forced to resign from her employment and she was constructively discharged.[7] (Doc. No. 216 at p. 12.)

Although the parties' trial briefs only references constructive discharge in connection with McCowan's hostile work environment claim, it is helpful to understand how and when Plaintiffs' have (and have not) asserted constructive discharge during this lengthy litigation. Therefore, the Court provides a brief timeline below before analyzing the parties' substantive arguments

### 1.    The Pleadings

In the Second Amended Complaint's recitation of facts, it states:

---

[7] Plaintiffs appear to focus on McCowan's claim for constructive discharge. Because Allen's only remaining claim is for retaliation related to her transfer to JET, any argument on constructive discharge is irrelevant as to her.

- "Defendants' retaliation against Plaintiffs has continued; and Plaintiff McCowan was constructively terminated." (Doc. No. 49 at ¶ Y.)

- "On October 2, 2019, McCowan was *forced to resign* from employment pursuant to her doctor's orders due to the detrimental impact that Defendants' ongoing retaliation was having on her physical and mental health." (*Id.* at ¶ 292 (emphasis added).)

- "Plaintiffs claim unlawful constructive and/or unlawful actual discharge and also seek reinstatement of their positions, benefits and seniority." (*Id.* at ¶ 304.)

Then, under their FMLA interference and retaliation claims, Plaintiffs state that the "City violated the FMLA by interfering with, restraining and/or denying Plaintiffs' rights under the FMLA by . . . [d]ischarging and/or constructively discharging . . . Plaintiffs." (*Id.* at ¶¶ 377g, 382b.)

Although Plaintiffs do not use the term "discharge" in connection with their hostile work environment claims, they do state, "[a]s a result of the hostile work environment, Plaintiffs suffered a 'tangible employment action' defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits." (*Id.* at ¶ 447.) And they allege that as a result, they "have suffered damages, including, but not limited to: past and future lost wages," suggesting that this claim could be read as giving a constructive discharge argument.

Neither party mentioned constructive discharge in the motion to dismiss, and we did not discuss it in the related opinion. (*See generally* Doc. Nos. 54, 60, 66, 120.)

## 2.   <u>Summary Judgment</u>

The City did not mention constructive discharge in its summary judgment brief. (Doc. No. 133.) But Plaintiffs did. To understand the import of that mention, it's necessary to understand each side's arguments on disparate treatment and hostile work environment at the summary judgment stage.

#### a.      Disparate Treatment Arguments

In connection with the disparate treatment claim, the City argued that Plaintiffs had put forth evidence of only four actions that "potentially constitute adverse employment actions . . . (1) McCowan's change of assignment from HIDTA to A&I; (2) McCowan's perceived 'exclusion' from supervisory meetings; (3) McCowan's detail to Police Radio, the resulting scheduling change, and the denial of McCowan's unreasonable hardship request; and (4) McCowan's disciplinary charges for violating the department's EEO directive." (Doc. No. 133 at p. 12.)

In response Plaintiffs argued that they were "subjected to a litany of adverse employment actions," including that "Plaintiffs were constructively discharged from employment." (Doc. No. 167 at p. 7.) That one, conclusory sentence is the only mention of constructive discharge in the entire brief.[8] And tellingly, when Plaintiffs discussed pretext in connection with each adverse action, they did not mention the forced resignation or argue that they were constructively discharged. (*See* Doc. No. 167 at pp. 10–11.)

Noting this lack of argument, the Court stated in a footnote:

> McCowan also asserts that she was constructively discharged. (Doc.
> No. 167 at p. 7.) But she does not provide any argument on this
> issue, nor does she cite record evidence or case law that supports her

_____

[8] There is also little indication in the parties' statements of material fact that either side was arguing about constructive discharge. In her response to paragraph 14 of the City's statement, which says, "McCowan remained detailed to Police Radio and remained assigned to the Intelligence Bureau until she resigned on November 1, 2019," McCowan responds, "Admitted in part, denied as stated. Plaintiff admits that she remained detailed to Police Radio until her resignation. Plaintiff denies that she resigned on November 1, 2019—Plaintiff resigned on October 2, 2019." (Doc. No. 164 at ¶ 14.) Interestingly, McCowan does not say either that she was forced to resign or that she was constructively discharged. (*Compare id., with id.* ¶ 172 ("It is admitted that Plaintiff Allen was forced to resign from employment on July 7, 2020.").) That said, in Plaintiffs counter-statement of facts, which largely quotes the Second Amended Complaint, it says, "Plaintiffs' were constructively terminated," and "McCowan was forced to resign from employment pursuant to her doctor's orders[.]" (Doc. No. 163 ¶ 410 (citing Plaintiffs' Verified Second Amended Complaint ¶ 292).) The Court did not consider many of Plaintiffs' counterstatements of fact because, like this paragraph, they were not supported by evidence.

> assertion. Moreover, the Court notes that the only allegations of constructive discharge contained in the second amended complaint are in relation to McCowan's FMLA claims. (*See* Doc. No. 49 at ¶¶ 377g, 382b.) Therefore, the Court does not address the issue.

(Doc. No. 171 at p. 36 n.16; *see also id.* at p. 82 ("The only adverse employment action that McCowan claims occurred after she left for FMLA leave is her alleged constructive discharge. However, as discussed above, *see supra* n.16, McCowan has neither argued nor shown that she was constructively discharged or that her alleged constructive discharge occurred because of her request for FMLA leave.").)

### b.      Hostile Work Environment

For the hostile work environment claim, the City mentioned the *Faragher-Ellerth* affirmative defense in its brief, noted that it applies "as long as the harassment or retaliation does not culminate in a tangible employment action by the harassing supervisor," defined the term "tangible employment action," and argued that (1) "Plaintiffs claim to have been harassed by a coworker, not a supervisor," and (2) "Officer Younger [did not] take any tangible employment actions against Plaintiffs."  (Doc. No. 133 at pp. 19–20.)

In response, Plaintiffs mentioned neither the *Faragher-Ellerth* defense, nor "tangible employment actions."  Instead, they copied, nearly word-for-word, the Court's opinion on the motion to dismiss, which recounts numerous actions by Younger and Plaintiffs' supervisors that contributed to the hostile work environment, but nowhere mentions Plaintiffs' resignation or constructive termination.  (Doc. No. 167 at p. 14.)

### 3.      <u>Analysis</u>

As this summary shows, Plaintiffs pleaded constructive discharge.  Although constructive discharge was only mentioned in connection with Plaintiffs' FMLA claims, it was also discussed—albeit in passing—in the Second Amended Complaint's discussion of relevant facts.

The question then, is whether Plaintiffs abandoned that claim by not raising it in their opposition to summary judgment.  District courts in the Third Circuit have held that "when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to particular claims, that failure 'constitutes an abandonment of those causes of action and essentially acts as a waiver of th[o]se issues.'"  *Campbell v. Jefferson Univ. Physicians*, 22 F. Supp. 3d 478, 487 (E.D. Pa. 2014) (quoting *Skirpan v. Pinnacle Health Hosps.*, No. 1:07-cv-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010)); *see also, e.g.*, *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 433 (E.D. Pa. 2008) ("[P]laintiff's failure to mention these issues in her summary judgment response constitutes abandonment of those claims."); *Skirpan*, 2010 WL 3632536, at *6 ("Indeed, a Plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues."); *Kosciolek v. Wilkes-Barre Fire Fighters Ass'n Local 104*, Civil Action No. 3:04-CV-1920, 2006 WL 3742700, at *3 n.1 (M.D. Pa. Dec. 18, 2006) ("Even if Plaintiff did raise these claims in his Amended Complaint, because he ignored them at summary judgment, they are deemed waived.").[9]  Abandonment in such circumstances is "a necessary corollary to the principle that summary judgment is appropriate where the nonmoving party fails to make a

---

[9] The Court's research revealed one case that went the other way.  *See Leone-Zwillinger v. New Jersey*, Civil Action No. 04–5103 (FLW), 2007 WL 1175786, at *3 (D.N.J. Apr. 19, 2007) (finding that the plaintiff did not waive her failure to rehire claim because even though she failed to address it in her opposition to summary judgment, she put forth disputed issues of fact as that claim in her statement of undisputed material fact and she "disputed the abandonment of the claim during oral argument and requested an additional opportunity to demonstrate to the Court that evidence was indeed presented in opposition to Defendants' motion as to that claim").  But *Leone-Zwillinger* is in the minority, and in any event, its facts are distinguishable from those presented here.  Plaintiffs mentioned constructive discharge only in passing in their counterstatement of facts at summary judgment, and that passing reference was taken from the Second Amended Complaint and included no citation to evidence in the record.  In addition, Plaintiffs never mentioned constructive discharge during oral argument.  Therefore, unlike the plaintiff in *Leone-Zwillinger*, there is no evidence that Plaintiffs developed their constructive discharge theory during litigation or substantively presented it to the Court at summary judgment.

showing sufficient to establish the existence of an element essential to that party's case."

*Campbell*, 22 F. Supp. 3d at 487 (quotation marks omitted)).

The Third Circuit and other appellate courts agree that when a plaintiff fails to raise an argument in opposition to a motion for summary judgment, it is waived, and she cannot later argue the issue on appeal:

> Plaintiffs argue that the District Court erred by granting summary judgment in favor of Motiva without addressing their claim that Motiva's negligence caused them to suffer a loss of quality of life. However, in response to Motiva's motion for summary judgment, Plaintiffs did not mention their claim for lost quality of life. We have held that, where the party opposing a motion for summary judgment bears the ultimate burden of proof, the moving party may discharge its initial burden of showing that there is no genuine issue of material fact by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case. If the moving party has satisfied its initial burden, the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact. The nonmoving party cannot later argue, on appeal, that there is evidence in the record that creates a genuine issue of material fact, if that evidence was not pointed out to the district court at the time of the motion for summary judgment. Assuming there is such a claim to be made, Plaintiffs never argued to the District Court that there was a genuine issue of material fact regarding their claim for lost quality of life. Consequently, they cannot now argue that the District Court erred by failing to consider it.

*Players v. Motiva Enters., LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007) (cleaned up); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("By failing to make this argument in his opposition to summary judgment, Grenier has failed to preserve this claim.  It is by now axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal. . . .  Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir. 1986) ("We cannot consider the plaintiffs' Unfair Trade Practices and Consumer Protection claim since Pulito did not assert this cause of action as a basis for opposing General Accident's motion for summary

judgment. If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.").

Building on this principle, at least one court in this District has found that a plaintiff abandoned a constructive discharge argument when she failed to raise it in her opposition brief to summary judgment. *See Barbounis v. Middle East Forum*, Case No. 2:19-cv-05030-JDW, 2021 WL 5106046, at *1 (E.D. Pa. May 28, 2021) ("Ms. Barbounis has abandoned her claim for constructive discharge. In fact, the term 'constructive discharge' does not appear anywhere in her opposition brief. . . . MEF is entitled to summary judgment on Ms. Barbounis' disparate treatment and/or constructive discharge claims in her First, Fourth, and Seventh causes of action."); *see also Fischer v. G4S Secure Sols. USA, Inc.*, Civil Action No. 10–6792 (JBS/AMD), 2014 WL 2887803, at *15 (D.N.J. June 25, 2014) ("Because Plaintiff does not argue [in his summary judgment opposition brief] that telling Sawders that 'he was considering going to the NLRB' constituted protected activity, the Court deems this argument waived.").

The Eleventh Circuit, in an unpublished opinion, reached a similar result:

> About the constructive discharge claim, Plaintiff failed to address constructive discharge in her brief in opposition to summary judgment before the magistrate judge; the magistrate judge concluded the constructive discharge claim was abandoned. Plaintiff sought to revive the constructive discharge claim in her objections to the magistrate report, although even Plaintiff conceded that "she was not specific in addressing the constructive discharge claim;" the district court adopted expressly the magistrate judge's conclusion that Plaintiff abandoned her constructive discharge claim. We agree.

*Christian v. Cartersville City Sch. Bd. of Educ.*, 167 F. App'x 89, 90 n.1 (11th Cir. 2006).

With this case law in mind, the Court finds that McCowan abandoned her constructive discharge claim. First, Plaintiffs' one sentence reference to constructive discharge in their summary judgment briefing, without any explanation, argument, or citation to the law or the

record, was insufficient to avoid waiver.  *See Person v. Teamsters Local Union 863*, Civil Case

No. 12–2293 (FSH), 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013) ("A fleeting reference to

each cause of action, without argument or legal analysis, is insufficient to prevent waiver.");

*Skirpan*, 2010 WL 3632536, at *7 ("A party cannot avoid summary [judgment] by simply

advancing merely colorable, conclusory, or speculative claims.  There must be more than a

scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as

to the material facts.  Further, a Plaintiff's failure to respond to arguments raised on summary

judgment effectively constitutes an abandonment of these causes of action and essentially acts as

a waiver of these issues.").

Second, even if Plaintiffs' conclusory statement of constructive discharge was sufficient,

they raised that argument *only* in relation to their disparate treatment claims.  Now, however,

McCowan attempts to argue that she has maintained a constructive discharge theory for purposes

of her hostile work environment claim.  But Plaintiffs not only failed to mention constructive

discharge in the relevant section of their opposition brief, they provided no response to the City's

argument that they had failed to identify a tangible employment action for purposes of hostile

work environment.  This failure alone supports a finding of abandonment, but when it is

considered in conjunction with Plaintiffs' failure to pursue their constructive discharge claim

throughout this litigation, the case for abandonment is even stronger.

Because Plaintiffs abandoned their constructive discharge claim, they cannot present that

claim at trial.[10]  The City's objection is sustained.

---

[10] Without a claim for constructive discharge, Plaintiffs cannot seek front and back pay.  *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 & n.6 (3d Cir. 2006) ("[A] successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a back pay award.  Put simply, if a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue.") (collecting cases from other courts of appeals); *see also Hare v. Potter*, 220 F. App'x 120, 135 (3d Cir. 2007) ("Given that Hare was not constructively

**IV.   CONCLUSION**

The parties' pretrial objections are sustained in part and overruled in part.  An appropriate order follows.

---

discharged, it appears that she probably will not be able to seek back pay or front pay."); *Pierce-Schmader v. Mount Airy Casino & Resort*, No. 3:13cv1141, 2013 WL 4854524, at *6 (M.D. Pa. 2013) ("[T]he Spencer case only discussed the back pay issue, not front pay, benefits and other monetary or equitable employment-related relief. The court's reasoning, however, applies equally to those other damages. Loss of pay, both back and front, and loss of benefits are not an issue if the plaintiff was not forced to leave her job.").